**08 CV 4240**

CLOSED, JURY

**JUDGE SPRIZZO**

## U.S. District Court
### Eastern District of Virginia (Alexandria)
### CIVIL DOCKET FOR CASE #: 1:07-cv-01235-GBL-TCB

Coors Brewing Company v. Oak Beverage, Inc. et al
Assigned to: District Judge Gerald Bruce Lee
Referred to: Magistrate Judge Theresa Carroll Buchanan
Demand: $75,000
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 12/11/2007
Date Terminated: 04/17/2008
Jury Demand: Defendant
Nature of Suit: 196 Contract: Franchise
Jurisdiction: Diversity

### Plaintiff

**Coors Brewing Company**
*a Colorado corporation*

represented by **Michael J. Lockerby**
Foley & Lardner LLP
3000 K St NW
Suite 500
Washington, DC 20007-5143
(202) 672-5300
Fax: (202) 672-5399
Email: mlockerby@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Defendant

**Oak Beverage, Inc.**
*a New York corporation*

represented by **Marshall Allen Winslow, Jr.**
Wolcott Rivers Gates
One Columbus Center
Suite 1100
Virginia Beach, VA 23462
(757) 497-6633
Fax: (757) 497-7267
Email: mwinslow@wolriv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

U.S. DISTRICT COURT
FILED
MAY 05 2008
S.D. OF N.Y.

### Defendant

**Boening Bros., Inc.**
*a New York corporation*

represented by **Marshall Allen Winslow, Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/11/2007 | ●1 | COMPLAINT against Oak Beverage, Inc., Boening Bros., Inc. ( Filing fee $ 350 receipt number 100005324.), filed by Coors Brewing Company. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Civil Cover Sheet # 6 Receipt # 7 Cover letter #1# 8 Cover letter #2) (yguy, ) (Entered: 12/14/2007) |
| 12/11/2007 | ●2 | Financial Interest Disclosure Statement (Local Rule 7.1) by Coors Brewing Company. (yguy, ) (Entered: 12/14/2007) |
| 12/11/2007 | ●3 | Summons Issued as to Oak Beverage, Inc., Boening Bros., Inc for service by Secretary of the Commonwealth. (yguy, ) (Entered: 12/14/2007) |
| 01/15/2008 | ●4 | Certificate of Compliance received from the Secretary of the Commonwealth; Boening Bros., Inc. served on 1/15/2008, answer due 2/4/2008. (stas) (Entered: 01/18/2008) |
| 01/15/2008 | ●5 | Certificate of Compliance received from the Secretary of the Commonwealth; Oak Beverage, Inc. served on 1/15/2008, answer due 2/4/2008. (stas) (Entered: 01/18/2008) |
| 01/18/2008 | ●6 | Letter to the Court by Coors Brewing Company Re: Service of Process as to the Defendants, Oak Beverage, Inc. and Boening Bros., Inc. (Attachments: # 1 Attachment 1 to the Letter# 2 Attachment 2 to the Letter) (stas) (Entered: 01/23/2008) |
| 01/23/2008 | ● | Atty for pltf called and reminded to register for ECF. (stas) (Entered: 01/23/2008) |
| 01/28/2008 | ●7 | MOTION to Change Venue by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 01/28/2008) |
| 01/28/2008 | ●8 | Amended MOTION to Change Venue by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 01/28/2008) |
| 01/28/2008 | ●9 | Financial Interest Disclosure Statement (Local Rule 7.1) by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 01/28/2008) |
| 01/28/2008 | ●10 | Memorandum in Support re 8 Amended MOTION to Change Venue filed by Oak Beverage, Inc., Boening Bros., Inc.. (Attachments: # 1 Affirmation in Support of Motion to Transfer)(Winslow, Marshall) (Entered: 01/28/2008) |
| 01/29/2008 | ● | Notice of Correction re 8 Amended MOTION to Change Venue. The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (krob) (Entered: 01/29/2008) |
| 01/29/2008 | ●12 | ORDER granting application of Gary Ettelman to appear Pro hac vice Filing fee $ 50, receipt number 100006221. Signed by Judge Gerald Bruce Lee on 1/29/08. (Attachments: # 1 Receipt # 2 Letter)(klau, ) (Entered: |

| | | 01/31/2008) |
|---|---|---|
| 01/31/2008 | ◑11 | Notice of Hearing Date set for 2/8/08 re 8 Amended MOTION to Change Venue (Winslow, Marshall) (Entered: 01/31/2008) |
| 02/04/2008 | ◑ | Set Deadlines as to 8 Amended MOTION to Change Venue. Motion Hearing set for 2/8/2008 at 10:00 AM before District Judge Gerald Bruce Lee. (clar, ) (Entered: 02/04/2008) |
| 02/06/2008 | ◑13 | Memorandum in Opposition re 8 Amended MOTION to Change Venue filed by Coors Brewing Company. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit # 4 Exhibit D# 5 Exhibit E)(Lockerby, Michael) (Entered: 02/06/2008) |
| 02/07/2008 | ◑ | Per GBL chambers motions set for 2/8/08 are to be continued date to be determined (clar, ) (Entered: 02/07/2008) |
| 02/07/2008 | ◑14 | SCHEDULING ORDER: Initial Pretrial Conference set for 3/5/2008 at 10:00 AM before Magistrate Judge Theresa Carroll Buchanan. Final Pretrial Conference set for 5/15/2008 at 10:00 AM before District Judge Gerald Bruce Lee. Discovery due by 5/9/2008. Signed by Judge Gerald Bruce Lee on 2/7/2008. (Attachments: # 1 Magistrate Consent# 2 Pretrial Notice)(rban, ) (Entered: 02/08/2008) |
| 02/08/2008 | ◑ | Reset Deadlines as to 8 Amended MOTION to Change Venue. Motion Hearing set for 3/6/2008 at 10:00 AM before District Judge Gerald Bruce Lee. (clar, ) (Entered: 02/08/2008) |
| 02/11/2008 | ◑15 | Rebuttal Brief re 8 Amended MOTION to Change Venue filed by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 02/11/2008) |
| 02/27/2008 | ◑16 | Discovery Plan by Coors Brewing Company.(Lockerby, Michael) (Entered: 02/27/2008) |
| 02/27/2008 | ◑17 | Discovery Plan by Oak Beverage, Inc., Boening Bros., Inc..(Winslow, Marshall) (Entered: 02/27/2008) |
| 02/27/2008 | ◑18 | MOTION for Extension *of Time to Conduct Discovery* by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 02/27/2008) |
| 02/27/2008 | ◑19 | Memorandum in Support re 18 MOTION for Extension *of Time to Conduct Discovery* filed by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 02/27/2008) |
| 02/27/2008 | ◑20 | AFFIDAVIT in Support re 18 MOTION for Extension *of Time to Conduct Discovery* filed by Oak Beverage, Inc., Boening Bros., Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Winslow, Marshall) (Entered: 02/27/2008) |

| | | |
|---|---|---|
| 02/27/2008 | ●21 | Notice of Hearing Date set for March 5, 2008 re 18 MOTION for Extension *of Time to Conduct Discovery* (Winslow, Marshall) (Entered: 02/27/2008) |
| 02/28/2008 | ● | Set Deadlines as to 18 MOTION for Extension of Time to Conduct Discovery. Motion Hearing set for 3/5/2008 at 10:00 AM before Theresa Carroll Buchanan. (clar, ) (Entered: 02/28/2008) |
| 03/03/2008 | ●22 | Request for Entry of Default as to *Defendants* by Coors Brewing Company. (Attachments: # 1 Exhibit A (Affidavit of Michael J. Lockerby))(Lockerby, Michael) (Entered: 03/03/2008) |
| 03/03/2008 | ●23 | AFFIDAVIT in Opposition re 18 MOTION for Extension *of Time to Conduct Discovery (Affidavit of Michael J. Lockerby)* filed by Coors Brewing Company. (Attachments: # 1 Exhibit A (February 22, 2005 Complaint in NDNY Action), # 2 Exhibit B (February 25, 2008 E-mails), # 3 Exhibit C (February 25, 2008 Show Cause Order in NDNY Action), # 4 Exhibit D (Doldo Affidavit in NDNY Action), # 5 Exhibit E (Vasile Affidavit), # 6 Exhibit F (Ryan Arbitration Award), # 7 Exhibit G (February 29, 2008 Decision in SDNY Action), # 8 Exhibit H (Coors' First Requests for Admissions, Document Requests, and Interrogatories)) (Lockerby, Michael) (Entered: 03/03/2008) |
| 03/03/2008 | ●24 | Memorandum in Opposition re 18 MOTION for Extension *of Time to Conduct Discovery* filed by Coors Brewing Company. (Lockerby, Michael) (Entered: 03/03/2008) |
| 03/04/2008 | ●25 | AFFIDAVIT in Opposition re 22 Request for Entry of Default as to *Defendants* filed by Oak Beverage, Inc., Boening Bros., Inc.. (Winslow, Marshall) (Entered: 03/04/2008) |
| 03/05/2008 | ●26 | Minute Entry for proceedings held before Magistrate Judge Theresa Carroll Buchanan: Initial Pretrial Conference and Motion Hearing held on 3/5/2008. Motion Hearing re 18 MOTION for Extension of Time to Conduct Discovery filed by Oak Beverage, Inc., Boening Bros., Inc. Appearance of counsel for Plaintiff and Defendant's present. Motion argued and Granted in part, Denied in part. Complete Discovery to be filed by 5/23/08. Order to issue. (Tape #FTR.) (jallen, ) (Entered: 03/05/2008) |
| 03/05/2008 | ●27 | Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that the Plaintiff's Proposed Discovery Plan is approved and shall control discovery to the extent of its application as modified by the Court. Signed by Judge Theresa Carroll Buchanan on 03/05/08. (Attachments: # 1 Proposed Discovery Plan)(jallen, ) (Entered: 03/05/2008) |
| 03/05/2008 | ●28 | ORDER granting in part and denying in part 18 Motion for Extension of Time to File. The deadline to complete discovery is extended to 5/23/08, but expert depositions may be conducted as late as 5/30/08. The parties will then have until 6/6/08 to exchange pretrial disclosures and until 6/13/08 to object to those disclosures. The final pretrial conference remains scheduled |

|  |  | for 5/15/08. It is further ORDERED that the parties will submit to the Court by Monday, 3/10/08 proposed dates for the production of expert reports, pursuant to Fed. R. Civ. P. 26(a)(2). It is further ORDERED that, provided defendants' pending Motion to Transfer is not granted, defendants shall file an answer to plaintiff's Complaint by 3/14/08. The Court shall deem such answer timely filed. Accordingly, the Clerk is directed not to enter default as to defendants.Signed by Judge Theresa Carroll Buchanan on 03/05/08. (jallen, ) (Entered: 03/05/2008) |
|---|---|---|
| 03/05/2008 | ●30 | CONSENT PROTECTIVE ORDER REGARDING CONFIDENTIALITY OF DISCOVERY MATERIAL re Handling and labeling of confidential materials (see order for details). Signed by Judge Gerald Bruce Lee on 3/5/08. (Attachments: # 1 Letter)(klau, ) (Entered: 03/07/2008) |
| 03/06/2008 | ●29 | Minute Entry for proceedings held before Judge Gerald Bruce Lee: Appearances: Counsel.Motion Hearing held on 3/6/2008 re 7 and 8 MOTION and Amended MOTION to Change Venue filed by Oak Beverage, Inc., Boening Bros., Inc. - argued and granted - transferred to SDNY. Order to follow.(Court Reporter Wilson.) (jsol, ) (Entered: 03/07/2008) |
| 03/13/2008 | ●32 | ORDER for Pro hac vice of Kimberly J. Shur Filing fee $ 50, receipt number 100007093. Signed by Judge Gerald Bruce Lee on 3/13/2008. (Attachments: # 1 Receipt)(rban, ) (Entered: 03/14/2008) |
| 03/13/2008 | ●33 | ORDER for Pro hac vice of Michael J. Harwin Filing fee $ 50, receipt number 100007093. Signed by Judge Gerald Bruce Lee on 3/13/2008. (Attachments: # 1 Receipt)(rban, ) (Entered: 03/14/2008) |
| 03/14/2008 | ●31 | ANSWER to 1 Complaint, with Jury Demand by Oak Beverage, Inc., Boening Bros., Inc..(Winslow, Marshall) (Entered: 03/14/2008) |
| 04/17/2008 | ●34 | MEMORANDUM ORDER granting 7 MOTION to Change Venue, 8 Amended MOTION to Change Venue. This case is transferred to the USDC for the SDNY. Signed by District Judge Gerald Bruce Lee on 4/17/2008. (jcor, ) (Entered: 04/21/2008) |
| 04/17/2008 | ● | Case transferred to District of Southern District of New York. (jcor, ) (Entered: 04/21/2008) |
| 04/30/2008 | ●35 | CASE transferred to Southern District of New York, with certified copy of docket sheet and transfer order. (nmck, ) (Entered: 04/30/2008) |

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
DEPUTY CLERK

FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2007 DEC 11  A 11: 31

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **COORS BREWING COMPANY,** <br> **a Colorado corporation,** | ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| **v.** | ) <br> ) |
| **OAK BEVERAGE, INC.,** <br> **a New York corporation, and** | ) <br> ) <br> ) |
| **BOENING BROS., INC.,** <br> **a New York corporation,** | ) <br> ) <br> ) |
| **Defendants.** | ) |

Civil Action No. __1:07CV1235-GBL/TCB__

## COMPLAINT

Plaintiff Coors Brewing Company ("Coors"), by counsel, for its complaint against

Defendants Oak Beverage, Inc. ("Oak") and Boening Bros., Inc. ("Boening"), respectfully states

as follows:

## THE PARTIES

1.    Plaintiff Coors is a Colorado corporation with its principal office and place of

business located in Golden, Colorado.

2.    Defendant Oak is a New York corporation with its office and principal place of

business located at 1 Flower Lane, Blauvelt, New York 10913.

3.    Defendant Boening is a New York corporation with its office and principal place

of business located at 1098 Route 109, Lindenhurst, New York 11757.

MILW_2715356.2

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, in that the controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      At stake in this matter is the value of the distribution rights for Molson products in certain New York territories.  As to each Defendant, the value of the Molson distribution rights exceeds $75,000, exclusive of interest and costs.

6.      Defendants Oak and Boening each consented to the *in personam* jurisdiction of this Court pursuant to contracts whereby all disputes between the parties and their successors and assigns, including the claims which are the subject of this Complaint, would be resolved by the U.S. District Court for the Eastern District of Virginia, Alexandria Division.  Pursuant to 28 U.S.C. § 1391(c), each of Defendants Oak and Boening is deemed to reside in the U.S. District Court Eastern District of Virginia, Alexandria Division.  Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(a)(1) because it is a judicial district in which both Defendants reside for venue purposes.  Venue is also proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(a)(2) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim — including formation of the contracts at issue — occurred.

7.      Venue is proper in the Alexandria Division pursuant to Local Civil Rule 3(C) of the Local Rules for the United States District Court for the Eastern District of Virginia because it is a division in which both Defendants reside for venue purposes.  Venue is also proper in the Alexandria Division pursuant to Local Civil Rule 3(C) and because it is a division in which a

2

substantial part of the events or omissions giving rise to the claim — including formation of the Distributor Agreements — occurred.

## (FACTS COMMON TO ALL COUNTS)

### Background Allegations

8.      Molson beer products are brewed in Canada by Molson Canada. Molson Canada is North America's oldest brewer, founded in 1786.

9.      Oak and Boening are beer distributors representing the products of numerous suppliers, including Molson products.

10.     Oak and Boening share certain common ownership and officers and are, thus, affiliates.

11.     In 1996, the importer of Molson products was Martlet Importing Co. Inc. ("Martlet"). At that time, Martlet had its principal place of business in Reston, Virginia.

12.     On October 23, 1996, Boening entered into the Distributor Agreement with Martlet attached as Exhibit A (the "Boening Distributor Agreement"). Pursuant to the Boening Distributor Agreement, Boening was appointed as a distributor of Molson products in a New York territory consisting of Suffolk and Nassau Counties and certain portions of Queens County.

13.     On October 23, 1996, Oak entered into the Distributor Agreement with Martlet attached as Exhibit B (the "Oak Distributor Agreement"). Pursuant to the Oak Distributor Agreement, Oak was appointed as a distributor of Molson products in a New York territory consisting of Bronx, Putnam, Rockland, and Westchester Counties and that portion of the borough of Manhattan that is north of, but excluding, 106th Street.

14.     Aside the from the description of the territories, the Boening Distributor Agreement and the Oak Distributor Agreement (collectively, the "Distributor Agreements") are

3

identical to one another. Pursuant to ¶ 17(b) of the Distributor Agreements, Boening and Oak

each consented to the jurisdiction and venue of this Court, as follows:

> Any action, claim, suit or proceeding between Importer and
> Distributor, including, but limited to, those connected with, arising
> out of or related to this Agreement or which in any way involves
> the relationship between Importer and Distributor, whether in
> contract, tort or statute, shall be initiated and prosecuted as to all
> parties and their successors and assigns solely and exclusively in
> the United States District Court for the Eastern District, Alexandria
> Division, State of Virginia, and each party waives, freely and
> completely, any right to dismiss and/or transfer any action pursuant
> to 28 U.S.C. §§ 1404 or 1406, and any successor statute. In the
> event said district Court does not have subject matter jurisdiction
> of said matter, then such matters shall be solely and exclusively
> under the jurisdiction of the appropriate state court of competent
> jurisdiction located in Fairfax County, Virginia. The parties
> consent to in personam jurisdiction of the herein described courts.

15.    The Distributor Agreements were eventually assigned to a joint venture between

Miller Brewing Company and Molson Canada. The Miller/Molson joint venture imported and

sold Molson products to distributors in the United States, including Oak and Boening.

16.    In late 2000, the distribution of Molson products in the United States was

transferred to a joint venture between Coors and Molson Canada. The joint venture was

originally called Molson 2000 LLC, but its name was later changed to Molson USA LLC

("Molson USA"). Molson USA is a Delaware limited liability company, the members of which

are Coors and Rathon, Inc., a subsidiary of Molson, Inc. After the formation of Molson USA,

Coors Brewing Company assisted with the sales and marketing of Molson products in the United

States.

17.    The Distributor Agreements were assigned by the Miller/Molson joint venture to

Molson USA. Thereafter, Molson USA supplied Molson products to Oak and Boening for resale

in their assigned territories.

4

18.    Following the formation of Molson USA, all Molson distributors were offered the right to enter into revised distributor agreements with Molson USA. However, Oak and Boening declined to enter into a new Molson distributor agreement.

19.    Therefore, since 2001, Molson USA has done business with Oak and Boening pursuant to the Distributor Agreements.

20.    On February 9, 2005, various Coors and Molson entities entered into a series of transactions that resulted in the acquisition of all of the stock of Molson, Inc. by a subsidiary of Adolph Coors Company, which is Coors' corporate parent. After the combination, Adolph Coors Company was renamed Molson Coors Brewing Company ("Molson Coors"). Molson USA continued its operations as a wholly owned subsidiary of Molson Coors, but more and more of the operations of Molson USA were taken over by Coors.

21.    Finally, on December 2, 2007, the Distributor Agreements were assigned by Molson USA to Coors in connection with a transaction by which nearly all of the assets of Molson USA were transferred to Coors. Coors continues to supply Molson products to Oak and Boening.

22.    The Distributor Agreements permit termination without cause.

### The Consolidation Plan and the Test Case

23.    Molson USA adopted a nationwide plan of consolidation for the distribution of Molson products in the United states (the "Consolidation Plan"). The goal of the Consolidation Plan was to consolidate the distribution of Molson products into the Coors distribution network.

24.    In 2001, there were more than 500 Molson distributors. Of these, 65 % were not Coors distributors (referred to as "unaligned" distributors). By the end of 2003, the percentage of unaligned distributors had shrunk to less than 20 %. This reduction was the result of efforts

5

by Molson USA to encourage the sale of Molson distribution rights by unaligned Molson distributor to the local Coors distributors.

25.    In 2005, Molson USA announced to the unaligned Molson distributors in New York that Molson USA would pursue the termination of the distribution rights of the unaligned New York Molson distributors pursuant to the Consolidation Plan.

26.    Thereafter, in late July 2005, Molson USA commenced a test case against unaligned Molson distributor John G. Ryan, Inc. ("Ryan") by means of a declaratory arbitration proceeding. Molson USA sought a declaration that it had the right to terminate its distribution agreement with Ryan pursuant to the provisions of § 55-c of the New York Alcoholic Beverages Control Law ("the Act"). The Act permits a brewer to terminate the distribution relationship with a distributor pursuant to the brewer's national or regional plan of consolidation. Molson USA sought a determination that the Consolidation Plan constituted good cause for termination under the Act.

27.    Ryan sued Molson USA in New York state court, seeking to enjoin Molson USA's arbitration proceeding. Ryan argued that the 21st Amendment to the United States Constitution precluded Molson USA's reliance on the Federal Arbitration Act to compel arbitration. Molson USA removed the case to federal court and obtained summary judgment compelling arbitration.

28.    Oak and Boening contributed funds to Ryan or Ryan's counsel to assist in the defense of the arbitration against Ryan in order to defeat Molson USA's attempt to invoke the consolidation provisions of Section 55-c to implement the Consolidation Plan in New York.

29.    After discovery and hearing, the arbitrator eventually concluded that Molson USA's Consolidation Plan complied with the requirements of the Act and permitted termination.

6

After a second hearing, the arbitrator ruled that the fair market value of Ryan's Molson

distribution rights was 2.9 times Ryan's trailing 12 month adjusted gross profit. Molson USA

has applied to the United States District Court for the Southern District of New York to confirm

the Ryan arbitration awards. Copies of the two Ryan arbitration awards are attached hereto as

Exhibits C and D.

30.    After the resolution of the Ryan test case, Molson USA attempted to negotiate the

purchase of the Molson distribution rights with the remaining unaligned New York Molson

distributors, but has been unsuccessful in doing so. As a result, Molson USA has given notice to

each unaligned New York distributor — including Defendants Oak and Boening — that Molson

USA will pursue termination of the Molson distribution rights pursuant to the Act.

31.    By virtue of the assignment of the Distributor Agreements from Molson USA to

Coors, Coors now seeks a declaratory judgment that it has the right under the Distributor

Agreements and the Act to terminate the Distributor Agreements pursuant to the Consolidation

Plan.

32.    The dispute between Molson (and now Coors, by assignment) and the Defendants

constitutes a case and controversy within the meaning of Article 3 of the U.S. Constitution and

28 U.S.C. § 2201.

**(COUNT ONE)**
**THE DISTRIBUTOR AGREEMENTS**

33.    Coors hereby incorporates by reference the allegations of Paragraphs 1-31 as if

fully set forth herein.

34.    Pursuant to 28 U.S.C. § 2201, Coors is entitled to a declaratory judgment

declaring that Coors has the contractual right to terminate the Distributor Agreements pursuant to

the Consolidation Plan.

7

(COUNT TWO)

**THE ACT**

35.     Coors hereby incorporates by reference the allegations of Paragraphs 1-34 as if fully set forth herein.

36.     The 2001 amendments to the Act do not apply to the Distributor Agreements, because the Distributor Agreements precede the effective date of the 2001 amendments. Application of the 2001 amendments to the Act would offend the Contracts Clause of the United States Constitution as a retroactive attempt to modify the contractual rights of the parties.

37.     The Consolidation Plan begun by Molson USA and continued by Coors satisfies the terms of the Act as it existed at the time of the Distributor Agreements.

38.     Even if the 2001 amendments to the Act were to apply to the Distributor Agreements, the provision of the Act, as amended, that purports to require Coors to show a contemporaneous reduction in the number of Molson distributors in the states contiguous to New York offends the Dormant Commerce Clause of the United States Constitution. It does so because the Act impermissibly attempts to regulate the conduct of Molson and Coors beyond the boundaries of the state of New York.

39.     Even if the 2001 amendments to the Act were to apply to the Distributor Agreements, the Consolidation Plan begun by Molson USA and continued by Coors satisfies the requirements of the Act. The Consolidation Plan is reasonable, non-discriminatory, and essential. Notice of the Consolidation Plan has been given to the Defendants in accordance with the terms of the Act. Implementation of the Consolidation Plan will result in a contemporaneous reduction in the number of Molson distributors nationally, in the states contiguous to New York, and in the state of New York. Molson and Coors have acted in good faith in pursuing the Consolidation Plan.

8

40.     Pursuant to 28 U.S.C. § 2201, Coors is entitled to a declaratory judgment declaring that Coors has the right under the Act and all applicable law to terminate the Distributor Agreements and any other agreement, right, or understanding pursuant to which Oak and Boening claim authorization to purchase and resell Molson products.

41.     Coors also requests a declaration of the fair market value of each Defendant's Molson distribution rights and a declaration that neither Defendant has suffered or will suffer any additional damages, as defined by §55-c7(a) of the Act, by virtue of the termination of the Molson distribution rights.

## PRAYER FOR RELIEF

WHEREFORE, Coors demands judgment in accordance with the allegations of this Complaint, as follows:

1.     Declaring that Coors has the right under the Distributor Agreements, the Act, and all applicable law to terminate the Distributor Agreements and any other agreement, right, or understanding pursuant to which Oak and Boening claim authorization to purchase and resell Molson products.

2.     Declaring the fair market value of each defendant's Molson distribution rights and a declaration that neither defendant has suffered or will suffer any additional damages, as defined by §55-c7(a) of the Act, by virtue of the termination of the Molson distribution rights.

3.     For such other relief as may be proper and just under the facts and law, and for Coors' costs and attorneys' fees.

9

Dated:  December 11, 2007

Respectfully submitted,

COORS BREWING COMPANY

By: _____
                    Counsel

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Telephone:  (202) 672-5300
Telecopier:  (202) 672-5399

Jon P. Christiansen
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Telephone: (414) 297-5557
Telecopier:  (414) 297-4900

Counsel for Plaintiff Coors Brewing Company

MILW_2715356.2

## MARTLET IMPORTING CO. INC.
## DISTRIBUTOR AGREEMENT

Martlet Importing Co. Inc. ("Importer"), agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1. **Distributor's Representations.**

   Distributor represents and warrants that:

   **(a)** The information submitted to Importer in Distributor's application, if such application was requested previously by Importer, including any marketing plans, and the information on the Distributor Data Sheet (which shall have been completed and signed by Distributor at the time this Agreement is executed) is true and complete.

   **(b)** Distributor has all permits and licenses necessary for Distributor lawfully to distribute Importer products in Distributor's Area as defined in Paragraph 2(a) below.

   **(c)** Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Importer or to or for the benefit of any Importer officer, director, employee or representative with respect to the issuance of this Agreement.

   In reliance on the above representations and warranties, Importer enters into this Agreement with Distributor.

2. **Distributor's Area.**

   **(a)** Importer hereby appoints Distributor as its sole distributor within the geographic areas described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). It is understood that the Distributor's Area may be different for different Importer products. Unless Importer has granted its prior written approval, Distributor shall not sell or supply Importer products to any retail location within another authorized Importer distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such products to any retail location within another authorized Importer distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Importer products to another authorized Importer distributor for the purpose of eliminating product shortages or inventory imbalances.

   **(b)** The following provisions, rather than the provisions of subparagraph (a), shall apply whenever any of the provisions of subparagraph (a) are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

   Importer hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). Distributor's primary responsibility shall be to promote and sell Importer products to retail locations in Distributor's Area. If Distributor sells or supplies Importer products to retail locations outside Distributor's Area or to any person (other than an authorized Importer distributor) who Distributor has reason to believe will sell or supply all or part of such products to retail locations outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Importer immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

(c)     Except as otherwise specifically agreed to in writing by Importer, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Importer product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Importer products to anyone Distributor has reason to believe intends to sell, distribute or resell such products outside of the United States. Importer reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

3.    Management of Distributor.

(a)     Distributor agrees to have at all times a Manager approved by Importer who shall manage Distributor's business and vigorously promote and sell Importer products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

(b)     Distributor may at its sole discretion terminate the employment of the Manager.

4.    Operation of Distributor.

(a)     Distributor shall sell Importer products only to retailers and other persons to whom Distributor is duly licensed to sell such products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Importer products. Distributor shall maintain all permits and licenses necessary to distribute Importer products in Distributor's Area. Distributor shall submit to Importer upon the request of Importer copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

(b)     Distributor shall aggressively market and promote the sale of the full package line of Importer products listed on the Distributor Data Sheet. Distributor shall submit marketing plans to Importer upon Importer's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor to Importer, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Importer shall otherwise specify in writing, (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account, and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

(c)     Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Importer for the full package line of Importer products listed on the Distributor Data Sheet.

(d)     Distributor shall take all necessary actions to ensure the quality control of Importer products in compliance with Importer's Quality Control Standards. Those actions shall include, but not be limited to:

(i)     observance of Importer's code-date requirements;

(ii)     proper stock rotation in the warehouse, vehicles and retail locations;

(iii)     proper handling and protection from damage of all Importer products, containers and dunnage;

    (iv)    sales of Importer products solely out of inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Importer shall otherwise approve in writing;

    (v)    maintenance of clean, operational warehouse(s) and;

    (vi)    implementation of a program in Distributor's Area for: (a) preventing Importer products bearing expired code dates ("overage products") from reaching consumers, (b) retrieving overage Importer products from retail locations, (c) replacing such products with fresh Importer products at no cost to the retailer and (d) destroying promptly any damaged or overage Importer products at no cost to Importer unless the overage or damaged condition was Importer's responsibility.

    (e)    Distributor shall preserve and enhance the high quality image, reputation and goodwill of Importer and Importer's products.

    (f)    Distributor shall maintain complete and accurate records of orders and deliveries from Importer, as well as sales and inventory records, and Importer shall have access to such records.

    (g)    Distributor shall provide regular delivery of Importer products with sufficient frequency to be competitive with other competition.

    (h)    Distributor shall ensure the safe and proper handling, storage, placement and installation of Importer point-of-sale materials, shall display such materials in a conspicuous place wherever possible at each retail location, and shall maintain records pertaining to their use.

    (i)    Upon receipt of written notice from Importer, Distributor shall discontinue any advertising or promotional practices that Importer finds injurious to Importer's image or business or Importer products.

    (j)    Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

    (k)    Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Importer may reasonably impose from time to time for the effective marketing of Importer products.

5.    <u>Agreement Term.</u>

    The Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

6.    <u>Ownership of Distributor.</u>

    There shall be no change in the control of Distributor's business unless Distributor shall have obtained Importer's prior written approval. As used herein "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10 percent or more of the voting stock; (ii) if Distributor is not incorporated, a 10 percent or more interest in Distributor's business; (iii) 10 percent or more voting stock of the corporation which owns 50

percent or more of Distributor's voting stock; and (iv) a change in the form of business entity presently used by Distributor (e.g. a change from individual ownership or a partnership to a corporation). Without Importer's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this subparagraph and to notify Importer promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

7.    **Distributor's Termination Rights.**

Distributor shall have the right to terminate this Agreement at any time by giving Importer at least ninety (90) days' prior written notice. In such event, Importer's sole obligation to Distributor shall be the purchase of Distributor's inventory pursuant to Paragraph 9(c) below. If Distributor ceases business operations with respect to Importer products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

8.    **Importer's Termination Rights.**

(a)    Importer shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

(b)    Without waiving its rights under Paragraph 8(a), Importer shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

(c)    If any of the following events occur, Importer shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law:

(i)    Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

(ii)    Distributor's fraudulent conduct or substantial misrepresentation in any of its dealing with Importer or with others concerning Importer's products.

(iii)    Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

(iv)    Distributor's insolvency or failure to pay monies due Importer in accordance with the terms of sale established by Importer;

(v)    Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

(vi)    Distributor's violation of the provisions of Paragraph 2 of this Agreement; and

(vii)    Importer no longer has the right to sell the Importer products in Distributor's Area.

(d)    Importer shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Importer contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who have executed this form of Agreement. Importer shall incur no liability to Distributor by reason of such termination. In the event Importer exercises its right under this subparagraph and offers such other distributors the right to enter into a new agreement, Importer shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

9.    **Post-Termination Provisions.**

In the event this Agreement is terminated, the following provisions shall apply:

(a)    Importer shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

(b)    Within ten (10) days after such termination, Distributor shall return to Importer all property belonging to Importer in Distributor's possession or control. Importer shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Importer on any such property, Importer shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Importer to Distributor, reasonable wear and tear expected.

(c)    Within ten (10) days after such termination, Distributor shall sell and Importer shall purchase Distributor's inventory of Importer products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following: the net price actually paid by Distributor to Importer for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Importer, plus the cost of transporting the inventory from Importer to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Importer), plus a handling charge to be set from time to time by Importer. In lieu of paying such repurchase price, Importer may, at its election, credit the equivalent amount to Distributor's account.

(d)    In no event with regard to a termination of this Agreement shall Importer be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Importer become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

10.    **Terms of Sale.**

(a)    The prices charged by Importer to Distributor shall be the prices established by Importer in effect on the date of shipment. Importer shall inform Distributor of its prices in writing from time to time.

(b)    All sales by Importer to Distributor shall be on a cash basis or on such credit terms as Importer, in its sole discretion, may establish from time to time. Importer shall not be obliged to extend credit to Distributor to assist Distributor in securing credit. Regardless of the method of payment, Importer shall retain a security interest in products and containers delivered to Distributor

until Importer receives full payment of all monies owed to Importer. Upon Importer's request, Distributor shall execute such documents as are reasonable or necessary to perfect Importer's security interest.

(c)    All products and containers which are sold to Distributor shall be sold F.O.B. that warehouse or brewery designated by Importer. If a sight draft bill of lading is used, title and risk of loss shall pass to Distributor when Importer delivers the product to the carrier for shipment to the Distributor.

(d)    All kegs and dunnage shall remain the property of Importer and shall be returned to Importer in accordance with Importer's instructions.

(e)    Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Importer products or other Importer property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Importer products to Distributor to the extent that such excise taxes are not included in Importer's prices.

11.    Financial Planning and Reporting

(a)    Distributor shall furnish to Importer annually one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements and balance sheets). All such statements shall be truthful and prepared with generally accepted accounting principles

(b)    Importer shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

(c)    Any financial data obtained by Importer pursuant to this Paragraph shall be treated by Importer and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Importer has provided prior written notice of such disclosure to Distributor.

12.    Rights Reserved to Importer.

(a)    All orders for Importer products placed by Distributor shall be subject to Importer's acceptance. Importer shall have the right to specify the forms and procedures governing the placement of such orders, including, but not limited to, the routing to be used for delivery of such orders as are accepted. In the event that Importer is restricted in the production, sale or delivery of its products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Importer's control, Importer shall not be compelled to honor previously accepted orders, but shall distribute available products among distributors in a fair and equitable manner.

(b)    Importer reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labelling or packaging of the Importer products; to determine the prices and other terms on which it sells Importer products; to produce or sell any particular brands; and to discontinue the sale of any of its products, packages or containers in any geographic area.

13.    **Importer Trade Designation.**

(a)    Distributor hereby acknowledges Importer's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "trade designations") relating to Importer's business or Importer's products. Importer hereby grants Distributor a nonexclusive, non-assignable, non-licensable privilege to use Importer trade designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Importer products. This privilege shall terminate upon termination of this Agreement. Such trade designations shall be used only in manners, forms and contexts specified or approved in writing by Importer, and upon Importer's request. Distributor shall discontinue the way in which Distributor uses any Importer trade designation. Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such designations without Importer's prior written approval.

(b)    Distributor agrees to remove all Importer trade designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Importer products.

14.    **Assignments.**

Any transfer, sale, assignment or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Importer has given its prior written approval. Nothing herein shall prevent Importer from assigning all or part of its rights or obligations under this Agreement.

15.    **New Importer Products.**

This Agreement shall extend only to the brands of Importer products listed on the Distributor Data Sheet. Importer and Distributor may at any time agree in writing to extend this Agreement to other Importer products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Importer at its sole discretion reserves the right not to offer any other Importer product to Distributor (including, but not limited to, line extensions).

16.    **Amendments to Agreement.**

(a)    Importer may at any time propose an amendment to this Agreement. Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Importer. The amendment shall become effective on the date executed by Importer, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor. If Distributor does not return an executed amendment to Importer within ninety (90) days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

(b)    The provisions of subparagraph (a) shall not apply to changes made by Importer to the Distributor Data Sheet, and Importer specifically reserves the right to delete, modify or change any Importer product described in the Distributor Data Sheet without Distributor's consent or approval. Distributor shall notify Importer immediately of any changes applicable to it. Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

17.    <u>Compliance with Law, Venue.</u>

(a)    The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision. The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement. If required by applicable law, Importer and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

(b)    Any action, claim, suit or proceeding between Importer and Distributor, including, but limited to, those connected with, arising out of or related to this Agreement or which in any way involves the relationship between Importer and Distributor, whether in contract, tort or statute, shall be initiated and prosecuted as to all parties and their successors and assigns solely and exclusively in the United States District Court for the Eastern District, Alexandria Division, State of Virginia, and each party waives, freely and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. §§ 1404 or 1406, and any successor statute. In the event said District Court does not have subject matter jurisdiction of said matter, then such matters shall be solely and exclusively under the jurisdiction of the appropriate state court of competent jurisdiction located in Fairfax County, Virginia. The parties consent to in personam jurisdiction of the herein described courts.

18.    <u>Notice.</u>

All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed. All telecopied notices shall also require a copy to also be mailed, postage prepaid to the addressee. Notices shall be addressed:    (i) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement or (ii) if to Importer, to 11911 Freedom Drive, Suite 1100, Reston, Virginia 22090-5609. Telecopies shall be sent to the number described in the Distributor Data Sheet and to Importer at such number as Importer shall designate. The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

19.    <u>Miscellaneous Provisions.</u>

(a)    "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Importer.

(b)    "Authorized importer distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Importer which is currently in effect.

(c)    No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet as referred to in Paragraph 1(a) or 4(b) of this Agreement has been made by Importer or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention. Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Importer or the predecessor, parent and affiliate of Importer are hereby terminated and Distributor releases Importer and Importer's predecessor, parent and affiliate from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings. This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

(d)     The failure of either Importer or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

(e)     Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Importer, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement.  No conduct of any such person shall be construed to create that authority.

(f)     Distributor acknowledges that it is, and shall remain, an independent business entity.  Importer and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

## 20.    ACKNOWLEDGMENTS

The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

This Agreement is effective on the **23rd** day of **October, 1996**.

Boening Bros., Inc.
(Sole Proprietorship, Partnership, Corporation)*

By _____ (SEAL)
(Owner, Partner, President)*

CORPORATE
SEAL

By _____ (SEAL)
(Partner, Secretary)*    TREASURER

By _____ (SEAL)
(Partner)

By _____ (SEAL)
(Partner)

Martlet Importing Co. Inc.

By _____
(Title)  Vice President

*Delete inapplicable words beneath signature lines.  In the case of a partnership, all partners must sign.

9



# PRODUCT PORTFOLIO and MARKET AREA

Boening Brothers, Inc.

North Lindenhurst, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

## MARKET AREA

In the State of New York:

All of Nassau and Suffolk Counties.

In Queens County, that portion lying generally east of Bell Boulevard, Springfield Boulevard to the Queens/Nassau County line and including the Rockaway Peninsula.

## BRANDS

**Molson Canadian**

**Molson Canadian Light**

**Molson Exel**

**Molson Export Ale**

**Molson Golden**

**Molson Ice**

Unless specifically included, the Market Area set forth above excludes distribution rights in Military Bases as well as Ship Chandler/Duty Free distribution.

Reviewed and Accepted this _28_ day of _November_ , 2001.

**Boening Brothers, Inc.**

By: _____

Harold Boening, Sr.

## NOTE: Contingent on state approval and product availability.

**EXHIBIT B**

## MARTLET IMPORTING CO. INC.
## DISTRIBUTOR AGREEMENT

Martlet Importing Co. Inc. ("Importer"), agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1.    **Distributor's Representations.**

Distributor represents and warrants that:

(a)    The information submitted to Importer in Distributor's application, if such application was requested previously by Importer, including any marketing plans, and the information on the Distributor Data Sheet (which shall have been completed and signed by Distributor at the time this Agreement is executed) is true and complete.

(b)    Distributor has all permits and licenses necessary for Distributor lawfully to distribute Importer products in Distributor's Area as defined in Paragraph 2(a) below.

(c)    Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Importer or to or for the benefit of any Importer officer, director, employee or representative with respect to the issuance of this Agreement.

In reliance on the above representations and warranties, Importer enters into this Agreement with Distributor.

2.    **Distributor's Area.**

(a)    Importer hereby appoints Distributor as its sole distributor within the geographic areas described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). It is understood that the Distributor's Area may be different for different Importer products. Unless Importer has granted its prior written approval, Distributor shall not sell or supply Importer products to any retail location within another authorized Importer distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such products to any retail location within another authorized Importer distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Importer products to another authorized Importer distributor for the purpose of eliminating product shortages or inventory imbalances.

(b)    The following provisions, rather than the provisions of subparagraph (a), shall apply whenever any of the provisions of subparagraph (a) are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

Importer hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). Distributor's primary responsibility shall be to promote and sell Importer products to retail locations in Distributor's Area. If Distributor sells or supplies Importer products to retail locations outside Distributor's Area or to any person (other than an authorized Importer distributor) who Distributor has reason to believe will sell or supply all or part of such products to retail locations outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Importer immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

090893E                                    1

(c)    Except as otherwise specifically agreed to in writing by Importer, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Importer product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Importer products to anyone Distributor has reason to believe intends to sell, distribute or resell such products outside of the United States. Importer reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

3.    <u>Management of Distributor.</u>

(a)    Distributor agrees to have at all times a Manager approved by Importer who shall manage Distributor's business and vigorously promote and sell Importer products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

(b)    Distributor may at its sole discretion terminate the employment of the Manager.

4.    <u>Operation of Distributor.</u>

(a)    Distributor shall sell Importer products only to retailers and other persons to whom Distributor is duly licensed to sell such products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Importer products. Distributor shall maintain all permits and licenses necessary to distribute Importer products in Distributor's Area. Distributor shall submit to Importer upon the request of Importer copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

(b)    Distributor shall aggressively market and promote the sale of the full package line of Importer products listed on the Distributor Data Sheet. Distributor shall submit marketing plans to Importer upon Importer's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor to Importer, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Importer shall otherwise specify in writing, (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account, and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

(c)    Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Importer for the full package line of Importer products listed on the Distributor Data Sheet.

(d)    Distributor shall take all necessary actions to ensure the quality control of Importer products in compliance with Importer's Quality Control Standards. Those actions shall include, but not be limited to:

(i)    observance of Importer's code-date requirements;

(ii)    proper stock rotation in the warehouse, vehicles and retail locations;

(iii)    proper handling and protection from damage of all Importer products, containers and dunnage;

(iv)    sales of Importer products solely out of inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Importer shall otherwise approve in writing;

(v)    maintenance of clean, operational warehouse(s) and;

(vi)    implementation of a program in Distributor's Area for: (a) preventing Importer products bearing expired code dates ("overage products") from reaching consumers, (b) retrieving overage Importer products from retail locations, (c) replacing such products with fresh Importer products at no cost to the retailer and (d) destroying promptly any damaged or overage Importer products at no cost to Importer unless the overage or damaged condition was Importer's responsibility.

(e)    Distributor shall preserve and enhance the high quality image, reputation and goodwill of Importer and Importer's products.

(f)    Distributor shall maintain complete and accurate records of orders and deliveries from Importer, as well as sales and inventory records, and Importer shall have access to such records.

(g)    Distributor shall provide regular delivery of Importer products with sufficient frequency to be competitive with other competition.

(h)    Distributor shall ensure the safe and proper handling, storage, placement and installation of Importer point-of-sale materials, shall display such materials in a conspicuous place wherever possible at each retail location, and shall maintain records pertaining to their use.

(i)    Upon receipt of written notice from Importer, Distributor shall discontinue any advertising or promotional practices that Importer finds injurious to Importer's image or business or Importer products.

(j)    Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

(k)    Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Importer may reasonably impose from time to time for the effective marketing of Importer products.

5.    Agreement Term.

The Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

6.    Ownership of Distributor.

There shall be no change in the control of Distributor's business unless Distributor shall have obtained Importer's prior written approval. As used herein "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10 percent or more of the voting stock; (ii) if Distributor is not incorporated, a 10 percent or more interest in Distributor's business; (iii) 10 percent or more voting stock of the corporation which owns 50

percent or more of Distributor's voting stock; and (iv) a change in the form of business entity presently used by Distributor (e.g. a change from individual ownership or a partnership to a corporation). Without Importer's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this subparagraph and to notify Importer promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

7.     **Distributor's Termination Rights.**

        Distributor shall have the right to terminate this Agreement at any time by giving Importer at least ninety (90) days' prior written notice. In such event, Importer's sole obligation to Distributor shall be the purchase of Distributor's inventory pursuant to Paragraph 9(c) below. If Distributor ceases business operations with respect to Importer products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

8.     **Importer's Termination Rights.**

        (a)     Importer shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

        (b)     Without waiving its rights under Paragraph 8(a), Importer shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

        (c)     If any of the following events occur, Importer shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law:

                (i)     Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

                (ii)     Distributor's fraudulent conduct or substantial misrepresentation in any of its dealing with Importer or with others concerning Importer's products.

                (iii)     Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

                (iv)     Distributor's insolvency or failure to pay monies due Importer in accordance with the terms of sale established by Importer;

                (v)     Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

                (vi)     Distributor's violation of the provisions of Paragraph 2 of this Agreement; and

(vii)    Importer no longer has the right to sell the importer products in Distributor's Area.

(d)    Importer shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Importer contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who have executed this form of Agreement. Importer shall incur no liability to Distributor by reason of such termination. In the event Importer exercises its right under this subparagraph and offers such other distributors the right to enter into a new agreement, Importer shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

9.    **Post-Termination Provisions.**

In the event this Agreement is terminated, the following provisions shall apply:

(a)    Importer shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

(b)    Within ten (10) days after such termination, Distributor shall return to Importer all property belonging to importer in Distributor's possession or control. Importer shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with importer on any such property, Importer shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Importer to Distributor, reasonable wear and tear expected.

(c)    Within ten (10) days after such termination, Distributor shall sell and importer shall purchase Distributor's inventory of Importer products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following:  the net price actually paid by Distributor to Importer for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Importer, plus the cost of transporting the inventory from Importer to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Importer), plus a handling charge to be set from time to time by Importer. In lieu of paying such repurchase price, Importer may, at its election, credit the equivalent amount to Distributor's account.

(d)    In no event with regard to a termination of this Agreement shall Importer be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Importer become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

10.    **Terms of Sale.**

(a)    The prices charged by Importer to Distributor shall be the prices established by Importer in effect on the date of shipment. Importer shall inform Distributor of its prices in writing from time to time.

(b)    All sales by Importer to Distributor shall be on a cash basis or on such credit terms as Importer, in its sole discretion, may establish from time to time. Importer shall not be obliged to extend credit to Distributor to assist Distributor in securing credit. Regardless of the method of payment, Importer shall retain a security interest in products and containers delivered to Distributor

until Importer receives full payment of all monies owed to Importer. Upon Importer's request, Distributor shall execute such documents as are reasonable or necessary to perfect Importer's security interest.

(c)    All products and containers which are sold to Distributor shall be sold F.O.B. that warehouse or brewery designated by Importer. If a sight draft bill of lading is used, title and risk of loss shall pass to Distributor when Importer delivers the product to the carrier for shipment to the Distributor.

(d)    All kegs and dunnage shall remain the property of Importer and shall be returned to Importer in accordance with Importer's instructions.

(e)    Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Importer products or other Importer property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Importer products to Distributor to the extent that such excise taxes are not included in Importer's prices.

11.    Financial Planning and Reporting

(a)    Distributor shall furnish to Importer annually one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements and balance sheets). All such statements shall be truthful and prepared with generally accepted accounting principles

(b)    Importer shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

(c)    Any financial data obtained by Importer pursuant to this Paragraph shall be treated by Importer and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Importer has provided prior written notice of such disclosure to Distributor.

12.    Rights Reserved to Importer.

(a)    All orders for Importer products placed by Distributor shall be subject to Importer's acceptance. Importer shall have the right to specify the forms and procedures governing the placement of such orders, including, but not limited to, the routing to be used for delivery of such orders as are accepted. In the event that Importer is restricted in the production, sale or delivery of its products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Importer's control, Importer shall not be compelled to honor previously accepted orders, but shall distribute available products among distributors in a fair and equitable manner.

(b)    Importer reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labelling or packaging of the Importer products; to determine the prices and other terms on which it sells Importer products; to produce or sell any particular brands; and to discontinue the sale of any of its products, packages or containers in any geographic area.

13.   Importer Trade Designation.

(a)   Distributor hereby acknowledges Importer's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "trade designations") relating to Importer's business or Importer's products.  Importer hereby grants Distributor a nonexclusive, non-assignable, non-licensable privilege to use Importer trade designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Importer products.  This privilege shall terminate upon termination of this Agreement.  Such trade designations shall be used only in manners, forms and contexts specified or approved in writing by Importer, and upon Importer's request, Distributor shall discontinue the way in which Distributor uses any Importer trade designation.  Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such designations without Importer's prior written approval.

(b)   Distributor agrees to remove all Importer trade designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Importer products.

14.   Assignments.

Any transfer, sale, assignment or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Importer has given its prior written approval.  Nothing herein shall prevent Importer from assigning all or part of its rights or obligations under this Agreement.

15.   New Importer Products.

This Agreement shall extend only to the brands of Importer products listed on the Distributor Data Sheet.  Importer and Distributor may at any time agree in writing to extend this Agreement to other Importer products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Importer at its sole discretion reserves the right not to offer any other Importer product to Distributor (including, but not limited to, line extensions).

16.   Amendments to Agreement.

(a)   Importer may at any time propose an amendment to this Agreement.  Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Importer.  The amendment shall become effective on the date executed by Importer, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor.  If Distributor does not return an executed amendment to Importer within ninety (90) days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

(b)   The provisions of subparagraph (a) shall not apply to changes made by Importer to the Distributor Data Sheet, and Importer specifically reserves the right to delete, modify or change any Importer product described in the Distributor Data Sheet without Distributor's consent or approval.  Distributor shall notify Importer immediately of any changes applicable to it.  Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

17.    **Compliance with Law, Venue.**

(a)    The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision. The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement. If required by applicable law, Importer and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

(b)    Any action, claim, suit or proceeding between Importer and Distributor, including, but limited to, those connected with, arising out of or related to this Agreement or which in any way involves the relationship between Importer and Distributor, whether in contract, tort or statute, shall be initiated and prosecuted as to all parties and their successors and assigns solely and exclusively in the United States District Court for the Eastern District, Alexandria Division, State of Virginia, and each party waives, freely and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. §§ 1404 or 1406, and any successor statute. In the event said District Court does not have subject matter jurisdiction of said matter, then such matters shall be solely and exclusively under the jurisdiction of the appropriate state court of competent jurisdiction located in Fairfax County, Virginia. The parties consent to in personam jurisdiction of the herein described courts.

18.    **Notice.**

All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed. All telecopied notices shall also require a copy to also be mailed, postage prepaid to the addressee. Notices shall be addressed: (i) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement or (ii) if to Importer, to 11911 Freedom Drive, Suite 1100, Reston, Virginia 22090-5609. Telecopies shall be sent to the number described in the Distributor Data Sheet and to Importer at such number as Importer shall designate. The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

19.    **Miscellaneous Provisions.**

(a)    "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Importer.

(b)    "Authorized Importer distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Importer which is currently in effect.

(c)    No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet as referred to in Paragraph 1(a) or 4(b) of this Agreement has been made by Importer or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention. Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Importer or the predecessor, parent and affiliate of Importer are hereby terminated and Distributor releases Importer and Importer's predecessor, parent and affiliate from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings. This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

(d)    The failure of either Importer or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

(e)    Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Importer, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement. No conduct of any such person shall be construed to create that authority.

(f)    Distributor acknowledges that it is, and shall remain, an independent business entity. Importer and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

## 20.    ACKNOWLEDGMENTS

The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

This Agreement is effective on the __23rd__ day of __October__, 1996.

Oak Beverage, Inc.
(Sole Proprietorship, Partnership, Corporation)*

By _____ (SEAL)
(Owner, Partner, President)*

By _____ (SEAL)
(Partner, Secretary)*  VICE PRESIDENT

By _____ (SEAL)
(Partner)

By _____ (SEAL)
(Partner)

CORPORATE
SEAL



Martlet Importing Co. Inc.

By _____
(Title)  Vice President

*Delete inapplicable words beneath signature lines. In the case of a partnership, all partners must sign.

9

**MOLSON**

# PRODUCT PORTFOLIO and MARKET AREA

Oak Beverage, Inc.

Blauvelt, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

## MARKET AREA

In the State of New York:

All of the Counties of Bronx, Putnam, Rockland and Westchester.

In New York County, the Borough of Manhattan north of but excluding 106th Street.

## BRANDS

**Molson Canadian**

**Molson Canadian Light**

**Molson Exel**

**Molson Export Ale**

**Molson Golden**

**Molson Ice**

Unless specifically included, the Market Area set forth above excludes distribution rights in Military Bases as well as Ship Chandler/Duty Free distribution.

Reviewed and Accepted this _29th_ day of _November_, 2001.

**Oak Beverage, Inc.**

By: _[signature]_

Harold Boeing, Sr.

---

## NOTE: Contingent on state approval and product availability.

330130

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

---

MOLSON USA, LLC,

      Claimant,

   vs.                                    Case No. 13 181 2798 05

JOHN G. RYAN, INC.,

      Respondent.

---

## AWARD, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated January 2, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties do hereby, AWARD, as follows:

    The undersigned arbitrator rendered an award in Phase I of this arbitration proceeding concluding that Molson USA, LLC ("Molson USA") had adopted and implemented a plan of consolidation constituting good cause of termination of the distributorship agreement and relationship with the respondent, John G. Ryan, Inc. ("Ryan"). That award, dated November 6, 2006, is incorporated herein as a partial basis for the second phase of this proceeding to determine, pursuant to New York Consolidated Statutes 55-c7(a), the amount of compensation due to Ryan for the termination of Ryan's Molson distribution rights.

    Evidence was taken in this matter on April 26 and 27, 2007. Ryan presented documentary evidence and testimony of Andrew Christon and Jerry Ryan. Molson presented the

testimony of William H. Beyer, Richard Carroll, Gary Styles, and Lamont Seckman. The parties have each presented post-hearing memoranda and reply memoranda. Submissions in this arbitration proceeding have been closed.

The final award in this matter shall include the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Both parties in this proceeding presented the testimony of expert witnesses who valued the distribution rights of Ryan using a valuation methodology referred to by various terms, but frequently by the term "discounted future cash flow" ("DFCF"). The methodologies of Ryan's expert, Andrew Christon, and Molson's expert, Lamont Seckman, in calculating DFCF were similar, but not identical.

2. Each expert's DFCF calculation was premised upon a projection of sales of Molson products in Ryan's territory for a period of years into the future. Mr. Christon's period was ten years, beginning January 1, 2007, and Mr. Seckman's period was for seven years beginning on the same date. Neither expert was critical of the choice of the other's projection period.

3. One of the key areas of dispute between the experts was the expected performance of the Molson brands in Ryan's territory in the future. Mr. Christon projected that Molson sales would essentially flatten out for the ten year projected period, while Mr. Seckman projected a continued gradual decline in Molson sales during his projected period.

4. The evidence supporting Mr. Christon's view on future Molson performance can be summed up in his phrase that the people running Molson Coors Brewing Company are smart people and would not let future brand declines continue.

5. Mr. Christon also pointed to Molson's efforts to repackage the Molson product to appear more "Canadian." Molson contends that there is no evidence that these efforts have been or will be successful. However, it appears elementary that Molson would not have undertaken these efforts unless it hoped to benefit from them. While it may be difficult or impossible to forecast the magnitude of the improvement, the makeover effort may be expected to improve sales.

6. On the other hand, Molson produced substantial evidence suggesting that the downward trend of the Molson brand was likely to continue. Among the factors supporting this conclusion are Molson Coors Brewing Company's ("MCBC") concentration of spending and support on the key Coors Light, Keystone and Blue Moon brands, the concentration of Molson U.S. spending in metropolitan markets, the reduction of Molson SKUs ("stock-keeping units") and the upward change in the pricing of Molson products to import levels. This latter strategy would likely have a disproportionately negative effect in the more economically challenged areas of New York, such as Ryan's territory. While it is not known how much each or all of these factors will impact sales of Molson products in Ryan's market, cumulatively they appear likely to cause a continuation of the downward trend.

7. In the absence of proof showing the likelihood of positive change, the best guide for future performance is past performance. Therefore, I believe that Mr. Seckman's projections of volume are more likely to occur.

8. Both experts' calculations of DFCF reached an incremental profit calculation by subtracting the cost of goods sold and incremental costs that would be avoided by Ryan by the loss of the Molson brand rights. The future incremental lost profits were reduced by the application of a discount rate. Mr. Christon's discount rate was 11.17%, and Mr. Seckman's

discount rate was 14.59%. Both experts used a technique known as the "weighted average cost of capital" method of calculating their discount rate.

9.   I find Mr. Seckman's calculation of the discount rate to be more credible and applicable to the present circumstances. A potential buyer of distribution rights for an individual brand is at a greater risk than the buyer of an entire distributorship, given the moderating effect of multiple brands within a distribution house, as some brands grow and others decline. The buyer of the distribution rights of an individual brand will expect a pay-back in a short period of time. Thus, even if the hypothetical buyer of the Molson distribution rights were to finance the entire purchase, over the projected DFCF period the balance of debt-to-equity invested in the brands more nearly approaches the 80% equity/20% debt assumed by Mr. Seckman in his model.

10.   There was a dispute between the experts on how the "terminal value" calculation would be made. A terminal value calculation seeks to value the brand rights at the end of the projection period. Mr. Christon suggests that the volume number for the last year of the projection period should be used for the terminal value calculation. Mr. Seckman takes an additional year of declining performance to reach the next year, which is the beginning of the terminal value calculation. Molson introduced a text by McKinsey & Co. (Ex. M-30) supporting Mr. Seckman's view of the terminal value calculation. While Mr. Christon suggested that his methodology was supported by a noted expert in the field, he provided no documentation of this view. Therefore, I adopt Mr. Seckman's methodology.

11.   Mr. Seckman also analyzed several other Molson brand sale transactions to do a "reality check" of his DFCF calculation. Mr. Christon did not examine any comparable transactions, even those in his company's database of transactions. The result of Mr. Seckman's examination of the Molson database (Ex. M-12) was to increase the valuation from his DFCF

calculations. It appears to me that other transactions could be useful as a reality check for the fair market value of the Molson brands.

12. There was evidence of other transactions also from a summary of Mr. Christon's database (Ex. M-26) and from an industry consultant, Joe Thompson (Ex. R-17). Each of these exhibits support Mr. Seckman's view of valuation.

13. In sum, I am convinced that the valuation proposed by Molson should be adopted in general for the purposes of my award in this arbitration. Mr. Seckman's report concludes with a range of values which, when rounded, range from a low of $700,00.00 (2.59 times 2006 gross profits) to $780,000.00 (2.90 times 2006 gross profits)(Ex. M-2, p. 22). Molson proposes a computation of value midway between the two, *i.e.* $740,000.00. Because I believe a valuation lower than 2.9 times 2006 gross profits would undervalue the distribution rights, I conclude that a value at the higher end of Mr. Seckman's range is appropriate here. Accordingly, I conclude that the fair market value of the Molson distribution rights held by Ryan is $780,000.00, the higher number in Mr. Seckman's range.

14. Ryan put on evidence of other damages that will be suffered by the distributor as a result of the proposed termination. Molson has agreed with Ryan's calculation that the out-of-pocket damages are $7,517.95.

## CONCLUSIONS OF LAW

1.    Ryan has the burden of proof in this phase of the hearing, including both the burden of going forward with the evidence and the risk of non-persuasion.

2.    Under New York law, expert testimony must be supported by an adequate factual basis and not be based upon conjecture or speculation. Here, Mr. Christon's projection of future sales as a part of his calculation of DFCF is based upon his speculation as to what

MCBC's management and Molson's management will do in the future to reverse the trend of lower sales in Ryan's market and the larger beer marketplace. Because the opinion is based upon speculation, Ryan has failed in its burden of proof.

3. Even if Mr. Christon's opinion were considered to have an adequate basis in fact, I would conclude that in weighing all of the factors, including the credibility of witnesses, the likelihood of future events portrayed by both parties, Ryan's track record of Molson performance, and my assessment of the merits of the methodologies of both experts, Molson's projection of value better estimates the fair market value of Ryan's Molson distribution rights under §55-c7(a).

4. As to the determination of "other damages sustained" under §55-c7(a), I do not accept the argument of Ryan and Mr. Christon that the difference between Mr. Christon's valuation of Ryan's Molson distribution rights and his calculation of fair market value (resulting from the application of a lack of marketability discount) constitutes the type of damages contemplated by the New York legislature.

5. When the statute refers to "other" damages, it should be construed to refer to matters other than the value of the brand distribution rights, for which the legislature chose to define fair market value in §55-c2(i). Moreover, it would be illogical for a supplier to be required to pay more for the termination of the brands for good cause pursuant to the implementation of a national plan of consolidation (§55-c7(a)) than for an outright termination without cause (§55-c7(b).

6. Rather, in my view, the damages provided in addition to fair market value of the terminated brand distribution rights are those sunk costs which the distributor has been unable to recoup or will be unable to recoup after the termination of the brand distribution rights.

7.    Therefore, by applying §55-c7(a) to the facts I have determined in this case, the following is my declaratory award:

a.    Per my award of November 6, 2006, Molson is entitled under all applicable law to terminate its agreement with the respondent Ryan upon notice to Ryan and payment to Ryan in the amount of $787,517.95.

b.    Per the application of §55-c7(c), the costs and arbitrator compensation of this arbitration shall be divided equally between Molson and Ryan. Accordingly, the administrative fees of the American Arbitration Association totaling $5,000.00, and the compensation of the arbitrator totaling $86,318.00 shall be borne equally by the parties. Therefore, Ryan shall reimburse Molson the sum of $2,250.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Molson.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

All claims not expressly granted herein are hereby, denied.


July 13, 2007                              _____
Date                                      Peter M. Collins


I, Peter, M. Collins, do hereby affirm upon my oath as an Arbitrator that I am the individual described in and who has executed this instrument which is my Award

July 13, 2007                             _____
Date                                      Peter M. Collins

**EXHIBIT D**

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
-------------------------------------------------------------

MOLSON USA, LLC,

Claimant,

v.

JOHN G. RYAN, INC.,

Respondent.
-------------------------------------------------------------

AAA Case No.: 15 181 00640 05

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 02, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue my INTERIM AWARD, as follows:

## INTERIM DECISION

### DISCUSSION

An evidentiary hearing in this proceeding took place on July 17 and 18, 2006. The parties have briefed the case comprehensively and both sides have submitted proposed findings of fact and conclusions of law as well as objections to one another's findings and conclusions. Accordingly, familiarity with the facts and the contentions of the parties is assumed.

Molson USA, LLC ("Molson"), the Claimant herein, is a limited liability

company owned by Coors Brewing Company ("Coors") and Molson, Inc. It sells beer products manufactured by Molson, Inc., in Canada to the United States market. John G. Ryan ("Ryan") is a duly licensed wholesaler of beer and other alcoholic and non-alcoholic beverages in New York State and acts as a wholesaler of Molson products in New York pursuant to a written agreement (the "Agreement") sometimes referred to as the "Molson Amendment."[1]

Molson seeks a declaratory judgment declaring that Molson has the right to terminate the Agreement and appoint a distributor of its choosing, and determination of the amount of compensation due to Ryan by virtue of the termination. Ryan requests denial of the requested relief in all respects.

At issue is application of Section 55-c of New York's Alcoholic Beverage Control Law ("ABCL"). As Ryan has discussed in its pre-hearing submission, pursuant to the protective measures imposed under ABCL §55-c, a brewer may only terminate a distributor for "good cause", as it is narrowly defined by the Statute. So far as applicable here, the "good cause" requirement establishes standards that must be met by a brewer in order to justify termination of a distributor as part of a national or regional policy of consolidation. The portion of the statute relevant to the instant dispute provides as follows:

---

[1] While the "Molson Amendment" was by its express terms executed "effective as of the 2nd day of January, 2001," there is some uncertainty concerning the actual times of execution by the signatories. See Findings of Fact, Nos. 14 through 22, *infra*. However, it does not seem to be in dispute that the parties did business from 2001 onward operating under the terms of the Molson Amendment. See Finding of Fact No. 22, *infra*.

"Good cause" means and shall be limited to: (i)(A) The implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential. Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

N.Y. ABCL §55-c 2(e)(i)(A).

Under the statutory language quoted above, in order for a consolidation policy to qualify as grounds for good cause for the termination of a New York distributor, a brewer seeking to terminate bears the burden of demonstrating that its policy meets the following requirements: (1) the consolidation policy will be implemented on a national or regional level; (2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-discriminatory; and (5) the brewer's implementation of the consolidation policy, if "regional", will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in the states contiguous to New York, or if "national" the brewer's

3

implementation of the consolidation policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brewer's brand is sold.

### This Proceeding Is Not Time-Barred

A preliminary issue is raised by Ryan's argument that this proceeding is time-barred by Subparagraph 6.2 of Paragraph 6 ("Dispute Resolution") of the Molson Amendment, which provides in relevant part:

> Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred.

Ryan contends that the present dispute arose during the first half of 2003, when Molson representatives attempted to "persuade or pressure" Ryan and other New York wholesalers into transferring or selling their distribution rights to the local Coors house, and therefore that the parties' agreed one-year limitation bars this proceeding, which was commenced on July 26, 2005. In so doing, he equates the present state of the dispute with what it was in 2003, framing the issue as (then as now) whether Molson had the right to consolidate Ryan and other New York distributors.   However, while there is no doubt that disputes between Molson and its New York wholesalers including Ryan were erupting in 2003, it does not follow that *the facts that are the subject of this proceeding* were then in dispute.  As Molson's counsel urges, there was no evidence at the hearing that Molson took any steps to terminate Ryan pursuant to the provisions of §55-c until the filing of the arbitration demand in this case, which seeks a declaratory judgment establishing that it may do so.  Moreover, as Molson points out, even if the

4

parties had discussed whether Molson had or did not have the right to terminate, this would not trigger a dispute within the intendment of §55-c until some action were taken by Molson to actually pursue termination.

Accordingly, I conclude that this proceeding is not time-barred.

### The 2001 Amendments to ABCL §55-c Apply to This Case

The sale of alcoholic beverages in the State of New York, as elsewhere in the United States, is subject to comprehensive state regulation. Threshold issues are presented in this case by Section 55-c of New York's ABCL, which governs agreements between brewers and beer wholesalers. That statute was amended by the New York State legislature effective June 15, 2001, during the pendency of the Molson-Ryan Agreement. Molson contends that applying the provisions of ABCL §55-c as amended in 2001 would be unconstitutional since application of the amendment would impair an existing contract in violation of the Contract Clause of the United States Constitution.

In support of its contention Molson cites *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 843 (8th Cir. 2002), in which contractual terms within certain manufacturers' pre-existing dealership agreements dealing with farm equipment were held to have been Constitutionally impaired by a state dealership statute enacted after the contracts went into effect.

To the contrary, Ryan points to *Garal Wholesalers, Ltd. v. Miller Brewing Co.*, 196 Misc.2d 630, 751 N.Y.S.2d 679 (Sup. Ct. Suffolk Co. 2002), which applied the same test as that used by the *Janklow* court to reach an opposite result on its facts. While both cases are well-reasoned, *Garal* has the advantage of being a closer fit to the instant case since, unlike the *Janklow* case, it deals specifically with §55-c of New York's ABCL -- the statute here in issue --

5

and addresses precisely the identical issue, *i.e.*, whether the Contracts Clause bars application of the 2001 Amendments to an attempted termination of an agreement entered into prior to the Amendments, pursuant to a brewer's consolidation policy.

As Ryan argues in its Post-hearing Memorandum of Law, *Garal* held that the retroactive application of the amendment of §55-c did not violate the Contracts Clause because:

- The distribution, sale and consumption of alcoholic beverages are highly regulated, and there is no reasonable expectation of unaltered continuation of the regulatory scheme;

- The agreements were entered into after passage of the original §55-c in 1996 and Miller there (like Molson here) knew at the time it entered into the agreement that it could not terminate its distributors without good cause. Ryan argues that the Amendment did not add or alter what constitutes good cause, but only clarified what types of consolidations satisfied the good cause requirement, and that no contractual rights were impaired retroactively by applying the Amendment to the already existing agreement. This may seem a bit of a stretch, but it has the support of the *Garal* court, which expressly reached this conclusion concerning the same statutory language: "In the instant case, the Amendments did not create a right which did not exist before, but merely created, or expanded upon, a remedy for an antecedent right [Citation omitted.]." 193 Misc.2d 630, 751 N.Y.S. 2d 679.

- The statute and the Amendment are "remedial" in nature and should be applied retroactively to avoid undermining its remedial purpose;

- The changes are not "drastic" and do not rise to the level of "substantial

6

impairment"; and

- The Amendment was intended as curative legislation, to clarify the intent behind an existing statute, and is properly retroactively applied.

The rationale of the *Garal* decision appears to have application in the present case, and will be followed here.

### Application of the Dormant Commerce Clause to NYABC Section 55-c

Molson invokes the Commerce Clause of the United States Constitution to argue that application of the year 2001 amendment provisions to §55-c, requiring the contemporaneous reduction in the number of wholesalers, either on a national basis or in states contiguous to New York, is constitutionally invalid.[2] It points to two Supreme Court cases: *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986) and *Healy v. The Beer Institute*, 491 U.S. 324 (1989) in support of its argument.

Both cases dealt with state statutes requiring affirmations that local prices were no higher than the prices at which the products in issue were sold in other states, and both concluded that the state statutes were invalid under the Commerce Clause because of their "impermissible extraterritorial effect." (*Healy*, 491 U.S. 334). Citing its previous decision in *Brown-Forman*, the Court said:

> The [Twenty-first] Amendment did not immunize the State from the Commerce Clause's proscription of state statutes that regulate the sale of alcohol in other States.

---

[2] The Commerce Clause states: "The Congress shall have Power . . .To regulate Commerce. . .among the several States. . . ." U.S. Const., Art. 1 ' 8, cl. 3. "This Court long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce. [Citations omitted.]" *Healy v. The Beer Institute*, 491 U.S. 324, 326 n.1 (1989).

491 U.S. at 334.

The Court characterized its decisions concerning extraterritorial effects of state

economic regulation as standing "at a minimum" for the following propositions:

> First, the "Commerce Clause ... Precludes the application of a state statute to
> commerce that takes place wholly outside of the State's borders, whether or not
> the commerce has effects within the State [Citations omitted.].

> *     *     *

> Second, a statute that directly controls commerce occurring wholly outside the
> boundaries of a State exceeds the inherent limits of the enacting State's authority
> and is invalid regardless of whether the statute's extraterritorial reach was
> intended by the legislature.

491 U.S. at 336.

The Court's emphasis is on the practical consequences of the state legislation in

issue:

> The critical inquiry is whether the practical effect of the regulation is to control
> conduct beyond the boundaries of the State. [Citing *Brown-Forman*.]

*Ibid.*

Finally, the Court prescribes consideration of the way the challenged statute may

interact with regulatory measures taken by other states:

> Third, the practical effect of the statute must be evaluated not only by considering
> the consequences of the statute itself, but also by considering how the challenged
> statute may interact with the legitimate regulatory regimes of other States and
> what effect would arise if not one, but many or every State adopted similar
> legislation. Generally speaking, the Commerce Clause protects against
> inconsistent legislation arising from the projection of one state regulatory regime
> into the jurisdiction of another State. [Citation omitted]

*Ibid.*

A well-reasoned opinion following the Supreme Court's *Healy* decision and

8

dealing with the application of the Commerce Clause specifically to §55-c, *S.K.I. Beer Corp v. Baltika Brewery*, 2006 U.S. Dist. LEXIS 47513 (E.D.N.Y. July 13, 2006) has been recently published. In that case Judge Glasser of the Eastern District of New York interpreted the language "in this state" appearing in the definition of "(b)rewer" in §55-c(2)(b) to modify the entire phrase preceding it, thus narrowing its ambit to brewers engaged in the sale and delivery of beer "in this state." Importantly, as one of the grounds of his decision Judge Glasser held that the alternate proffered interpretation of this language "would run afoul of the dormant Commerce Clause." *Id.* at 6. The reasoning underlying this conclusion echoes the Supreme Court's *Healy* decision:

> The "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders whether or not the commerce has effects within the State." [Citing *Healy.*] "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." [Quoting *Healy.*]

*Ibid.*

Finding that "[the alternate interpretation] would impose New York's statutory regime for brewer-wholesaler relations on agreements consummated and completed on the other side of the globe simply because the wholesaler was licensed under New York law" Judge Glasser elected to follow the rubric that "a court should construe legislative enactments to avoid constitutional difficulties if possible. [Citations omitted.]" *Ibid.* This led to the conclusion that since under the terms of the contract there in issue physical delivery of the beer was made at the Balkala brewery at St. Petersburg, Russia, no sale took place in the State of New York which would justify an application of §55-c.[3]

---

[3]Molson contends that the specific finding of the *Baltica* case that under the

9

Based on the foregoing, I find that the §55-c's requirement that "a national or regional policy of consolidation" result in ". . . a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state <u>but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand</u>" (§55-c(2)(c) (i)(A) (emphasis supplied) constitutes facially an effort to regulate "conduct beyond the boundaries of the State" (*Healy,* 491 U.S. 336, quoting *Brown-Forman*), and therefore that this portion of the statute is barred by the Commerce Clause.

### The Molson USA Consolidation Policy is Reasonable, Non-Discriminatory, and Essential

Molson asks rhetorically exactly what kind of consolidation could qualify as reasonable and essential under §55-c if the Molson consolidation does not. While declamatory, its argument points to a relevant consideration: in enacting §55-c, the New York legislature must be deemed to have concluded that some consolidations *would* qualify as reasonable and essential. While, admittedly, expressions of intent by individual sponsors and post-passage memoranda are

terms of delivery there applicable delivery of the beer took place outside the State of New York entitles it to dismissal here, and Molson "reserves the right" to introduce evidence at any subsequent hearing that Ryan took delivery outside the State of New York. No evidence was presented at the evidentiary hearing tending to show that delivery to Ryan took place outside New York. In addition, Molson states in its Pre-hearing Memorandum (p. 3) that "Molson USA ships Molson products to Ryan in New York." In light of the disposition below, it appears unnecessary to reach Molson's argument on this point.

not reliable indicators of the intention of the entire legislature, see *Schrader v. Carney*, 188 A.D.2d 200, 206-207, 586 N.Y.S.2d 687, 691 (4th Dep't 1992), the introducers' memorandum suggests an intention to avoid "subjective, arbitrary, or retaliatory terminations." There has been no evidence in the present case that Molson's efforts to terminate the Ryan relationship have been actuated by such motivations. Perhaps more importantly, principles of statutory interpretation dictate an effort to interpret a regulatory statute to reach a result that is not unreasonable.

To the contrary, Molson has submitted unrebutted evidence of a good-faith effort to fashion its consolidation policy around compliance with the rather technical requirements of §55-c. Molson has further demonstrated the need to reduce costs because it has in fact lost substantial (*i.e.*, multimillion-dollar) sums in four of the last five years. See Finding of Fact No. 38, *infra*. In interpreting a statute governing commerce, it would seem unreasonable to reach without a very good reason a result imposing continued operation of a business for years at substantial annual losses.

The present decision is not the end of this matter. §55-c 7 of the ABC allows Molson to terminate its distributor agreement with Ryan only upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of its consolidation policy, together with fair and reasonable compensation for other damages suffered. In the event that the parties are unable to agree on the amount of that compensation, such compensation will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

11

## FINDINGS OF FACT

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006, hereby makes the following findings of fact.

1.  Molson beer products are brewed in Canada by Molson, Inc. and sold in the United States by Molson USA, LLC ("Molson USA"), which contracts with distributors to sell beer to both on-premise retailers (such as taverns and restaurants) and off-premise retailers (such as grocery stores and convenience stores). Molson is North America's oldest brewer, founded in 1786.

2.  Molson USA is a limited liability company owned by Coors Brewing Company ("Coors") and Molson, Inc. It began operating in 2001 for the purpose of distributing Molson beer products in the United States. (At the time Molson USA was known as Molson 2000, LLC. It subsequently changed its name to Molson USA, LLC)

3.  Beer is sold in the United States through what is referred to as a "three-tier" distribution system. A brewer sells to independent distributors (or wholesalers) who sell to retailers, both off-sale, such as liquor and grocery stores and on-sale, such as bars and restaurants. State law prevents a brewer from selling directly to retailers or from owning wholesalers. A brewer is only as good as its distributors, since the brewer relies upon distributors to get products to retailers.

4.  In today's market Anheuser-Busch has approximately a 50% share of the national market. Miller's national share is approximately 20%. Coors' national share is

approximately 10%. The national shares of Heineken and Corona are 3% and 4% respectively.

5.    There are multiple distributors in every market. Each distributor carries multiple brands. Since retail shelf space and beer taps are limited, there is intense competition among distributors for "distribution" of beer brands and packages, meaning the share of the retailer's facility. Wholesalers also want to get brands placed in preferred spots in the distributor's facility, such as high traffic areas. The bigger a supplier is within a distributor's business the more likely that the supplier will have a greater share of the distributor's attention, known in the industry as "share of mind."

6.    Prior to 2001, the distribution of Molson products in the U.S. was done by a subsidiary of Miller Brewing Company under joint venture with Molson, Inc.

7.    John G. Ryan, Inc. is a New York beer distributor with a principal place of business in Pine City New York. It currently is a distributor for Molson beer products and other brands, including Miller, Guinness, Bass, Sam Adams and Seagrams. Its territory for Molson products includes the New York counties of Chemung, Schuyler, Tompkins and parts of Steuben and Yates.

8.    Since 2001, when Molson USA took over the United States distribution of Molson products, Coors Brewing Company has assisted with the sales and marketing of Molson products in the United States.

9.    Coors began a national policy of consolidation in 1997, focused on obtaining economically viable distributors. In many cases, this involved joining Coors and Miller in the same distributor's portfolio.

10.    In February, 2005, various Coors and Molson entities were combined into

13

what was loosely referred to as a "merger of equals." After the combination, Adolph Coors Company was renamed Molson Coors Brewing Company.

11.    In connection with the unwinding of the prior Miller Brewing Company distribution of Molson products, Molson USA promised Miller in 2000 that existing United States Molson distributors would be allowed the opportunity to continue distributing Molson and a provision of the distribution agreement would contain a provision by which Molson USA would not terminate without cause during the first five years.

12.    In a meeting in Canada prior to the operation of Molson USA, Gerald Ryan heard Daniel O'Neil of Molson, Inc. assure distributors that they would not be terminated if they were performing. Mr. O'Neil did not indicate whether this position would be adopted by the proposed joint venture between Coors and Molson or for how long the status quo would continue.

13.    Mr. Ryan did not testify that his distributorship did anything differently in the intervening six years that he otherwise would not have done in reliance on Mr. O'Neil's comments. Likewise Mr. Ryan did not testify that his distributorship elected not to do something that it would have done in reliance on Mr. O'Neil's comments.

14.    When Molson USA started its operations following the termination of the Miller joint venture, Molson USA could not locate a prior distributorship agreement with Ryan. Therefore, Molson USA created a Molson Amendment for Ryan with a blank exhibit. This was the first written agreement between the newly formed Molson USA and Ryan.

15.    Gerald Ryan signed the Molson Amendment "under protest" and returned the agreement to Coors on February 2, 2001 with a letter noting the protest. He did this after

14

consulting with counsel.

16. Molson USA refused to accept the amendment with the protest. Counsel for Molson USA, Neal Peters, returned the Molson Amendment to Ryan on February 12, 2001 with a memo that indicated that Ryan should return the signed Molson Amendment with no alteration and without protest or not at all.

17. Gerald Ryan then signed the Molson Amendment and returned it on March 1, 2001. Mr. Ryan, however, prepared a memo to file noting his protest, but also stating that the protest was not conveyed to Molson USA.

18 When Mr. Ryan sent the Molson Amendment back to Molson USA he intended to create a contract with Molson USA concerning the operation of his distributorship for Molson products.

19. Molson USA does not know whether or not the Molson Amendment signed by Ryan was signed by anyone on behalf of Molson USA in 2001 or 2002. A search of the Molson USA records does not show one way or another.

20. On October 28, 2002, Molson USA wrote to Ryan and offered Ryan the opportunity to sign an entirely new Molson distributorship agreement. In that letter, Molson USA acknowledged the previous receipt of Ryan's signed Molson Amendment. Molson USA has no record that Ryan ever signed the new Molson distributorship agreement.

21. In June 2005, Molson USA discovered that it did not have in its files a Molson Amendment signed by both Ryan and Molson USA. Molson signed another copy of the Molson Amendment on June 27, 2005 and attached the signature page with the demand for arbitration. The full Molson Amendment was sent to Ryan on August 29, 2005

15

22.   Both Ryan and Molson USA did business from 2001 onward operating under the terms of the Molson Amendment.

23.   The Ryan agreement with Molson USA states that it is terminable without cause, except for the first five years during which termination is permitted only for cause and except for any statutory limitation or expansion of the right to terminate.

24.   When Molson USA began the importation and sale of Molson products in 2001, the joint venture partners Molson and Coors determined to consolidate, where possible, the distribution of Molson products into the Coors distribution network in the United States. This has been Molson USA's continuous policy since the formation of Molson USA.

25.   When Molson USA began, there were over 502 Molson distributors in the United States and of these, 65% were not also Coors distributors (referred to from time to time as "unaligned" or "Molson-only" distributors). As of the hearing, there were 452 total Molson distributors. From 2001 to July 18, 2006 the total number of Molson distributors decreased in 24 states. There were 8 states in which the total number of Molson distributors increased. In 19 states the number of Molson distributors stayed the same, but in 10 of these states there was only one distributor to begin with. Molson could not reduce its distributors to zero and still operate in those ten states. In the five states contiguous to New York, during this period, the total number of Molson distributors has decreased from 41 distributors to 24 distributors, while declining in three states and remaining the same in two states.

26.   In New York, the proposed termination of Ryan's distributorship agreement would not cause any reduction in the total number of Molson distributors, but the proposed termination of the other Molson-only distributors in New York would cause the total

16

number of distributors to decrease from nine to five.

27.     Molson USA used a number of tactics in carrying out its plan of consolidation. Beginning in 2001, Molson USA began attempting to persuade unaligned Molson distributors to voluntarily sell the Molson brands to the local Coors distributor. This process proved to be very successful. Over time, Molson USA also used the availability of new brands (although Ryan received all new brands) and the prospect of the appointment of a second Molson distributor (in one state) to encourage consolidation. Molson distributors in Michigan, Pennsylvania, New York and Ohio resisted voluntary consolidation.

28.     Molson USA implemented its consolidation program with consideration given to the fact that the company was also attempting to grow sales of the Molson brands in the United States. Molson USA sought to recover from the double digit declines the brand suffered during the period when the brands were distributed in the United States by Miller. Molson USA invested over 20 million dollars per year in promoting the Molson products. Sales of Molson products in New York constitute approximately 30% of Molson USA's sales of Molson products in the United States.

29.     Molson's consolidation plan included the targeting of specific groups of distributors for consolidation in each year. Originally, Ryan was not on the list of targeted distributors.

30.     "Targeting" a distributor referred to the focus and immediacy of the consolidation efforts for that distributor. If a distributor was not a target for a particular year, it did not mean that Molson USA did not wish to consolidate the brands of that distributor into the local Coors distribution house. Rather, given the business demands of selling Molson products,

17

it simply meant that the distributor was not the subject of focus by the Coors wholesaler development staff to promote consolidation.

31.    At a point in time in later 2002, Ryan was put on the target list for consolidation. In 2003, Ryan was contacted by a representative of Coors who asked Ryan to consider selling the Molson brands to the local Coors distributor. Mr. Ryan did not testify that termination of the distributorship was an option discussed by the Coors representative.

32.    Ryan, together with other New York distributors, retained counsel to communicate with Molson USA concerning Molson request that Ryan and others voluntarily sell the Molson distribution rights to the local Coors distributors.

33.    Following the merger of Molson and Coors in February, 2005, Molson USA took the first formal step to invoke the consolidation provisions of New York ABC §55-c. On March 11, 2005, Molson Coors sent to all U.S. distributors (except three in Ohio), including Ryan and the other unaligned New York Molson distributors, a notice informing the distributors that Molson Coors would be taking further steps to effect the consolidation of the Molson brands into the local Coors distributors. Molson USA was not able to locate any prior written notice to all of the New York Molson distributors informing them of the Molson USA consolidation process.

34.    Prior to the beginning of 2006, Molson USA made no distinction in its expenditures for marketing and promotion based upon whether a distributor was aligned with Coors. Following the merger of Coors and Molson a decision was made to increase advertising and marketing support for Coors Light. This reduced the amount of funds available to promote Molson products. Molson USA decided to reduce the amount of funds available for media

18

spending and reduced the number of markets in which media spending would be done. Whether a distributor was aligned with Coors was a part of the decision making process concerning media spending. Ryan did not receive any media spending in his market in 2005 so there was no reduction in 2006. As to "tactical spending" (promotions, point of sale materials, and other similar in-market expenditures) each Molson distributor, including Ryan, regardless of whether the distributor was aligned or unaligned, was given the same amount of tactical spending in the distributor's market as had been allocated in 2005.

      35    In May, 2005 Dean Valdez of Molson Coors visited with Mr. Ryan in New York. Mr. Valdez indicated that as the result of the Molson/Coors merger, the likely support for Molson brands would be decreased because of an overall corporate decision to increase marketing support for Coors Light. He indicated that it would be an opportune time for Ryan to consider selling to the local Coors distributor because the value of the distributorship might fall as a result of declining brand sales. Valuation of beer distributorships is typically done on the basis of trailing 12 month performance. Mr. Ryan declined to sell the distributorship in response to Mr. Valdez's comments. There is no evidence that the decision to place more corporate resources in support of the Coors Light brand was done in order to have an effect upon the Molson consolidation or an effect upon New York Molson-only distributors, including Ryan.

      36.    This arbitration was commenced on July 22, 2005. This is a test case for Molson, rather than commencing simultaneous actions against all unaligned New York Molson distributors. Molson USA seeks an award declaring that under §55-c, Molson has the right to terminate its Distribution Agreement with Ryan pursuant to Molson USA's policy of consolidation.

19

37.    Molson USA informed all of the other New York Molson-only distributors that it was the intent of Molson USA to pursue similar termination proceedings with respect to each New York distributor in the event that Molson USA was permitted by the arbitrator to terminate Ryan as a Molson distributor, with an appropriate payment for the brands.

38.    Molson USA's financial statements show that it suffered financial losses, as follows:

39.    Consolidation of the Molson distribution into the Coors distribution houses has a number of substantial benefits. At the most elemental level, consolidation of the distribution of Molson into the Coors distributors has allowed Coors and Molson USA to have fewer personnel calling on fewer distributors. This has saved Molson USA and Coors several million dollars, apart from the benefits accruing from the merger between Coors and Molson. This reduction also permits field personnel to concentrate their efforts among fewer distributors, which means that there is more time to spend with each distributor.

40.    Molson Coors obtained costs savings, sometimes referred to as the synergies from the merger, but there were separate and distinct cost savings realized from the elimination of Molson USA employees in the Molson sales network attributable to the consolidation policy and not the merger. The head count for the Molson USA sales force went from 35 people calling on only Molson USA distributors to the current 15 people who are "fully integrated with Coors," meaning that they call on distributors for both Coors and Molson brands

in a network that is 85% aligned.

41.    Consolidation of the Molson and Coors brands in a single distributor also permits both Molson USA and the distributor to increase selling focus on the combined Molson/Coors brands because they constitute a greater overall share of the distributor's business. In the beer business, this is referred to as "share of mind," meaning the ability to convince the distributor to focus on the supplier's brands, instead of diluting efforts across the distributor's entire brand portfolio, which can involve dozens of different brands.  For example, the distributor can offer joint promotions to retailers.  Instead of having to spend a day with the Molson-only distributor, and then a day with the Coors distributor in the same market, the Molson Coors employees are thus able to serve both brands during a single visit and coordinate the various corporate programs with a single distributor.  Also, in a single call the distributor can ensure that the Coors and Molson brands are fresh on the retailer's shelves, thus promoting the important freshness imperative for both Coors and Molson.

42.    Consolidation also assists in creating a larger portfolio for the Coors distributor so that the distributor is in a better position to convince retailers to devote greater shelf space or number of taps to the combined Coors/Molson products.  The Coors distributor has an incentive to promote both products to a greater degree.

43.    Consolidation has also shown that over time (and on average) aligned Molson distributors outperform unaligned Molson distributors in sales of Molson products. Some unaligned Molson distributors may outperform some aligned distributors and during some periods the average sales performance of unaligned distributors may exceed that of aligned Molson distributors.  Short term sales performance can be affected by several matters, including

21

such factors as weather, a hockey strike, or changes in performance by a relatively few number of distributors.

## CONCLUSIONS OF LAW

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006 hereby makes the following conclusions of law.

1.      Both by signed document and course of dealing the parties have manifested an intent no later than March, 2001 to be bound by the Molson Amendment, as embodied in Exhibit 88.

2.      Inasmuch as there is no evidence that Molson USA attempted to terminate Ryan or communicated to Ryan its intention to terminate the distributorship contract between them pursuant to §55-c prior to one year before the commencement of this arbitration proceeding, Molson USA has satisfied the terms of paragraph 6.2 of the Molson Amendment, which requires that a dispute be submitted to arbitration within one year of the date that the dispute first arose.

3.      The proposed termination of the distributorship agreement between Molson USA and Ryan is governed by the provisions of §55-c including the 2001 amendments to §55-c which were effective June 15, 2001.

4.      Molson USA's national plan of consolidation is "reasonable, nondiscriminatory and essential" within the meaning of §55-c.

5.      Molson USA's national plan of consolidation is nondiscriminatory because it has been in effect since 2001 and has been pursued steadily since that date. Molson's decision to

stage its consolidation efforts consistent with the limitations of state law and the need to operate its business does not constitute discrimination. Molson has stated its intention to pursue the termination of the remaining unaligned distributors in New York if termination is permitted in this arbitration. There is no contrary evidence suggesting otherwise and, thus, the commencement of this arbitration as a test case is not discriminatory within the meaning of §55-c. The term "nondiscriminatory" in the statute refers to the policy of consolidation and not to the staged implementation of the policy for legitimate business reasons.

6.    In interpreting the meaning of the terms "reasonable" and "essential" in §55-c, reference is made to cases interpreting the same terms in the Wisconsin Fair Dealership Law, Wis. Stat. §135.02(4)(a).

A.    The terms reasonable and essential must be construed together within the context of the statute. In order for a national plan of consolidation to be reasonable and essential under §55-c the brewer need not risk financial ruin if the plan is not implemented or completed.

B.    Instead, the plan of consolidation is reasonable if it is the product of the brewer's good faith rational business judgment, which can be shown if it is consistent with industry practice.

C.    In order to be essential, the plan of consolidation must be not merely incidental or desirable, but necessary for the proper functioning of a brewer's distribution network.

D.    Factors such as cost savings to Molson USA and its corporate parent Molson Coors Brewing Company, avoidance of financial losses, increases in distributor efficiency and focus on the Molson brands that contribute to increased revenues satisfy the

23

requirement that a plan be reasonable and essential.

7.     Section 55-c(3) requires that a beer distributorship agreement "may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided that brewer has acted in good faith." The statute defines good faith as "honesty in fact and the observance of reasonable commercial standards in the trade." In the context of this arbitration good faith is to be determined in connection with the decision to terminate and the implementation of the termination of Ryan.

A.     A brewer does not fail to act in good faith in implementing a plan of consolidation over time. State law and the need to run a business permit a brewer to achieve its consolidation in stages.

B.     A brewer also does not fail to act in good faith by utilizing lawful means to encourage consolidation, such as selectively awarding brands or planning to "dual" brands in a territory or monitoring sales performance.

C.     Ryan has presented no evidence that Molson USA did not act with "honesty in fact" in connection with the implementation of the policy of consolidation.

(1)     The 2000 remarks of Daniel O'Neil do not show dishonesty in fact on the part of Molson USA. Molson USA had yet to be formed. Moreover, Mr. O'Neil's statement does not constitute a promise of any type. Nothing about any statement by Mr. O'Neil of present intention on the part of Molson, Inc. has any impact on the honesty of Molson USA's decision to invoke §55-c nearly five years later. Even after the meeting with Mr. O'Neil, Ryan signed the 2001 Molson Amendment with the five year termination provision. Ryan has also not presented any evidence that it would have done anything different in reliance between the time of

24

Mr. O'Neil's remarks and the announcement by Molson USA of its policy of consolidation.

(2)    Molson USA's encouragement of Ryan to sell in May, 2005 was based upon a factual statement that Molson Coors' support for the Molson brands would decrease as part of an overall company strategy. Molson USA's statement that this would provide an opportune time for Ryan to sell since less marketing support could lead to lesser revenues was not false.

(3)    Molson USA's proposed statements to distributors as to future actions beyond the expiration of the "five year period" was an honest statement of intention, given the legal impediments to forced consolidation faced by Molson USA and the need to continue Molson USA's business with distributors. In any event, there is no evidence that Ryan was ever contacted and presented with these statements.

D.    Ryan has presented no evidence that Molson USA has acted contrary to the observance of reasonable commercial standards in the trade. The only evidence of commercial standards in the trade was provided by Molson USA concerning the consolidation by Stroh Brewing Company.

E.    Molson USA has acted in good faith concerning the termination of Ryan.

8.    Section 55-c requires that a brewer's policy of consolidation "shall have previously been disclosed, in writing, in reasonable detail to the brewer's wholesalers . . ." In addition, "[a]ll affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of the policy." The obvious purpose of these provisions is to provide adequate notice to distributors who will be terminated under the consolidation policy. The notice period is not a maximum period, but a minimum period.

A.    In this case, Ryan has been provided more than 90 days notice of Molson USA's policy. The policy was described in writing at least as early as 2003 as a result of correspondence between the attorneys for Molson USA and Ryan. The policy was described in reasonable detail because it is elementally simple: Molson USA desired that the Molson brands be represented by the local Coors distributor.

B.    In addition, Molson USA provided a description of its policy and notice of implementation in its letter of March 1, 2005, which was sent to Ryan and all other New York wholesalers.

C.    Finally, Ryan has also had notice of Molson USA's intent to terminate and the description of the policy by virtue of the arbitration demand in this case, which was filed in July, 2005. Molson USA has not terminated Ryan and more than 90 days have elapsed from the date of the commencement of the arbitration.

9.    Under §55-c, a brewer's policy of consolidation must "result in a reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of states in which the brewer sells the brand." The term "contemporaneous" must be interpreted in a reasonable fashion given the New York legislature's knowledge of the laws restricting terminations in nearly every other state. A brewer could not possibly accomplish consolidation through persuasion in a short time period. The evidence in this case suggests that a national policy of consolidation takes considerable time, given the restrictions of state law and the need to conduct ongoing business. Thus, "contemporaneous" in the context of §55-c means that consolidation is measured over the period of time that the consolidation policy is in effect.

10.    That portion of §55-c which conditions termination of a New York distributor on actions of the brewer outside of New York is not enforceable under the Dormant Commerce Clause of the United States Constitution. *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986); *Healy v. The Beer Institute, Inc.*, 491 U.S. 324 (1989). New York has made the operation of §55-c dependent upon the brewer's activities in other states, which has the practical effect of regulating commerce occurring wholly outside of the borders of the state of New York. The inability of Molson USA to compel or persuade distributors to consolidate in contiguous states or in a majority of other states would operate as an effective bar to the brewer's right to invoke the provisions of §55-c and this extra-territorial trigger is not permitted under the Commerce Clause.

11.    Even if the out-of-state conditions of §55-c were to be enforced, Molson USA has complied with the provisions of the Act.

A.    Molson USA's uncontested evidence showed that the number of Molson distributors in states contiguous to New York has been reduced since the adoption of the policy of consolidation by Molson USA. The statute uses the term "in contiguous states," to mean the total number of distributors in those states, not measuring the results in each state. At the commencement of the policy there were 38 Molson distributors in contiguous states and there were 28 distributors in contiguous states at the time of the hearing.

B.    In addition, on a national basis, Molson USA began its operations with only one distributor in each of ten states. Because a brewer may not be expected to reduce its distributors to less than one in any given state (given that a brewer may not sell direct to retailers, but must sell through a distributor), the calculation under 55-c should not consider these states.

27

Given this, Molson USA has used its consolidation policy to reduce the number of Molson distributors in a majority of the states of the United States, reducing the number of Molson distributors in 24 states, increasing or remaining the same in 17 states.

        C.     While the number of distributors in New York will not be reduced with the termination of Ryan and the splitting of Ryan's territory among two distributors (one of whom already carries the Molson brands), the implementation of Molson's consolidation policy in New York, as desired by Molson USA, will reduce the number of distributors from nine to five and thus complies with the provisions of §55-c pertaining to New York distributors.

        12.     Molson USA is entitled to an award declaring that it has the right under all applicable law to terminate its distributor agreement with Ryan upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with the fair and reasonable compensation for other damages suffered pursuant to §55-c 7. In the event of failure of the parties to agree to such compensation, such matter will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

 

   _Nov 6 2006_                _____
      Date                           Peter M. Collins

I, Peter M. Collins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

   _Nov 6 2006_                _____
      Date                           Peter M. Collins

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Coors Brewing Company

## DEFENDANTS

Oak Beverage, Inc. and Boening Bros., Inc.

(b) County of Residence of First Listed Plaintiff    Jefferson County, CO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, Telephone Number)
Michael J. Lockerby, (VSB No. 24003)
Foley & Lardner LLP
3000 K Street, NW, Suite 500
Washington, DC 20007
(202) 672-5300

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

X 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | X 2 | X 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| X 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)

Brief description of cause: Breach of Contract and Section 55-c of the New York Alcoholic Beverages Control Law

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE    December 11, 2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____

```
Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 1
Receipt Number: 100005324
Cashier ID: fcansler
Transaction Date: 12/11/2007
Payer Name: FOLEY AND LARDNER LLP
-----------------------------------
CIVIL FILING FEE
  For: FOLEY AND LARDNER LLP
  Amount:      $350.00
-----------------------------------
CHECK
  Check/Money Order Num: 1092796
  Amt Tendered: $350.00
-----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:      $0.00

NEW SUIT  07-CV-1235
```

# ▪FOLEY

**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C. 20007-5143
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
202.945.6079
mlockerby@foley.com EMAIL

CLIENT/MATTER NUMBER
065765-0107

December 11, 2007

Mr. Fernando Galindo
Clerk of the Court
U.S. District Court for the
Eastern District of Virginia
401 Courthouse Square
Alexandria, Virginia 22314

**Re:**   *Coors Brewing Company v. Oak Beverage, Inc., and Boening Bros., Inc.*

Dear Mr. Galindo:

On behalf of our client, plaintiff Coors Brewing Company, enclosed for filing with the Court please find one original and three copies of the following documents: Complaint, Civil Cover Sheet, and Financial Interest Disclosure Statement. Please date stamp one copy of each for our records and return the copies to me.

Also enclosed please find a Summons for each Defendant for service upon the Secretary of the Commonwealth. Once the Summonses have been issued, please contact Kimberly C. O'Brien in my office (telephone: 202.672.5552) so that she can arrange to have them picked up and served.

I have enclosed a check in the amount of $350.00 payable to Clerk of the Court to cover the cost of filing.

Thank you for your assistance in this matter.

Sincerely,

Michael J. Lockerby
Enclosures

BOSTON
BRUSSELS
CHICAGO
DETROIT
JACKSONVILLE

LOS ANGELES
MADISON
MILWAUKEE
NEW YORK
ORLANDO

SACRAMENTO
SAN DIEGO
SAN DIEGO/DEL MAR
SAN FRANCISCO
SILICON VALLEY

TALLAHASSEE
TAMPA
TOKYO
WASHINGTON, D.C.



**FOLEY**

FOLEY & LARDNER LLP

ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C. 20007-5143
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

RECEIVED
MAILROOM

DEC 1 2 2007

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

WRITER'S DIRECT LINE
202.945.6079
mlockerby@foley.com EMAIL

CLIENT/MATTER NUMBER
065765-0107

December 11, 2007

Mr. Fernando Galindo
Clerk of the Court
U.S. District Court for the
Eastern District of Virginia
401 Courthouse Square
Alexandria, Virginia 22314

**Re:**   *Coors Brewing Company v. Oak Beverage, Inc. and Boening Bros., Inc.*
       **Case No. 1:07CV1235**

Dear Mr. Galindo:

Enclosed for filing with the Court please find Exhibits A through D to the Complaint that was filed earlier today. These were inadvertently omitted from the filing.

Thank you for your assistance with this matter.

Sincerely,

Michael J. Lockerby
Enclosures

BOSTON
BRUSSELS
CHICAGO
DETROIT
JACKSONVILLE

LOS ANGELES
MADISON
MILWAUKEE
NEW YORK
ORLANDO

SACRAMENTO
SAN DIEGO
SAN DIEGO/DEL MAR
SAN FRANCISCO
SILICON VALLEY

TALLAHASSEE
TAMPA
TOKYO
WASHINGTON, D.C.

WASH_2153041.1

FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
_____ Alexandria _____ DIVISION

2007 DEC 11  A 11: 31

CLERK
ALEXANDRIA

Coors Brewing Company
_____

vs.                                    Civil/Criminal Action No. 1:07cV1235-GBL/TCB
Oak Beverage, Inc., and Boening Bros., Inc.
_____

## FINANCIAL INTEREST DISCLOSURE STATEMENT

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel for
Coors Brewing Company
_____

in the above captioned action, certifies that the following are parents, trusts, subsidiaries and/or affiliates of said party that have issued shares or debt securities to the public or own more than ten percent of the stock of the following:
Molson Coors Brewing Company
_____
_____

Or

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel for

_____

in the above captioned action, certifies that the following are parties in the partnerships, general or limited, or owners or members of non-publicly traded entities such as LLCs or other closely held entities:
_____
_____

Or

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualifications or recusal, the undersigned counsel for

_____

in the above captioned action, certifies that there are no parents, trusts, subsidiaries and/or affiliates of said party that have issued shares or debt securities to the public.

12/11/2007
_____        _____
Date                        Signature of Attorney or Litigant
                            Counsel for   Coors Brewing Company
                            _____

Rev. 7/14/04

*Note: Under L.R. 7.1 (A)(1), this form is to be filed <u>in duplicate</u> with the Clerk of Court.*

COPY
SEC. OF COMMONWEALTH

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Eastern | District of | Virginia |

Coors Brewing Company

**SUMMONS IN A CIVIL CASE**

V.

Oak Beverage, Inc., and

Boening Bros., Inc.

CASE NUMBER:

TO: (Name and address of Defendant)

Oak Beverage, Inc.

1 Flower Lane

Blauvelt, NY 10913

By serving Office of the Secretary of Commonwealth,

Registered Agent

1111 East Broad Street, 4th Floor

Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Michael J. Lockerby (VSB No. 24003)

Kimberly J. Shur

FOLEY & LARDNER LLP

3000 K Street, NW, Suite 500

Washington, DC 20007-5143

Tel. (202) 672-5300

Fax (202) 672-5399

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

CLERK

DATE

(By) DEPUTY CLERK



COPY

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Eastern | District of | Virginia |

Coors Brewing Company

**SUMMONS IN A CIVIL CASE**

V.

Oak Beverage, Inc., and
Boening Bros., Inc.

CASE NUMBER:

TO: (Name and address of Defendant)

Boening Bros., Inc.                By serving Office of the Secretary of Commonwealth,
1098 Route 109                     Registered Agent
Lindenhurst, NY 11757              1111 East Broad Street, 4th Floor
                                   Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 500
Washington, DC 20007-5143
Tel. (202) 672-5300
Fax (202) 672-5399

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

_____          _____
CLERK                              DATE

_____
(By) DEPUTY CLERK

**AFFIDAVIT FOR SERVICE OF PROCESS ON THE SECRETARY OF THE COMMONWEALTH**
Commonwealth of Virginia
Va. Code § 8.01-301, -310, -329; 55-218.1; 57-51

Case No.: 1:07CV1235

**FILED MAILROOM**

JAN 1 5 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION ...... District Court

COORS BREWING COMPANY ...................................    v.    OAK BEVERAGE, INC. AND BOENING BROS., INC.

TO THE PERSON PREPARING THIS AFFIDAVIT: You must comply with the appropriate requirements listed on the back of this form.

Attachments:  [  ] Warrant  [  ] Motion for Judgment  [  ] Garnishment Summons  [✓] SUMMONS IN A CIVIL CASE

I, the undersigned Affiant, state under oath that:
[  ] the above-named defendant  [✓] BOENING BROS, INC.
whose last known address is: [✓] same as above  [  ] 1098 ROUTE 109, LINDENHURST, NY, 11757

1. [✓] is a non-resident of the Commonwealth of Virginia or a foreign corporation and Virginia Code § 8.01-328.1(A) ............
applies (see NON-RESIDENCE GROUNDS REQUIREMENT on reverse).

2. [  ] is a person whom the party seeking service, after exercising due diligence, has been unable to locate (see DUE DILIGENCE REQUIREMENT ON BACK) and that

| 20 DAYS AFTER SERVICE | is the return date on the attached warrant, motion for judgment or notice (see TIMELY SERVICE REQUIREMENT on reverse). |

JANUARY 4, 2008
...................................    ...................................
DATE    [  ] PARTY  [✓] PARTY'S ATTORNEY  [  ] PARTY'S AGENT

State of .District. of. Columbia...........................  [  ] city [✓] county of ...................................
Acknowledged, subscribed and sworn to before me this day:

January 4, 2008...................    ...................................
DATE    [  ] CLERK  [  ] MAGISTRATE  [✓] NOTARY PUBLIC (My commission expires: 8/31/2011........)

[✓] Verification of the date of filing of the certificate of compliance requested in the self-addressed stamped envelope provided.

NOTICE TO THE RECIPIENT from the Office of the Secretary of the Commonwealth of Virginia:
You are being served with this notice and attached pleadings under Section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process. The Secretary of the Commonwealth's ONLY responsibility is to mail, by certified mail, return receipt requested, the enclosed papers to you. If you have any questions concerning these documents, you may wish to seek advice from a lawyer.
SERVICE OF PROCESS IS EFFECTIVE ON THE DATE THAT THE CERTIFICATE OF COMPLIANCE IS FILED WITH THE ABOVE-NAMED COURT.

**CERTIFICATE OF COMPLIANCE**
I, the undersigned, Clerk in the Office of the Secretary of the Commonwealth, hereby certify the following:

1. On ....JAN 0 7 2008........................... , legal service in the above-styled case was made upon the Secretary of the Commonwealth, as statutory agent for persons to be served in accordance with Section 8.01-329 of the Code of Virginia, as amended.

2. On....JAN 1 4 2008................................. , papers described in the Affidavit were forwarded by certified mail, return receipt requested, to the party designated to be served with process in the Affidavit.

...................................
SERVICE OF PROCESS CLERK, DESIGNATED BY THE AUTHORITY OF THE
SECRETARY OF THE COMMONWEALTH

FORM DC-410 (FRONT) REVISED 7/03

AO 440 (Rev. 8/01) Summons in a Civil Action

```
                                                    ┌─────────────────────┐
                                                    │        FILED        │
                                                    │     MAILROOM        │
                                                    │  ┌───────────────┐  │
                                                    │  │  JAN 1 5 2008 │  │
                                                    │  └───────────────┘  │
                                                    │ CLERK, U.S. DISTRICT COURT │
                                                    │ ALEXANDRIA, VIRGINIA │
                                                    └─────────────────────┘
```

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Virginia

Coors Brewing Company

## V.

Oak Beverage, Inc., and
Boening Bros., Inc.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: *1:07CV 1235*

TO: (Name and address of Defendant)

Boening Bros., Inc.              By serving Office of the Secretary of Commonwealth,
1098 Route 109                   Registered Agent
Lindenhurst, NY 11757            1111 East Broad Street, 4th Floor
                                 Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 500
Washington, DC 20007-5143
Tel. (202) 672-5300
Fax (202) 672-5399

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

Fernando Galindo, Clerk                    December 11, 2007
_____            _____
CLERK                                      DATE

_____
(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me<sup>(1)</sup> | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

     I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                *Date*                    *Signature of Server*

_____
                              *Address of Server*

---

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**AFFIDAVIT FOR SERVICE OF PROCESS ON THE SECRETARY OF THE COMMONWEALTH**
Commonwealth of Virginia
Va. Code § 8.01-301, -310, -329; 55-218.1; 57-51

Case No.: 1:07CV1235

FILED
MAILROOM

JAN 1 5 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION ...... District Court

COORS BREWING COMPANY.......................................    v.    OAK BEVERAGE, INC. AND BOENING BROS., INC.

TO THE PERSON PREPARING THIS AFFIDAVIT: You must comply with the appropriate requirements listed on the back of this form.

Attachments:  [  ] Warrant  [  ] Motion for Judgment  [  ] Garnishment Summons  [✓] .SUMMONS IN A CIVIL CASE.........

I, the undersigned Affiant, state under oath that:
[  ] the above-named defendant  [✓] OAK BEVERAGE, INC.

whose last known address is: [✓] same as above  [  ] .1 FLOWER LANE, BLAUVELT, NY. 10913.......................

1.  [✓]  is a non-resident of the Commonwealth of Virginia or a foreign corporation and Virginia Code § 8.01-328.1(A) .............
applies (see NON-RESIDENCE GROUNDS REQUIREMENT on reverse).

2.  [  ]  is a person whom the party seeking service, after exercising due diligence, has been unable to locate (see DUE DILIGENCE
REQUIREMENT ON BACK) and that

| 20 DAYS AFTER SERVICE | is the return date on the attached warrant, motion for judgment or notice (see TIMELY SERVICE REQUIREMENT on reverse). |

JANUARY 4, 2008
......................................
DATE

[  ] PARTY  [✓] PARTY'S ATTORNEY  [  ] PARTY'S AGENT

State of ..District of Columbia......................    [  ] city/ [ ] county of ..................................................
Acknowledged, subscribed and sworn to before me this day:

January 4, 2008
......................................
DATE

[  ] CLERK  [  ] MAGISTRATE  [✓] NOTARY PUBLIC (My commission expires: 8/31/2011......)

[✓] Verification of the date of filing of the certificate of compliance requested in the self-addressed stamped envelope provided.

NOTICE TO THE RECIPIENT from the Office of the Secretary of the Commonwealth of Virginia:
You are being served with this notice and attached pleadings under Section 8.01-329 of the Code of Virginia which designates the Secretary of the Commonwealth as statutory agent for Service of Process. The Secretary of the Commonwealth's ONLY responsibility is to mail, by certified mail, return receipt requested, the enclosed papers to you. If you have any questions concerning these documents, you may wish to seek advice from a lawyer.
SERVICE OF PROCESS IS EFFECTIVE ON THE DATE THAT THE CERTIFICATE OF COMPLIANCE IS FILED WITH THE ABOVE-NAMED COURT.

**CERTIFICATE OF COMPLIANCE**
I, the undersigned, Clerk in the Office of the Secretary of the Commonwealth, hereby certify the following:

JAN 07 2008

1.  On ............................................................. , legal service in the above-styled case was made upon the Secretary of the
Commonwealth, as statutory agent for persons to be served in accordance with Section 8.01-329 of the Code of Virginia, as amended.

2.  On.......................................JAN 14 2008......... , papers described in the Affidavit were forwarded by certified mail, return
receipt requested, to the party designated to be served with process in the Affidavit.

SERVICE OF PROCESS CLERK, DESIGNATED BY THE AUTHORITY OF THE
SECRETARY OF THE COMMONWEALTH

FORM DC-410 (FRONT) REVISED 7/03

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Eastern _____ **District of** _____ Virginia

```
                                              FILED
                                            MAILROOM

                                          JAN 1 5 2008

                                    CLERK, U.S. DISTRICT COURT
                                      ALEXANDRIA, VIRGINIA
```

Coors Brewing Company

V.

Oak Beverage, Inc., and

Boening Bros., Inc.

## SUMMONS IN A CIVIL CASE

CASE NUMBER: 1:07cv1235

TO: (Name and address of Defendant)

Oak Beverage, Inc.

1 Flower Lane

Blauvelt, NY 10913

By serving Office of the Secretary of Commonwealth,

Registered Agent

1111 East Broad Street, 4th Floor

Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Michael J. Lockerby (VSB No. 24003)

Kimberly J. Shur

FOLEY & LARDNER LLP

3000 K Street, NW, Suite 500

Washington, DC 20007-5143

Tel. (202) 672-5300

Fax (202) 672-5399

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

**Fernando Galindo, Clerk**

_____
CLERK

_____
(By) DEPUTY CLERK

_____December 11, 2007_____
DATE

✎AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

     I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                Date                   *Signature of Server*

_____
                                       *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.



**FOLEY & LARDNER LLP**



ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C. 20007-5143
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
202.945.6079
mlockerby@foley.com EMAIL

CLIENT/MATTER NUMBER
065765-0107

January 16, 2008

Mr. Fernando Galindo
Clerk of the Court
U.S. District Court for the
Eastern District of Virginia
401 Courthouse Square
Alexandria, Virginia 22314

**Re:**    *Coors Brewing Company v. Oak Beverage, Inc. and Boening Bros., Inc.*
       *Case No. 1:07CV1235*

Dear Mr. Galindo:

Enclosed for filing with the Court in the above-referenced matter please find proof of service upon the Defendants, Oak Beverage, Inc. and Boening Bros, Inc.

Thank you for your assistance with this matter.

Sincerely,

Michael J. Lockerby
Enclosures

cc:   Kim Shur
      Jon Christiansen
      Gary Ettelman

BOSTON          LOS ANGELES      SACRAMENTO         TALLAHASSEE
BRUSSELS        MADISON          SAN DIEGO          TAMPA
CHICAGO         MILWAUKEE        SAN DIEGO/DEL MAR  TOKYO
DETROIT         NEW YORK         SAN FRANCISCO      WASHINGTON, D.C.
JACKSONVILLE    ORLANDO          SILICON VALLEY



⚫AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Eastern                                           District of          Virginia

Coors Brewing Company

V.                                    SUMMONS IN A CIVIL CASE

Oak Beverage, Inc., and
Boening Bros., Inc.                   CASE NUMBER:

TO: (Name and address of Defendant)
Oak Beverage, Inc.              By serving Office of the Secretary of Commonwealth,
1 Flower Lane                   Registered Agent
Blauvelt, NY 10913              1111 East Broad Street, 4th Floor
                                Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 500
Washington, DC 20007-5143
Tel. (202) 672-5300
Fax (202) 672-5399

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

CLERK                                               DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other (specify): _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                        Date                                    *Signature of Server*


                                            _____
                                            *Address of Server*


On behalf of Defendant Oak Beverage, Inc., as of the date set forth below (the "Date of Service"), I hereby accept service of process and represent and warrant that I am authorized to do so. I understand that a judgment may be entered against Defendant Oak Beverage, Inc. if an answer or motion under Rule 12 is not filed with the Court and served upon counsel for Plaintiff Coors Brewing Company within twenty (20) days of the Date of Service.

1/9/08
_____        _____
Date of Service                                    Signature
                                Gary Ettelman (gettelman@e-hlaw.com)
                                Ettelman & Hochheiser, P.C.
                                100 Quentin Roosevelt Blvd., Suite 401
                                Garden City, New York 11530
                                516.227.6300; 516.227.6307 fax

                                Counsel for Defendant Oak Beverage, Inc.

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

COPY

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Eastern **District of** Virginia

Coors Brewing Company

V.

**SUMMONS IN A CIVIL CASE.**

Oak Beverage, Inc., and

Boening Bros., Inc.

CASE NUMBER:

TO: (Name and address of Defendant)

Boening Bros., Inc.                By serving Office of the Secretary of Commonwealth,

1098 Route 109                     Registered Agent

Lindenhurst, NY 11757              1111 East Broad Street, 4th Floor

Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Michael J. Lockerby (VSB No. 24003)

Kimberly J. Shur

FOLEY & LARDNER LLP

3000 K Street, NW, Suite 500

Washington, DC 20007-5143

Tel. (202) 672-5300

Fax (202) 672-5399

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

CLERK                                             DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                    Date                          *Signature of Server*


                                        _____
                                             *Address of Server*


On behalf of Defendant Boening Bros., Inc., as of the date set forth below (the "Date of Service"), I hereby accept service of process and represent and warrant that I am authorized to do so. I understand that a judgment may be entered against Defendant Boening Bros., Inc. if an answer or motion under Rule 12 is not filed with the Court and served upon counsel for Plaintiff Coors Brewing Company within twenty (20) days of the Date of Service.

1/9/08
_____              _____
Date of Service                                    Signature
                                     Gary Ettelman (gettelman@e-hlaw.com)
                                     Ettelman & Hochheiser, P.C.
                                     100 Quentin Roosevelt Blvd., Suite 401
                                     Garden City, New York 11530
                                     516.227.6300; 516.227.6307 fax

                                     Counsel for Defendant Boening Bros., Inc.


(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division
------------------------------------------------------------------x
COORS BREWING COMPANY,
a Colorado Company                                    1:07 CV 1235

                Plaintiff,

   -  against –


OAK BEVERAGE, INC.,
a New York corporation, and

BOENING BROS., INC.,
a New York corporation,

                Defendants.
------------------------------------------------------------------x


## DEFENDANTS' MOTION TO TRANSFER VENUE

      Defendants Oak Beverage, Inc. and Boening Bros., Inc., by counsel, and pursuant to

Rule 12(b)(3) Fed. R. Civ. P. and 28 U.S.C. 1404(a), move this Court for entry of an order to

transfer this action to the United States District Court for the Southern District of New York.

The grounds for this Motion are set forth in the accompanying Memorandum and Affirmation.

Dated: January 28, 2008

                         Respectfully submitted,

                         OAK  BEVERAGE,  INC.  and  BOENING
                         BROS., INC.


                         By _____/s/_____
                              Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

Of Counsel:
Gary Ettleman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of January, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C. 20007-5143

/s/
Marshall A. Winslow, Jr., Esquire
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division
-----------------------------------------------------------------x

COORS BREWING COMPANY,
a Colorado Company                                        1:07 CV 1235

                        Plaintiff,

    -    against –


OAK BEVERAGE, INC.,
a New York corporation, and

BOENING BROS., INC.,
a New York corporation,

                        Defendants.
-----------------------------------------------------------------x


## DEFENDANTS' MOTION TO TRANSFER VENUE

Defendants Oak Beverage, Inc. and Boening Bros., Inc., by counsel, and pursuant to

Rule 12(b)(3) Fed. R. Civ. P. and 28 U.S.C. 1404(a), move this Court for entry of an order to

transfer this action to the United States District Court for the Southern District of New York.

The grounds for this Motion are set forth in the accompanying Memorandum and Affirmation.

Dated: January 28, 2008


                                        Respectfully submitted,

                                        OAK BEVERAGE, INC. and BOENING
                                        BROS., INC.


                                        By _____/s/_____
                                                    Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

<u>Of Counsel</u>:
Gary Ettleman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of January, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143

                                        /s/
                            _____
                            Marshall A. Winslow, Jr., Esquire
                            Virginia State Bar No.  30307
                            WOLCOTT RIVERS GATES
                            One Columbus Center, Suite 1100
                            Virginia Beach, Virginia 23462
                            (757) 497-6633
                            Fax: (757) 497-7267
                            mwinslow@wolriv.com
                            *Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division


COORS BREWING COMPANY,

        Plaintiff,

v.                                               Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

        Defendants.


**FINANCIAL INTEREST DISCLOSURE STATEMENT**

        Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel for Oak Beverage, Inc. and Boening Brothers, Inc. in the above captioned action, certifies that the following are parties in the partnerships, general or limited, or owners or members of non-publicly traded entities, such as LLCs or other closely held entities:

        Harold Boening
        Debra Boening
        Harold Boening, Jr.


Date:  January 28, 2008                      /s/
                                     Marshall A. Winslow, Jr., Esquire
                                     Virginia State Bar No.  30307
                                     WOLCOTT RIVERS GATES
                                     One Columbus Center, Suite 1100
                                     Virginia Beach, Virginia 23462
                                     (757) 497-6633
                                     Fax: (757) 497-7267
                                     mwinslow@wolriv.com
                                     *Counsel for Oak Beverage, Inc.*
                                     *and Boening Brothers, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 28th day of January, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143


        /s/
———————————————————
Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc.*
*and Boening Bros., Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division
--------------------------------------------------------------------x
COORS BREWING COMPANY,
a Colorado Company                                    1:07 CV 1235

                         Plaintiff,


        -    against –


OAK BEVERAGE, INC.,
a New York corporation, and

BOENING BROS., INC.,
a New York corporation,

                         Defendants.
--------------------------------------------------------------------x




**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO TRANSFER VENUE**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ii-iii

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ........................................................................................4

    I.      Section 55-c of New York's Alcohol Beverage Control Law..........4

    II.     History of the Parties' Relationship…………………………….....7

ARGUMENT………………………………………………………………………...9

    I.      Standard of Law……………………….…………………………10

    II.     Coors' Choice of Forum Is Entitled To No Weight……………....11

    III.    New York Is A More Convenient Forum For
              The Witnesses And Other Sources Of Proof……………….…….12

    IV.    Convenience Of The New York Attorney General…………………14

    V.     Interests Of Justice Support Transfer To New York………………14

    VI.    The Parties' Have Not Agreed To A Forum Selection Clause……..17

    VII.   The Purported Forum Selection Clause Is Not Enforceable………..18

CONCLUSION..........................................................................................................20

## TABLE OF AUTHORITIES

CASES

*Actmedia, Inc. v. Stroh*,
 830 F.2d 957 (9th Cir. 1986) ................................................5

*Battaglia v. New York State Liquor Authority*,
 745 F.2d 166 (2d Cir. 1984) ................................................5

*Beam Laser Sys., Inc. v. Cox Communications Inc.*,
 117 F. Supp. 2d 515 (E.D. Va. 2000) ................................................10

*BHP International Investment, Inc. v. Online Exchange, Inc.*,
 105 F. Supp. 2d 493 (E.D. Va. 2000) ................................................11, 15

*Brock v. Entre Computer Centers, Inc.*,
 933 F.2d 1253 (4th Cir. 1991) ................................................19

*Capital One Financial Corp. v. Drive Financial Services, L.P.*,
 434 F. Supp. 2d 367 (E.D. Va. 2006) ................................................10, 14

*Cognitronics Imaging Sys., Inc. v Recognition Res. Inc.*,
 83 F. Supp. 2d 689 (E.D. Va. 2000) ................................................11

*East Coast Resources LLC v. Town of Hempstead*,
 No. 3:07CV352, 2007 WL 2071724 (E.D. Va. July 16, 2007) ................................................12

*Glamorgan Coal Corp. v. Ratners Group P.L.C.*,
 854 F. Supp. 436 (W.D. Va. 1993) ................................................11

*JTH Tax, Inc. v. Lee*,
 482 F. Supp. 2d 731 (E.D. Va. 2007) ................................................15

*LG Electronics v. Advance Creative Computer Corp.*,
 131 F.Supp.2d 804 (E.D. Va. 2001) ................................................10

*LG Electronics v. Asustek Computers*,
 126 F. Supp. 2d 414 (E.D. Va. 2000) ................................................15-16

*LG Electronics v. Everex Systems*,
 No. 00-CV-984, 2000 WL 33777650 ................................................12

*Liobmedia, LLC v. Dataflow/Alaska, Inc.*,
 No. 1:07cv355, 2007 WL 2109279 (E.D. Va. July 16, 2007) ................................................19

*Melnor v. SKR Resources*,
 No. 5:05CV00113, 2005 WL 1528700 (W.D. Va. June 23, 2005) ................................................19-20

*Precision Franchising, LLC v. Coombs*,
    No. 01:06cv1148, 2006 WL 3840334 (E.D. Va. Dec. 27, 2006) ............................................14

*Stewart Org., Inc. v. Ricoh Corp.*,
    487 U.S. 22, 108 S. Ct. 2239 (1988) ...............................................................................10, 19

*Venners v. Kimball International, Inc.*,
    749 F. Supp 714 (E.D. Va. 1990) ..........................................................................................19

*Verizon Online Services, Inc. v. Ralsky*,
    203 F. Supp. 2d 601 (E.D. Va. 2002) ......................................................................... 10-11, 14

**S**TATUTES

28 U.S.C. §1404(a) .................................................................................................... Passim

§55-c of New York's Alcoholic Beverage Control Law .................................................. Passim

§55-c(1) of ABC Law .........................................................................................................21

§55-c(11) of ABC Law. ...............................................................................................11, 22

§55-c(2)(e) of ABC Law. ....................................................................................................11

§55-c(2)(e)(i)(A) of ABC Law. ...........................................................................................11

§55-c(6) of ABC Law. ....................................................................................6, 11, 20, 22

**O**THER **A**UTHORITIES

21st Amendment .................................................................................................................9

Fed. R. Civ. P. 5.1 .........................................................................................................7, 18

## PRELIMINARY STATEMENT

Coors Brewing Company ("Coors"), a Delaware corporation headquartered in Colorado, brings the instant declaratory judgment action against Oak Beverages and Boening Brothers ("O&B"), two New York corporations that are headquartered and operate solely in New York, seeking to terminate the parties' distributor agreements ("Distributor Agreements").  The Distributor Agreements grant O&B exclusive distribution rights for Molson beer products ("Molson Products") in various New York counties.  Because of the highly regulated nature of the beer industry in New York State, the parties relationship is statutorily governed by §55-c of New York's Alcoholic Beverage Control Law, which protects a New York beer wholesaler from arbitrary termination and provides other statutory protections.  In fact, §55-c prohibits any material modification, alteration, or termination of a beer distribution agreement except for good cause, which is narrowly defined as (i) the implementation of a national or regional policy of consolidation that complies with the statutory requirements, including those requiring the policy to be "reasonable, non-discriminating, and essential," or (ii) the failure to comply with a material term of the distribution agreement after notice and an opportunity to cure.  Thus, as a pretext to avoid the stringent requirements of good cause under §55-c, Coors asserts in its Complaint that either §55-c is unconstitutional pursuant to the Dormant Commerce Clause and Contracts Clause of the Constitution or that a consolidation plan initiated by its predecessor in interest, namely Molson USA LLC (a wholly different entity), complies with the stringent statutory requirements.

What is glaringly absent from Coors' Complaint is any real connection to the state of Virginia.  The only such connection is that twelve years ago a New York corporation

with an office in Virginia, namely Martlet Importing Co. ("Martlet"), held the importing rights to the Molson Products and appointed O&B as distributors for Molson Products in New York pursuant to an agreement that contained a Virginia forum selection clause. However, approximately one year later in 1997, Martlet assigned those import rights to a joint venture comprised of the Miller Brewing Company (a Wisconsin Company) and Molson Canada (a Canadian Company). The import rights to the Molson Products were transferred again in 2000 to a joint venture between Molson Canada and the Coors Brewing Company that was initially named Molson 2000 LLC and then renamed Molson USA LLC (a Delaware limited liability company headquartered in Colorado). In 2007, the import rights were again assigned, this time from Molson USA LLC to Coors. Thus, due to the fact that Martlet has not had any involvement with the importation of Molson Products for over a decade, the Martlet forum selection clause currently serves no legitimate function.

In fact, the forum selection clause is not enforceable for several reasons. First, the forum selection clause directly conflicts with §55-c, which states that a "beer wholesaler may maintain a civil action in a court of competent jurisdiction within [New York]" and that this right may not be "altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy." §§55-c(6), (11). Second, the language of the Distributor Agreement itself provides that the forum selection clause is superseded by §55-c(6), providing that "[t]he laws, rules and regulations of the jurisdiction in which Distributor conducts business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement." §17(a) of the Distributor Agreement. Third,

the initial purpose of this forum clause, which was to provide a convenient forum for Coor's distant predecessor in interest, Martlet Importing Co. Inc. ("Martlet Importing"), a New York company which had an office in the Eastern District of Virginia, is no longer relevant and thus serves no rational basis other than for Coors to harass O&B and to make it more expensive for them to protect their rights pursuant to New York law.

Thus, in accordance with 28 U.S.C. §1404(a), this Court must transfer to a District Court located in New York. The overwhelming majority of factors clearly balance in favor of New York. These include:

- Plaintiff Coors is a Delaware corporation headquartered in Golden, Colorado.

- Defendant Oak Beverages is a New York Corporation headquartered in Rockland County, NY, which is in the Southern District of NY.

- Defendant Boening Bros. is a New York Corporation headquartered in Suffolk County NY, which is in the Eastern District of NY.

- Because Coors challenges the constitutionality of New York law, pursuant to Fed. R. Civ. P. 5.1, the New York Attorney General has the right to intervene. The maintenance of this suit in Virginia would effectively preclude the NY Attorney General from intervening and protecting NY's interest in the constitutional questions regarding §55-c.

- The Distributor Agreement with Oak Beverages that is the subject of this suit concerns the distribution of alcoholic beverages in New York and performance occurs in New York.

3

- The Distributor Agreement with Boening Bros. that is the subject of this suit concerns the distribution of alcoholic beverages in New York and performance occurs in New York.

- This Court is largely unfamiliar with New York law, whereas a New York court is not. The relationship between the parties is governed by §55-c of New York's ABC Law.

- A related action that Coors specifically cites to and attaches as an exhibit to its Complaint, namely the Ryan matter, is currently pending in the Southern District of New York. Thus, not only does this demonstrate that the Southern District is not inconvenient for Coors, but that the Southern District is familiar with the issues and law at hand.

- All of the documents and witnesses relating to the action are located in either New York, or Colorado; none are located in Virginia.

- Virginia has had no connection with or interest in anything even casually related to this matter since Martlet Importing Company transferred the import rights to the Molson beer products at issue in the late 1990's.

Therefore, because the convenience of the parties and witnesses, and the interests of justice clearly balance in favor of transferring venue to New York, pursuant to 28 USC §1404(a), this Court must transfer venue to the Southern District of New York.

## STATEMENT OF FACTS

### I.    Section 55-c of New York's Alcohol Beverage Control Law

The distribution of beer in New York is governed by New York's Alcohol Beverage Control Law ("ABC Law"), which was first passed in 1934 pursuant to the

powers delineated in §2 of the 21st Amendment to the Constitution.   In *Battaglia v. New York State Liquor Authority*, 745 F.2d 166 (2d Cir. 1984), Judge Friendly astutely commented,

> The Twenty-First Amendment was designed to end the "noble experiment" by which the Federal government endeavored to control the drinking habits of all citizens and to place control of alcoholic beverages in the states. Fulfillment of the latter purpose required that, in addition to repealing the Eighteenth Amendment, which was accomplished by § 1, the Amendment should give the states full authority to deal with the subject of intoxicating liquor free from limitations imposed by the Commerce Clause, which had hampered such regulation before the Eighteenth Amendment was adopted. *Battipaglia,* 745 F.2d at 168-69

As part of its regulation of alcohol within its borders, New York statutorily mandates a three tier network for the distribution of malt-based alcoholic beverages ("Beer").  The three tiered system has four primary goals, namely (1) to avoid the overly aggressive marketing and sales practices that were prevalent in the pre-Prohibition era; (2) to generate tax revenue that can be easily and efficiently collected, particularly from domestically located distributors; (3) to facilitate state and local control of alcoholic beverages by requiring each tier to be licensed, and (4) to encourage moderate consumption.  *See generally Actmedia, Inc. v. Stroh*, 830 F.2d 957, 959 (9th Cir. 1986). At the top of the three-tiered system is the supplier or brewer of Beer, such as Coors and Molson.  Distributors or wholesalers such as Oak Beverages and Boening Brothers occupy the middle tier – they purchase, resell, market, and promote Beer.  Retailers occupy the bottom tier and sell to the general public.  *See generally*, N.Y. Alcoholic Beverage Control Law.

Brewers selling Beer in New York do so by granting distributors exclusive territories. In other words, when a brewer grants the right to distribute its products in a given territory, no other distributor may distribute those same products in the territory. Thus, within the second tier, the products of a brewer are sold by one wholesaler in a given territory. As a result, wholesalers within a territory tend to become associated with the brands they distribute, *e.g.*, the "Molson wholesaler," or the "Coors wholesaler." Further, distributors such as O&B do much more than simply re-sell a brewers' product to retailers. They compete with distributors of other brands for market share by actively marketing the brand. They also insure freshness, ensure sufficient supply, collect empty containers, participate in promotions, and generally create and ensure the continuation of good-will in a given brewer's products.

In recognition of the substantial role distributors play in the development of the market and good will of a brewer's products, and the equity that wholesalers develop in such products, as well as to protect the significant investment of capital and resources distributors invest, in 1996 New York enacted §55-c of the ABC Law. Section 55-c was enacted as a remedial statute to level the playing field between brewers and wholesalers by providing procedural and substantive protections not available at common law. The primary remedial provisions of §55-c relate to (a) requiring all distribution agreements to conform to the provisions of the statute and be in writing, and (b) the prohibitions against terminating and/or materially modifying the terms of the agreement without good cause. The definition of "Good Cause" is exceedingly narrow, limited to (i) the implementation of a national or regional policy of consolidation which is "reasonable, non-discriminating, and essential," and (ii) the failure to comply with a material term of the

distribution agreement after notice and an opportunity to cure.  §55-c(2)(e) of ABC Law.

The provisions of §55-c "may not be altered, waived or modified in advance of a bona

fide case and controversy  . . ." §55-c(11) of ABC Law.

In essence, once a brewer commences a relationship with a distributor, that

relationship can not be terminated unless the distributor fails to perform its obligations or

the brewer can establish compliance with the strict requirements of a national or regional

policy of consolidation.  To constitute good cause for termination of a wholesaler's

agreement, a policy of consolidation must extend beyond New York and must be

"reasonable, nondiscriminatory and essential."  §55-c(2)(e)(i)(A) of ABC Law.

Moreover, §55-c now makes clear that the burden of proof falls on the brewer, and that

injunctive relief is available to prevent improper terminations.  §55-c(6) of ABC Law.

## II.    History of the Parties' Relationship

On October 23, 1996 Oak Beverage and Boening Brothers each separately entered

into Distributor Agreements with Martlet for exclusive distribution rights of Molson

Products in their respective territories, namely Nassau, Suffolk, and parts of Queens

County for Boening, and Bronx, Putnam, Rockland, Westchester, and parts of New York

County for Oak.  A copy of the Distributor Agreements are annexed as Exhibit B and

Exhibit C to the affirmation of Gary Ettelman.  Martlet, which in 1996 was the exclusive

importer of Molson products into the United States, is a New York corporation with

offices located in Reston, Virginia.  Both Oak Beverage and Boening Brothers are also

New York companies, headquartered in Suffolk County, New York for Boening, and

Rockland County, New York for Oak.

For the last twelve years, Oak & Boening have fully performed the terms of the Distributor Agreements by distributing Molson Products in their respective territories. However, it would be inaccurate to simply say that O&B have "distributed" Molson. O&B have successfully developed a market for Molson products in their respective territories while undergoing fierce competition by other wholesalers peddling other brands of beer. O&B have accomplished this by spending large sums to actively market the brand, ensuring product freshness, ensuring that retailers have adequate supplies, collecting empty product, and participating in various promotional activities. Thus, O&B's investment of time, effort, and money, has created substantial good will for Molson products in the eyes of customers residing in their New York territories.

Shortly after O&B signed their Distributor Agreements with Martlet, in December 1997 those agreements were transferred to a joint venture between Miller Brewing Company and Molson Canada. That joint venture was located in Wisconsin. In 2000, the Distributor Agreements were again transferred, this time to a joint venture between Coors and Molson Canada, initially called Molson 2000 LLC but later renamed Molson USA LLC. Molson USA is a Delaware limited liability company headquartered in Lakewood, Colorado. Recently, on December 2, 2007, the Distributor Agreements were assigned a third time, this time to Coors. Pursuant to that assignment, Coors has assumed the relationship with O&B and has continued to supply Molson products to O&B in New York State.

On December 11, 2007, Coors filed a declaratory judgment action against O&B in Virginia seeking to terminate the Distributor Agreements dated October 23, 1996 ("Distributor Agreement"), entered into between O&B and Martlet Importing, Coors

predecessor in interest.  Coors' action alleges that (1) it has the contractual right to

terminate the Distributor Agreement, and that (2) such termination is in compliance with

NY's Alcohol Beverage Control Act, §55-c, because (a) the 2001 Amendments to §55-c

are not applicable because they constitute a retroactive attempt to modify contractual

rights and thus offend the Contracts Clause of the Constitution, (b) even if they apply, the

provision of §55-c requiring contemporaneous reduction in the number of Molson

distributors in states contiguous to New York is not applicable because it violates the

Dormant Commerce Clause of the Constitution, and (c) the Consolidation plan is

reasonable, non-discriminatory, and essential; (3) Coors seeks a declaration of the fair

market value of O&B's Distributor rights and that O&B will not suffer additional

damages as defined by §55-c7(a) as a result of the termination.

## **ARGUMENT**

In support of its allegation that venue is proper in the Eastern District of Virginia,

Coors alleges that the Eastern District of Virginia is "a judicial district in which a

substantial part of the events or omissions giving rise to the claim – including formation

of the contract occurred." This is a gross misstatement and is flatly wrong.  In fact, this

case has no connection to the Eastern District of Virginia; not even contract formation.

Rather, all of the factors require that the case be transferred to the Southern District of

New York.  As will be expounded upon below, (1) neither party is domiciled or in

Virginia, with O&B domiciled in New York and Coors domiciled in Delaware and

Colorado; (2) the parties' relationship is governed by New York Law, namely section 55-

c of the ABC Law; (3) performance of the contracts at issue take place in New York; (4)

all potential witnesses and documentary sources of proof are located in New York and

Colorado; (5) a related suit that Coors cites to and attaches as an exhibit to its complaint, namely the Ryan matter, is currently pending in the Southern District of New York; and (6) because Coors challenges the constitutionality of a New York State statute, the New York Attorney General has a right to intervene in this matter.

## I.    **Standard of Law**

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C.A. § 1404(a). The decision whether to transfer an action under §1404(a) is within the sound discretion of the court. *LG Electronics v. Advance Creative Computer Corp.*, 131 F.Supp.2d 804, 809 (E.D. Va. 2001). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S. Ct. 2239, 2244 (1988), *quoting Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S. Ct. 805, 812 (1964). The party moving for a transfer of venue bears the burden of showing that the transfer is warranted. *Verizon Online Services, Inc. v. Ralsky*, 203 F. Supp. 2d 601, 623 (E.D. Va. 2002); *Beam Laser Sys., Inc. v. Cox Communications Inc.*, 117 F. Supp. 2d 515, 518 (E.D. Va. 2000).

The factors courts should consider when determining whether to grant a motion to transfer include (1) the plaintiff's choice of venue; (2) the convenience of the parties and witnesses; (3) the interests of justice. *Capital One Financial Corp. v. Drive Financial Services, L.P.*, 434 F.Supp.2d 367, 375 (E.D. Va. 2006). Further, "[a] forum selection clause should 'be a significant factor that figures centrally' in a transfer analysis, but that

a forum selection clause should be considered 'only one relevant factor.'" *BHP International Investment, Inc. v. Online Exchange, Inc.*, 105 F. Supp. 2d 493, 495-96 (E.D. Va. 2000), quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 108 S. Ct. 2239 (1988). "The weight given to these factors should be commensurate with the degree each impacts the policy behind section 1404(a), that is to make the trial 'easy, expeditious, and inexpensive.'" *Glamorgan Coal Corp. v. Ratners Group P.L.C.*, 854 F. Supp. 436, 437 (W.D. Va. 1993).

## II.    Coors' Choice of Forum Is Entitled To No Weight

Coors' decision to litigate this matter in the Eastern District of Virginia must be afforded little or no weight because Coors is not domiciled in Virginia and this action has no connection to Virginia other than presence of a forum selection clause drafted by a non-party. As will be discussed below, the forum selection clause is unenforceable and serves no current function especially since Martlet, which drafted the clause, assigned its rights away approximately twelve years ago. The only reason that Coors has chosen to litigate this matter in Virginia and not New York is to harass O&B and make it more expensive for them to protect their rights pursuant to New York law. Coors currently has an action pending in the Southern District of New York, which is cited to and annexed to its Complaint, and it very easily and conveniently could have also filed this suit in New York.

A plaintiff's choice of forum is entitled to "substantial weight," unless the plaintiff chooses a foreign forum and the cause of action bears little relation to the chosen forum. *Verizon Online Services*, 203 F. Supp. 2d at 623; *Cognitronics Imaging Sys., Inc. v Recognition Res. Inc.*, 83 F. Supp. 2d 689, 696 (E.D. Va. 2000). "When a plaintiff

11

chooses a foreign forum, and the cause of action bears little or no relation to that forum, the plaintiff's chosen forum is not entitled to substantial weight." *LG Electronics v. Everex Systems*, No. 00-CV-984, 2000 WL 33777650, at * 4 (E.D. Va. Dec. 15, 2000). In *East Coast Resources LLC v. Town of Hempstead*, a declaratory judgment action brought regarding an insurance agreement, the court held that Plaintiff's chosen forum was entitled to no weight at all because "[t]he contract was essentially performed in the Town of Hempstead, located in the Eastern District of New York, with some administrative matters handled in Virginia." *East Coast Resources LLC v. Town of Hempstead*, No. 3:07CV352, 2007 WL 2071724, at *3 (E.D. Va. July 16, 2007).

Therefore, because Coors has chosen a foreign forum, the contracts at issue were performed exclusively in New York, and the cause of action bears no relation to Virginia, Coors' selection of Virginia must be afforded no deference.

### III. New York Is A More Convenient Forum For The Witnesses And Other Sources of Proof

This action is largely one of statutory interpretation, namely whether pursuant to §55-c of New York's ABC Law, Coors can terminate its distributor agreements with O&B. The witnesses that will be required to testify as to these issues are located both in New York and Colorado; no witnesses or documents are located in Virginia. In addition, Coors also asks this Court to determine the fair market value of O&B's distribution rights and whether O&B has suffered or will suffer any additional damages as defined by §55-c(7)(a). All of the documents and witnesses related to the fair market value of O&B's New York distribution rights, (other than potential expert witnesses) are located in New York. Again, no witnesses or documents are located in Virginia. In fact, of the ten potential witnesses to the case referred to in the affirmation of Gary Ettelman, four are

located in New York, five are located in Colorado, and one is located in Canada.  The

witnesses that are necessary to prove or disprove whether Coors' plan of consolidation

complies with §55-c, and then what the fair market value of O&B's distribution rights

are, include the following:

(1)     **Harold Boening**, President of Boening Brothers and a resident of
        New York State.

(2)     **Dennis Noyes**, General Manager of Boening Brothers and a
        resident of New York State.

(3)     **Debra Boening**, President of Oak Beverages and a resident of
        New York State.

(4)     **Gerry Scaperotti**, General Manager of Oak Beverages and a
        resident of  New York State.

(5)     **Gary Styles**, Director of Mergers and Acquisitions for Coors and a
        resident of Colorado.

(6)     **Bill Byers**, Assistant general counsel of Coors and a resident of
        Colorado.

(7)     **David Perkins**, former president of Molson USA and a resident of
        Colorado.

(8)     **Geoff Molson**, VP of Quality and Distributor Development and a
        resident of Canada.

(9)     **Tim Owston**, Vice President for Wholesale Development for
        Coors and a resident of Colorado.

(10)    **Vinny Prattico**, former VP of sales for Molson USA and a
        resident of Colorado.

"This factor [witness convenience] is often the most important in balancing for a

potential §1404(a) transfer, but the influence of this factor may not be assessed without

reliable information identifying their witnesses involved and specifically describing their

testimony.  Transfer is inappropriate when the result of transfer merely serves to shift the

balance of inconvenience from one party's witnesses to the other's." *Precision Franchising, LLC v. Coombs*, No. 01:06cv1148, 2006 WL 3840334, at * 5 (E.D. Va. Dec. 27, 2006) (internal citations omitted).  In *Verizon Online Services Inc. v. Ralsky*, 203 F.Supp.2d 601, 623 (E.D. Va. 2002), the court put considerable emphasis on the fact that many of plaintiff's employee witnesses resided in a given forum and that most of the documents relevant to the matter were also in the same forum.

Therefore, because of all of the documentary and testimonial evidence is located in New York and Colorado, this factor strongly supports transferring this action to New York.

### IV.    Convenience Of The New York Attorney General

Fed. R. Civ. P. 5.1(a)(2) requires that a party challenging the constitutionality of a state statute file notice on the New York Attorney General.  In addition, Fed. R. Civ. P. 5.1(c) permits the New York Attorney General to intervene within 60 days after notice is filed.  Because Coors challenges the constitutionality of §55-c, the New York Attorney General is permitted to intervene.  Thus, in the instant case, the convenience of the parties may also include the convenience to the NY Attorney General.  The presence of this case in Virginia effectively prohibits the NY Attorney General from intervening and this factor strongly favors transferring this case to New York.

### V.    Interests of Justice Support Transfer To New York

The interest of justice factors include circumstances such as, *inter alia*, (1) the court's familiarity with the applicable law; (2) the possibility of harassment; and (3) the Pendency of a related action.  *Capital One Financial Corp. v. Drive Financial Services, L.P.*, 434 F. Supp. 2d 367, 372 (E.D. Va. 2006).  "Courts have stated when evaluating

interest of justice, that '[c]onsideration should . . . be given to judicial familiarity with governing laws." *JTH Tax, Inc. v. Lee*, 482 F. Supp. 2d 731 (E.D. Va. 2007), *quoting Bertnick v. Home Fed. Sav. & Loan Ass'n*, 337 F.Supp. 968, 971 (W.D. Va. 1972).  In *BHP International Investment*, in deciding to transfer the action from Virginia to Missouri, the court put considerable emphasis on the fact that action was based on Missouri law, stating the following:  "Although this court could familiarize itself with Missouri law for the purposes of the case at bar, the court finds that Missouri courts have a strong interest in having local controversies decided at home."  *BHP International Investment, Inc. v. Online Exchange, Inc*., 105 F. Supp. 2d 493, 499 (E.D. Va. 2000).  *See also East Coast Resources,* 2007 WL 2071724, at *3 ("Regarding the interest of justice, the Court finds that this factor also weighs in favor of transfer. . . It is likely that resolution of this matter will involve application of New York law."); *LG Electronics v. Asustek Computers*, 126 F.Supp.2d 414, 424 (E.D. Va. 2000)("Third, the interest of justice warrants a transfer to the Northern District of California.  Such District is familiar with at least one of the patents at issue because it previously rendered a claim construction concerning one of the patents at issue.")

In this case, the interest of justice factors clearly and strongly council in favor of transferring this case to New York.  First, this action is centered on the application and interpretation of New York law, namely §55-c.  In particular, Coors requests that this Court declare New York law unconstitutional because (i) it violates the Contracts clause and is a retroactive attempt to modify its contracts rights, and (ii) it violates the Dormant Commerce clause.  Thus, because this Court is largely unfamiliar with the New York law at issue, this favors transferring this case to a New York court.

In addition, although this case involves a contract that initially concerned a New York company that had an office in Virginia, namely Martlet, the principles of contract law and contract formation are largely irrelevant because Coors is attempting to terminate O&B pursuant to a statutory right, not a contracted right.  Specifically, Coors seeks to terminate O&B pursuant to a policy of consolidation implemented by its predecessor Molson USA.  The distribution agreement does not permit termination for this purpose. It is the New York statute, §55-c on which Coors relies for this purpose.  Further, Section 55-c(6) provides that "the laws of this state shall govern all disputes arising under an agreement or by reason of its making and performance."  Thus, even if contract law principles are relevant, as dictated by §55-c(6) it is New York contract law and not Virginia contract law that applies.

Second, Coors currently is prosecuting the related Ryan matter in the Southern District of New York   Coors has also recently commenced arbitrations before the American Arbitration Association in New York, N.Y., against other distributors seeking the identical relief it seeks herein against O&B.  Thus, the Southern District of New York is equally convenient for Coors and the Southern District is familiar with the applicable laws and issues at hand.  *See LG Electronics*, 126 F.Supp.2d at 424.

Third, the only reason Coors has filed suit in Virginia is to harass O&B and to make it more expensive for them to litigate this matter and protect their contractual rights.  Both O&B are regional New York distributors with no presence or connection to Virginia.  As all of the above factors demonstrate, this case has no connection to Virginia and it is inconceivable that but for an improper attempt to harass, that Coors selection to litigate in Virginia serves a legitimate purpose.

16

## VI.    The Parties' Have Not Agreed To A Forum Selection Clause

In its complaint, Coors alleges venue to be proper based upon, a forum selection clause in the distributor agreements.  By the express terms of that agreement, however, the forum selection clause is not applicable or enforceable.  In particular, ¶17(a) of the parties' agreement provides "[t]he laws, rules and regulations of the jurisdiction in which Distributor conducts business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement." §17(a) of the Distributor Agreement.

Indeed, §55-c of New York's Alcoholic Beverage Control law is a law "of the jurisdiction in which Distributor conducts its business" and is "required to be so incorporated" in all beer distribution agreements in the State of New York.   The expressed purpose of §55-c is to require that the sale and delivery of beer by brewers to beer wholesalers be pursuant to a written agreement which conforms to the requirements of the Statute. See §55-c(1) of ABC Law (emphasis added).  Moreover, §55-c(3) entitled "Written agreement required" provides that

> Except as provided for in subdivision ten[1] . . . beer offered for sale in this state by a brewer to a beer wholesaler shall be sold and delivered pursuant to a written agreement which conforms to the provisions of this section and which sets forth all of the essential and material terms, requirements, standards of performance and conditions of the business relationship between the brewer and a beer wholesaler." (emphasis added).

Thus, by specifically stating that the agreement between the brewer and beer wholesaler must conform to the provision of §55-c, the legislature has required the

---

[1] Subdivision 10, paragraph (a) exempts from the Statutes coverage only those written agreements in effect prior to the effective date of the Statute "which set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler."

Statute to be incorporated in these agreements.   Indeed, this is the same position that Coors is taking when asserting its right to terminate Plaintiffs for "good cause" as defined in §55-c.  Absent the incorporation of §55-c(2)(e)(i) and (4) into the parties' agreement, Coors would have no basis to terminate Plaintiffs as a result of the implementation of a policy of consolidation.  Thus, it would be disingenuous, at best, for Coors to dispute that the provisions of §55-c are terms of the parties' distribution agreement.

In this case, the terms of §55-c clearly conflict with the forum selection clause contained in ¶17(b).  Specifically, §55-c(6) provides  that "a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this state for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement  or by reason of its making and performance."  Further, §55-c(11) states that "[t]he requirements of this section may not be altered, waived, or modified by written or oral agreement in advance of a bona fide case or controversy."

Therefore, because the terms of §55-c are incorporated and supersede any conflicting provisions of the agreement, the parties did not agree to a forum selection clause.

**VII.     The Purported Forum Selection Clause Is Not Enforceable**

The public policy of New York State, as expressed in §§55-c(6) and (11), is clear and unambiguous, namely that wholesalers of beer shall have access to New York courts and that this right shall not be subject to waiver or modification prior to the commencement of a dispute.  Thus, any pre-dispute agreement that contains a pre-dispute forum selection clause violates §55-c.  Accordingly, regardless of whether the language

of §55-c is incorporated as a term of the agreement, the forum selection clause contained in ¶17b of the agreement is unenforceable as against New York public policy.

However, even if the Court determines the forum selection clause is enforceable, it should be afforded little weight because Coors was not a party to the Distributor Agreement (it acquired its rights by way of Martlet) and there exists no valid or rational reason for Coors to enforce the forum selection clause other than mere harassment and to make it more expensive for O&B to protect their rights pursuant to New York law. *See Steward Org*., 487 U.S. at 31, 108 S. Ct. at 2245 ("The forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration (as respondent might have it) nor no consideration (as [state] law might have it), but rather the consideration for which Congress provided in §1404(a)."); *Liobmedia, LLC v. Dataflow/Alaska, Inc*., No. 1:07cv355, 2007 WL 2109279, at *3 (E.D. Va. July 16, 2007), *quoting Venners v. Kimball International, Inc.*, 749 F. Supp. 714 (E.D. Va. 1990) ("Thus, the *Stewart* decision requires a district court sitting in diversity 'to balance the conveniences of the parties and witnesses pursuant to 28 U.S.C. § 1404(a) even though a forum selection clause is present.'"); *Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253, 1258 (4th Cir. 1991) ("Section 1404(a) directs a district court to take account of factors other than those that bear solely on the parties' private ordering of their affairs.")

In *Melnor v. SKR Resources*, No. 5:05CV00113, 2005 WL 1528700 (W.D. Va. June 23, 2005), plaintiff filed a diversity action for fraud and unjust enrichment in Virginia. Defendant moved to have the action transferred to New York because of a forum selection clause. The court found that "[n]either party has alleged any connection

between the controversy and the state of New York other than the forum selection clause, and [plaintiff] argues that Virginia is the most convenient because its witnesses reside in Virginia." *Melnor*, 2005 WL 1528700, at * 1. In rejecting the application of the forum selection clause the court stated "[t]hough the forum selection clause weighs forcefully in favor of a transfer, the court finds countervailing the potential inconvenience of litigating in New York and the fact that the forum selection clause serves as the sole nexus between the parties controversy and the state of New York." *Id.*

Therefore, because the forum selection clause clearly violates and contradicts the clear and unambiguous provisions of §55-c(6) and (11), it is unenforceable because it directly violates O&B's right to maintain this action in New York as codified in New York law. In the alternative, even if this Court determines that the forum selection clause is enforceable, much like the *Melnor* decision, because the forum clause is the sole nexus to Virginia, it should be entitled to little weight and does not outweigh all of the aforementioned factors, including the convenience of the parties and witnesses, which clearly council in favor of transferring this case to the Southern District of New York.

## CONCLUSION

For all of the reasons set forth herein, it is respectfully submitted that this Court grant Plaintiffs' motion to transfer this action to either the Southern District of New York.

Respectfully submitted,

OAK BEVERAGE, INC. and
BOENING BROS., INC.

By:    /s/
            Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com

Gary Ettleman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY  11530
(516) 227-6300
Fax: (516) 227-6307

*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of January, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143

_____/s/_____
Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and*
*Boening Bros., Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division
-----------------------------------------------------------------------x
COORS BREWING COMPANY,
a Colorado Company                                                1:07 CV 1235

                                    Plaintiff,

                                                                  **AFFIRMATION IN**
    -    against –                                                **SUPPORT OF MOTION**
                                                                  **TO TRANSFER**

OAK BEVERAGE, INC.,
a New York corporation, and

BOENING BROS., INC.,
a New York corporation,

                                    Defendants.
-----------------------------------------------------------------------x

    Gary Ettelman, an attorney duly admitted to practice before all Courts of the State

of New York, affirms the following under the penalties of perjury:

    1.    I am a partner with the law firm of Ettelman & Hochheiser P.C., attorneys

for Defendants Oak Beverages and Boening Brothers ("O&B") and I am fully familiar

with the above captioned proceeding.  The source of my knowledge is my review of the

file maintained in my offices, discussions with my clients, and my prior handling of this

matter.

    2.    Coors Brewing Company ("Coors") brings the instant declaratory

judgment proceeding against O&B seeking to terminate the beer distribution rights of

O&B pursuant to New York's Alcoholic Beverage Control Law §55-c ("§55-c") and

challenging the constitutionality of §55-c.  In particular, Coors alleges, *inter alia*, that it

has the right to terminate O&B pursuant to a plan of consolidation originated by another

entity that it purports is "reasonable, non discriminatory, and essential."  In addition,

Coors' alleges that the New York's §55-c violates both the Dormant Commerce Clause and the Contracts Clause of the Constitution. A copy of the Complaint is annexed as Exhibit A to this affirmation.

3.      This affirmation is submitted in support of O&B's motion to transfer this action to the Southern District of New York, pursuant to 28 USC §1404(a), because Virginia has no connection to this lawsuit or any of the parties and is inconvenient to all potential witnesses.

**Relationship of the Parties**

4.      Defendants O&B are New York beer wholesalers that distribute Molson beer products in certain counties in New York State. In particular, Oak Beverages distributes to an exclusive territory comprising Bronx, Rockland, Putnam, Westchester, and parts of New York County. Boening Brothers distributes to an exclusive territory comprising Nassau, Suffolk, and parts of Queens County. Further, Oak Beverages is a New York corporation with its principal place of business in Rockland County, New York, which is in the Southern District of New York. Boening Brothers is a New York Corporation with its principal place of business in Suffolk County, New York, which is in the Eastern District of New York. O&B are licensed as wholesalers of beer in New York State. O&B do not conduct any commercial activity in the Commonwealth of Virginia and operate solely in the State of New York.

5.      For the last twelve years, O&B have distributed Molson beer products in their respective New York territories pursuant to separate but identical distributor agreements entered into with Martlet Importing Co. ("Martlet") on October 23, 1996 (the "Distributor Agreements"). A copy of the Distributor Agreements are annexed as Exhibit

B and Exhibit C to this affirmation. Martlet is a New York Corporation, but at the time the Distributor Agreements were signed, it had an office in Virginia. A copy of the New York Corporate Entity Search for Martlet is annexed as Exhibit D to this affirmation.

6.      In or about December 1997, Martlet transferred its importing rights for Molson beer products to a joint venture between Miller Brewing Company (a Wisconsin Company) and Molson Canada (a Canadian Company). In 2000, the import rights were again transferred to Molson 2000 LLC, a Delaware limited liability company with its principal place of business in Colorado. Molson 2000 LLC was a joint venture between Coors Brewing Company and Molson Canada. Subsequently, Molson 2000 LLC changed its name to Molson USA LLC. Thereafter, in 2007, the import rights were transferred to Coors, a Colorado corporation with its principal place of business in Colorado. A copy of Certificate of Good Standing for Coors Brewing Company is annexed as Exhibit E to this affirmation.

**Location of Potential Witnesses**

7.      As stated above, Coors seeks a declaration that it can terminate O&B pursuant to a plan of consolidation originated by it predecessor Molson USA, which it purports is "reasonable, non-discriminatory, and essential," and otherwise complies with all statutory requirements. If successful, Coors also requests that the Court determine the fair market value of O&B's distribution rights.

8.      The following individuals have knowledge of the facts and are potential witnesses in this action:

a.      **Harold Boening** is President of Boening Brothers and resides in New York State. Mr. Boening is expected to testify as to the making of relevant

distributor agreements and the relationship between Boening Brothers and Martlet, Miller, Molson USA, and Coors. He is also expected to testify as to his conversations with Molson USA and Coors representatives regarding consolidation and to the unreasonable and discriminatory nature of the proposed consolidation plan. In addition, Mr. Boening is expected to testify as to the nature of Boening Brothers' business and all factors necessary to make an accurate determination as to the company's fair market value, including but not limited to volume, pricing, expenses, and potential sales growth.

b.    **Dennis Noyes** is General Manager of Boening Brothers and resides in New York State. He is expected to testify as to the nature of Boening Brothers' business and issues related to the New York beer distribution market. In addition, Mr. Noyes is expected to testify as to the discriminatory and unreasonable nature of the proposed consolidation. Lastly, Mr. Noyes is expected to testify as to all factors necessary to make an accurate determination as to the company's fair market value, including but not limited to volume, pricing, expenses, and potential sales growth.

c.    **Debra Boening** is the President of Oak Beverages and resides in New York. Ms. Boening is expected to testify as to the making of relevant distributor agreements and the relationship between Oak Beverages and Martlet, Miller, Molson USA, and Coors. She is also expected to testify as to her conversations with Molson USA and Coors representatives regarding consolidation and to the unreasonable and discriminatory nature of the proposed consolidation plan. In addition, Ms. Boening is expected to testify as to the nature of Oak Beverages' business and all factors necessary to make an accurate determination as to the company's fair market value, including but not limited to volume, pricing, expenses, and potential sales growth.

d.    **Gerry Scaperotti** is the General Manager of Oak Beverages and resides in New York. He is expected to testify as to the nature of Oak Beverages' business and issues related to the New York beer distribution market. In addition, Mr. Scaperotti is expected to testify as to the discriminatory and unreasonable nature of the proposed consolidation. Lastly, Mr. Scaperotti is expected to testify as to all factors necessary to make an accurate determination as to the company's fair market value, including but not limited to volume, pricing, expenses, and potential sales growth.

e.    Upon information and belief, **Gary Styles** is the director of Mergers and Acquisitions for Coors Brewing Company and resides in Colorado. He is expected to testify as to the relationship between Molson USA and Coors and the assignment of import rights, the recent announced merger of Coors and Miller, the dissolution of Molson USA, and the implementation of the plan of consolidation by Molson USA. In particular, Mr. Styles is expected to testify that the plan of consolidation proposed by Coors is unreasonable, discriminatory, and non-essential.

f.    Upon information and belief, **Bill Byers** is the assistant general counsel of Coors Brewing Company, formerly represented Molson USA, and resides in Colorado. He is expected to testify as to the relationship between Molson USA and Coors and the assignment of import rights, the recent announced merger of Coors and Miller, the dissolution of Molson USA, and the implementation of the plan of consolidation by Molson USA. In particular, Mr. Byer is expected to testify that the plan of consolidation proposed by Coors is unreasonable, discriminatory, and non-essential.

g.    Upon information and belief, **David Perkins** is former president of Molson USA and resides in Colorado. Mr. Perkins was intimately involved on a day-to-

5

day basis with making decisions regarding the implementation of the plan of consolidation in New York. He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.

      h.      Upon information and belief, **Geoff Molson** is the former VP of Quality and Distributor Development and resides in Canada. Mr. Molson was intimately involved on a day-to-day basis with making decisions regarding the implementation of the plan of consolidation in New York. He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential. Further, Mr. Molson is expected to testify as to the financial aspects of the proposed consolidation and the assignment of import rights from Molson USA to Coors.

      i.      Upon information and belief, **Tim Owston** is Vice President for Wholesale Development for Coors and resides in Colorado. Mr. Owston has extensive knowledge relating to the plan of consolidation, including its planning and implementation, and to the wholesaler markets in New York State. He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.

      j.      Upon information and belief, **Vinny Prattico,** is the former VP of sales for Molson USA, was the rep for Oak and Boening, and resides in Colorado. Mr. Prattico has extensive knowledge relating to the plan of consolidation, including its planning and implementation, and to the wholesaler markets in New York State. He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.

9.      All of the above mentioned ten individuals reside either in New York, or are believed to reside in Colorado or Canada. None resides in Virginia. Furthermore, none of the documents that will be the subject of discovery in the litigation are located in Virginia.

10.     Therefore, based on the foregoing, none of the parties or potential witnesses resides in Virginia, and no discoverable documents are located in Virginia. In fact, Virginia has no connection to this lawsuit whatsoever, except for the fact that Martlet, a New York corporation with offices in Virginia, was the initial importer for a period of approximately one year from 1996 to 1997. Rather, both defendants and four potential witnesses, namely Harold Boening, Debra Boening, Dennis Noyes, and Gerry Scaperotti, all reside in New York, thus, the Southern District of New York would be a much more convenient forum to litigate this action. In addition, both Boening Brothers and Oak Beverages conduct business in New York, not Virginia

WHEREFORE, Defendants respectfully requests that this Court transfer this action pursuant to 28 USC §1404(a) to the Southern District of New York.

Dated: Garden City, New York
        January, 18, 2008

ETTELMAN & HOCHHEISER P.C.

By: _____
        Gary Ettelman
        Attorney for Defendant
        100 Quentin Roosevelt Blvd, Suite 401
        Garden City, NY 11530
        Tel. 516.227.6300
        Fax 516.227.6307

# Exhibit A



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

COORS BREWING COMPANY,            )
a Colorado corporation,           )
                                  )
            Plaintiff,            )
                                  )      Civil Action No. _1:07CV1235-GBL/TCB_
v.                                )
                                  )
OAK BEVERAGE, INC.,               )
a New York corporation, and       )
                                  )
BOENING BROS., INC.,              )
a New York corporation,           )
                                  )
            Defendants.           )

## COMPLAINT

Plaintiff Coors Brewing Company ("Coors"), by counsel, for its complaint against

Defendants Oak Beverage, Inc. ("Oak") and Boening Bros., Inc. ("Boening"), respectfully states

as follows:

## THE PARTIES

1.      Plaintiff Coors is a Colorado corporation with its principal office and place of

business located in Golden, Colorado.

2.      Defendant Oak is a New York corporation with its office and principal place of

business located at 1 Flower Lane, Blauvelt, New York 10913.

3.      Defendant Boening is a New York corporation with its office and principal place

of business located at 1098 Route 109, Lindenhurst, New York 11757.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, in that the controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      At stake in this matter is the value of the distribution rights for Molson products in certain New York territories. As to each Defendant, the value of the Molson distribution rights exceeds $75,000, exclusive of interest and costs.

6.      Defendants Oak and Boening each consented to the *in personam* jurisdiction of this Court pursuant to contracts whereby all disputes between the parties and their successors and assigns, including the claims which are the subject of this Complaint, would be resolved by the U.S. District Court for the Eastern District of Virginia, Alexandria Division. Pursuant to 28 U.S.C. § 1391(c), each of Defendants Oak and Boening is deemed to reside in the U.S. District Court Eastern District of Virginia, Alexandria Division. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(a)(1) because it is a judicial district in which both Defendants reside for venue purposes. Venue is also proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(a)(2) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim — including formation of the contracts at issue — occurred.

7.      Venue is proper in the Alexandria Division pursuant to Local Civil Rule 3(C) of the Local Rules for the United States District Court for the Eastern District of Virginia because it is a division in which both Defendants reside for venue purposes. Venue is also proper in the Alexandria Division pursuant to Local Civil Rule 3(C) and because it is a division in which a

2

substantial part of the events or omissions giving rise to the claim — including formation of the Distributor Agreements — occurred.

## (FACTS COMMON TO ALL COUNTS)

### Background Allegations

8.    Molson beer products are brewed in Canada by Molson Canada. Molson Canada is North America's oldest brewer, founded in 1786.

9.    Oak and Boening are beer distributors representing the products of numerous suppliers, including Molson products.

10.    Oak and Boening share certain common ownership and officers and are, thus, affiliates.

11.    In 1996, the importer of Molson products was Martlet Importing Co. Inc. ("Martlet"). At that time, Martlet had its principal place of business in Reston, Virginia.

12.    On October 23, 1996, Boening entered into the Distributor Agreement with Martlet attached as Exhibit A (the "Boening Distributor Agreement"). Pursuant to the Boening Distributor Agreement, Boening was appointed as a distributor of Molson products in a New York territory consisting of Suffolk and Nassau Counties and certain portions of Queens County.

13.    On October 23, 1996, Oak entered into the Distributor Agreement with Martlet attached as Exhibit B (the "Oak Distributor Agreement"). Pursuant to the Oak Distributor Agreement, Oak was appointed as a distributor of Molson products in a New York territory consisting of Bronx, Putnam, Rockland, and Westchester Counties and that portion of the borough of Manhattan that is north of, but excluding, 106th Street.

14.    Aside the from the description of the territories, the Boening Distributor Agreement and the Oak Distributor Agreement (collectively, the "Distributor Agreements") are

3

identical to one another. Pursuant to ¶ 17(b) of the Distributor Agreements, Boening and Oak

each consented to the jurisdiction and venue of this Court, as follows:

> Any action, claim, suit or proceeding between Importer and
> Distributor, including, but limited to, those connected with, arising
> out of or related to this Agreement or which in any way involves
> the relationship between Importer and Distributor, whether in
> contract, tort or statute, shall be initiated and prosecuted as to all
> parties and their successors and assigns solely and exclusively in
> the United States District Court for the Eastern District, Alexandria
> Division, State of Virginia, and each party waives, freely and
> completely, any right to dismiss and/or transfer any action pursuant
> to 28 U.S.C. §§ 1404 or 1406, and any successor statute. In the
> event said district Court does not have subject matter jurisdiction
> of said matter, then such matters shall be solely and exclusively
> under the jurisdiction of the appropriate state court of competent
> jurisdiction located in Fairfax County, Virginia. The parties
> consent to in personam jurisdiction of the herein described courts.

15.     The Distributor Agreements were eventually assigned to a joint venture between

Miller Brewing Company and Molson Canada. The Miller/Molson joint venture imported and

sold Molson products to distributors in the United States, including Oak and Boening.

16.     In late 2000, the distribution of Molson products in the United States was

transferred to a joint venture between Coors and Molson Canada. The joint venture was

originally called Molson 2000 LLC, but its name was later changed to Molson USA LLC

("Molson USA"). Molson USA is a Delaware limited liability company, the members of which

are Coors and Rathon, Inc., a subsidiary of Molson, Inc. After the formation of Molson USA,

Coors Brewing Company assisted with the sales and marketing of Molson products in the United

States.

17.     The Distributor Agreements were assigned by the Miller/Molson joint venture to

Molson USA. Thereafter, Molson USA supplied Molson products to Oak and Boening for resale

in their assigned territories.

4

18.    Following the formation of Molson USA, all Molson distributors were offered the right to enter into revised distributor agreements with Molson USA. However, Oak and Boening declined to enter into a new Molson distributor agreement.

19.    Therefore, since 2001, Molson USA has done business with Oak and Boening pursuant to the Distributor Agreements.

20.    On February 9, 2005, various Coors and Molson entities entered into a series of transactions that resulted in the acquisition of all of the stock of Molson, Inc. by a subsidiary of Adolph Coors Company, which is Coors' corporate parent. After the combination, Adolph Coors Company was renamed Molson Coors Brewing Company ("Molson Coors"). Molson USA continued its operations as a wholly owned subsidiary of Molson Coors, but more and more of the operations of Molson USA were taken over by Coors.

21.    Finally, on December 2, 2007, the Distributor Agreements were assigned by Molson USA to Coors in connection with a transaction by which nearly all of the assets of Molson USA were transferred to Coors. Coors continues to supply Molson products to Oak and Boening.

22.    The Distributor Agreements permit termination without cause.

### The Consolidation Plan and the Test Case

23.    Molson USA adopted a nationwide plan of consolidation for the distribution of Molson products in the United states (the "Consolidation Plan"). The goal of the Consolidation Plan was to consolidate the distribution of Molson products into the Coors distribution network.

24.    In 2001, there were more than 500 Molson distributors. Of these, 65 % were not Coors distributors (referred to as "unaligned" distributors). By the end of 2003, the percentage of unaligned distributors had shrunk to less than 20 %. This reduction was the result of efforts

5

by Molson USA to encourage the sale of Molson distribution rights by unaligned Molson distributor to the local Coors distributors.

25.     In 2005, Molson USA announced to the unaligned Molson distributors in New York that Molson USA would pursue the termination of the distribution rights of the unaligned New York Molson distributors pursuant to the Consolidation Plan.

26.     Thereafter, in late July 2005, Molson USA commenced a test case against unaligned Molson distributor John G. Ryan, Inc. ("Ryan") by means of a declaratory arbitration proceeding. Molson USA sought a declaration that it had the right to terminate its distribution agreement with Ryan pursuant to the provisions of § 55-c of the New York Alcoholic Beverages Control Law ("the Act"). The Act permits a brewer to terminate the distribution relationship with a distributor pursuant to the brewer's national or regional plan of consolidation. Molson USA sought a determination that the Consolidation Plan constituted good cause for termination under the Act.

27.     Ryan sued Molson USA in New York state court, seeking to enjoin Molson USA's arbitration proceeding. Ryan argued that the 21st Amendment to the United States Constitution precluded Molson USA's reliance on the Federal Arbitration Act to compel arbitration. Molson USA removed the case to federal court and obtained summary judgment compelling arbitration.

28.     Oak and Boening contributed funds to Ryan or Ryan's counsel to assist in the defense of the arbitration against Ryan in order to defeat Molson USA's attempt to invoke the consolidation provisions of Section 55-c to implement the Consolidation Plan in New York.

29.     After discovery and hearing, the arbitrator eventually concluded that Molson USA's Consolidation Plan complied with the requirements of the Act and permitted termination.

6

After a second hearing, the arbitrator ruled that the fair market value of Ryan's Molson distribution rights was 2.9 times Ryan's trailing 12 month adjusted gross profit. Molson USA has applied to the United States District Court for the Southern District of New York to confirm the Ryan arbitration awards. Copies of the two Ryan arbitration awards are attached hereto as Exhibits C and D.

30.     After the resolution of the Ryan test case, Molson USA attempted to negotiate the purchase of the Molson distribution rights with the remaining unaligned New York Molson distributors, but has been unsuccessful in doing so. As a result, Molson USA has given notice to each unaligned New York distributor — including Defendants Oak and Boening — that Molson USA will pursue termination of the Molson distribution rights pursuant to the Act.

31.     By virtue of the assignment of the Distributor Agreements from Molson USA to Coors, Coors now seeks a declaratory judgment that it has the right under the Distributor Agreements and the Act to terminate the Distributor Agreements pursuant to the Consolidation Plan.

32.     The dispute between Molson (and now Coors, by assignment) and the Defendants constitutes a case and controversy within the meaning of Article 3 of the U.S. Constitution and 28 U.S.C. § 2201.

**(COUNT ONE)**
**THE DISTRIBUTOR AGREEMENTS**

33.     Coors hereby incorporates by reference the allegations of Paragraphs 1-31 as if fully set forth herein.

34.     Pursuant to 28 U.S.C. § 2201, Coors is entitled to a declaratory judgment declaring that Coors has the contractual right to terminate the Distributor Agreements pursuant to the Consolidation Plan.

7

MILW_2715356.2

## (COUNT TWO)
## THE ACT

35.     Coors hereby incorporates by reference the allegations of Paragraphs 1-34 as if fully set forth herein.

36.     The 2001 amendments to the Act do not apply to the Distributor Agreements, because the Distributor Agreements precede the effective date of the 2001 amendments. Application of the 2001 amendments to the Act would offend the Contracts Clause of the United States Constitution as a retroactive attempt to modify the contractual rights of the parties.

37.     The Consolidation Plan begun by Molson USA and continued by Coors satisfies the terms of the Act as it existed at the time of the Distributor Agreements.

38.     Even if the 2001 amendments to the Act were to apply to the Distributor Agreements, the provision of the Act, as amended, that purports to require Coors to show a contemporaneous reduction in the number of Molson distributors in the states contiguous to New York offends the Dormant Commerce Clause of the United States Constitution. It does so because the Act impermissibly attempts to regulate the conduct of Molson and Coors beyond the boundaries of the state of New York.

39.     Even if the 2001 amendments to the Act were to apply to the Distributor Agreements, the Consolidation Plan begun by Molson USA and continued by Coors satisfies the requirements of the Act. The Consolidation Plan is reasonable, non-discriminatory, and essential. Notice of the Consolidation Plan has been given to the Defendants in accordance with the terms of the Act. Implementation of the Consolidation Plan will result in a contemporaneous reduction in the number of Molson distributors nationally, in the states contiguous to New York, and in the state of New York. Molson and Coors have acted in good faith in pursuing the Consolidation Plan.

8

40.     Pursuant to 28 U.S.C. § 2201, Coors is entitled to a declaratory judgment declaring that Coors has the right under the Act and all applicable law to terminate the Distributor Agreements and any other agreement, right, or understanding pursuant to which Oak and Boening claim authorization to purchase and resell Molson products.

41.     Coors also requests a declaration of the fair market value of each Defendant's Molson distribution rights and a declaration that neither Defendant has suffered or will suffer any additional damages, as defined by §55-c7(a) of the Act, by virtue of the termination of the Molson distribution rights.

## PRAYER FOR RELIEF

WHEREFORE, Coors demands judgment in accordance with the allegations of this Complaint, as follows:

1.     Declaring that Coors has the right under the Distributor Agreements, the Act, and all applicable law to terminate the Distributor Agreements and any other agreement, right, or understanding pursuant to which Oak and Boening claim authorization to purchase and resell Molson products.

2.     Declaring the fair market value of each defendant's Molson distribution rights and a declaration that neither defendant has suffered or will suffer any additional damages, as defined by §55-c7(a) of the Act, by virtue of the termination of the Molson distribution rights.

3.     For such other relief as may be proper and just under the facts and law, and for Coors' costs and attorneys' fees.

9

Dated:  December 11, 2007

Respectfully submitted,

COORS BREWING COMPANY

By: _____
                    Counsel

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Telephone:  (202) 672-5300
Telecopier:  (202) 672-5399

Jon P. Christiansen
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Telephone: (414) 297-5557
Telecopier:  (414) 297-4900

Counsel for Plaintiff Coors Brewing Company

10

# Exhibit B

MARTLET IMPORTING CO. INC.
DISTRIBUTOR AGREEMENT

Martlet Importing Co. Inc. ("Importer"), agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1.    Distributor's Representations.

Distributor represents and warrants that:

(a)    The information submitted to Importer in Distributor's application, if such application was requested previously by Importer, including any marketing plans, and the information on the Distributor Data Sheet (which shall have been completed and signed by Distributor at the time this Agreement is executed) is true and complete.

(b)    Distributor has all permits and licenses necessary for Distributor lawfully to distribute Importer products in Distributor's Area as defined in Paragraph 2(a) below.

(c)    Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Importer or to or for the benefit of any Importer officer, director, employee or representative with respect to the issuance of this Agreement.

In reliance on the above representations and warranties, Importer enters into this Agreement with Distributor.

2.    Distributor's Area.

(a)    Importer hereby appoints Distributor as its sole distributor within the geographic areas described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). It is understood that the Distributor's Area may be different for different Importer products. Unless Importer has granted its prior written approval, Distributor shall not sell or supply Importer products to any retail location within another authorized Importer distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such products to any retail location within another authorized Importer distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Importer products to another authorized Importer distributor for the purpose of eliminating product shortages or inventory imbalances.

(b)    The following provisions, rather than the provisions of subparagraph (a), shall apply whenever any of the provisions of subparagraph (a) are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

Importer hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). Distributor's primary responsibility shall be to promote and sell Importer products to retail locations in Distributor's Area. If Distributor sells or supplies Importer products to retail locations outside Distributor's Area or to any person (other than an authorized Importer distributor) who Distributor has reason to believe will sell or supply all or part of such products to retail locations outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Importer immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

(c)    Except as otherwise specifically agreed to in writing by Importer, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Importer product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Importer products to anyone Distributor has reason to believe intends to sell, distribute or resell such products outside of the United States. Importer reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

3.    Management of Distributor.

(a)    Distributor agrees to have at all times a Manager approved by Importer who shall manage Distributor's business and vigorously promote and sell Importer products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

(b)    Distributor may at its sole discretion terminate the employment of the Manager.

4.    Operation of Distributor.

(a)    Distributor shall sell Importer products only to retailers and other persons to whom Distributor is duly licensed to sell such products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Importer products. Distributor shall maintain all permits and licenses necessary to distribute Importer products in Distributor's Area. Distributor shall submit to Importer upon the request of Importer copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

(b)    Distributor shall aggressively market and promote the sale of the full package line of Importer products listed on the Distributor Data Sheet. Distributor shall submit marketing plans to Importer upon Importer's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor to Importer, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Importer shall otherwise specify in writing, (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account, and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

(c)    Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Importer for the full package line of Importer products listed on the Distributor Data Sheet.

(d)    Distributor shall take all necessary actions to ensure the quality control of Importer products in compliance with Importer's Quality Control Standards. Those actions shall include, but not be limited to:

(i)    observance of Importer's code-date requirements;

(ii)    proper stock rotation in the warehouse, vehicles and retail locations;

(iii)    proper handling and protection from damage of all Importer products, containers and dunnage;

(iv)    sales of Importer products solely out of inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Importer shall otherwise approve in writing;

(v)    maintenance of clean, operational warehouse(s) and;

(vi)    implementation of a program in Distributor's Area for: (a) preventing Importer products bearing expired code dates ("overage products") from reaching consumers, (b) retrieving overage Importer products from retail locations, (c) replacing such products with fresh Importer products at no cost to the retailer and (d) destroying promptly any damaged or overage Importer products at no cost to Importer unless the overage or damaged condition was Importer's responsibility.

(e)    Distributor shall preserve and enhance the high quality image, reputation and goodwill of Importer and Importer's products.

(f)    Distributor shall maintain complete and accurate records of orders and deliveries from Importer, as well as sales and inventory records, and Importer shall have access to such records.

(g)    Distributor shall provide regular delivery of Importer products with sufficient frequency to be competitive with other competition.

(h)    Distributor shall ensure the safe and proper handling, storage, placement and installation of Importer point-of-sale materials, shall display such materials in a conspicuous place wherever possible at each retail location, and shall maintain records pertaining to their use.

(i)    Upon receipt of written notice from Importer, Distributor shall discontinue any advertising or promotional practices that Importer finds injurious to Importer's image or business or Importer products.

(j)    Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

(k)    Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Importer may reasonably impose from time to time for the effective marketing of Importer products.

5.    <u>Agreement Term</u>.

The Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

6.    <u>Ownership of Distributor</u>.

There shall be no change in the control of Distributor's business unless Distributor shall have obtained Importer's prior written approval. As used herein "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10 percent or more of the voting stock; (ii) if Distributor is not incorporated, a 10 percent or more interest in Distributor's business; (iii) 10 percent or more voting stock of the corporation which owns 50

percent or more of Distributor's voting stock; and (iv) a change in the form of business entity presently used by Distributor (e.g. a change from individual ownership or a partnership to a corporation). Without Importer's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this subparagraph and to notify Importer promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

7.    Distributor's Termination Rights.

        Distributor shall have the right to terminate this Agreement at any time by giving Importer at least ninety (90) days' prior written notice. In such event, Importer's sole obligation to Distributor shall be the purchase of Distributor's inventory pursuant to Paragraph 9(c) below. If Distributor ceases business operations with respect to Importer products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

8.    Importer's Termination Rights.

        (a)    Importer shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

        (b)    Without waiving its rights under Paragraph 8(a), Importer shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

        (c)    If any of the following events occur, Importer shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law:

                (i)    Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

                (ii)    Distributor's fraudulent conduct or substantial misrepresentation in any of its dealing with Importer or with others concerning Importer's products.

                (iii)    Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

                (iv)    Distributor's insolvency or failure to pay monies due Importer in accordance with the terms of sale established by Importer;

                (v)    Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

                (vi)    Distributor's violation of the provisions of Paragraph 2 of this Agreement; and

(vii)    Importer no longer has the right to sell the Importer products in Distributor's Area.

(d)    Importer shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Importer contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who have executed this form of Agreement. Importer shall incur no liability to Distributor by reason of such termination. In the event Importer exercises its right under this subparagraph and offers such other distributors the right to enter into a new agreement, Importer shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

9.    Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

(a)    Importer shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

(b)    Within ten (10) days after such termination, Distributor shall return to Importer all property belonging to Importer in Distributor's possession or control. Importer shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Importer on any such property, Importer shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Importer to Distributor, reasonable wear and tear expected.

(c)    Within ten (10) days after such termination, Distributor shall sell and Importer shall purchase Distributor's inventory of Importer products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following:  the net price actually paid by Distributor to Importer for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Importer, plus the cost of transporting the inventory from Importer to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Importer), plus a handling charge to be set from time to time by Importer. In lieu of paying such repurchase price, Importer may, at its election, credit the equivalent amount to Distributor's account.

(d)    In no event with regard to a termination of this Agreement shall Importer be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Importer become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

10.    Terms of Sale.

(a)    The prices charged by Importer to Distributor shall be the prices established by Importer in effect on the date of shipment. Importer shall inform Distributor of its prices in writing from time to time.

(b)    All sales by Importer to Distributor shall be on a cash basis or on such credit terms as Importer, in its sole discretion, may establish from time to time. Importer shall not be obliged to extend credit to Distributor to assist Distributor in securing credit. Regardless of the method of payment, Importer shall retain a security interest in products and containers delivered to Distributor

until Importer receives full payment of all monies owed to Importer. Upon Importer's request, Distributor shall execute such documents as are reasonable or necessary to perfect Importer's security interest.

(c)    All products and containers which are sold to Distributor shall be sold F.O.B. that warehouse or brewery designated by Importer. If a sight draft bill of lading is used, title and risk of loss shall pass to Distributor when Importer delivers the product to the carrier for shipment to the Distributor.

(d)    All kegs and dunnage shall remain the property of Importer and shall be returned to Importer in accordance with Importer's instructions.

(e)    Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Importer products or other Importer property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Importer products to Distributor to the extent that such excise taxes are not included in Importer's prices.

11.    Financial Planning and Reporting

(a)    Distributor shall furnish to Importer annually one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements and balance sheets). All such statements shall be truthful and prepared with generally accepted accounting principles

(b)    Importer shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

(c)    Any financial data obtained by Importer pursuant to this Paragraph shall be treated by Importer and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Importer has provided prior written notice of such disclosure to Distributor.

12.    Rights Reserved to Importer.

(a)    All orders for Importer products placed by Distributor shall be subject to Importer's acceptance. Importer shall have the right to specify the forms and procedures governing the placement of such orders, including, but not limited to, the routing to be used for delivery of such orders as are accepted. In the event that Importer is restricted in the production, sale or delivery of its products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Importer's control, Importer shall not be compelled to honor previously accepted orders, but shall distribute available products among distributors in a fair and equitable manner.

(b)    Importer reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labelling or packaging of the Importer products; to determine the prices and other terms on which it sells Importer products; to produce or sell any particular brands; and to discontinue the sale of any of its products, packages or containers in any geographic area.

13.    Importer Trade Designation.

(a)    Distributor hereby acknowledges Importer's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "trade designations") relating to Importer's business or Importer's products.    Importer hereby grants Distributor a nonexclusive, non-assignable, non-licensable privilege to use Importer trade designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Importer products.    This privilege shall terminate upon termination of this Agreement.    Such trade designations shall be used only in manners, forms and contexts specified or approved in writing by Importer, and upon Importer's request.    Distributor shall discontinue the way in which Distributor uses any Importer trade designation.    Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such designations without Importer's prior written approval.

(b)    Distributor agrees to remove all Importer trade designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Importer products.

14.    Assignments.

Any transfer, sale, assignment or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Importer has given its prior written approval.    Nothing herein shall prevent Importer from assigning all or part of its rights or obligations under this Agreement.

15.    New Importer Products.

This Agreement shall extend only to the brands of Importer products listed on the Distributor Data Sheet.    Importer and Distributor may at any time agree in writing to extend this Agreement to other Importer products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Importer at its sole discretion reserves the right not to offer any other Importer product to Distributor (including, but not limited to, line extensions).

16.    Amendments to Agreement.

(a)    Importer may at any time propose an amendment to this Agreement.    Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Importer.    The amendment shall become effective on the date executed by Importer, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor.    If Distributor does not return an executed amendment to Importer within ninety (90) days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

(b)    The provisions of subparagraph (a) shall not apply to changes made by Importer to the Distributor Data Sheet, and Importer specifically reserves the right to delete, modify or change any Importer product described in the Distributor Data Sheet without Distributor's consent or approval.    Distributor shall notify Importer immediately of any changes applicable to it.    Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

17.    Compliance with Law, Venue.

(a)    The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision.  The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement.  If required by applicable law, Importer and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

(b)    Any action, claim, suit or proceeding between Importer and Distributor, including, but limited to, those connected with, arising out of or related to this Agreement or which in any way involves the relationship between Importer and Distributor, whether in contract, tort or statute, shall be initiated and prosecuted as to all parties and their successors and assigns solely and exclusively in the United States District Court for the Eastern District, Alexandria Division, State of Virginia, and each party waives, freely and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. §§    1404 or 1406, and any successor statute.  In the event said District Court does not have subject matter jurisdiction of said matter, then such matters shall be solely and exclusively under the jurisdiction of the appropriate state court of competent jurisdiction located in Fairfax County, Virginia.  The parties consent to in personam jurisdiction of the herein described courts.

18.    Notice.

All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed.  All telecopied notices shall also require a copy to also be mailed, postage prepaid to the addressee.  Notices shall be addressed:  (i) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement or (ii) if to Importer, to 11911 Freedom Drive, Suite 1100, Reston, Virginia  22090-5609.  Telecopies shall be sent to the number described in the Distributor Data Sheet and to Importer at such number as Importer shall designate.  The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

19.    Miscellaneous Provisions.

(a)    "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Importer.

(b)    "Authorized Importer distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Importer which is currently in effect.

(c)    No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet as referred to in Paragraph 1(a) or 4(b) of this Agreement has been made by Importer or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention.  Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Importer or the predecessor, parent and affiliate of Importer are hereby terminated and Distributor releases Importer and Importer's predecessor, parent and affiliate from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings.  This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

(d)    The failure of either Importer or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

(e)    Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Importer, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement. No conduct of any such person shall be construed to create that authority.

(f)    Distributor acknowledges that it is, and shall remain, an independent business entity. Importer and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

20.    **ACKNOWLEDGMENTS**

The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

This Agreement is effective on the 23rd day of October, 1996.

Boening Bros., Inc.
(Sole Proprietorship, Partnership, Corporation)*

By _____ (SEAL)
(Owner, Partner, President)*

CORPORATE
SEAL

By _____ (SEAL)
(Partner, Secretary)*    TREASURER

By
_____ (SEAL)
(Partner)

By
_____ (SEAL)
(Partner)

Martlet Importing Co. Inc.

By _____
(Title)  Vice President

*Delete inapplicable words beneath signature lines. In the case of a partnership, all partners must sign.



# PRODUCT PORTFOLIO and MARKET AREA

Boening Brothers, Inc.

North Lindenhurst, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

## MARKET AREA

In the State of New York:

All of Nassau and Suffolk Counties.

In Queens County, that portion lying generally east of Bell Boulevard, Springfield Boulevard to the Queens/Nassau County line and including the Rockaway Peninsula.

## BRANDS

**Molson Canadian**

**Molson Canadian Light**

**Molson Exel**

**Molson Export Ale**

**Molson Golden**

**Molson Ice**

Unless specifically included, the Market Area set forth above excludes distribution rights in Military Bases as well as Ship Chandler/Duty Free distribution.

Reviewed and Accepted this ___28___ day of _Movember_ , 2001.

**Boening Brothers, Inc.**

By: _Harold J. Boening_

Harold Boening, Sr.

---

## NOTE: Contingent on state approval and product availability.

330150          11/1/2001

# Exhibit C

MARTLET IMPORTING CO. INC.
DISTRIBUTOR AGREEMENT

Martlet Importing Co. Inc. ("Importer"), agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1.    Distributor's Representations.

Distributor represents and warrants that:

(a)    The information submitted to Importer in Distributor's application, if such application was requested previously by Importer, including any marketing plans, and the information on the Distributor Data Sheet (which shall have been completed and signed by Distributor at the time this Agreement is executed) is true and complete.

(b)    Distributor has all permits and licenses necessary for Distributor lawfully to distribute Importer products in Distributor's Area as defined in Paragraph 2(a) below.

(c)    Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Importer or to or for the benefit of any Importer officer, director, employee or representative with respect to the issuance of this Agreement.

In reliance on the above representations and warranties, Importer enters into this Agreement with Distributor.

2.    Distributor's Area.

(a)    Importer hereby appoints Distributor as its sole distributor within the geographic areas described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). It is understood that the Distributor's Area may be different for different Importer products. Unless Importer has granted its prior written approval, Distributor shall not sell or supply Importer products to any other authorized Importer distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such products to any retail location within another authorized Importer distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Importer products to another authorized Importer distributor for the purpose of eliminating product shortages or inventory imbalances.

(b)    The following provisions, rather than the provisions of subparagraph (a), shall apply whenever any of the provisions of subparagraph (a) are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

Importer hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the Importer products listed in the Distributor Data Sheet ("Importer products"). Distributor's primary responsibility shall be to promote and sell Importer products to retail locations in Distributor's Area. If Distributor sells or supplies Importer products to retail locations outside Distributor's Area or to any person (other than an authorized Importer distributor) who Distributor has reason to believe will sell or supply all or part of such products to retail locations outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Importer immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

(c)    Except as otherwise specifically agreed to in writing by Importer, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Importer product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Importer products to anyone Distributor has reason to believe intends to sell, distribute or resell such products outside of the United States. Importer reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

3.    Management of Distributor.

(a)    Distributor agrees to have at all times a Manager approved by Importer who shall manage Distributor's business and vigorously promote and sell Importer products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

(b)    Distributor may at its sole discretion terminate the employment of the Manager.

4.    Operation of Distributor.

(a)    Distributor shall sell Importer products only to retailers and other persons to whom Distributor is duly licensed to sell such products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Importer products. Distributor shall maintain all permits and licenses necessary to distribute Importer products in Distributor's Area. Distributor shall submit to Importer upon the request of Importer copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

(b)    Distributor shall aggressively market and promote the sale of the full package line of Importer products listed on the Distributor Data Sheet. Distributor shall submit marketing plans to Importer upon Importer's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor to Importer, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Importer shall otherwise specify in writing, (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account, and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

(c)    Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Importer for the full package line of Importer products listed on the Distributor Data Sheet.

(d)    Distributor shall take all necessary actions to ensure the quality control of Importer products in compliance with Importer's Quality Control Standards. Those actions shall include, but not be limited to:

(i)    observance of Importer's code-date requirements;

(ii)    proper stock rotation in the warehouse, vehicles and retail locations;

(iii)    proper handling and protection from damage of all Importer products, containers and dunnage;

(iv)     sales of Importer products solely out of Inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Importer shall otherwise approve in writing;

(v)     maintenance of clean, operational warehouse(s) and;

(vi)     Implementation of a program in Distributor's Area for: (a) preventing Importer products bearing expired code dates ("overage products") from reaching consumers, (b) retrieving overage Importer products from retail locations, (c) replacing such products with fresh Importer products at no cost to the retailer and (d) destroying promptly any damaged or overage Importer products at no cost to Importer unless the overage or damaged condition was Importer's responsibility.

(e)     Distributor shall preserve and enhance the high quality image, reputation and goodwill of Importer and Importer's products.

(f)     Distributor shall maintain complete and accurate records of orders and deliveries from Importer, as well as sales and inventory records, and Importer shall have access to such records.

(g)     Distributor shall provide regular delivery of Importer products with sufficient frequency to be competitive with other competition.

(h)     Distributor shall ensure the safe and proper handling, storage, placement and installation of Importer point-of-sale materials, shall display such materials in a conspicuous place wherever possible at each retail location, and shall maintain records pertaining to their use.

(i)     Upon receipt of written notice from Importer, Distributor shall discontinue any advertising or promotional practices that Importer finds injurious to Importer's image or business or Importer products.

(j)     Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

(k)     Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Importer may reasonably impose from time to time for the effective marketing of Importer products.

5.     Agreement Term.

The Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

6.     Ownership of Distributor.

There shall be no change in the control of Distributor's business unless Distributor shall have obtained Importer's prior written approval. As used herein "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10 percent or more of the voting stock; (ii) if Distributor is not incorporated, a 10 percent or more interest in Distributor's business; (iii) 10 percent or more voting stock of the corporation which owns 50

percent or more of Distributor's voting stock; and (iv) a change in the form of business entity presently used by Distributor (e.g. a change from individual ownership or a partnership to a corporation). Without Importer's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this subparagraph and to notify Importer promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

7.    Distributor's Termination Rights.

        Distributor shall have the right to terminate this Agreement at any time by giving Importer at least ninety (90) days' prior written notice. In such event, Importer's sole obligation to Distributor shall be the purchase of Distributor's inventory pursuant to Paragraph 9(c) below. If Distributor ceases business operations with respect to Importer products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

8.    Importer's Termination Rights.

        (a)    Importer shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

        (b)    Without waiving its rights under Paragraph 8(a), Importer shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

        (c)    If any of the following events occur, Importer shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law:

                (i)    Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

                (ii)    Distributor's fraudulent conduct or substantial misrepresentation in any of its dealing with Importer or with others concerning Importer's products.

                (iii)    Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

                (iv)    Distributor's insolvency or failure to pay monies due Importer in accordance with the terms of sale established by Importer;

                (v)    Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

                (vi)    Distributor's violation of the provisions of Paragraph 2 of this Agreement; and

(vii)    Importer no longer has the right to sell the Importer products in Distributor's Area.

(d)    Importer shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Importer contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who have executed this form of Agreement. Importer shall incur no liability to Distributor by reason of such termination. In the event Importer exercises its right under this subparagraph and offers such other distributors the right to enter into a new agreement, Importer shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

9.    Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

(a)    Importer shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

(b)    Within ten (10) days after such termination, Distributor shall return to Importer all property belonging to Importer in Distributor's possession or control. Importer shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Importer on any such property, Importer shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Importer to Distributor, reasonable wear and tear expected.

(c)    Within ten (10) days after such termination, Distributor shall sell and Importer shall purchase Distributor's inventory of Importer products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following:  the net price actually paid by Distributor to Importer for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Importer, plus the cost of transporting the inventory from Importer to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Importer), plus a handling charge to be set from time to time by Importer. In lieu of paying such repurchase price, Importer may, at its election, credit the equivalent amount to Distributor's account.

(d)    In no event with regard to a termination of this Agreement shall Importer be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Importer become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

10.    Terms of Sale.

(a)    The prices charged by Importer to Distributor shall be the prices established by Importer in effect on the date of shipment. Importer shall inform Distributor of its prices in writing from time to time.

(b)    All sales by Importer to Distributor shall be on a cash basis or on such credit terms as Importer, in its sole discretion, may establish from time to time. Importer shall not be obliged to extend credit to Distributor to assist Distributor in securing credit. Regardless of the method of payment, Importer shall retain a security interest in products and containers delivered to Distributor

until Importer receives full payment of all monies owed to Importer. Upon Importer's request, Distributor shall execute such documents as are reasonable or necessary to perfect Importer's security interest.

(c)     All products and containers which are sold to Distributor shall be sold F.O.B. that warehouse or brewery designated by Importer. If a sight draft bill of lading is used, title and risk of loss shall pass to Distributor when Importer delivers the product to the carrier for shipment to the Distributor.

(d)     All kegs and dunnage shall remain the property of Importer and shall be returned to Importer in accordance with Importer's instructions.

(e)     Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Importer products or other Importer property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Importer products to Distributor to the extent that such excise taxes are not included in Importer's prices.

11.     Financial Planning and Reporting

(a)     Distributor shall furnish to Importer annually one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements and balance sheets). All such statements shall be truthful and prepared with generally accepted accounting principles

(b)     Importer shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

(c)     Any financial data obtained by Importer pursuant to this Paragraph shall be treated by Importer and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Importer has provided prior written notice of such disclosure to Distributor.

12.     Rights Reserved to Importer.

(a)     All orders for Importer products placed by Distributor shall be subject to Importer's acceptance. Importer shall have the right to specify the forms and procedures governing the placement of such orders, including, but not limited to, the routing to be used for delivery of such orders as are accepted. In the event that Importer is restricted in the production, sale or delivery of its products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Importer's control, Importer shall not be compelled to honor previously accepted orders, but shall distribute available products among distributors in a fair and equitable manner.

(b)     Importer reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labelling or packaging of the Importer products; to determine the prices and other terms on which it sells Importer products; to produce or sell any particular brands; and to discontinue the sale of any of its products, packages or containers in any geographic area.

13.    Importer Trade Designation.

(a)    Distributor hereby acknowledges Importer's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "trade designations") relating to Importer's business or Importer's products.    Importer hereby grants Distributor a ·nonexclusive, non-assignable, non-licensable privilege to use Importer trade designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Importer products.  This privilege shall terminate upon termination of this Agreement.  Such trade designations shall be used only in manners, forms and contexts specified or approved in writing by Importer, and upon Importer's request.  Distributor shall discontinue the way in which Distributor uses any Importer trade designation.  Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such designations without Importer's prior written approval.

(b)    Distributor agrees to remove all Importer trade designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Importer products.

14.    Assignments.

Any transfer, sale, assignment or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Importer has given its prior written approval.  Nothing herein shall prevent Importer from assigning all or part of its rights or obligations under this Agreement.

15.    New Importer Products.

This Agreement shall extend only to the brands of Importer products listed on the Distributor Data Sheet.  Importer and Distributor may at any time agree in writing to extend this Agreement to other Importer products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Importer at its sole discretion reserves the right not to offer any other Importer product to Distributor (including, but not limited to, line extensions).

16.    Amendments to Agreement.

(a)    Importer may at any time propose an amendment to this Agreement.  Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Importer.  The amendment shall become effective on the date executed by Importer, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor.  If Distributor does not return an executed amendment to Importer within ninety (90) days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

(b)    The provisions of subparagraph (a) shall not apply to changes made by Importer to the Distributor Data Sheet, and Importer specifically reserves the right to delete, modify or change any Importer product described in the Distributor Data Sheet without Distributor's consent or approval.  Distributor shall notify Importer immediately of any changes applicable to it.  Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

17.    Compliance with Law, Venue.

(a)    The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision.    The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement.    If required by applicable law, Importer and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

(b)    Any action, claim, suit or proceeding between Importer and Distributor, including, but limited to, those connected with, arising out of or related to this Agreement or which in any way involves the relationship between Importer and Distributor, whether in contract, tort or statute, shall be initiated and prosecuted as to all parties and their successors and assigns solely and exclusively in the United States District Court for the Eastern District, Alexandria Division, State of Virginia, and each party waives, freely and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. §§    1404 or 1406, and any successor statute.    In the event said District Court does not have subject matter jurisdiction of said matter, then such matters shall be solely and exclusively under the jurisdiction of the appropriate state court of competent jurisdiction located in Fairfax County, Virginia.    The parties consent to in personam jurisdiction of the herein described courts.

18.    Notice.

All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed. All telecopied notices shall also require a copy to also be mailed, postage prepaid to the addressee. Notices shall be addressed:    (i) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement or (ii) if to Importer, to 11911 Freedom Drive, Suite 1100, Reston, Virginia  22090-5609.    Telecopies shall be sent to the number described in the Distributor Data Sheet and to Importer at such number as Importer shall designate.    The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

19.    Miscellaneous Provisions.

(a)    "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Importer.

(b)    "Authorized Importer distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Importer which is currently in effect.

(c)    No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet as referred to in Paragraph 1(a) or 4(b) of this Agreement has been made by Importer or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention. Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Importer or the predecessor, parent and affiliate of Importer are hereby terminated and Distributor releases Importer and Importer's predecessor, parent and affiliate from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings.    This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

090893E                                                          8

(d)    The failure of either Importer or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

(e)    Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Importer, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement.  No conduct of any such person shall be construed to create that authority.

(f)    Distributor acknowledges that it is, and shall remain, an independent business entity.  Importer and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

## 20.    ACKNOWLEDGMENTS

The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

This Agreement is effective on the 23rd day of October, 1996.

Oak Beverage, Inc.
(Sole Proprietorship, Partnership, Corporation)*

By _____ (SEAL)
(Owner, Partner, President)*

CORPORATE
SEAL

By _____ (SEAL)
(Partner, Secretary)* VICE PRESIDENT

By _____ (SEAL)
(Partner)

By _____ (SEAL)
(Partner)

Martlet Importing Co. Inc.

By _____
(Title)  Vice President

*Delete inapplicable words beneath signature lines.  In the case of a partnership, all partners must sign.

9



# PRODUCT PORTFOLIO and MARKET AREA

Oak Beverage, Inc.

Blauvelt, NY

According to our records, the following constitutes Distributor's authorized Products and Market Area.

## MARKET AREA

In the State of New York:

All of the Counties of Bronx, Putnam, Rockland and Westchester.

In New York County, the Borough of Manhattan north of but excluding 106th Street.

## BRANDS

**Molson Canadian**

**Molson Canadian Light**

**Molson Exel**

**Molson Export Ale**

**Molson Golden**

**Molson Ice**

Unless specifically included, the Market Area set forth above excludes distribution rights in Military Bases as well as Ship Chandler/Duty Free distribution.

Reviewed and Accepted this _29th_ day of _November_, 2001.

**Oak Beverage, Inc.**

By _[signature]_

Harold Boeing, Sr.

## NOTE: Contingent on state approval and product availability.

330130

Effective 11/1/2001

# Exhibit D

# NYS Department of State

## Division of Corporations

## Entity Information

Selected Entity Name: MARTLET IMPORTING CO. INC.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | MARTLET IMPORTING CO. INC. |
| **Initial DOS Filing Date:** | JANUARY 26, 1968 |
| **County:** | NASSAU |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**
MICHAEL T. JONES
3939 WEST HIGHLAND BLVD
MILWAUKEE, WISCONSIN, 53208-2866

**Principal Executive Office**
MARTLET IMPORTING CO. INC.
11921 FREEDOM DR / SUITE 550
RESTON, VIRGINIA, 20190

**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

# Exhibit E

## OFFICE OF THE SECRETARY OF STATE
## OF THE STATE OF COLORADO

# CERTIFICATE

I, Mike Coffman, as the Secretary of State of the State of Colorado, hereby certify that, according to the records of this office,

COORS BREWING COMPANY

is a

Corporation

formed or registered on 08/07/1990 under the law of Colorado, has complied with all applicable requirements of this office, and is in good standing with this office. This entity has been assigned entity identification number 19901079745 .

This certificate reflects facts established or disclosed by documents delivered to this office on paper through 01/11/2008 that have been posted, and by documents delivered to this office electronically through 01/17/2008 @ 09:46:01 .

I have affixed hereto the Great Seal of the State of Colorado and duly generated, executed, authenticated, issued, delivered and communicated this official certificate at Denver, Colorado on 01/17/2008 @ 09:46:01 pursuant to and in accordance with applicable law. This certificate is assigned Confirmation Number 6982947 .



_Mike Coffman_

Secretary of State of the State of Colorado

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*End of Certificate\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_Notice: A certificate issued electronically from the Colorado Secretary of State's Web site is fully and immediately valid and effective. However, as an option, the issuance and validity of a certificate obtained electronically may be established by visiting the Certificate Confirmation Page of the Secretary of State's Web site, http://www.sos.state.co.us/biz/CertificateSearchCriteria.do entering the certificate's confirmation number displayed on the certificate, and following the instructions displayed. Confirming the issuance of a certificate is merely optional and is not necessary to the valid and effective issuance of a certificate. For more information, visit our Web site, http://www.sos.state.co.us/ click Business Center and select "Frequently Asked Questions."_



Colorado Secretary of State
**BUSINESS CENTER**

Elections Center | **Business Center** | Information Center | **Licensing Center** | **Secretary of State Home** 🏠

**For this Record...**
History & Documents
View Trade names
Cert of Good Standing
File Document
Email Notification

Business Home
Business Information
Business Search

FAQs
Glossary

# Summary

| | |
|---|---|
| ID Number: | 19990107945 |
| Name: | COORS BREWING COMPANY |

| | |
|---|---|
| Registered Agent: | The Corporation Company |
| Registered Agent Street Address: | 1675 Broadway, Suite 1200, Denver, CO 80202, United States |
| Registered Agent Mailing Address: | |

| | |
|---|---|
| Principal Office Street Address: | 311 10TH ST, NH#311, GOLDEN , CO 80401, United States |
| Principal Office Mailing Address: | Post Office Box 4030, MCCC, Golden, CO 80401, United States |

| | |
|---|---|
| Status: | Good Standing |
| Form: | Corporation |
| Jurisdiction: | Colorado |
| Formation Date: | 08/07/1990 |
| Term of Duration: | Perpetual |
| Annual Report Month: | August |

You may:

- View History and Documents
- View Trade names
- Obtain Certificate of Good Standing
- File a Document
- Set Up Email Notification

[ Previous Page ]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division

COORS BREWING COMPANY,

      Plaintiff,

v.                                       Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

      Defendants.

## NOTICE OF HEARING

PLEASE TAKE NOTICE that on the 8th day of February at 10:00 a.m., Defendants, by counsel, will ask this Honorable Court to enter an Order granting its Motion to Transfer Venue previously filed herein.

Date:  January 31, 2008              OAK BEVERAGES, INC. and
                                    BOENING BROS., INC.

By:  _____/s/_____
                          Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc.*
*and Boening Brothers, Inc.*

<u>Of Counsel</u>:
Gary Ettleman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of January, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143

_____/s/_____

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc.*
*and Boening Bros., Inc.*

JAN 2 9 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL CRIMINAL RULE 57.4

In Case Number 1:17 CV 1235 GBL/TRJ Case Name *Coors Brewing Company v. Oak Beverages, Inc and Boening Bros., Inc*

Party Represented by Applicant: *Oak Beverages Inc and Boening Bros. Inc*

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

### PERSONAL STATEMENT

FULL NAME (no initials, please) *GARY ETTELMAN*
Bar Identification Number *N/A*          State *New York*
Firm Name *Ettelman & Hochheiser, P.C*
Firm Phone # *(516) 227-6300*    Direct Dial # *Ext 206*    FAX # *(516) 227-6307*
E-Mail Address *gettelman@e-hlaw.com*
Office Mailing Address *100 Quentin Roosevelt Blvd, Garden City, NY 11530*

Name(s) of federal court(s) in which I have been admitted *Eastern District of New York, Southern District of N.Y, 2nd, 17th Circuit Courts of Appeal*

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice* admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence is current.

I am _____ am not __✓__ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

(Applicant's Signature)

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and petition the court to admit the applicant *pro hac vice*.

(Signature)                    01/22/08
*Marshall A. Winslow, Jr.*    (Date)
(Typed or Printed Name)

Court Use Only:

Clerk's Fee Paid _____ or Exemption Granted _____

The motion for admission is GRANTED __✓__ or DENIED _____

/s/

Gerald Bruce Lee
United States District Judge
(Judge's Signature)

1-29-08
(Date)

```
Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 1
Receipt Number: 100006221
Cashier ID: fcansler
Transaction Date: 01/24/2008
Payer Name: WOLCOTT RIVERS PC
------------------------------------
PRO HOC VICE
 For: WOLCOTT RIVERS PC
 Case/Party: D-VAE-1-08-CR-PROHAC-001
 Amount:      $50.00
------------------------------------
CHECK
 Check/Money Order Num: 95627
 Amt Tendered: $50.00
------------------------------------
Total Due:      $50.00
Total Tendered: $50.00
Change Amt:     $0.00

PROHAC  07-CV-1235

GARY ETTELMAN
```

# Wolcott|Rivers|Gates

W. Brantley Basnight, III
David M. Bastiaans
Richard E. Biemiller
Steven L. Brown
Jennifer E. Damelio
Barry Dorans
Carl A. Eason
Cheshire I'Anson Eveleigh
Ronald M. Gates
Kyle D. Korte
Samuel W. Meekins, Jr.
Kellam T. Parks
Mark V. Pascucci

One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462-6765
Telephone (757) 497-6633
Fax (757) 497-7267
www.wolcottriversgates.com

M. Powell Pfiffer
Stephen P. Pfeiffer
Anthony F. Radd
David N. Reda
Wilson L. Rivers
Glen M. Robertson
C. Arthur Robinson, II
John F. Sawyer
Leslie R. Watson
Marshall A. Winslow, Jr.
Edward W. Wolcott, Jr.
Brandon H. Zeigler

January 23, 2008

**VIA FEDERAL EXPRESS**
Fernando Galindo, Clerk
United States District Court
for the Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 22314-5798

      Re:    Coors Brewing Company v. Oak Beverage, Inc., et al.
             Case No. 1:07cv1235

Dear Mr. Galindo:

    Enclosed please find an Application to Qualify as a Foreign Attorney Under Local Civil Rule 83.1(D) of Gary Ettelman, Esquire with regard to the above matter. I have also enclosed the appropriate $50 filing fee. Please process accordingly.

    Thank you for your assistance in this regard.

                Very truly yours,

                WOLCOTT RIVERS GATES

                Marshall A. Winslow, Jr.

MAWjr/scs
Enclosure
cc:    Gary Ettelman, Esquire
       Michael J. Lockerby, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **COORS BREWING COMPANY,** | ) | |
| **a Colorado corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:07 CV 1235** |
| **v.** | ) | |
| | ) | |
| **OAK BEVERAGE, INC.,** | ) | |
| **a New York corporation, and** | ) | |
| | ) | |
| **BOENING BROS., INC.,** | ) | |
| **a New York corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COORS' OPPOSITION TO
DEFENDANTS' MOTION TO TRANSFER VENUE**

Plaintiff Coors Brewing Company ("Coors"), by counsel, respectfully states as follows in opposition to the Motion to Transfer Venue filed by Defendants Oak Beverage, Inc. ("Oak") and Boening Bros., Inc. ("Boening") (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

Defendants concede that venue in this Court is proper, having failed to raise a defense of improper venue in either an answer as required by Rule 12(a)(1)(A) or in a motion in accordance with Rule 12(b).[1]  Defendants' concession is hardly surprising in view of the plain language of the contracts that each of them signed on October 23, 1996.  These contracts (the "1996

---

[1] Defendants' answer to Coors' Complaint was due January 29, 2008, twenty (20) days after service.  To date, Defendants' Motion to Transfer Venue is the only substantive pleading that they have filed in this Court.

Distributor Agreements")[2] contain a provision mandating dispute resolution here in the Eastern District of Virginia (the "Mandatory Forum Selection Clause").[3]

While conceding that venue is proper in the Eastern District of Virginia, Defendants ask this Court to invoke its discretion pursuant to 28 U.S.C. § 1404(a) to transfer this action to another district "where it might have been brought." As authority for the change of venue that they seek, Defendants cite the provisions of § 55-c of the New York Alcoholic Beverages Control Act (the "New York Beer Franchise Law").

One of the two districts where Defendants allege this action "might have been brought," the Eastern District of New York,[4] has already rejected the notion that the New York Beer Franchise Law invalidates forum selection clauses. *See S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 314, 323-24 (E.D.N.Y. 2006) (enforcing forum selection clause requiring dispute resolution in Russia "in the Arbitration Court of St. Petersburg and the Leningradskaya Oblast").[5] So Defendants seek transfer to the other judicial district where Defendants allege this action "might have been brought,"[6] the Southern District of New York.[7]

---

[2] The 1996 Distributor Agreements are attached as Exhibits A and B to Coors' Complaint and as Exhibits B and C to the Affirmation in Support of Transfer ("Aff.").

[3] Each of the Defendants is a "Distributor" as that term is defined in the 1996 Distributor Agreements. At the time the parties executed the 1996 Distributor Agreements, the "Importer" identified therein was Martlet Distributing Co. ("Martlet"), which had its principal place of business in the Eastern District of Virginia. Coors, as the successor-in-interest to Martlet under the 1996 Distributor Agreements, is now the "Importer" (Aff. at ¶ 6).

[4] The territory assigned to Defendant Boening under the 1996 Distributor Agreement that it signed is comprised of Nassau and Suffolk Counties and parts of Queens County. (Aff. at ¶ 4; Aff. Exh. B) Boening's territory is therefore within the venue of the Eastern District of New York.

[5] The plaintiff in that case was represented by counsel for Defendants in this case.

[6] The Conclusion in Defendants' Motion to Transfer requests that this Court "transfer this action to either [sic] the Southern District of New York."

[7] The territory assigned to Defendant Oak under the 1996 Distributor Agreement that it signed is comprised of the Counties of The Bronx, Rockland, Putnam, and Westchester, together with part of New York County. (Aff. at ¶ 4; Aff. Exh. C) Oak's territory is therefore within the venue of the Southern District of New York.

In fact, neither the Eastern District of New York nor the Southern District of New York is one where this action "might have been brought" — at least not properly in view of the plain language of the Mandatory Forum Selection Clause. The Mandatory Forum Selection Clause is, in the words of the Supreme Court, "prima facie valid and should be enforced unless enforcement is shown by …[Defendants] to be unreasonable under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). Consistent with this Supreme Court precedent, the Fourth Circuit[8] and the Second Circuit[9] generally enforce forum selection clauses. To the extent that the law of New York is relevant to this Court's analysis, that state actually has a strong public policy in favor of enforcing forum selection clauses.[10] To ignore such precedents and instead invalidate the Mandatory Forum Selection Clause as Defendants seek — effectively rewriting the 1996 Distributor Agreements— this Court would first have to rewrite the New York Beer Franchise Law itself.

As enacted by the New York Legislature, the New York Beer Franchise Law does not prohibit forum selection clauses. That was certainly true in 1996, when the 1996 Distributor Agreements became effective. The statute was amended in 1997 and 2001. Retroactive application of these amendments, however, would be contrary to the plain language of the amendments themselves, basic principles of statutory construction, and the Contracts Clause. Even if these amendments applied retroactively, the New York Beer Franchise Law has never been amended to prohibit forum selection clauses. When the New York Legislature wishes to

---

[8] *See, e.g., Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 213-14 (4th Cir. 2007).

[9] "The Second Circuit has a 'strong policy' of enforcing forum selection agreements." *Elite Parfums, Ltd. v. Rivera*, 872 F. Supp. 1269, 1271 (S.D.N.Y. 1995). *See also Int'l Minerals and Resources, S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) ("there is a 'strong public policy in favor of forum selection and arbitration clauses.'").

[10] *See* C.P.L.R. § 501 (a "written agreement fixing place of trial, made before an action is commenced, shall be enforced upon a motion for change of place of trial.").

WASH_2352676.2

invalidate forum selection clauses, it knows how to do so expressly, as do the legislatures of other states. The New York Legislature has not done so in enacting the Beer Franchise Law. Defendants cite no authority for this Court to — in the context of a venue transfer motion — amend a state statute by judicial fiat.

## II.    PROCEDURAL STANDARD

Defendants have waived the defense of improper venue because they failed to raise it in either an answer pursuant to Rule 12(a)(1)(A) or a motion to dismiss pursuant to Rule 12(b)(3) within twenty (20) days of service of Coors' Complaint. *See Longwall-Assocs., Inc. v. Wolfgang Preinfalk GmbH*, No. 1:00-cv-86, 2001 WL 667804, at *2 (W.D. Va. June 12, 2001) (failure to challenge venue in motion to dismiss or in answer to complaint waives right to challenge venue under Rule 12(h)). Even if Defendants had raised the defense of improper venue by way of a Rule 12(b)(3) motion, the factual allegations of Coors' Complaint would be deemed to be true. *Walker v. White*, No. 1:06-cv-350, 2007 WL 1612451, at *5 (W.D.N.C. May 31, 2007) (*citing Micromuse, Inc. v. Aprisma Management Technologies, Inc.*, 2005 WL 1241924, *2 (S.D.N.Y. 2005).

Moving to transfer venue pursuant to 28 U.S.C. § 1404(a) does not, of course, relieve Defendants of their obligation to answer Coors' Complaint. Rather than answer Coors' Complaint, however, Defendants had their counsel submit an Affirmation in Support of Motion to Transfer ("Defendants' Affirmation," cited herein as "Aff."). Defendants' Affirmation does not refute any of the factual allegations of Coors' Complaint.[11]  For purposes of Defendants'

---

[11] To the extent the statements of Defendants' counsel have any potential relevancy to Defendants' burden under 28 U.S.C. § 1404(a), these statements are addressed in the Declaration of Jon P. Christiansen ("Christiansen Decl.") attached as **Exhibit A**.

WASH_2352676.2

Motion to Transfer Venue, the factual allegations of Coors' Complaint therefore must be taken as true.

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Under 28 U.S.C. § 1404(a), Defendants bear the burden of showing that transfer is warranted. *Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 623 (E.D. Va. 2002). The factors that this Court considers when determining whether to grant a motion to transfer include (1) the plaintiff's choice of venue; (2) witness convenience and access; (3) the convenience of the parties; and (4) the interests of justice. *Precision Franchising, LLC v. Coombs*, No. 1:06-cv-1148, 2006 WL 3840334, at *2 (E.D. Va. Dec. 27, 2006). In this case, all four factors weigh in favor of denying Defendants' Motion to Transfer Venue, as set forth in the section that follows.

## III.    ARGUMENT

### A.    The 1996 Distributor Agreements Require Defendants to Resolve Their Dispute With Coors Here in the Eastern District of Virginia.

For more than twelve years, Defendants have reaped the benefits of the 1996 Distributor Agreements whereby they were granted the exclusive right to distribute MOLSON® brands of beer in their assigned territories. While retaining these benefits, Defendants now seek to be relieved of what they now contend is the burden of compliance with one contractual provision. That provision, the Mandatory Forum Selection Clause, required Coors to bring this action in the Eastern District of Virginia. By commencing this action in this Court, Coors complied with its contractual obligations. The Mandatory Forum Selection Clause also provided that "each party waives, freely and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. §§ 1404 or 1406." By filing their Motion to Transfer Venue, Defendants have breached

5

the foregoing contractual obligations to Coors while needlessly increasing the costs of this litigation. In this regard, Defendants have failed to even address controlling Fourth Circuit precedents requiring enforcement of the Mandatory Forum Selection Clause contained in the 1996 Distributor Agreements from which — more than twelve years after their execution — Defendants continue to benefit to this day.

### 1.    Supreme Court and Fourth Circuit precedents require enforcement of the Mandatory Forum Selection Clause.

To meet their burden of showing that the Mandatory Forum Selection Clause is "unreasonable under the circumstances" (*Bremen*, 407 U.S. at 10), Defendants must show that "(1) it was the result of 'fraud or overreaching'; (2) 'trial in the contractual forum [would] be so gravely difficult and inconvenient [for Defendants] that [they would] for all practical purposes be deprived of [their] day in court'"; or (3) enforcement would contravene a strong public policy in the forum in which the suit could have been brought. *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 213-14 (4th Cir. 2007), *quoting Bremen*, 407 U.S. at 15-18. *See also Vulcan Chem. Techs., Inc. v. Barker*, 297 F.3d 332, 339 (4th Cir. 2002); *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996); *Middleburg Training Center, Inc. v. Firestone*, 477 F. Supp. 2d 719, 726-27 (E.D. Va. 2007).

In view of *Bremen* and its progeny, the Fourth Circuit has rejected similar requests to rewrite forum selection clauses. The forum selection clause at issue in *Sterling Forest Assocs., Ltd. v. Barnett-Range Corp.*, 840 F.2d 249 (4th Cir. 1988) (abrogated on separate grounds),[12]

---

[12] *Sterling Forest* was abrogated on its determination that a failure to transfer a matter to another district constituted a "final decision" that could be the subject of an appeal. *Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989). *See Scotland Memorial Hosp., Inc. v. Integrated Informatics, Inc.*, No. Civ. 1:02-cv-00796, 2003 WL 151852, *4 n. 4 (M.D.N.C. Jan. 8, 2003) ("*Sterling Forest* continues to govern the distinction between mandatory and permissive forum selection clauses in this circuit, because the Supreme Court's subsequent overruling of the case was limited to a holding on an unrelated issue.").

WASH_2352676.2

provided that "venue shall be in California." The district court, however, refused to transfer the matter to California in accordance with that contractual provision. On appeal, the Fourth Circuit observed:

> We would demean the intelligence and legal ability of the drafters of the Purchase Agreement were we to hold that, when, after negotiating the issue, they wrote that the Agreement shall be "construed and enforced" in accordance with California laws and that "venue shall be in California," what they really meant was that the place in which suit may be brought "shall exist" in California and "elsewhere as well."

*Id.* at 252.

In this case, there is similarly no reason to "demean the intelligence and legal ability of the drafters of" the 1996 Distributor Agreements. Defendants do not even argue — much less establish — that the 1996 Distributor Agreements are the result of "fraud or overreaching" as required by *Bremen*. *See* 407 U.S. at 15. Nor do Defendants assert or establish that litigation in the Eastern District of Virginia would be "so gravely difficult and inconvenient" that they would "for all practical purposes be deprived of [their] day in court." *Bremen*, 407 U.S. at 18.[13] Last but not least, Defendants fail to meet their burden of showing that enforcement of the Mandatory Forum Selection Clause would contravene a strong public policy of New York. *Pee Dee Health Care*, 509 F.3d at 213. To the contrary, New York has a strong public policy in favor of enforcing forum selection clauses. *See* C.P.L.R. § 501 (a "written agreement fixing place of trial, made before an action is commenced, shall be enforced upon a motion for change of place of trial."). The New York Beer Franchise Law provides no basis for invalidating the Mandatory Forum Selection Clause in the 1996 Distributor Agreements.

---

[13] In a parallel arbitration matter, Defendants' counsel called only two witnesses, one of whom — an expert — was from Florida. (Christiansen Decl. ¶ 3) There would simply be no substantial burden for Defendants to litigate in this Court, as discussed herein. *See* pp. 15-17, *infra*.

### 2.    The Mandatory Forum Selection Clause is not invalidated by the New York Beer Franchise Law.

Notwithstanding the clear and unambiguous language of the Mandatory Forum Selection Clause, Defendants' Motion to Transfer (*see* p. 18) makes the heroic assertion that they "have not agreed to a forum selection clause."  In support of this assertion, Defendants cite ¶ 17(a) of the 1996 Distributor Agreements.  This provision incorporates the laws of the jurisdiction in which each Distributor operates "to the extent that such laws … are required to be so incorporated and shall supersede any conflicting provision of this Agreement."  It is certainly true that the New York Beer Franchise Law contains an anti-waiver provision.  *See* New York Alcoholic Beverages Control Act § 55-c(11).  The anti-waiver provision, however, does not invalidate the Mandatory Forum Selection Clause of the 1996 Distributor Agreements.  That is among the reasons that the Eastern District of New York rejected a challenge under the New York Beer Franchise Law to the enforceability of a forum selection clause requiring dispute resolution in Russia "in the Arbitration Court of St. Petersburg and the Leningradskaya Oblast."  *See S.K.I. Beer*, 443 F. Supp. 2d at 323-24 ("Assuming that the Contract fell within the scope of the Statute, the Court would find that it does not constitute a 'strong public policy' capable of overcoming the federal policy favoring F[orum]S[election]C[lause] enforcement.").  In this case, the argument is even stronger for finding no conflict between the New York Beer Franchise Law and the Mandatory Forum Selection Clause requiring dispute resolution in the Eastern District of Virginia.

At the time the 1996 Distributor Agreements were signed, the New York Beer Franchise Law permitted New York beer wholesalers such as Oak and Boening to bring a cause of action for damages "in a court of competent jurisdiction."  McKinney's 1996 Session Law News of

New York, S. 5410-B.[14]   Under the New York Beer Franchise Law as enacted, Defendants therefore could have asserted a claim for its violation in the Eastern District of Virginia.  In fact, they could still do so today notwithstanding subsequent amendments to the statute.

Effective September 17, 1997, the New York Beer Franchise Law was amended.  *See* McKinney's 1997 Session Law News of New York, S. 5743[15] (the "1997 Amendments").  The 1997 Amendments provided that statutory claims for damages could be asserted "in a court of competent jurisdiction ***within this state*** for damages sustained ***in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance***."  *See id.*  The foregoing provision of the 1997 Amendments does not mandate venue in New York for this case or any other case arising under the New York Beer Franchise Law.  Even if Coors' Complaint were a claim for damages under the New York Beer Franchise Law, the 1997 Amendments provide merely that a civil action ***may*** proceed in New York.  In other words, New York is a permissive forum in which a wholesaler may seek relief under the New York Beer Franchise Law.  As a result, the Defendants could have sought relief in New York or in any court of competent jurisdiction — but for the Mandatory Forum Selection Clause of the 1996 Distributor Agreements.  The New York Beer Franchise Law does not prohibit a New York beer wholesaler from contracting for venue outside New York.  *See S.K.I. Beer*, 443 F. Supp. 2d at 323-24.  Even if it did, the 1997 Amendments did not purport to apply retroactively to pre-existing contracts such as the 1996 Distributor Agreements.  Rather, Section 5 of the 1997 Amendments states:  "This act shall take effect immediately [*i.e.*,

---

[14] A copy of the New York Franchise Law as enacted and effective September 25, 1996 is attached as **Exhibit B**.

[15] A copy of the New York Franchise Law as enacted and effective September 17, 1997 is attached as **Exhibit C**.

September 17, 1997].”  *See id*.  In any event, retroactive application of the 1997 Amendments

would be inconsistent with basic principles of statutory construction[16] if not the Contracts

Clause.[17]

Nor did subsequent amendments to the New York Beer Franchise Law that were enacted

in 2001 invalidate forum selection clauses.  *See* McKinney’s 2001 Session Law News of New

York, S.5577-A[18] (the “2001 Amendments”).    By virtue of the 2001 Amendments, the

provisions of the New York Beer Franchise Law regarding private rights of action were amended

as follows:

> 6.  Right of action.  If a brewer fails to comply with the provisions of this section,
> a beer wholesaler may maintain a civil action in a court of competent jurisdiction
> within this state for damages sustained in accordance with the laws of this state
> which shall govern all disputes arising under an agreement or by reason of its
> making and performance.  ~~Except in the case of a brewer’s implementation of a
> national or regional consolidation policy with regard to its wholesaler network, in~~
> ***In*** any such action the court may grant such equitable relief as is necessary or
> appropriate, considering the purposes of this section, to remedy the effects of any
> failure to comply with the provisions of this section or the effects of conduct
> prohibited hereunder, including declaratory judgment, mandatory or prohibitive
> injunctive relief, or preliminary or other interim equitable relief***; provided,
> however, that permanent injunctive relief shall not be granted to prohibit the
> effectiveness of a termination or nonrenewal of an agreement in furtherance of
> a policy of consolidation that is in compliance with subparagraph (i) of
> paragraph (e) of subdivision two of this section***.  In any legal action challenging
> any cancellation, termination or failure to renew, ***or where an issue is the
> brewer’s compliance with the provisions of subparagraph (i) of paragraph (e) of
> subdivision two of this section,*** the brewer shall have the burden of proof that its
> action was based upon good cause, provided however, the wholesaler shall retain
> the burden of proof in all other respects.  ***The rights and remedies provided in
> this section to a beer wholesaler with respect to an agreement with a brewer and***

---

[16] *See Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S. Ct. 1483, 128 L.Ed.2d 229 (1994) (“the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.”).

[17] U.S. Const. art. I § 10, cl. 1 (“[n]o State shall … pass any … Law impairing the Obligation of Contracts.”).  *See, e.g.*, *Morgan v. Kemper Ins. Co.*, 754 F.2d 145, 147-48 (4th Cir. 1985) (retroactive application of law impairing contractual termination rights violated Contracts Clause).

[18] A copy of the New York Franchise Law as enacted and effective September 19, 2001 is attached as **Exhibit D**.

> *to an affected wholesaler or an affected brewer shall be intended to supplement*
> *and not be exclusive of any rights and remedies otherwise available pursuant to*
> *any other statute, or at law or equity.*

Like the 1997 Amendments, the 2001 Amendments did not purport to invalidate forum selection

provisions. On their face, the 2001 Amendments did not apply retroactively. *See* § 7 ("This act

shall take effect immediately and shall be deemed to have been in full force and effect on and

after June 15, 2001, and shall apply to agreements amended, cancelled, terminated, modified or

not renewed on or after such date.").

   When the New York Legislature wants to invalidate forum selection clauses, it knows

how to do so, expressly. In fact, the New York Legislature has invalidated forum selection

clauses in other franchise statutes — but not in the New York Beer Franchise Law. For example,

under the New York Motor Vehicle Dealer Act, a motor vehicle franchisor cannot require "a

franchised motor vehicle dealer to agree to a term or condition in a franchise, which … specifies

the jurisdiction, venues or tribunals in which disputes arising with respect to the franchise … or

agreement shall or shall not be submitted for resolution or otherwise prohibits a franchised motor

vehicle dealer from bringing an action in a particular forum otherwise available." McKinney's

Vehicle and Traffic Laws § 463(x)(2) (2002). The failure of the New York Legislature to

include a comparable provision in the New York Beer Franchise Law suggests that the omission

was deliberate under the basic maxim of statutory construction known as *expressio unius est*

*exclusio alteriusis*. *See* McKinney's Consolidated Laws of New York, Book 1, Statutes sec. 240

("where a law expressly describes a particular act, thing or person to which it shall apply, an

irrefutable inference must be drawn that what is omitted or not included was intended to be

omitted or excluded."). *See also New York City Council v. City of New York*, 4 A.D.3d 85, 96,

770 N.Y.S.2d 346 (1st Dep't 2004).

WASH_2352676.2

Similarly, other states that wish to prohibit forum selection clauses in franchise agreements do so expressly. For example, under the New Jersey Franchise Practices Act, forum selection clauses are invalid to the extent they require dispute resolution in a forum outside New Jersey. *See* N.J.S.A. § 56:10-7.3(2) ("It shall be a violation of the 'Franchise Practices Act' for a motor vehicle franchisor to require a motor vehicle franchisee to agree to a term or condition in a franchise, which … [s]pecifies the jurisdictions, venues or tribunals in which disputes arising with respect to the franchise … shall or shall not be submitted for resolution or otherwise prohibits a motor vehicle franchisee from bringing an action in a particular forum otherwise available under the law of this State."). Even with such an express prohibition — which is conspicuous by its absence from the New York Beer Franchise Law — the New Jersey courts do not reject forum selection clauses out of hand. Rather, they hold merely that such clauses are ***presumptively invalid*** unless the franchisor can show that such a provision was not imposed on the franchisee unfairly on the basis of the franchisor's superior bargaining position. *See Allen v. World Inspection Network Intern., Inc.*, 389 N.J. Super. 115, 120-25, 911 A.2d 484 (A.D. 2006).

Had this dispute been the subject of a court filing in New York, such an action would properly be subject to transfer to the Eastern District of Virginia by virtue of the Mandatory Forum Selection Clause. As the court observed in *S.K.I. Beer*, "there is a 'strong public policy in favor of forum selection and arbitration clauses.'" *See* 443 F. Supp.2d at 313. The Eastern District of New York gave short shrift to the contention that Russian courts would not afford the protections offered in the New York Beer Franchise Law, finding that claim to be "unsupported by any evidence." *Id.* at 324. *See also Fidelity & Deposit Co. of Maryland v. Altman*, 209 A.D.2d 195, 195, 618 N.Y.S.2d 286 (1st Dep't 1994). Defendants ought not be heard to argue

WASH_2352676.2

that this Court would offer them any less protection under the New York Beer Franchise law than would the Arbitration Court of St. Petersburg and the Leningradskaya Oblast.

### B. Application of the Section 1404(a) Venue Transfer Factors Warrants Denial of Defendants' Motion to Transfer Venue.

To the extent that the Mandatory Forum Selection Clause of the 1996 Distributor Agreements is not determinative, application of the Section 1404(a) factors does not favor transfer to the Southern District of New York.  To the contrary, all four factors on which Defendants bear the burden of proof — (1) the plaintiff's choice of venue; (2) witness convenience and access; (3) the convenience of the parties; and (4) the interests of justice (*Precision Franchising*, 2006 WL 3840334, at *2) — weigh against transfer.

As this Court has previously observed, "in weighing the factors in a § 1404(a) analysis, a district court should consider the presence of a valid forum selection clause as central to the calculus, weighing heavily in favor of the contractual forum." *Precision Franchising,* 2006 WL 3840334, at *2 (E.D. Va. Dec. 27, 2006).  *See also Atley Pharmaceuticals v. Brighton Pharmaceuticals, Inc.*, No. 3:06-cv-301-HEH, 2006 WL 2868934, at *3-5 (E.D. Va. Oct. 4, 2006) (holding that transfer was appropriate based on existence of valid forum selection clause).

"Thus, while other factors might 'conceivably' militate [in favor of] a transfer … the venue mandated by a choice of forum clause rarely will be outweighed by 1404(a) factors." *P&S Business Machines, Inc. v. Canon USA, Inc.,* 331 F.3d 804, 807 (11th Cir. 2003) (quoting *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989)).  *See also Central Coal Co. v. Phibro Entergy, Inc.*, 685 F. Supp. 595, 596 (W.D. Va. 1988) (transferring case to New York when contract negotiated and executed in New York based on forum selection clause mandating venue in New York despite the fact that neither party was based in New York).

WASH_2352676.2

**1.    Coors' choice of the Eastern District of Virginia forum
is entitled to substantial weight under 28 U.S.C. § 1404(a).**

Under the first Section 1404(a) factor, Coors' choice of this forum is entitled to substantial weight in determining whether transfer is appropriate.  *JTH Tax. Inc. v. Whitaker*, 2:07-cv-170, 2007 WL 2126300 (E.D. Va. July 16, 2007).  "It is well settled that a court should rarely disturb a plaintiff's choice of forum unless the balance of the hardships clearly favor transfer in favor of the defendant."  *Verizon Online*, 203 F. Supp. 2d at 623.  *See also Capital One Financial Corp. v. Drive Financial Servs., LP*, 434 F. Supp. 2d 367, 375 (E.D. Va. 2006). This is especially true when the chosen venue is the contractual forum mandated by a forum selection clause.  *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) ("[t]he presence of a forum selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's analysis."); *Precision Franchising, LLC v. Starr*, No. 1:06-cv-505, 2006 WL 2456378, at *3 (E.D. Va. Aug. 22, 2006).

Ignoring the foregoing authority, Defendants contend that Coors' choice of forum should be "afforded no deference" because Coors does not have its headquarters in Virginia[19] and because the 1996 Distributor Agreements provide for distribution of the MOLSON® brands of beer in New York.  In support of this contention, Defendants cite authority that is inapposite and readily distinguishable.  From the reported decisions, it is clear that courts provide less deference to a plaintiff's choice of forum only when that forum is not the plaintiff's home forum *and* it is also not the contractual choice of forum.  As this Court has previously held, a "plaintiff's choice of forum is entitled to substantial weight in determining whether transfer is appropriate, especially when the chosen venue is his home forum *or the contractual forum in a forum*

---

[19] Coors does have a brewery, however, in the Western District of Virginia, in Shenandoah.  *See* http://www.molsoncoors.com/about/company/breweries/shenandoah/.

WASH_2352676.2

*selection clause*." *Precision*, 2006 WL 3840334, at *5 (emphasis added) (*citing Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1946)).  Defendants' discussion of the Section 1404(a) factors on which they have the burden of proof simply ignores the fact that the parties have agreed to dispute resolution in the Eastern District of Virginia.  Virginia courts will grant significant weight to a party's choice of forum even when it is not the party's home forum when the forum is selected by contract.  *See Central Coal Co. v. Phibro Entergy, Inc.*, 685 F. Supp. 595, 596 (W.D. Va. 1988) (transferring case to New York when contract negotiated and executed in New York based on forum selection clause mandating venue in New York despite the fact that neither party was based in New York).

Defendants' authorities are also distinguishable because Coors' Complaint is based on the construction of contracts — the 1996 Distributor Agreements — that were entered into in Virginia.  Therefore, the true nexus of operative facts in this matter is in Virginia.  *See Central Coal*, 685 F. Supp. at 596 ("The last act necessary for a binding contract, execution by [the Plaintiff], occurred within Virginia.  Accordingly, Virginia law would normally be applicable.").

### C.    The Convenience of Defendants' Witnesses Does Not Weigh in Favor of Transfer to the Southern District of New York.

In view of Defendants' failure to answer Coors' Complaint, it is by no means clear that any witnesses will be necessary to resolve the relatively simple questions of contract interpretation and/or statutory construction raised by Coors' Complaint.  In this regard, it is telling that, in the *Ryan* arbitration referenced in Defendants' Motion to Transfer Venue, Defendants' Motion to Transfer Venue, Defendants' counsel called only one fact witness on behalf of the beer wholesaler, plus an expert from Florida.  *See* Christiansen Decl. ¶ 3.

Defendants' Motion to Transfer nevertheless identifies ten individuals who supposedly may be called as witnesses in this case.  Because all of these witnesses reside outside the

Commonwealth of Virginia, Defendants would have this Court conclude that New York is a more convenient forum. This argument is insufficient to meet Defendants' burden under Section 1404(a).

Of the ten witnesses identified in Defendants' Motion to Transfer, only four reside in New York. All of them are Defendants' executives. To the extent that their testimony is in fact necessary, Defendants' Motion to Transfer is premised entirely on the convenience of Defendants and these four executives. This argument ignores the principle that "the signing of a valid forum selection clause is a waiver of the right to move for a change of venue on the ground of inconvenience to the moving party." *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 378 (7th Cir. 1990). In this case, the Mandatory Forum Selection Clause contains an express waiver of Defendants' right to seek a venue transfer on this or any other grounds. Moreover, "[a] party challenging venue does not prevail if transfer does [nothing] more than merely shift the inconvenience to the other party." *Taltwell, LLC v. Zonet USA Corp.,* No. 3:07-cv-543, 2007 WL 4562874, at *12 (E.D. Va. Dec. 20, 2007) (internal quotations omitted).

Three of the remaining ten witnesses are Coors employees. Their residence outside Virginia cannot be used to bolster Defendants' Motion to Transfer. *See Mullins v. Equifax Information Servs., LLC*, No. Civ. A. 3:05-cv-888, 2006 WL 1214024, at *6 (E.D. Va. Apr. 28, 2006) ("Assuming arguendo, that the plaintiff has inconvenienced himself in this case, he may do so if he so desires") (internal citations and quotations omitted).

The remaining three witnesses (former Molson executives) are non-party witnesses located in either Colorado or Canada.[20] Their convenience is afforded greater weight than party

---

[20] Defendants' Affirmation identifies the state of residence of one of Coors' witnesses, Mr. Styles, as Colorado. He actually resides in California, not Colorado. In any event, the residency of Coors' witnesses is immaterial.

witnesses in deciding a motion to transfer venue. *See id.* at *7. These witnesses, however, are no more inconvenienced by proceeding in New York than in Virginia. *See also Koh v. Microtek Int'l, Inc.,* 250 F. Supp. 2d 627, 637 (E.D. Va. 2003).

> ### D.      The Convenience of the New York Attorney General is Irrelevant to Defendants' Motion to Transfer.

The convenience of the New York Attorney General has no bearing on Defendants' Motion to Transfer Venue. Coors is not challenging the constitutionality of the New York Beer Franchise Law. To the extent that the New York Beer Franchise Law controls resolution of the parties' dispute, its provisions are unambiguous. In particular, the 1997 Amendments and the 2001 Amendments are both clear that they do not apply retroactively. Retroactive application of the New York Beer Franchise Law is among the ways of construing the statute to avoid constitutional conflicts. By asking this Court to follow this basic principle of statutory construction, Coors' Complaint is hardly challenging the constitutionality of the New York Beer Franchise Law. As the Eastern District of New York observed in *S.K.I. Beer*, "a court should construe legislative enactments to avoid constitutional difficulties if possible." 443 F. Supp. 2d at 320. In that case, the court construed the New York Beer Franchise Law as being limited to sales within New York — thereby avoiding conflict with dormant Commerce Clause. The court did so without holding the statute unconstitutional and without requiring the intervention of the New York Attorney General. Nothing can prevent the New York Attorney General from seeking to intervene in a private commercial dispute in Virginia or New York. Coors is not required to provide notice to the Attorney General, however, because Coors is not challenging the constitutionality of the New York Beer Franchise Law.[21]

---

[21] In *Molson USA LLC v. John G. Ryan, Inc.*, the prior arbitration referenced in Coors' Complaint, the distributor agreement did not predate the amendments to the New York Beer Franchise Law as is the case here. The

17

**E.    The Interests of Justice Weigh Against Transfer of Coors' Complaint
From the Eastern District of Virginia to the Southern District of New York.**

There is no merit to Defendants' contention that the interests of justice favor transfer to New York because (1) Coors' Complaint requires the construction of New York law and (2) Coors' predecessor-in-interest, Molson USA LLC ("Molson USA"), has arbitrated a "related" *Ryan* matter in New York and sought judicial confirmation of the arbitral award there.

The interests of justice do not favor transferring this matter to New York because the parties have already agreed to litigation in Virginia.  It is irrelevant that Coors was not the original "Importer" under the 1996 Distributor Agreements.  The rights and obligations of the original "Importer," Martlet, have long since been assumed, first by Molson USA and later by Coors.  Defendants do not argue, nor could they argue, that Coors' rights and obligations under the 1996 Distributor Agreements were diminished when Coors assumed Martlet's rights and obligations.

This matter can be easily resolved in the Eastern District of Virginia.  It requires no special knowledge of New York law.  The issue before the Court is simple:  whether Coors can terminate the 1996 Distributor Agreements pursuant to a plan of consolidation and Defendants' entitlement to compensation as a result of the termination.  Coors' Complaint presents issues of contract interpretation and statutory construction that this Court can handle just as readily as the Southern District of New York — and certainly more expeditiously.[22]

The pendency of the *Ryan* matter in the Southern District of New York is not relevant to this case.  The *Ryan* matter is (or was) before the Southern District of New York because that

---

arbitrator thus reached the issue of whether the New York Beer Franchise Law could constitutionally define Molson's plan of consolidation by reference to acts occurring outside of New York.

[22] In the Eastern District of Virginia, the median time from filing to trial of civil cases is 9.3 months.  In the Southern District of New York, the average is 25.7 months.  *See* http://www.uscourts.gov/cgi-bin/cmsd2006.pl.

WASH_2352676.2

was the appropriate venue for the confirmation of an arbitration award under the Federal Arbitration Act in the district in which the arbitration occurred. 9 U.S.C. § 9. Moreover, the Court never looked to the merits of the award because the confirmation petition was never opposed. In any event, that matter has been concluded by the confirmation of the award.[23]

Last but not least, Defendants' accusation that Coors initiated this proceeding in Virginia for the sole purpose of harassing Defendants is as baseless as it is gratuitous. Defendants and the predecessors of Coors agreed to have their disputes resolved in Virginia. To suggest that, by merely following the mutually agreed upon terms of the contracts between them, Coors is seeking to harass Defendants is patently absurd. If Defendants were so concerned about the inconvenience of litigating in Virginia, they could have insisted on removing the Mandatory Forum Selection Clause before signing the 1996 Distributor Agreements and reaping their benefits for more than twelve years. Section 1404(a) provides no authority for this Court to rewrite the contracts years after their execution simply because Defendants no longer like one particular provision. To invalidate the Mandatory Forum Selection Clause by transferring this matter to New York would unnecessarily undermine the rights of contracting parties by rewarding parties that simply ignore a contract's terms. This Court should not invite that result.

## IV.    CONCLUSION

This is a private commercial dispute involving sophisticated parties whose relationship is the subject of integrated written agreements. Certain provisions of these contracts are subject to the New York Beer Franchise Law. The New York Legislature, however, has chosen not to invalidate forum selection clauses in agreements between breweries and New York wholesalers. A motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is not an appropriate vehicle for

---

[23] A copy of the confirmation is attached as **Exhibit E**.

rewriting either private contracts or state statutes. Coors therefore respectfully requests that Defendants' Motion to Transfer Venue be denied.

Dated: February 6, 2008

Respectfully submitted,

COORS BREWING COMPANY

By: _____ /s/ _____
                                    Counsel

Michael J. Lockerby (Virginia Bar No. 24003)
Kimberly J. Shur[*]
Michael J. Harwin[*]
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone:  (202) 672-5300
Fax:  (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen[**]
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax:  (414) 297-4900

Counsel for Plaintiff Coors Brewing Company

---

[*] Admitted in New York, Georgia and the District of Columbia only

[**] Admitted in Wisconsin only

20

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 6th day of February, 2008, I will electronically file the foregoing COORS' OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record for Defendants:

> Marshall A. Winslow, Jr., Esq.
> WOLCOTT RIVERS GATES
> 1 Columbus Center, Suite 1100
> Virginia Beach, Virginia  23462
> MWinslow@wolriv.com

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

> Gary Ettelman, Esq.
> ETTELMAN & HOCHHEISER, P.C.
> 100 Quentin Roosevelt Boulevard, Suite 401
> Garden City, New York  11530


> _____/s/_____
> Michael J. Lockerby
> Virginia Bar No. 24003
> Attorney for Coors Brewing Company
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street N.W., Suite 500
> Washington, D.C. 20007-5143
> Phone:  (202) 672-5300
> Fax:  (202) 672-5399
> E-mail:  mlockerby@foley.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **COORS BREWING COMPANY,** | ) | |
| **a Colorado corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:07 CV 1235** |
| **v.** | ) | |
| | ) | |
| **OAK BEVERAGE, INC.,** | ) | |
| **a New York corporation, and** | ) | |
| | ) | |
| **BOENING BROS., INC.,** | ) | |
| **a New York corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF JON P. CHRISTIANSEN

Jon P. Christiansen declares as follows:

1.      I am one of the counsel representing Coors Brewing Company in this matter.  I am a member of the law firm of Foley & Lardner LLP.  I make this declaration of my own personal knowledge.

2.      I was lead counsel in the case of Molson USA, LLC v. John G. Ryan, Inc., an arbitration proceeding pending before the American Arbitration Association, Case No. 15-181-00640-05.  Counsel for the Respondent, John G. Ryan, Inc., was Gary Ettelman, counsel for the Defendants in this matter.  The issues in the Ryan arbitration were similar to those presented in this case, namely the application of New York Alcohol Beverage Control Statute 55-c to Coors' (as successor to Molson USA LLC) national plan of consolidation.

3.      In the Ryan case, Mr. Ettelman presented two witnesses, the owner of the distributor and a valuation expert from Florida.

4.    I declare subject to the penalties of perjury that the foregoing is true and correct.

Executed on this 4th day of February, 2008.

Jon P. Christiansen



1996 Sess. Law News of N.Y. Ch. 679 (S. 5410-B) (McKINNEY'S)
**(Publication page references are not available for this document.)**


                    McKINNEY'S 1996 SESSION LAW NEWS OF NEW YORK
                                219th Legislature

                      Copr. © West 1996.  All rights reserved

                Additions are indicated by **<<+ Text +>>**; Deletions by **<<- Text ->>**
                        Changes in tables are made but not highlighted.

                                     CHAPTER 679
                                      S. 5410-B
                      AGREEMENTS BETWEEN BREWERS AND BEER WHOLESALERS


                         Approved and effective Sept. 25, 1996

        AN ACT to amend the alcoholic beverage control law, in relation to agreements
        between brewers and beer wholesalers

          The People of the State of New York, represented in Senate and Assembly, do
                                  enact as follows:

          § 1. The alcoholic beverage control law is amended by adding a new section 55-c
        to read as follows:

                              << NY AL BEV CON § 55-c >>

        **<<+**§ 55-c. Agreements between brewers and beer wholesalers**+>>**

          **<<+**1. Purpose.  It is hereby declared to be the policy of this state, that the
        sale and delivery of beer by brewers to beer wholesalers shall be pursuant to a
        written agreement.  That further, the regulation of business relations between
        brewers and beer wholesalers is necessary and appropriate to the general economy
        and tax base of this state and in the public interest.**+>>**

          **<<+**2. Definitions.  As used in this section, the following words shall have the
        following meanings:**+>>**

          **<<+**(a) "Agreement" means any contract, agreement, arrangement, course of dealing
        or commercial relationship between a brewer and a beer wholesaler pursuant to which
        a beer wholesaler is granted the right to purchase, offer for sale, resell,
        warehouse or physically deliver beer sold by a brewer.**+>>**

          **<<+**(b) "Brewer" means any person or entity engaged in business as a brewer,
        manufacturer, importer, marketer, broker or agent of any of the foregoing who sells
        or offers to sell beer to a beer wholesaler in this state or any successor to a
        brewer.**+>>**

                        Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 679 (1996)                                                                 Page 2
 1996 Sess. Law News of N.Y. Ch. 679 (S. 5410-B) (McKINNEY'S)
**(Publication page references are not available for this document.)**

   **<<+**(c) "Successor to a brewer" means any person or entity which acquires the business or beer brands of a brewer, without limitation, by way of the purchase, assignment, transfer, lease, or license or disposition of all or a portion of the assets, business or equity of a brewer in any transaction, including merger, corporate reorganization or consolidation or the formation of a partnership, joint venture or other joint marketing alliance.**+>>**

   **<<+**(d) "Beer wholesaler" and "wholesaler" means the holder of a wholesaler's license pursuant to section fifty-three of this article who purchases, offers to sell, resells, markets, promotes, warehouses or physically distributes beer sold by a brewer.**+>>**

   **<<+**(e) "Good Cause" means:**+>>**

   **<<+**(i) The implementation by a brewer of a national or regional policy of consolidation which results in a reduction in the number of a brewer's wholesalers for a brand in this state, provided that all affected wholesalers are afforded ninety days prior notice of the implementation of such policy. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.**+>>**

   **<<+**(ii) There is a failure by the beer wholesaler to comply with a material term of an agreement required by subdivision three of this section between the brewer and beer wholesaler, provided that: (A) the wholesaler was given written notice by the brewer of the failure to comply with the agreement and such notice sets forth with particularity the basis for the brewer's determination of non-compliance; (B) the wholesaler was afforded a reasonable opportunity to assert good faith efforts to comply with the agreement within the time limits provided for in clause (C) of this subparagraph; (C) the wholesaler was afforded thirty days in which to submit a plan of corrective action to comply with the agreement and an additional ninety days to cure such non-compliance in accordance with the plan.**+>>**

   **<<+**(f) "Good faith" means honesty in fact and the observance of reasonable commercial standards in the trade.**+>>**

   **<<+**(g) "Material modification" of an agreement or to "materially modify" means and includes a substantial and significant change in the competitive circumstances under which the agreement was entered into and is performed which is caused by a brewer without fault on the part of the wholesaler.**+>>**

   **<<+**3. Written agreement required. Except as provided for in subdivision ten of this section, beer offered for sale in this state by a brewer to a beer wholesaler shall be sold and delivered pursuant to a written agreement which conforms to the provisions of this section and which sets forth all essential and material terms, requirements, standards of performance and conditions of the business relationship between a brewer and a beer wholesaler. Such agreement may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided the brewer has acted in good faith. The requirements of this section may not be altered, waived or modified by written or oral agreement.**+>>**

Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 679 (1996)                                                     Page 3
 1996 Sess. Law News of N.Y. Ch. 679 (S. 5410-B) (McKINNEY'S)
**(Publication page references are not available for this document.)**

    <<+4. Termination for cause and opportunity to cure.  (a) No brewer may cancel, fail to renew an agreement unless the party intending such action has good cause for such cancellation, failure to renew, or termination and in any case in which prior notification is required under this section, the party intending to act has furnished said prior notification specifying the reasons for cancellation, failure to renew or termination to the affected party and the affected party has been afforded thirty days in which to submit a plan of corrective action to cure the claimed defaults or deficiencies specified in such notification, and has failed to cure such defaults or deficiencies within ninety days of submission of the plan of corrective action.+>>

    <<+(b) No brewer shall amend or materially modify or otherwise terminate any essential and material term or requirement of an agreement unless the brewer has good cause therefor and has furnished the affected party with the prior notification required under this section.+>>

    <<+5. Notice of default or deficiency.  (a) Except as provided in paragraph  (d) of this subdivision, no brewer may cancel, fail to renew or terminate an agreement unless the brewer or beer wholesaler furnished prior notification in accordance with paragraph (c) of this subdivision.+>>

    <<+(b) Notwithstanding any agreement, no brewer or beer wholesaler may materially amend or modify an essential and material term or requirement unless the brewer or beer wholesaler furnished prior notification in accordance with paragraph (c) of this subdivision.+>>

    <<+(c) The notification required under paragraphs (a) and (b) of this subdivision shall be in writing and sent to the affected party by certified mail.  Such notification shall contain:+>>

    <<+(i) a statement of intent to cancel, not renew, otherwise terminate, materially amend or modify an agreement;+>>

    <<+(ii) a statement of all reasons therefor, stated with particularity;  and+>>

    <<+(iii) the date on which such action shall take effect.+>>

    <<+(d) A brewer or beer wholesaler may cancel, fail to renew or otherwise terminate an agreement without furnishing the prior notification required under this section only:+>>

    <<+(i) in the event the affected party has made an assignment for the benefit of creditors or similar disposition of all or substantially all of the assets of such party's business;+>>

    <<+(ii) in the event of a conviction or plea of guilty or no contest to a felony which in the reasonable judgment of the brewer may adversely affect the goodwill or interests of the wholesaler or brewer;+>>

    <<+(iii) in the event of the revocation or suspension for thirty-one days or more of any license or permit required of the wholesaler for the normal operation of its business;+>>

Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 679 (1996)                                                                Page 4
 1996 Sess. Law News of N.Y. Ch. 679 (S. 5410-B) (McKINNEY'S)
**(Publication page references are not available for this document.)**

   <<+(iv) in the event there was fraudulent conduct on the part of the brewer or
beer wholesaler in its dealings with the other party;+>>

   <<+(v) in the event of the failure by either party to pay sums of money to the
other party when due or if either party takes any action that provides for its
immediate termination pursuant to the terms of a written enforceable agreement;
or+>>

   <<+(vi) in the event the brewer and beer wholesaler voluntarily agree in writing
to terminate the agreement.+>>

   <<+6. Right of action.  If a brewer fails to comply with the provisions of this
section, a beer wholesaler may maintain a civil action in a court of competent
jurisdiction for damages sustained.  Except in the case of a brewer's
implementation of a national or regional consolidation policy with regard to its
wholesaler network, in any such action the court may grant such equitable relief as
is necessary or appropriate, considering the purposes of this section, to remedy
the effects of any failure to comply with the provisions of this section or the
effects of conduct prohibited hereunder, including declaratory judgment, mandatory
or prohibitive injunctive relief, or preliminary or other interim equitable relief.
In any legal action challenging any cancellation, termination or failure to renew,
the brewer shall have the burden of proof that its action was based upon good
cause, provided however, the wholesaler shall retain the burden of proof in all
other respects.+>>

   <<+7. Reasonable compensation.  (a) Any brewer who shall implement a national or
regional consolidation policy with regard to its wholesaler network in this state
or who without good cause amends, cancels, terminates, materially modifies or fails
to renew any agreement, or who in violation of this section causes a beer
wholesaler to resign from an agreement or denies or withholds consent to any
assignment, transfer or sale of a beer wholesaler's business assets or capital
stock or other equity or debt securities, shall pay the affected beer wholesaler
reasonable compensation for damages sustained.+>>

   <<+(b) In the event that the brewer and the beer wholesaler are unable to agree on
the compensation to be paid for the value of the beer wholesaler's business and
assets, the matter may with the consent of both the brewer and the beer wholesaler,
be submitted to a neutral arbitrator to be selected by the parties;  if they cannot
agree on such an arbitrator, the same shall be selected by a judge of a court of
competent jurisdiction.  No brewer or beer wholesaler may impose binding
arbitration of any issue as as [FN1] term or condition of an agreement.
Arbitration costs shall be equally divided by the beer wholesaler and the brewer.
The award of the arbitrator shall be confirmed by a court of competent jurisdiction
in this state, the judgment of which shall be binding.+>>

   <<+8. Sale and transfer of beer wholesaler's business.  No brewer shall
unreasonably withhold or delay its approval of any assignment, sale or transfer of
all or any portion of beer wholesaler's corporate equity or debt or assets,
including the beer wholesaler's rights and obligations under the terms of an
agreement, whenever the person or persons to be substituted meet objectively
reasonable standards imposed by the brewer.+>>

Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 679 (1996)                                                                    Page 5
 1996 Sess. Law News of N.Y. Ch. 679 (S. 5410-B) (McKINNEY'S)
**(Publication page references are not available for this document.)**

   **<<+**9. A brewer qualified to do business in the state of New York may hold an interest in a limited partnership licensed by the authority as a wholesaler, when the brewer or its affiliate is a limited partner and the beer wholesaler is the general partner.  Notwithstanding any other provision of law, such brewer may loan money to a general partner of an aforementioned limited partnership.**+>>**

   **<<+**10. Coverage.  (a) This section shall not apply to written agreements that were in effect prior to the effective date of this section which set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler, including but not limited to the grounds and procedures which govern:  (i) termination of the relationship; (ii) approval and disapproval of managers;  (iii) change in ownership;  and (iv) whether or not the wholesaler is entitled to compensation in the event the wholesaler is terminated for deficient performance under such agreement or without good cause.  Provided, however, that this section shall apply to any agreement entered into, and renewals, extensions, amendments or conduct constituting a material modification of an agreement on or after the effective date of this section.**+>>**

   **<<+**(b) Where an agreement between a brewer and beer wholesaler in effect prior to the effective date of this section is continuous in nature or has no specific duration or has no renewal provision and fails to set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler, including but not limited to the grounds and procedures which govern:  (i) termination of the relationship;  (ii) approval and disapproval of managers;  (iii) change in ownership;  and (iv) whether or not the wholesaler is entitled to compensation in the event the wholesaler is terminated for deficient performance under such agreement or without good cause;  such agreement shall be considered for purposes of this section to have been renewed sixty days after the effective date of this section.**+>>**

   [FN1] So in original.  Probably should be "a".

                << Note:  NY AL BEV CON § 55-c >>

   **<<+**§ 2. Severability.  If any provision of this act is declared invalid by a court of competent jurisdiction, such invalidity shall not affect the other provisions of this act which can be given effect without the invalid provisions and to that end the provisions of this act shall be severable.**+>>**

   § 3. This act shall take effect immediately.

NY LEGIS 679 (1996)

END OF DOCUMENT

Copr. © West 2008 No Claim to Orig. Govt. Works



```
              McKINNEY'S 1997 SESSION LAW NEWS OF NEW YORK
                          220th Legislature

              Copr. © West Group 1997.  All rights reserved.

              Additions are indicated by <<+ Text +>>;
                     deletions by <<- Text ->>
              Changes in tables are made but not highlighted.

                          CHAPTER 612
                            S. 5743
        ALCOHOLIC BEVERAGES--AGREEMENTS BETWEEN BREWERS AND WHOLESALERS


            Approved Sept. 17, 1997, effective as provided in section 5
```

  AN ACT to amend the alcoholic beverage control law, in relation to agreements between brewers and beer wholesalers

  The People of the State of New York, represented in Senate and Assembly, do enact as follows:


  § 1. Paragraphs (b) and (e) of subdivision 2 of section 55-c of the alcoholic beverage control law, as added by chapter 679 of the laws of 1996, are amended and a new paragraph (h) is added to read as follows:


                        << NY AL BEV CON § 55-c >>

  (b) "Brewer" means any person or entity engaged <<+primarily+>> in business as a brewer, manufacturer <<+of alcoholic beverages+>>, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in this state or any successor to a brewer.


  (e) "Good Cause" means:

  (i) The implementation by a brewer of a national or regional policy of consolidation which results in a reduction in the number of a brewer's wholesalers for a brand in this state, provided that all affected wholesalers <<+and affected brewers+>> are afforded ninety days prior notice of the implementation of such policy.  <<+Such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer.  The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler.+>>  The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss <<+or diminishment+>> of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

  (ii) There is a failure by the beer wholesaler to comply with a material term of
an agreement required by subdivision three of this section between the brewer and
beer wholesaler, provided that:  (A) the wholesaler was given written notice by the
brewer of the failure to comply with the agreement <<- and such notice sets forth-
>> <<+as provided for in subdivision five of this section and in which the brewer
states+>> with particularity the basis for the brewer's determination of non-
compliance<<+, and upon the wholesaler's written request within ten days of receipt
of the notice, the brewer has supplemented such notice by submitting to the
wholesaler in writing the brewer's recommended plan of corrective action to cure
the claimed defaults or deficiencies in a manner satisfactory to it+>>;  (B) the
wholesaler was afforded a reasonable opportunity to assert good faith efforts to
comply with the agreement <<+by curing the claimed defaults or deficiencies
specified in said notice+>> within the time  <<-limits->> provided for in clause (C)
of this subparagraph;  <<+and+>> (C) the wholesaler was afforded <<- thirty->>
<<+fifteen+>> days <<-in which->> <<+after receipt of such notice+>> to submit a
<<+written+>> plan of corrective action to comply with the agreement <<+by curing
the claimed non-compliance+>> and <<-an additional ninety days->> <<+seventy-five
days+>> to cure such non-compliance in accordance with the plan.  <<+Provided,
however, that such period for cure may be increased or reduced to a commercially
reasonable period by an order of a court in this state entered after a hearing at
which the brewer has the burden to demonstrate that the claimed defaults or
deficiencies can be substantially rectified in the period of time afforded the
wholesaler or that, after receipt of notice of default or deficiency as provided
for in subdivision five of this section, the wholesaler has intentionally engaged
in an affirmative course of conduct in which the brewer's current marketing plans
and other trade secrets are disclosed to a third party without the prior consent of
the brewer or in which the wholesaler acts or threatens to act to significantly
impair, harm or dilute the reputation or competitive position of the brewer or
otherwise irreparably injure the brewer, its brands or trademarks.  Provided,
further however:  (1) that such period for cure need not exceed forty-five days if
within the twelve months immediately following a cure, the wholesaler intentionally
engages in conduct which repeats the same specified default and deficiency which
the brewer had deemed cured; and (2) that such period for cure need not exceed
sixty days in the event that during the twelve month period preceding the notice,
the total case purchases by the wholesaler of the affected products of the brewer
account for less than one-half of one percent of the wholesaler's aggregate case
purchases from all sources or one thousand cases.  For purposes of this
subdivision, case purchases of affected products whether package or draught shall
be computed in twenty-four twelve ounce equivalence units.+>>

  <<+(h) "Multiple brands wholesaler" means a wholesaler which pursuant to
agreements with different brewers holds the rights to purchase, resell, warehouse
or physically deliver two or more competing products in substantially the same
geographic area or to the same customer class.+>>

  § 2. Subdivisions 3 and 4 of section 55-c of the alcoholic beverage control law,
as added by chapter 679 of the laws of 1996, are amended to read as follows:

                        << NY AL BEV CON § 55-c >>

  3. Written agreement required.  Except as provided for in subdivision ten of this
section, beer offered for sale in this state by a brewer to a beer wholesaler shall

**(Publication page references are not available for this document.)**

be sold and delivered pursuant to a written agreement which conforms to the
provisions of this section and which sets forth all essential and material terms,
requirements, standards of performance and conditions of the business relationship
between a brewer and a beer wholesaler.  Such agreement may be cancelled,
terminated, materially modified or not renewed for good cause as defined in this
section, provided the brewer has acted in good faith.  **<<-The requirements of this
section may not be altered, waived or modified by written or oral agreement.->>**

   4. Termination for cause and opportunity to cure.  (a) No brewer may cancel, fail
to renew**<<+, or terminate+>>** an agreement unless the party intending such action
has good cause for such cancellation, failure to renew, or termination and in any
case in which prior notification is required under this section, the party
intending to act has furnished said prior notification **<<-** specifying the reasons
for cancellation, failure to renew or termination to the affected party and the
affected party has been afforded thirty days in which to submit a plan of
corrective action to cure the claimed defaults or deficiencies specified in such
notification,**->>** **<<+**as provided for in subdivision five of this section**+>>** and
**<<+the wholesaler+>>** has failed to cure such defaults or deficiencies **<<-**within
ninety days of submission of the plan of corrective action**->>** **<<+**after a period for
cure, as provided for in clause (C) of subparagraph (ii) of paragraph (e) of
subdivision two of this section**+>>**.

   (b) No brewer shall amend or materially modify or otherwise terminate any
essential and material term or requirement of an agreement unless the brewer has
good cause therefor and has furnished the affected party with **<<-** the**->>** **<<+**at
least fifteen days**+>>** prior notification **<<+**as**+>>** required **<<-**under**->>** **<<+**by
subdivision five of**+>>** this section.

   § 3. Subparagraph (v) of paragraph (d) of subdivision 5 of section 55-c of the
alcoholic beverage control law, as added by chapter 679 of the laws of 1996, is
amended to read as follows:

                        << NY AL BEV CON § 55-c >>

   (v) in the event of the failure by either party to pay sums of money to the other
party when due or if either **<<-**party**->>** **<<+**the wholesaler or brewer**+>>** takes any
action **<<-**that provides**->>** **<<+**which would provide grounds**+>>** for **<<-**its**->>**
immediate termination pursuant to the **<<+** reasonable**+>>** terms of a written
enforceable agreement**<<-;  or->>** **<<+** between them, which was freely entered into
without threat of termination or other coercion or compulsion and was in full force
and effect sixty days from the effective date of the chapter of the laws of
nineteen hundred ninety-seven which amended this subparagraph**;+>>**

   § 4. Subdivisions 6, 8 and 9 of section 55-c of the alcoholic beverage control
law, as added by chapter 679 of the laws of 1996, are amended and a new subdivision
11 is added to read as follows:

                        << NY AL BEV CON § 55-c >>

   6. Right of action.  If a brewer fails to comply with the provisions of this
section, a beer wholesaler may maintain a civil action in a court of competent
jurisdiction **<<+**within this state**+>>** for damages sustained **<<+**in accordance with

Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 612 (1997)                                                                 Page 4
 1997 Sess. Law News of N.Y. Ch. 612 (S. 5743) (McKINNEY'S)
**(Publication page references are not available for this document.)**

the laws of this state which shall govern all disputes arising under an agreement
or by reason of its making and performance+>>.  Except in the case of a brewer's
implementation of a national or regional consolidation policy with regard to its
wholesaler network, in any such action the court may grant such equitable relief as
is necessary or appropriate, considering the purposes of this section, to remedy
the effects of any failure to comply with the provisions of this section or the
effects of conduct prohibited hereunder, including declaratory judgment, mandatory
or prohibitive injunctive relief, or preliminary or other interim equitable relief.
In any legal action challenging any cancellation, termination or failure to renew,
the brewer shall have the burden of proof that its action was based upon good
cause, provided however, the wholesaler shall retain the burden of proof in all
other respects.

   8. Sale and transfer of beer wholesaler's business.  No brewer shall unreasonably
withhold or delay its approval of any assignment, sale or transfer of all or any
portion of beer wholesaler's corporate equity or debt or assets, including the beer
wholesaler's rights and obligations under the terms of an agreement, whenever the
person or persons to be substituted meet objectively reasonable standards imposed
by the brewer.  <<+A wholesaler who sells, assigns or transfers an agreement made
pursuant to this section shall provide written notice of such sale, assignment or
transfer to all other brewers with whom it has entered agreements.+>>

   9. <<+(a)+>> A brewer qualified to do business in the state of New York may hold
an interest in a limited partnership licensed by the authority as a wholesaler,
when the brewer or its affiliate is a limited partner and the beer wholesaler is
the general partner.  Notwithstanding any other provision of law, such brewer may
loan money to a general partner of an aforementioned limited partnership.
<<+Provided, however, any brewer or its affiliate who holds an interest in a
limited partnership licensed by the authority as a wholesaler or who loans money to
a general partner of such limited partnership may only exercise such control of the
business as permitted by section 121-303 of the partnership law.+>>

   <<+(b) Notwithstanding subdivision (a) of this subdivision, no brewer or its
affiliate may acquire or hold an interest in or loan money to a general partner of
a multiple brands wholesaler unless and until all other brewers having agreements
with said multiple brands wholesaler have been afforded sixty days prior written
notice of the particular terms and conditions of the limited partnership or loan
agreement or of any change therein.  A "loan" for purposes of this subdivision
shall not include bona fide credit terms for product purchases customarily extended
by a brewer to wholesalers in the normal course of business.+>>

   <<+(c) For one hundred twenty days after the formation, licensing and commencement
of operations as a beer wholesaler of a limited partnership or the making of a
loan, and upon at least fifteen days prior notification as required by subdivision
five of this section, a brewer may terminate an agreement with a multiple brands
wholesaler in the event:  (i) a competing brewer or its affiliate becomes a limited
partner with or loans money to a general partner of a multiple brands wholesaler,
(ii) by reason of said loan, the performance of a loan agreement, or the terms or
conduct of the limited partnership, there is a reasonable likelihood that
competition between brands of the competing brewers has been or may be
significantly reduced in a relevant geographic area or market, and (iii) in lieu of
other rights and remedies it might have under this chapter to terminate for good
cause, the terminating brewer pays reasonable compensation as provided for herein

Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 612 (1997)                                                           Page 5
 1997 Sess. Law News of N.Y. Ch. 612 (S. 5743) (McKINNEY'S)
**(Publication page references are not available for this document.)**


to the multiple brands wholesaler.**+>>**


  **<<+**11. The requirements of this section may not be altered, waived or modified by
written or oral agreement in advance of a bona fide case and controversy arising
under a written agreement complying with this section.**+>>**


                        << Note:  NY AL BEV CON § 55-c >>


  § 5. This act shall take effect immediately;  provided, however, that for a period
of 60 days from the effective date of this act, any amendment by a brewer and
wholesaler to a written agreement otherwise complying with section 55-c of the
alcoholic beverage control law that is allowed by virtue of the provisions of this
act and which brings such agreement into compliance with such section as amended by
this act shall be deemed for good cause and, therefore, not in violation of such
section as it existed prior to the effective date of this act.


NY LEGIS 612 (1997)

END OF DOCUMENT

Copr. © West 2008 No Claim to Orig. Govt. Works



 2001 Sess. Law News of N.Y. Ch. 346 (S. 5577-A) (McKINNEY'S)
**(Publication page references are not available for this document.)**


McKINNEY'S 2001 SESSION LAW NEWS OF NEW YORK
224th Legislature

Copr. © West Group 2001.  All rights reserved.


Additions are indicated by **<<+ Text +>>**; deletions by **<<- Text ->>**.
Changes in tables are made but not highlighted.

CHAPTER 346
S. 5577-A
ALCOHOLIC BEVERAGE CONTROL--BREWERS AND BEER WHOLESALERS--AGREEMENTS


Approved September 19, 2001, effective as provided in section 7


 AN ACT to amend the alcoholic beverage control law, in relation to agreements
between brewers and beer wholesalers


 The People of the State of New York, represented in Senate and Assembly, do
enact as follows:


 § 1. The opening paragraph and subparagraph (i) of paragraph (e) of subdivision 2
of section 55-c of the alcoholic beverage control law, as amended by chapter 612 of
the laws of 1997, are amended to read as follows:

<< NY AL BEV CON § 55-c >>

 "Good <<-Cause->> <<+cause+>>" means <<+and shall be limited to+>>:

 (i)<<+(A)+>> The implementation by a brewer of a national or regional policy of
consolidation which <<-results-> <<+is reasonable, nondiscriminatory and
essential.  Such policy shall have been previously disclosed, in writing, in
reasonable detail to the brewer's wholesalers, and shall result+>> in a
<<+contemporaneous+>> reduction in the number of a brewer's wholesalers <<+not
only+>> for a brand in this state, <<- provided that all->> <<+but also for a brand
in contiguous states or in a majority of the states in which the brewer sells the
brand.  All+>> affected wholesalers and affected brewers <<-are->> <<+shall be+>>
afforded ninety days prior notice of the implementation of such policy<<-. Such-
>><<+, and such+>> notice shall be provided by the brewer implementing said policy.
Further, an affected wholesaler who has actual knowledge of the intended
implementation of such policy shall also notify each affected brewer.  The term
"affected brewers" means all other brewers with an agreement with an affected
wholesaler who is a multiple brands wholesaler.  The term "affected wholesalers"
means wholesalers who may reasonably be expected to experience a loss or
diminishment of a right to distribute a brand, in whole or in part, as a
consequence of a proposed consolidation policy.

NY LEGIS 346 (2001)                                                              Page 2
 2001 Sess. Law News of N.Y. Ch. 346 (S. 5577-A) (McKINNEY'S)
**(Publication page references are not available for this document.)**


   <<+(B) An affected brewer receiving notice pursuant to this paragraph may, within
one hundred twenty days after receiving such notice, terminate an agreement with a
multiple brands wholesaler in the event: (1) the total case purchases computed in
twenty-four twelve ounce equivalence units by the wholesaler of the products of the
affected brewer amounted to two percent or less of the multiple brands wholesaler's
total sales volume during the twelve month period preceding the notice;  and (2)
the affected brewer, prior to such termination, pays compensation to the multiple
brands wholesaler.+>>


   § 2. Subdivision 2 of section 55-c of the alcoholic beverage control law is
amended by adding a new paragraph (i) to read as follows:


                          << NY AL BEV CON § 55-c >>


   <<+(i) "Fair market value of distribution rights" means the amount a willing
seller, under no compulsion to sell, would be willing to accept and a willing
buyer, under no compulsion to purchase, would be willing to pay for the
distribution rights.+>>


   § 3. Subdivision 6 of section 55-c of the alcoholic beverage control law, as
amended by chapter 612 of the laws of 1997, is amended to read as follows:


                          << NY AL BEV CON § 55-c >>


   6. Right of action.  If a brewer fails to comply with the provisions of this
section, a beer wholesaler may maintain a civil action in a court of competent
jurisdiction within this state for damages sustained in accordance with the laws of
this state which shall govern all disputes arising under an agreement or by reason
of its making and performance.  <<-Except in the case of a brewer's implementation
of a national or regional consolidation policy with regard to its wholesaler
network, in->> <<+In+>> any such action the court may grant such equitable relief
as is necessary or appropriate, considering the purposes of this section, to remedy
the effects of any failure to comply with the provisions of this section or the
effects of conduct prohibited hereunder, including declaratory judgment, mandatory
or prohibitive injunctive relief, or preliminary or other interim equitable
relief<<+; provided, however, that permanent injunctive relief shall not be granted
to prohibit the effectiveness of a termination or nonrenewal of an agreement in
furtherance of a policy of consolidation that is in compliance with subparagraph
(i) of paragraph (e) of subdivision two of this section+>>.  In any legal action
challenging any cancellation, termination or failure to renew, <<+or where an issue
is the brewer's compliance with the provisions of subparagraph (i) of paragraph (e)
of subdivision two of this section,+>> the brewer shall have the burden of proof
that its action was based upon good cause, provided however, the wholesaler shall
retain the burden of proof in all other respects.  <<+The rights and remedies
provided in this section to a beer wholesaler with respect to an agreement with a
brewer and to an affected wholesaler or an affected brewer shall be intended to
supplement and not be exclusive of any rights and remedies otherwise available
pursuant to any other statute, or at law or equity.+>>


   § 4. Subdivision 7 of section 55-c of the alcoholic beverage control law, as
added by chapter 679 of the laws of 1996, is amended to read as follows:


Copr. © West 2008 No Claim to Orig. Govt. Works

2001 Sess. Law News of N.Y. Ch. 346 (S. 5577-A) (McKINNEY'S)
**(Publication page references are not available for this document.)**

<< NY AL BEV CON § 55-c >>

  7. Reasonable compensation.  (a) Any brewer who shall implement a national or
regional consolidation policy <<-with regard to its wholesaler network in this
state or->><<+, pursuant to this section, shall not terminate its relationship with
an affected wholesaler until compensation as provided for in this subdivision has
been paid.  Such brewer shall pay the affected beer wholesaler the fair market
value of the distribution rights which will be lost or diminished by reason of the
implementation of such policy, together with fair and reasonable compensation for
other damages sustained.+>>

  <<+(b) Every brewer+>> who without good cause amends, cancels, terminates,
materially modifies or fails to renew any agreement, or who in violation of this
section causes a beer wholesaler to resign from an agreement or denies or withholds
consent to any assignment, transfer or sale of a beer wholesaler's business assets
or capital stock or other equity or debt securities, shall pay the affected beer
wholesaler <<-reasonable compensation for damages sustained->> <<+the fair market
value of the beer wholesaler's business, including distribution rights, which have
been lost or diminished as the result of the brewer's actions+>>.

  <<-(b)->><<+(c)+>> In the event that the brewer and the beer wholesaler are unable
to agree on the compensation to be paid for the value of the beer wholesaler's
business and assets, the matter may with the consent of both the brewer and the
beer wholesaler, be submitted to a neutral arbitrator to be selected by the
parties;  if they cannot agree on such an arbitrator, the same shall be selected by
a judge of a court of competent jurisdiction.  No brewer or beer wholesaler may
impose binding arbitration of any issue as <<- as->> <<+a+>> term or condition of
an agreement.  Arbitration costs shall be equally divided by the beer wholesaler
and the brewer.  The award of the arbitrator shall be confirmed by a court of
competent jurisdiction in this state, the judgment of which shall be binding.

  § 5. Paragraph (c) of subdivision 9 of section 55-c of the alcoholic beverage
control law, as added by chapter 612 of the laws of 1997, is amended to read as
follows:

<< NY AL BEV CON § 55-c >>

  (c) For one hundred twenty days after the formation, licensing and commencement of
operations as a beer wholesaler of a limited partnership or the making of a loan,
and upon at least fifteen days prior notification as required by subdivision five
of this section, a brewer may terminate an agreement with a multiple brands
wholesaler in the event:  (i) a competing brewer or its affiliate becomes a limited
partner with or loans money to a general partner of a multiple brands wholesaler,
(ii) by reason of said loan, the performance of a loan agreement, or the terms or
conduct of the limited partnership, there is a reasonable likelihood that
competition between brands of the competing brewers has been or may be
significantly reduced in a relevant geographic area or market, and (iii) in lieu of
other rights and remedies it might have under this chapter to terminate for good
cause, the terminating brewer pays <<- reasonable->> compensation <<-as provided
for herein->> to the multiple brands wholesaler.

  § 6. Severability.  If any clause, sentence, paragraph, subdivision or section
contained in this act shall be adjudged by any court of competent jurisdiction to

Copr. © West 2008 No Claim to Orig. Govt. Works

NY LEGIS 346 (2001)                                                           Page 4
2001 Sess. Law News of N.Y. Ch. 346 (S. 5577-A) (McKINNEY'S)
**(Publication page references are not available for this document.)**


be invalid, such judgment shall not affect, impair or invalidate the remainder
thereof, but shall be confined in its operation to the clause, sentence, paragraph,
subdivision or section contained in this act directly involved in the controversy
in which such judgment shall have been rendered. It is hereby declared to be the
intent of the legislature that this act would have been enacted even if the invalid
provisions had not been included herein.

  § 7. This act shall take effect immediately and shall be deemed to have been in
full force and effect on and after June 15, 2001, and shall apply to agreements
amended, cancelled, terminated, modified or not renewed on or after such date.

NY LEGIS 346 (2001)

END OF DOCUMENT

Copr. © West 2008 No Claim to Orig. Govt. Works

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/25/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MOLSON USA, LLC.

                    Petitioner,

    -against-

JOHN G. RYAN, INC.,

                    Respondent.

-------------------------------------------------------------:

07CV6965(HB)
DEFAULT JUDGMENT

Hon. HAROLD BAER, JR. District Judge

      This action having been commenced on August 3, 2007, by the filing of the
Summons and Petition, and Respondent having waived service of the Summons and
Petition on August 14, 2007, and Petitioner having filed such waiver of service on August
14, 2007, and Respondent not having answered the Petition, and the time for answering
the Petition having expired, and the Clerk of the United States District Court for the
Southern District of New York having certified Respondent's default on October 16,
2007, it is

      ORDERED, ADJUDGED AND DECREED: That the Petition of Molson USA,
LLC, to confirm the attached arbitration awards, dated November 6, 2006 and July 13,
2007 (the "Awards"), is granted and the Awards are hereby confirmed.

Dated: New York, New York
     January 15, 2008

                                  U.S.D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB - 7 2008

Coors Browing Company,
                                    Plaintiff,

v.                                                                          Civil Action No. 1:07CV1235A

Oak Beverage, Inc.
Boening Bros., Inc.,
                                    Defendant.

## ORDER

A Fed. R. Civ. P. 16(b) PRETRIAL CONFERENCE will be held on Wednesday,  March 5, 2008 at 10:00 a.m. before a magistrate judge.

The parties shall confer prior to this conference to consider the claims, defenses, possibilities of a prompt settlement or resolution of the case, trial before a magistrate judge, to arrange for the disclosures required by Rule 26(a)(1), and develop a discovery plan which will complete discovery by Friday, May 9, 2008. A party may not exceed five (5) non-party, non expert witness dispositions and may not serve on any  other party more than thirty (30) interrogatories, including parts and subparts, without leave of the court.  Proposed discovery plans must be filed by the Wednesday one week before the Rule 16 (b) pretrial conference.

Any party required to file an answer must do so within twenty (20) days.

The FINAL PRETRIAL CONFERENCE will be held on Thursday, May 15, 2008 at 10:00 a.m.

The parties must electronically file on or before the final pretrial conference the Rule 26(a)(3) disclosures and a list of the exhibits to be used at trial, a list of the witnesses to be called at trialexhibits to be used at trial, and a written stipulation of uncontested facts. The exhibits themselves or a copy should be exchanged with opposing counsel before the conference. Objections to exhibits must be filed within 10 days after the conference; otherwise the exhibits shall stand admitted in evidence. The original exhibits shall be delivered to the clerk as provided by Local Rule 79(A). Non-expert witnesses and exhibits not so disclosed and listed will not be permitted at trial except for impeachment or rebuttal, and no person may testify whose identity, being subject to disclosure or timely requested in discovery, was not disclosed in time to be deposed or to permit the substance of his knowledge and opinions to be ascertained. The trial of this case will be set for a day certain, within 4-8 weeks of the final pretrial conference.

Discovery may begin as of receipt of this Order.

                                                        /s/
                                                        **Gerald Bruce Lee**
                                                        **United States District Judge**

                                                        Gerald Bruce Lee
                                                        UNITED STATES DISTRICT JUDGE

February 7, 2008
Alexandria, Virginia
This order is being mailed to local counsel only.

# UNITED STATES DISTRICT COURT

## FOR THE
## EASTERN DISTRICT OF VIRGINIA
Alexandria Division

_____, Plaintiff

V.

Case Number: _____

_____, Defendant

## NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE
## TO EXERCISE JURISDICTION

In accordance with the provisions of 28 U.S.C. §636(c), and Fed.R.Civ.P. 73, you are notified that a United States magistrate judge of this district court is available to conduct any or all proceedings in this case including a jury or nonjury trial, and to order the entry of a final judgment. Exercise of this jurisdiction by a magistrate judge is, however, permitted only if all parties voluntarily consent.

You may, without adverse substantive consequences, withhold your consent, but this will prevent the court's jurisdiction from being exercised by a magistrate judge. If any party withholds consent, the identity of the parties consenting or withholding consent will not be communicated to any magistrate judge or to the district judge to whom the case has been assigned.

An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.

## CONSENT TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE

In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.

| Party | Signature of Counsel or *Pro Se* Party | Date |
|-------|----------------------------------------|------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## ORDER OF REFERENCE

IT IS ORDERED that this case be referred to a United States Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §636(c) and Fed.R.Civ.P. 73.

_____        _____
Date                                                        United States District Judge

NOTE: RETURN THIS FORM TO THE CLERK OF THE COURT <u>ONLY IF</u> ALL PARTIES HAVE CONSENTED
TO THE EXERCISE OF JURISDICTION BY A UNITED STATES MAGISTRATE JUDGE.

# N O T I C E

## INITIAL AND FINAL PRETRIAL FILINGS

In accordance with Rules 5 and 73, Federal Rules of Civil Procedure, the following procedures are to be followed:

### Initial Pretrial

Counsel should confer with their clients prior to the initial pretrial conference and be prepared to respond to inquiry by the judge regarding consent to exercise of jurisdiction by a United States Magistrate Judge for trial and entry of final judgment.

### Final Pretrial

Witness lists and exhibit lists, signed by local counsel, accompanied by a certification of service are to be filed at the final pretrial conference.

Original exhibits, labeled consistent with the exhibit list, bound and tabbed, to be filed one (1) business day before trial. A copy of the exhibits should be exchanged with opposing counsel before the final pretrial conference.

Fernando Galindo
Clerk of Court

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

COORS BREWING COMPANY,

      Plaintiff,

v.                                   Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

      Defendants.


**REBUTTAL MEMORANDUM OF LAW SUBMITTED IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS AND TRANSFER VENUE**

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES .................................................................. ii

PRELIMINARY STATEMENT ........................................................1

ARGUMENT ....................................................................................2

   I.   Defendants' Motion is Based on
       Fed. R. Civ. P. 12(B)(3) and 28 U.S.C. §1404 ............................2

   II.  Section 55-c(6) does Conflict with the Venue Clause as
       Set Forth in Paragraph 17(b) of the Distributor Agreements......................4

   III. Plaintiff's Complete Reliance on *The Bremen*
       and its Progeny Is Misplaced .......................................................8

   IV. This Court Must Transfer Venue Pursuant
       to 28 U.S.C. §1404(a) .................................................................9

       1.  Standard of Law.................................................................10

       2.  Coors Fails to Offer Facts Evidencing
          any Connection to Virginia.................................................10

       3.  Coors' Complaint does Challenge
          the Constitutionality of Section 55-c ....................................12

       4.  None of the Witnesses Resides in Virginia...........................14

       5.  This Action Requires Special Knowledge
          of New York Law ...............................................................15

       6.  New York has a Strong Interest in Having
          a Local Matter Decided Locally .........................................16

       7.  All of the Factors Weigh in Favor of Transfer
          to the Southern District of New York ....................................16

CONCLUSION..................................................................................18

i

# <u>TABLE OF AUTHORITIES</u>

**CASES**
**PAGE(S)**

*BHP International Investment, Inc. v. Online Exchange, Inc.*,
    105 F. Supp. 2d 493 (E.D. Va. 2000) .................................................................................9, 15

*Capital One Financial Corp. v. Drive Financial Services, L.P.*,
    434 F.Supp.2d 367 (E.D. Va. 2006) ...............................................................................10, 15

*East Coast Resources LLC v. Town of Hempstead*,
    No. 3:07CV352, 2007 WL 2071724 (E.D. Va. July 16, 2007) .............................................15

*Garal Wholesalers, Ltd. v. Miller Brewing Company*,
    193 Misc. 2d 630 (N.Y.Sup. 2002) .................................................................................3, 6

*Glamorgan Coal Corp. v. Ratners Group P.L.C.*,
    854 F.Supp. 436 (W.D. Va. 1993) .......................................................................................10

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501, (1947)..............................................................................................……11

*JTH Tax, Inc. v. Lee*,
    482 F.Supp.2d 731 (E.D. Va. 2007) ....................................................................................15

*LG Electronics v. Asustek Computers*,
    126 F.Supp.2d 414 (E.D. Va. 2000) ....................................................................................16

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972)...............................................................................................................8, 9

*Precision Franchising LLC v. Star*,
    No. 1:06-cv-505, 2006 WL 3840334 (E.D. Va. Aug. 22, 2006) ...........................................11

*S.K.I. Beer Corp. v. Baltika Brewery*,
    443 F.Supp.2d 313 (E.D.N.Y. 2006) .....................................................................................5

*Stewart Organization, Inc. v. Ricoh Corporation*,
    487 U.S. 22 (1988)...........................................................................................................9-10

*Verizon Online Services Inc. v. Ralsky*,
    203 F. Supp. 2d 601 (E.D. Va. 2002) ..................................................................................14

**STATUTES**

28 U.S.C. §1404(a) ..................................................................................................... Passim

§55-c of New York's ABC Law. ...................................................................................... Passim

ii

**OTHER AUTHORITIES**

Fed. R. Civ. P. 5.1 ................................................................................................13

Fed. R. Civ. P. 5.1(a)(2) ......................................................................................14

Fed. R. Civ. P. 12(b)(3) ....................................................................................2,8

## PRELIMINARY STATEMENT

Contrary to Coors' claims, Defendants Oak Beverage Inc. ("Oak") and Boening Bros. Inc. ("Boening") have not conceded that venue is proper in this District. In fact, Oak and Boening brought the instant motion pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. §1404(a). Accordingly, the motion is to dismiss this action due to improper venue or to transfer it to the Southern District of New York because the Eastern District of Virginia has no connection to this case, the facts, or the parties. In particular, Defendants argue venue is not proper in this District because there is no binding forum selection clause; the clause Plaintiff relies upon having been superseded by the clear and unambiguous terms of the Distribution Agreements in issue by a provision calling for venue in New York. Further, even if the Court determines that venue is proper, because this case has no connection to the Eastern District of Virginia, under applicable law the Court should transfer it to the Southern District of New York.

In response to Oak and Boening's motion, Coors engages in a pattern of gross prevarication and misrepresentation. For instance, in an effort to downplay the significant prejudice to the Attorney General's Office of New York that has a fundamental right to intervene in this action, Coors incredibly alleges that it does not challenge the constitutionality of New York's Alcoholic Beverage Control law §55-c ("Section 55-c"). Yet, the Complaint states very clearly that Section 55-c is unconstitutional pursuant to both the Contracts Clause and the Dormant Commerce Clause. Equally as incredible is Coors' allegation that this Court will not need to apply New York law despite the fact that its Complaint and even its brief repeatedly cite to and rely on New York law. Indeed, as will be demonstrated in detail below, it is New York law that governs not only the parties' contract but also all facets of their relationship; in fact, Coors is attempting to enforce a provision under Section 55-c which permits a brewer to

terminate a wholesaler if the brewer can prove that it has enacted a statutory policy of

consolidation.  Coors also falsely alleges that the 2001 Amendments to Section 55-c state on

their face that they are not to be applied retroactively.  However, as will be demonstrated below,

not only do the 2001 Amendments state that they are to be applied retroactively but relevant case

law holds that they are to be applied retroactively.  Lastly, Coors attempts to obfuscate the issues

before the Court by asserting that the motion is governed by *The Bremen* decision, despite

subsequent Supreme Court precedent which holds the principles enunciated in *The Bremen* to be

irrelevant in the context of a §1404(a) motion.

Therefore, as set forth in Oak and Boening's initial brief and as will be demonstrated

below, this Court must grant the instant motion pursuant to Fed. R. Civ. P. 12(b)(3) and 28

U.S.C. §1404(a) to dismiss this action due to improper venue or to transfer it to the Southern

District of New York.

<u>**ARGUMENT**</u>

I.    **Defendants' Motion is Based on**
      <u>**Fed. R. Civ. P. 12(B)(3) and 28 U.S.C. §1404**</u>

Lacking any credible arguments to defeat Defendants' motion pursuant to Rule 12(b)(3)

and 28 U.S.C. §1404 (a) to dismiss and/or to transfer the instant action to the United States

District Court for the Southern District of New York based upon improper venue, Plaintiff

attempts to create issues where none exist by alleging that Defendant waived the defense of

improper venue by failing to file an answer. Indeed, as set forth in Defendants' Notice of

Motion, Defendants' motion is based upon <u>both</u> Rule 12(b)(3) and 28 U.S.C. §1404 (a).  As

such, Plaintiffs' argument is a nonstarter.

Significantly, in its opposition, Plaintiff fails to refute the very argument which

establishes why venue is improper in this court.  This argument, which is set forth more fully in

Point VII of Defendants' Memorandum of Law submitted in support of this motion, is based upon the simple fact the parties did not agree that venue would be proper in this District. Specifically, the Distributor Agreements in issue, provide that the law of New York, (which necessarily includes Section 55-c) would be <u>incorporated</u> into the agreement, and that §55-c would <u>supersede</u> any conflicting provision of the Distribution Agreement.

The pertinent provision of Section 55-c which is applicable to Defendants' motion to dismiss or transfer for improper venue is Section 55-c (6).  As set forth in Defendants' Memorandum of Law in Support of the instant motion, Section 55-c(6) grants the Defendants the right to bring an a civil action in a court of competent jurisdiction in the <u>State of New York</u> if a brewer fails to comply with the provisions of §55-c. This provision directly contradicts the venue clause contained in ¶17(b) of the Distributor Agreements, which Plaintiff completely relies upon to support venue in the Eastern District of Virginia.

Since the two clauses are in conflict, by the very terms of the Distributor Agreements, which were drafted by the Plaintiff's predecessor, the provisions of Section 55-c supersede. Thus, there is no provision in the parties' agreement providing for venue in this court. Moreover, had the parties not agreed, both the New York State Legislature and the courts have already determined that the provisions of §55-c supersede any conflicting provisions of the written distribution agreement.  *See Garal Wholesalers, Ltd. v. Miller Brewing Company,* 193 Misc. 2d 630, 632, 634 (N.Y.Sup. 2002). Accordingly, based upon the above, §55-c (6) which is incorporated into the Distributor Agreements unambiguously and specifically precludes and vitiates the venue clause set forth in ¶17(b).

To be sure, the unambiguous language chosen for this contract, which was drafted by Plaintiff's predecessor, reveals the parties' true intent that the provisions of Section 55-c will

govern the parties' relationship.  This intent is further supported by the expressed purpose of

Section 55-c which requires written distribution agreements to contain provisions that conform to

the statute.  As aptly stated by Plaintiff in its opposition,[1] "[i]n this case, there is [simply] no

reason to 'demean the intelligence and legal ability of the drafters of the 1996 Distributor

Agreements.'"  By this motion, Defendants are merely seeking to assert their contractual rights.

## II.    Section 55-(c)(6) does Conflict with the Venue Clause as Set Forth in Paragraph 17(b) of the Distributor Agreements

In support of its position, Coors argues that §55-c (6) does not conflict with the venue

clause set forth in ¶17(b) of the Distributor Agreements because (i) the anti-waiver provision

does not invalidate the venue clause; (ii) §55-c (6) provides a permissive forum in which a

wholesaler may seek relief for a violation of the Statute; (iii) the amendment to §55-c which

granted beer wholesalers the right to maintain their action in the state of New York was not

retroactive; and (iv) the New York Legislature did not expressly invalidate forum selection

clauses.  Simply stated, each of Plaintiff's contentions is wrong.

First, Defendants are not relying independently upon the anti-waiver provision found in

§55-c (11) to establish that the venue provision contained in the Distributors Agreement was

vitiated by another contractual term.[2]  Section 55-c (11) provides, "[t]he requirements of this

section may not be altered, waived or modified by written agreement in advance of a bona fide

case or controversy arising under a written agreement complying with this section."  Notably,

this anti-waiver provision directly contradicts Plaintiff's argument that Defendants waived their

right to bring an action in New York as provided for in the venue provision contained in Section

---

[1] *See* Plaintiff's Memorandum of Law in Opposition at 7.

[2] While Plaintiff seeks to rely upon *S.K.I. Beer Corp. v. Baltika Brewery,* 443 F.Supp.2d 313 (E.D.N.Y. 2006) for the proposition that §55-c does not invalidate forum selection clause, the facts of *S.K.I. Beer* is readily distinguishable for the following reasons (i) *S.K.I. Beer* did not involve a contract that incorporated §55-c as a provision of the Distributor Agreement; and (ii) the issue before the court in *S.K.I. Beer* was the enforceability of a

55-c(6).   As a result of §55-c(11), Coors was not in a position to effectuate a waiver of Defendants' statutory right to maintain an action in New York and therefore, §55-c(6) directly conflicts with ¶17(b).

Second, lacking any support for its conclusion, Coors argues that §55-c(6) is a permissive venue clause.  However, Coors' argument is irrelevant.  Indeed, irrespective of whether §55-c (6) is viewed as a permissive venue provision, the provision still conflicts with the venue provision set forth in ¶17(b) of the Distributor Agreements as §55-c (6) allows a wholesaler to maintain an action in New York and ¶17(b) requires the action to be brought in Virginia.  Reconciling these two provisions is an impossibility and therefore, pursuant to the parties' agreement, §55-c(6) supersedes and vitiates ¶17(b).

Notwithstanding, Coors' position that §55-c(6) does not mandate venue in New York in this instance Plaintiff is wrong. As set forth above, a specific protection afforded to wholesalers pursuant to Section 55-c (6) is the right to maintain an action in the State of New York if a brewer fails to comply with any of the provisions of §55-c.  Coupled with the fact that this protection "may not be altered, waived or modified by written agreement in advance of a bona fide case or controversy," this subsection (6) becomes a mandatory provision.  Succinctly stated, Defendants right to maintain an action against Plaintiff for violating §55-c may not be waived by written agreement absent a bona fide case and controversy.  Here, there was no bona fide case or controversy at the time Defendants signed the Distributors Agreement, and therefore, a waiver of this rights could not be effectuated.  Accordingly, the Defendants right to maintain an action in New York pursuant to Section 55-c(6)), becomes a mandatory venue provision in light of the fact that their right was not properly waived.

---

forum selection clause and  not whether venue was improper under Rule 12(b)(3) or whether venue should be transferred pursuant to  28 U.S.C. §1404(a).

Third, in a further attempt to mislead this court, Coors argues that the 1997 Amendments and the 2001 Amendments do not apply retroactively. This argument is without a foundation in law or in fact. To begin, the 2001 Amendments (which are the only amendments applicable to Defendants' arguments) are expressly written to apply retroactively, contrary to Plaintiff's assertion. The 2001 Amendments state "[t]his act shall take effect immediately and shall be deemed to have been in full force and effect on and after June 15, 2001, and shall apply to agreements amended, cancelled, terminated, modified or not renewed on or after such date." (emphasis added). Thus, because Plaintiff is attempting to terminate Defendants, after June 15, 2001, the statute expressly provides that Plaintiff is bound by the amended provisions. This view is supported by *Garal Wholesalers, Ltd. V. Miller Brewing Company,* 193 Misc.2d 630 (N.Y. Sup. 2002) which held that the 2001 Amendments apply retroactively to agreements modified or terminated on or after the date the legislature approved the amendments.

Similarly, the 1997 Amendments[3] also contain language to show that they are to be applied retroactively and that the parties were required to amend their agreements to conform to the Statute. Specifically, the statute provides "[t]his act shall take effect immediately;[4] provided, however, that for a period of 60 days from the effective date of this act, any amendment by a brewer and wholesaler to a written agreement otherwise complying with section 55-c of the alcoholic beverage control law that is allowed by virtue of the provisions of this act which brings such agreement into compliance with such section as amended by this act shall be deemed for good cause and, therefore, not in violation of such section as it existed prior to the effective date of this act." Thus, this language demonstrates that the amendments were intended to apply retroactively.

---

[3] Notably, the 1997 Amendments are not applicable to Defendants' arguments herein.
[4] Not surprisingly, Plaintiff ends the quotation at this point without citing the complete paragraph.

Equally significant is the fact that even the parties' own agreement supports the finding that the amendments should be applied retroactively. Specifically, ¶17(a) of the Distributor Agreements provide "[i]f required by applicable law, Importer and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with this law." By this language, the parties have contracted for the new restrictions contained in the Amendments to Section 55-c and therefore, the amendments do apply retroactively to these parties.

Finally, Coors, through a tortured interpretation of the statute, argues that the New York Legislature deliberately failed to include specific language in §55-c (6) invalidating forum selection clauses and that this omission evidences the legislative intent that forum selection clauses are not invalid under the Statute. Indeed, by expressly including an anti-waiver provision in the Statute, the New York Legislature has not only mandated all of the provisions, requirements and protections of §55-c but, even more significantly, the New York Legislature has intentionally invalidated any attempt to waive the requirements and protections of the Statute, including the venue provision of §55-c (6). Thus, Plaintiff's contention that the New York Legislature failed to include language in Section 55-c to invalidate forum selection clauses is without merit.

### III.    Plaintiff's Complete Reliance On *The Bremen* and its Progeny is Misplaced

Coors' attempt to mislead this Court once again and recast Defendants' arguments by relying upon *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972) as the basis to enforce the venue clause in ¶17(b) must be rejected because the abstract enforceability of a forum selection clause is not at issue here. As stated above, Defendants' arguments in support of their motion are twofold: (i) venue is improper and dismissal is appropriate under Rule 12 (b)(3) because the venue clause which Plaintiff relies upon was vitiated by the express terms of the parties'

7

agreement; and/or (ii) venue should be transferred pursuant to 28 U.S.C. §1404(a) for the convenience of the parties and witnesses and in the interests of justice.   Thus, principles set forth *The Bremen* and its progeny are inapposite and fail to address either of these arguments.

The issue that the Supreme Court addressed in *The Bremen* was the enforceability of forum selection clauses. 407 U.S. 1, 8 (1972).   Notably, however, this issue was not decided in the context of either a 12(b)(3) motion or 28 U.S.C. § 1404(a).   Notwithstanding, the basis for the Defendants' motion under 12(b)(3) is that  the ¶17(b) venue clause which Plaintiff relies upon to support its position that venue is proper was abrogated by another contractual provision, §55-c(6) which provides for actions to be brought in the state of New York.   Thus, the enforceability of the ¶17(b) venue clause, as addressed by *The Bremen* case, is not at issue here.

Moreover, the Supreme Court has expressly held that the factors set forth in *The Bremen* are <u>not applicable to deciding whether to transfer venue pursuant 28 U.S.C. §1404(a)</u>.  *See Stewart Organization, Inc. v. Ricoh Corporation,* 487 U.S. 22 (1988).  In *Stewart Organization*, the Supreme Court specifically held that 28 U.S.C. §1404(a) governs the court's decision whether to give effect to the parties' forum selection clause, not the factors set forth in *The Bremen* when a party is seeking to transfer venue.  Notably, the Supreme Court specifically stated that "[t]he forum selection clause which represents the parties agreement as to the proper forum, should receive neither dispositive consideration . . . nor no consideration . . . but rather the consideration for which Congress provided in § 1404(a)."  *Id.* at 31;  *See also BHP International Investment, Inc. v. Online Exchange, Inc.*, 105 F. Supp. 2d 493, 495-96 (E.D. Va. 2000).  Thus, contrary to Coors' argument, even if the ¶17(b) venue clause is enforceable, this action can still be properly transferred to the Southern District of New York.

> **IV.    This Court Must Transfer Venue**
> **Pursuant to 28 U.S.C. §1404(a)**

Coors' response fails to refute that New York and not Virginia is the most convenient forum to try this case.  It attaches no relevant affidavits, elicits no new facts, and does not challenge any of the facts brought out by Defendants in their initial filing. Rather, as stated above, Coors' relies exclusively on *The Bremen,* 407 U.S. 1 (1972) and the presence of a forum selection clause, drafted by its predecessor three times removed, as the sole basis for maintaining venue in Virginia.  However, as addressed above, *The Bremen* and the litany of cases cited by Coors are inapposite because none addresses the issue of transfer of venue pursuant to 28 U.S.C. § 1404(a).  Therefore, based on the foregoing, and as will be demonstrated below, all of the relevant factors require that this Court transfer the case to the Southern District of New York because it is the most convenient forum for the parties and the witnesses and Virginia has no connection to any of the facts or the parties' relationship.  Coors' sole reliance on the forum selection clause, drafted by its predecessor three times removed, particularly when every other factor weighs in favor of transfer to the Southern District of New York, is misplaced and this case must be transferred.

    1.   <u>Standard of Law</u>

The factors courts should consider when determining whether to grant a motion to transfer include (1) the plaintiff's choice of venue; (2) the convenience of the parties and witnesses; (3) the interests of justice.  *Capital One Financial Corp. v. Drive Financial Services, L.P.*, 434 F.Supp.2d 367, 375 (E.D. Va. 2006).  "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness."  *Stewart,* 487 U.S. at 29, 108 S. Ct. at 2244.  "The weight given to these factors should be commensurate with the degree each impacts the

policy behind section 1404(a), that is to make the trial 'easy, expeditious, and inexpensive.'"

*Glamorgan Coal Corp. v. Ratners Group P.L.C.*, 854 F.Supp. 436, 437 (W.D. Va. 1993).

 2. Coors Fails to Offer Facts Evidencing
  <u>Any Connection To Virginia</u>

 Coors' brief is devoid of any facts evidencing a connection to Virginia.  The only

connection to Virginia it offers is that one of the initial parties to the contract, a party who

assigned its rights away over twelve years ago and who has since been followed by three

successive importers before Coors was assigned its rights, was a New York corporation with an

office in Virginia, namely Martlet Importing Co. ("Martlet").  Notably, Coors fails to offer any

evidence by way of affidavit that Martlet's principal place of business was in Virginia, that the

contracts were signed or negotiated in Virginia, that there was any performance in Virginia, or

that Defendants made any payments pursuant to the Distributor Agreements in Virginia.

 Further, Coors' reliance on *Precision Franchising LLC v. Star*, No. 1:06-cv-505, 2006

WL 3840334, *2 (E.D. Va. Aug. 22, 2006), for the proposition that its choice of the Eastern

District of Virginia is entitled to substantial weight is easily distinguishable.  First, in *Precision*

the plaintiff actually resided in Virginia.  Therefore, any reference by the court as to the presence

of a forum selection clause was merely dicta.  Second, although there was a forum selection

clause that named the Eastern District of Virginia as the appropriate forum, there was a

legitimate reason other than mere harassment for the selection of that forum, namely that

plaintiff resided in that forum.  In this case, because Martlet assigned its rights away long ago,

any legitimate purpose for Coors bringing this case in the Eastern District of Virginia, other than

to harass and make it more expensive for Defendants to enforce there rights, no longer exists.

See *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S. Ct. 839, 843 (1947) ("It is often said that

the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the

defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his

remedy.")  This is most evident by the fact that Coors' choose to litigate and arbitrate the *Ryan*

decision in the Southern District of New York.  Clearly, the Southern District of New York was

and is a convenient forum for Coors to litigate.  Lastly, Coors' insistence that it has a right to

inconvenience itself and its employees demonstrates that it has no legitimate reason to have

selected the Eastern District of Virginia other than mere harassment.  *See* Pl. Br. at 16.

> 3.    Coors' Complaint Does Challenge
>        The Constitutionality of Section 55-c

Coors' asserts that it "is hardly challenging the constitutionality of the New York Beer

Franchise Law."  Pl. Br. at 17.  However, the clear and unambiguous language of its Complaint

leaves no doubt that this is a gross misrepresentation.  Thus, despite Coors' assertions to the

contrary, Coors was required to notify the New York Attorney General pursuant to Fed. R. Civ.

P. 5.1.

> 36.    The 2001 amendments to the Act do not apply to the
> Distributor Agreements because the Distributor Agreements
> precede the effective date of the 2001 amendments.  Application of
> the 2001 amendments to the Act would offend the Contracts
> Clause of the United States Constitution as a retroactive attempt to
> modify the contractual rights of the parties.
>
> * * * *
>
> 38.    Even if the 2001 amendments to the Act were to apply to
> the Distributor Agreements, the provisions of the Act, as amended,
> that purports to require Coors to show a contemporaneous
> reduction in the number of Molson distributors in the states
> contiguous to New York offends the Dormant Commerce Clause.
> Pl. Comp. ¶¶36, 38.

Rather than admit that it has in fact challenged the constitutionality of Section 55-c,

Coors' engages in revisionist double-speak.  First, Coors' asserts that it is not making a

constitutional challenge because the 1997 and 2001 amendments are "clear that they do not apply

retroactively." Pl. Br. at 17. If this were truly the case, Coors' Complaint would make reference to this "clear" language rather than raise a Contracts Clause and Dormant Commerce Clause challenge. Tellingly, the Complaint is deafeningly silent as to this "clear" language.

Instead, ¶36 states that the 2001 Amendments came into effect after the Distributor Agreements and any retroactive application of the 2001 Amendments would violate the Contracts Clause. As described above, while the language of the 2001 Amendment is in fact clear, it is also clear that amendments do apply retroactively. As set forth above, Section 7 of the 2001 Amendment states that it "shall apply to agreements, cancelled, terminated, modified or not renewed on or after such date." (emphasis added). In this case, Coors' *amended* the Distributor Agreements on November 29, 2001. Further, by way of this action, Coors is *terminating* the Agreements "on or after such date." Thus, it is "clear" that the 2001 Amendments do apply retroactively, and ¶¶36 and 38 of Coors' Complaint are challenging the constitutionality of a New York statute.

Second, Coors' asserts that it does not have to comply with Fed. R. Civ. P. 5.1 because this Court is able to avoid a constitutional challenge and decide the case on other grounds. While it is basic tenet of jurisprudence that a Court should always avoid ruling on constitutional matters when other non-constitutional reasons exist, Coors ignores the clear and unambiguous language of Fed. R. Civ. P. 5.1, which states "[a] party that files a pleading, written motion, or other paper *drawing into question* the constitutionality of a federal or state statute must . . . ." (emphasis added). Surely, while this Court may be able to decide this case on non-constitutional grounds, it is clear that Coors' Complaint draws into question the constitutionality of New York' §55-c.

Therefore, as asserted in Defendants' brief, Coors was required to notify the New York Attorney General pursuant to Fed. R. Civ. P. 5.1(a)(2), a point which Coors' freely admits it has

failed to do.  Further, pursuant to Rule 5.1(c), the New York Attorney General has a right to intervene in this action if he so chooses.  Thus, in the instant case, the convenience of the parties should also include the convenience of the NY Attorney General, particularly because the presence of this case in Virginia effectively prohibits such intervention.

   4. <u>None of the Witnesses Resides in Virginia</u>

   Coors' brief does not rebut the Affidavit of Gary Ettelman, which states that out of eight potential witnesses in this case, four reside in New York and none resides in Virginia.  Further, Coors' does not rebut the relevance of any of these witnesses.  Rather, Coors improperly asserts that in the *Ryan* arbitration only two witnesses were called by the *Ryan* plaintiff.  However, *Ryan* is a different case with different parties and different facts.  The trial strategy adopted by a different plaintiff is wholly irrelevant and immaterial to these Defendants and these facts.  Clearly, based on the location of the witnesses, New York is a more convenient forum in which to try this case than Virginia, which has no connection to any of the facts or parties.  Further, because all of the documentary evidence is located either in New York or Colorado (Coors' also did not rebut this aspect of Ettelman's affidavit) the Southern District is a more convenient forum than the Eastern District of Virginia.  *See Verizon Online Services Inc. v. Ralsky*, 203 F. Supp. 2d 601, 623 (E.D. Va. 2002) (The court put considerable emphasis on the fact that many of plaintiff's employee witnesses resided in a given forum and that most of the documents relevant to the matter were also in the same forum.)

   5. This Action Requires Special
     <u>Knowledge of New York Law</u>

   Coors asserts that this case "requires no special knowledge of New York law."  Pl. Br. at 18.  This is another gross misrepresentation of the facts.  Over 90% of its brief deals specifically with interpretation of New York law.  For instance, Coors cites to not only the New York Beer

13

Franchise Law (§55-c), which governs the parties' relationship, but also the New York Vehicle

Dealer Act and the *S.K.I. Beer* and *Ryan* decisions.  Further, the fact that Coors' refers to a

purported "national plan of consolidation" as justification for Defendants' termination

demonstrates that this Court will require special knowledge of New York law because a national

plan of consolidation is not contained in the parties' agreement, but only found in §55-c.  In

addition, §55-c(6) provides that New York law "shall govern all disputes arising under an

agreement or by reason of its making and performance."

Therefore, the application of New York law clearly and strongly councils in favor of

transferring this case to New York.  See *JTH Tax, Inc. v. Lee*, 482 F.Supp.2d 731 (E.D. Va.

2007) (When evaluating interest of justice, '[c]onsideration should  . . . be given to judicial

familiarity with governing laws."); *East Coast Resources LLC v. Town of Hempstead*, No.

3:07CV352, 2007 WL 2071724, at *3 (E.D. Va. July 16, 2007) ("Regarding the interest of

justice, the Court finds that this factor also weighs in favor of transfer. . . It is likely that

resolution of this matter will involve application of New York law."); *Capital One Financial*

*Corp. v. Drive Financial Services, L.P.*, 434 F.Supp.2d 367, 372 (E.D. Va. 2006); *BHP*

*International Investment, Inc. v. Online Exchange, Inc*., 105 F. Supp. 2d 493, 499 (E.D. Va.

2000) ("Although this court could familiarize itself with Missouri law for the purposes of the

case at bar, the court finds that Missouri courts have a strong interest in having local

controversies decided at home."); *LG Electronics v. Asustek Computers*, 126 F.Supp.2d 414, 424

(E.D. Va. 2000) ("Third, the interest of justice warrants a transfer to the Northern District of

California.  Such District is familiar with at least one of the patents at issue because it previously

rendered a claim construction concerning one of the patents at issue.").

6.    New York has a Strong Interest in
      Having a Local Matter Decided Locally

14

"There is a local interest in having localized controversies decided at home."

Gulf Oil Corp., 330 U.S. at 509, 67 S. Ct. at 843.  This case involves the distribution of beer in

several New York counties, pursuant to New York law, by two New York corporations who are

New York licensed beer distributors.  Performance of the Distributor Agreements occurred

solely in New York and not in the Eastern District of Virginia.  Further, it is New York public

policy, as expressed in §55-c(6), which gives a beer wholesaler the unwaivable right to maintain

a cause of action in New York, that these specific type of "localized controversies" be decided

locally.  Coors does not refute any of these facts or of the importance of having this case decided

locally in New York.

> 7.    All of the Factors Weigh In Favor of
>        Transfer to the Southern District of New York

Thus, in accordance with 28 U.S.C. §1404(a), this Court must transfer to the Southern

District Court located in New York.  The overwhelming majority of factors clearly balance in

favor of New York.  These include:

- Plaintiff Coors is a Delaware corporation headquartered in Golden, Colorado.

- Defendant Oak Beverages is a New York Corporation headquartered in Rockland
  County, NY, which is in the Southern District of NY.

- Defendant Boening Bros. is a New York Corporation headquartered in Suffolk
  County NY, which is in the Eastern District of NY.

- Because Coors challenges the constitutionality of New York law, pursuant to Fed.
  R. Civ. P. 5.1, the New York Attorney General has the right to intervene.  The
  maintenance of this suit in Virginia would effectively preclude the NY Attorney

General from intervening and protecting NY's interest in the constitutional questions regarding §55-c.

- The Distributor Agreement with Oak Beverages that is the subject of this suit concerns the distribution of alcoholic beverages in New York and performance occurs in New York.

- The Distributor Agreement with Boening Bros. that is the subject of this suit concerns the distribution of alcoholic beverages in New York and performance occurs in New York.

- This Court is largely unfamiliar with New York law, whereas a New York court is not. The relationship between the parties is governed by §55-c of New York's ABC Law.

- A related action that Coors specifically cites to and attaches as an exhibit to its Complaint, namely the Ryan matter, is currently pending in the Southern District of New York. Thus, not only does this demonstrate that the Southern District is not inconvenient for Coors, but that the Southern District is familiar with the issues and law at hand.

- All of the documents and witnesses relating to the action are located in either New York, or Colorado; none are located in Virginia.

- Virginia has had no connection with or interest in anything even unusually related to this matter since Martlet Importing Company transferred the import rights to the Molson beer products at issue in the late 1990's.

## **CONCLUSION**

For all of the reasons set forth herein, it is respectfully submitted that this Court grant

Defendants' motion to dismiss or transfer this action to either the Eastern or Southern District of

New York.

Respectfully submitted,

OAK BEVERAGE, INC. and
BOENING BROS., INC.

By: ____/s/_____
                Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mvinslow@wolriv.com

Gary Ettelman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY  11530
(516) 227-6300
Fax: (516) 227-6307

*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of February, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143

        /s/

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **COORS BREWING COMPANY,** ) | |
| **a Colorado corporation,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 1:07 CV 1235** |
| **v.** ) | |
| ) | |
| **OAK BEVERAGE, INC.,** ) | |
| **a New York corporation, and** ) | |
| ) | |
| **BOENING BROS., INC.,** ) | |
| **a New York corporation,** ) | |
| ) | |
| **Defendants.** ) | |

**PROPOSED DISCOVERY PLAN OF**
**PLAINTIFF COORS BREWING COMPANY**

Plaintiff Coors Brewing Company, ("Coors"), by counsel, hereby submits its Proposed

Discovery Plan pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and the Court's

Order dated February 7, 2008 (the "Scheduling Order"), and respectfully states as follows:

       1.     **Conference**.  Pursuant to the Scheduling Order, the parties conferred at various

times regarding a Proposed Joint Discovery Plan via correspondence and telephone calls.

Participants included the undersigned counsel for Coors and counsel for Defendants Oak

Beverage, Inc. ("Oak") and Boening Brothers, Inc., ("Boening") (collectively "Defendants").

Initially it appeared as if counsel for Coors and Defendants would be able to agree upon a

Proposed Joint Discovery Plan as contemplated by the Scheduling Order.  On February 25 and

26, 2008, counsel for Coors learned that counsel for Defendants intended to seek an extension of

the May 9, 2008 discovery deadline contained in the Scheduling Order and/or bifurcation of

discovery so that discovery with respect to damages would continue beyond May 9, 2008.  At

that point, counsel for Defendants expressed an unwillingness to agree to the previously discussed deadlines contained herein, and counsel for Coors expressed an unwillingness to agree to an extension of the May 9, 2008 discovery deadline contained in the Scheduling Order.  As a result of this impasse, Coors is submitting its own Proposed Discovery Plan.

      **2.**    **Pre-discovery Disclosures**.  Each party shall serve its initial disclosures required by Rule 26(a)(1) no later than Friday, March 7, 2008.

      **3.**    **Discovery Plan**.  Coors proposes to the Court the following discovery plan:

        a.    Discovery will be needed on the following subjects:

            i.    Coors' claims against the Defendants, and Defendants' defenses;

            ii.    Defendants' claims against Coors, if any, and Coors' defenses;

            iii.    Damages; and

            iv.    Expert issues.

        b.    As required by the Scheduling Order, all discovery will be completed by Friday, May 9, 2008.

        c.    All fact discovery will be completed by Monday, March 31, 2008.

        d.    Coors and Defendants collectively shall propound no more than thirty (30) requests for production of documents, including parts and subparts thereof, to one another.  The parties shall serve their requests for production by e-mail on the other party no later than Friday, February 29, 2008.

        e.    Coors and Defendants collectively shall propound no more than thirty (30) interrogatories, including parts and subparts thereof, to one another.  The parties shall serve their interrogatories by e-mail on the other party no later than Friday, February 29, 2008.

WASH_2684241.4

f.      Coors and Defendants collectively shall propound no more than thirty (30) requests for admission, including parts and subparts thereof, to one another.  The parties shall serve their requests for admission by e-mail on the other party no later than Friday, February 29, 2008.

g.      Objections and answers to the requests for production of documents, interrogatories, and requests for admission shall be served by e-mail on the party requesting discovery no later than Friday, March 14, 2008.

h.      Documents responsive to requests for production of documents not objected to shall be sent by overnight courier to the requesting party no later than Friday, March 14, 2008.

i.      Coors and Defendants collectively shall take no more than ten (10) depositions — including no more than five (5) non-party, non expert witness depositions — on their claims, counterclaims, and defenses against each other.

j.      Each deposition, other than expert depositions, is limited to a maximum of one (1) day, consisting of seven (7) hours of deposition time unless extended by agreement of the parties or order of the Court.

k.      Except as otherwise provided herein, depositions and written discovery (responses to requests for production of documents, interrogatories, and requests for admission) will take place as provided in the Federal Rules of Civil Procedure and the Local Rules of this Court.

l.      Initial reports from retained experts and expert disclosure under Rule 26(a)(2) are due from the proponent by Friday, April 4, 2008.  The opponent shall submit rebuttal expert reports and expert disclosure pursuant to Rule 26(a)(2), limited to

3

contradicting or rebutting initial expert opinions disclosed by the proponent, by Friday, April 25, 2008. The proponent shall submit any evidence that is solely contradictory or rebuttal evidence to the opponent's disclosure by Friday, May 2, 2008. Drafts of expert reports and expert communications with counsel need not be retained or produced.

m.        Supplementations under Rule 26(e) are due no later than Friday, May 2, 2008.

n.        The parties will submit a proposed Stipulated Protective Order to the Court that will include provisions for the recall, destruction, and/or return of inadvertently produced privileged documents. The parties contemplate entering into a Stipulated Protective Order or Confidentiality Agreement that will permit them to designate information they produce in discovery as "Confidential" if it is eligible for protection under Fed. R. Civ. P. 26(c).

o.        The parties agree that electronically stored information comes within the scope of their discovery obligations.

p.        The parties agree that they must undertake reasonable and good faith efforts to preserve electronically stored information relevant to the claims or defenses in this matter, including a-mails and other electronic documents (including those in formats such as Word, WordPerfect, Excel, PowerPoint, Acrobat PDF, tiff and other off-the-shelf application and those in proprietary formats). To adequately discharge their preservation obligations, the parties are not required to suspend their respective automated document destruction policies or systems, nor to retain or restore backup tapes.

4

q.    Given the nature of the case, the parties do not currently anticipate any need to access electronically stored information that is not reasonably accessible, such as deleted electronically stored information.

r.    All productions of electronically stored information shall be sent to the opposing party on a CD, DVD, hard drive, or other electronic media.

s.    The parties agree that all electronically stored information not produced in native format shall be produced in searchable .tiff or searchable .pdf format, or in .tiff, or .pdf format with corresponding text files, with appropriate Concordance load files. The parties agree that corresponding metadata will not be provided; however, the parties reserve the right to request metadata for individual documents upon a showing of particularized need. Each page of electronically stored information that is produced shall bear a unique Bates number. The parties agree that documents kept in paper form in the ordinary course of business need not be converted to .tiff or .pdf format for purposes of production, but a party may do so at its own election. The parties agree that call detail records will be produced in native form in industry-standard format.

t.    The parties agree that productions of electronically stored information and documents shall be served by overnight courier on the requesting party's attorney of record.

u.    The parties agree that, absent the showing required under Rule 26(b) for cost shifting, each party should bear its own costs for preservation and production of electronically stored information. If any party requests that back-up tapes be maintained or restored, or requests forensic imaging of electronically stored information, then the requesting party shall bear the costs associated with such a request, although the parties

WASH_2684241.4

reserve their respective rights to file appropriate motions pursuant to Rule 26(b) should any such requests related to backup tapes or forensic imaging impose unreasonable burdens beyond cost.

**4.    Other items**.

a.    The parties will attend a pretrial conference on March 5, 2008 at 10:00 a.m. before a Magistrate Judge.

b.    The parties propose that they will have until March 21, 2008 to amend their pleadings.  The parties propose that they will have until March 21, 2008 to add additional parties.  Responses to amended pleadings shall be served ten (10) days from service.

c.    A Final Pretrial Conference is scheduled for Thursday, May 15, 2008 at 10:00 a.m.

d.    All potentially dispositive motions should be filed no later than April 15, 2008.

e.    At this time the parties do not believe alternative dispute resolution techniques would be fruitful in encouraging settlement.  The parties may revisit this question if the Court dismisses any of the claims from the case.

f.    Final lists of witnesses to be called at trial, lists of the exhibits to be used at trial, the exhibits themselves, and a written stipulation of uncontested facts under Rule 26(a)(3) should be exchanged with opposing counsel at or before the May 15, 2008 Final Pretrial Conference.

g.    The parties will have until May 22, 2008 to file objections to the opposing party's final lists of witnesses and exhibits under Rule 26(a)(3).

WASH_2684241.4

h.    Based on the parties and pleadings as they currently stand, the parties

expect approximately 3 days of trial.

i.    Other matters.  NONE


Dated:  February 27, 2008

Respectfully submitted,

COORS BREWING COMPANY

By:    _____/s/_____
                    Counsel

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur[*]
Michael J. Harwin[*]
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone:  (202) 672-5300
Fax:  (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen[**]
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax:  (414) 297-4900

Counsel for Plaintiff
     Coors Brewing Company

---

[*] Admitted in New York, Georgia, and the District of Columbia only

[**] Admitted in Wisconsin only

7

## CERTIFICATE OF SERVICE

I hereby certify that, on February 27, 2008, a true and correct copy of the Proposed

Discovery Plan of Plaintiff Coors Brewing Company was served by electronic mail through the

Court's ECF system upon the following counsel of record for Defendants Oak Beverage, Inc.

and Boening Brothers, Inc.:

> Marshall A. Winslow, Jr., Esq.
> WOLCOTT RIVERS GATES
> 1 Columbus Center, Suite 1100
> Virginia Beach, Virginia  23462
> MWinslow@wolriv.com

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user

who is counsel of record for Defendants Oak Beverage, Inc. and Boening Brothers, Inc.:

> Gary Ettelman, Esq.
> ETTELMAN & HOCHHEISER, P.C.
> 100 Quentin Roosevelt Boulevard, Suite 401
> Garden City, New York  11530

> _/s/_
> Michael J. Lockerby
> Virginia Bar No. 24003
> Attorney for Coors Brewing Company
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street N.W., Suite 500
> Washington, D.C. 20007-5143
> Phone:  (202) 672-5300
> Fax:  (202) 672-5399
> E-mail:  mlockerby@foley.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

COORS BREWING COMPANY,

       Plaintiff,

v.                                                            Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

       Defendants.

## <u>DEFENDANTS' PROPOSED DISCOVERY PLAN</u>

Defendants Oak Beverage Inc. and Boening brothers, Inc. ("O&B" or Defendants") through their counsel, hereby submit their Proposed Discovery Plan pursuant to Fed. R. Civ. P. 26(f) and the Court's Order dated February 7, 2008, and state as follows:

1.     **Pre-Discovery Disclosures.**  The parties shall exchange the automatic disclosure required under Fed. R. Civ. P. 26(a)(1), on or before March 17, 2008.

2.     **Amendments.**  All motions to amend pleadings, including joinder of additional parties, shall be filed no later than March 21, 2008.

3.     **Discovery Plan.**

**(a)** Initial document production demands, interrogatory requests, and requests for admissions shall be served no later than March 21, 2008, and responses to those demands shall be served on or before April 11, 2008.

**(b)** The number of depositions and time limits for each deposition shall be as designated under the Federal Rules of Civil Procedure.

(c) Initial reports from retained experts and expert disclosure under Rule 26(a)(2) are due from the proponent by Friday April 11, 2008. The opponent shall submitted rebuttal expert reports and expert disclosure pursuant to Rule 26(a)(2) by April 25, 2008. Depositions of experts shall be completed by May 5, 2008. The proponent shall submit any evidence that is solely contradictory or rebuttal evidence to the opponent's expert disclosure by May 9, 2008.

(d) All discovery shall be completed no later than May 9, 2008.

4. **Dispositive Motions.** All potentially dispositive motions shall be filed no later than May 15, 2008.

5. **Protective Order.** The parties will submit a Proposed Consent Order Regarding Confidentiality.

6. **Pretrial Conference.** The parties will attend a pretrial conference on March 5, 2008 at 10:00 a.m. before a Magistrate Judge.

7. **Final Pretrial Conference.** A final pretrial conference shall be scheduled for May 15, 2008 at 10:00 a.m.

8. **Alternative Dispute Resolution.** The parties do not believe that alternative dispute resolution techniques will be of assistance.

9. **Other Matters.** None

Respectfully submitted,


By: ____/s/_____
        Of Counsel

Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax:  (757) 497-7267
mwinslow@wolriv.com

Gary Ettleman, Esq.
ETTELMAN & HOCHHEISER P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, New York 11530
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of February 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143
mlockerby@foley.com

_____/s/_____
Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COORS BREWING COMPANY,

       Plaintiff,

v.                                                          Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

       Defendants.

## DEFENDANTS' MOTION TO EXTEND THE TIME TO CONDUCT DISCOVERY

     Defendants Oak Beverage, Inc. and Boening Bros., Inc., by counsel, and pursuant to

Rule 16(b) Fed. R. Civ. P., move this Court for leave to extend the May 9, 2008 deadline for the

completion of discovery set forth in the Court's Order of February 7, 2008 for thirty (30) days to

June 9, 2008.  The grounds for this Motion are set forth in the accompanying Memorandum and

Affirmation.

Dated: February 27, 2008                         Respectfully submitted,

                                           OAK BEVERAGE, INC.
                                           and BOENING BROS., INC.

                                           By _____/s/_____
                                               Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com

Gary Ettleman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of February, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143
mlockerby@foley.com

_____/s/_____
Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc.*
*and Boening Bros., Inc.*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COORS BREWING COMPANY,

      Plaintiff,

v.                                        Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

      Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO EXTEND THE TIME TO CONDUCT DISCOVERY

**ARGUMENT**

**DEFENDANTS' REQUEST TO EXTEND THE**
**DISCOVERY DEADLINE IS NECESSARY AND APPROPRIATE**

Defendants Oak Beverages Inc. and Boening Brothers Inc. ("O&B" or "Defendants"), by this motion hereby respectfully request pursuant to Fed. R.Civ. P. 16(b) that the deadline for the completion of discovery which was set by this Court as May 9, 2008 be extended for thirty (30) days until June 9, 2008, as this original deadline was set prior to the hearing and decision of O&B's pre-answer motion to dismiss. Moreover, this thirty (30) day extension will allow the Defendants to obtain all of the information necessary to effectively defend their interests.

**I.        Standard of Law**

This Court has the authority to extend deadlines to complete discovery. *See Ardrey v. UPS*, 798 F.2d 679, 682 (4th Cir. 1986); *Commonwealth Group-Winchester Partners, L.P. v. Winchester Warehousing, Inc.,* Slip Copy, 2007 WL 2570218 (W.D.Va. Aug. 31, 2007). In fact, in *Commonwealth Group* the court found it advisable to grant a motion to extend discovery dates when there was a dispositive motion pending.

**II.        An Extension of Time is Appropriate**

As a procedural matter, an extension of time for the completion of discovery is appropriate as there is a dispositive motion pending before this Court which is scheduled to be heard on March 6, 2008. Originally, Defendants' pre-answer motion to dismiss and/or transfer for improper venue was scheduled to be heard on February 8, 2008. However, the hearing date of the motion was adjourned at the Court's direction to March 6, 2008. Notwithstanding the adjournment of the hearing date of Defendants' dispositive motion, on February 7, 2008, this Court issued an Order scheduling the Fed.R.Civ. P. 16(b) Pretrial Conference to be held on March 5, 2008, one day prior to the hearing date. Pursuant to this Order, this Court set a

deadline for discovery to be completed by May 9, 2008.   Based upon the fact that, at this time,

the Federal Rules do not require Defendants to file and answer to Plaintiff's complaint because

they have filed a pre-answer motion to dismiss,  the discovery deadline should be extended.

Substantively, even if this Court requires the Defendants to engage in discovery prior to

their submission of an answer, the discovery deadline set by this Court does not allow

Defendants the opportunity to effectively defend their interests as this litigation entails a detailed

analysis of Plaintiffs' business.

Specifically, by its complaint, Plaintiff seeks, among other things, to terminate the beer

distribution rights of O&B pursuant to New York's Alcoholic Beverage Control Law §55-c

("§55-c") as a result of the implementation of a nationwide policy of consolidation. As the

legislative history of §55-c unequivocally demonstrates, Coors cannot effectuate this termination

by a simple announcement.  To the contrary, the brewer must establish through sufficient

evidence that it meets the stringent requirements of §55-c.

Specifically, the relevant portion of §55-c provides:

"Good cause" means and shall be limited to:
(i)(A) The implementation by a brewer of a national or regional policy of
consolidation which is reasonable, nondiscriminatory and essential. Such policy
shall have been previously disclosed, in writing, in reasonable detail to the
brewer's wholesalers, and shall result in a contemporaneous reduction in the
number of a brewer's wholesalers not only for a brand in this state, but also for a
brand in contiguous states or in a majority of the states in which the brewer sells
the brand. All affected wholesalers and affected brewers shall be afforded ninety
days prior notice of the implementation of such policy, and such notice shall be
provided by the brewer implementing said policy.

Indeed, the Statute is clear that in order for a consolidation policy to qualify as grounds

for good cause, a brewer, like Coors, seeking to terminate bears the burden of demonstrating that

its policy meets the following requirements: (1) the policy will be implemented on a national or

regional level; (2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy

is non-discriminatory; and (5) the implementation of the policy, if "regional", will result in a

contemporaneous reduction of the number of distributors for its brand both in New York, as well as in the states contiguous to New York, or if "national" brewer's implementation of the policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brand is sold.  Here, Coors alleges the latter, and therefore must establish in addition to meeting the Statute's other requirements, its policy will result in a contemporaneous reduction in the number of wholesalers both in this State, as well as in the majority of states in which the Molson brand is sold.

Significantly, §55-c places the burden of proof that the consolidation policy meets the requirements of the Statute with the brewer. *See* §55-c(6).  Thus, in this case, it is Coors that has the burden of proving that it has satisfied the objective requirements of the Statute, namely, that its national policy of consolidation is reasonable, essential and non-discriminatory.

Accordingly, if Defendants' pre-answer motion to dismiss is denied, the central issue to be determined by this Court is whether Coors has implemented a national policy of consolidation that comports with the requirements of §55-c.  Thus, generally speaking, extensive discovery is needed to be produced by Coors with regard to the following, among other things: (i) the details of the alleged consolidation policy including its formation, planning, decision-making and implementation; (ii) the actions taken by Coors with regard to the implementation of the alleged consolidation policy; (iii) the effect of  this alleged consolidation policy on Coors' business; (iv) the effect of the alleged consolidation policy on Coors' wholesalers; (v) the relationship between Molson USA and Coors and the assignments of rights under the distribution agreements; (vi) relationship between Molson USA's consolidation policy and Coors' alleged consolidation policy; (vii) the financial aspects of the proposed consolidation;; and (viii) the financial aspect of Coors' business over the last five years.

In addition, Defendants have identified three (3) party witnesses (*Gary Styles*, the director of Mergers and Acquisitions for Coors Brewing Company, *Bill Byers*, the assistant general counsel of Coors Brewing Company, formerly represented Molson USA and *Tim Owston,* Vice President for Wholesale Development for Coors) that they would like to depose and three (3) non-party witnesses (*David Perkins*, former president of Molson USA, *Geoff Molson*, the former VP of Quality and Distributor Development, *Vinny Prattico,* the former VP of sales for Molson USA, was the rep for Oak and Boening), that they need to depose. Notably, these witnesses are believed to reside in Colorado or Canada, accordingly the scheduling of depositions is an additional issue which needs to be accounted for.

Finally, only Defendants stand to be prejudiced by a short discovery schedule since all of the facts that Coors needs to rely on are exclusively within their possession. Coors needs little, if any, fact discovery from O&B. On the other hand, O&B must obtain that information from Coors in order to adequately prepare for trial. Based upon the above, it is respectfully requested that this Court extend the deadline for the completion of discovery for thirty (30) days from May 9, 2008 to June 9, 2008.

## <u>CONCLUSION</u>

For all of the reasons set forth herein, it is respectfully submitted that this Court grant Defendants' motion to extend the time to complete discovery.

Respectfully submitted,

OAK BEVERAGE, INC. and
BOENING BROS., INC.


By:____/s/_____
        Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com

Gary Ettelman, Esquire (GE 9315)
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of February 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
3000 K. Street N.W., Suite 500
Washington, D.C. 20007-5143
mlockerby@foley.com

_____/s/_____

Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COORS BREWING COMPANY,

        Plaintiff,

v.                                      Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

        Defendants.

**<u>AFFIRMATION IN SUPPORT OF MOTION TO EXTEND DISCOVERY</u>**

        Marshall A. Winslow, Jr., an attorney duly admitted to practice before this Court, affirms the following under the penalties of perjury:

        1.        I am a partner with the law firm of Wolcott Rivers Gates., attorneys for Defendants Oak Beverages and Boening Brothers ("O&B") and I am fully familiar with the above captioned proceeding.  The source of my knowledge is my review of the file maintained in my office and discussions with my co-counsel, Gary Ettelman.

        2.        This affirmation is submitted in support of O&B's motion to extend the deadline for the completion of discovery set by this Court as May 9, 2008 for thirty (30) days to June 9, 2008.  Annexed as **Exhibit A** is Defendants' Proposed Discovery Plan in the event Defendants' request for an extension of time is granted.

**<u>Procedural History</u>**

        3.        This action was commenced by Plaintiff Coors Brewing Company ("Coors") on December 11, 2007.  On January 9, 2008 Defendants accepted service of the summons and complaint.

4.      Pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. 1404(a), on January 28, 2008, Defendants filed a pre-answer motion to dismiss and/or transfer for improper venue.  This motion was originally returnable on February 8, 2008 and was thereafter adjourned at the Court's direction to March 6, 2008.  Because Defendants' motion has not been decided, Defendants are not required to file their answer to Plaintiff's complaint.

5.      On February 7, 2008, this Court issued an Order scheduling the Fed.R.Civ. P. 16(b) Pretrial Conference to be held on March 5, 2008.

6.      Pursuant to this Order, this Court set a deadline for discovery to be completed by May 9, 2008.

7.      The parties, through their counsel, conferred at various times via correspondence and telephone calls regarding the Proposed Joint Discovery Plan. Defendants' counsel advised Plaintiff's counsel that it was Defendants' intention to request additional time for discovery but would try to agree upon possible dates for discovery within the time frame initially set by this Court if Defendants' request for an extension of time was denied.  Because the parties were unable to agree upon a Proposed Joint Discovery Plan, Defendants have filed their Proposed Discovery Plan in the event the instant request is denied.

**Substantive Issues**

8.      By its complaint, Coors seeks, among other things, to terminate the beer distribution rights of O&B pursuant to New York's Alcoholic Beverage Control Law §55-c ("§55-c") as a result of the implementation of what Coors refers to as its nationwide policy of consolidation.  A true and correct copy of §55-c is annexed hereto as **Exhibit B**.

9.    Under the Statute, in order for Coors to terminate O&B pursuant to §55-c, Coors has the burden to prove it has "good cause," which is narrowly defined.

10.    The relevant portion of the Statute provides as follows:

"Good cause" means and shall be limited to:
(i)(A) The implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential. Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy.

11.    In order for a consolidation policy to qualify as grounds for good cause, a brewer seeking to terminate bears the burden of demonstrating that its policy meets the following requirements: (1) the policy will be implemented on a national or regional level; (2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-discriminatory; and (5) the implementation of the policy, if "regional", will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in the states contiguous to New York, or if "national" brewer's implementation of the policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brand is sold.

12.    Here, Coors alleges the latter, and therefore must establish in addition to meeting the Statute's other requirements, its policy will result in a contemporaneous reduction in the number of wholesalers both in this State, as well as in the majority of states in which the Molson brand is sold.

13.    Moreover, pursuant to §55-c(6) it is Coors that has the burden of proving that it has satisfied the objective requirements of the Statute, namely, that its national policy of consolidation is reasonable, essential and non-discriminatory.

**Need for Additional Time to Conduct Discovery**

14.    If Defendants' motion is denied, the central issue to be determined by this Court is whether Coors has implemented a national policy of consolidation that comports with the requirements of §55-c.  Thus, while Coors does not need significant, or perhaps any discovery with respect to its burden O&B do because all of the information and documentation in relation to such proof is necessarily solely within Coors' possession. Extensive discovery is needed to be produced by Coors with regard to the following, among other things: (i) the details of the alleged consolidation policy including its formation, planning, decision-making and implementation; (ii) the actions taken by Coors with regard to the implementation of the alleged consolidation policy; (iii) the effect of this alleged consolidation policy on Coors' business; (iv) the effect of the alleged consolidation policy on Coors' wholesalers; (v) the relationship between Molson USA and Coors and the assignments of rights under the distribution agreements; (vi) relationship between Molson USA's consolidation policy and Coors' alleged consolidation policy; (vii) the financial aspects of the proposed consolidation;; and (viii) the financial aspect of Coors' business over the last five years.

15.    In addition, as set forth in Defendants' pre-answer motion to dismiss, Defendants have preliminarily identified the following individuals to depose as party and non-party witnesses, as each have knowledge of the facts and are potential witnesses in this action:

a.      Upon information and belief, **Gary Styles** is the director of Mergers and Acquisitions for Coors Brewing Company and resides in Colorado. He is expected to testify as to the relationship between Molson USA and Coors and the assignment of import rights, the recent announced merger of Coors and Miller, the dissolution of Molson USA, and the implementation of the plan of consolidation by Molson USA. In particular, Mr. Styles is expected to testify that the plan of consolidation proposed by Coors is unreasonable, discriminatory, and non-essential.

b.      Upon information and belief, **Bill Byers** is the assistant general counsel of Coors Brewing Company, formerly represented Molson USA, and resides in Colorado. He is expected to testify as to the relationship between Molson USA and Coors and the assignment of import rights, the recent announced merger of Coors and Miller, the dissolution of Molson USA, and the implementation of the plan of consolidation by Molson USA. In particular, Mr. Byer is expected to testify that the plan of consolidation proposed by Coors is unreasonable, discriminatory, and non-essential.

c.      Upon information and belief, **David Perkins** is former president of Molson USA and resides in Colorado. Mr. Perkins was intimately involved on a day-to-day basis with making decisions regarding the implementation of the plan of consolidation in New York. He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.

d.      Upon information and belief, **Geoff Molson** is the former VP of Quality and Distributor Development and resides in Canada. Mr. Molson was intimately involved on a day-to-day basis with making decisions regarding the implementation of the plan of consolidation in New York. He is expected to testify regarding the proposed

plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.  Further, Mr. Molson is expected to testify as to the financial aspects of the proposed consolidation and the assignment of import rights from Molson USA to Coors.

   e.  Upon information and belief, **Tim Owston** is Vice President for Wholesale Development for Coors and resides in Colorado.  Mr. Owston has extensive knowledge relating to the plan of consolidation, including its planning and implementation, and to the wholesaler markets in New York State.  He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.

   f.  Upon information and belief, **Vinny Prattico**, is the former VP of sales for Molson USA, was the rep for Oak and Boening, and resides in Colorado. Mr. Prattico has extensive knowledge relating to the plan of consolidation, including its planning and implementation, and to the wholesaler markets in New York State.  He is expected to testify regarding the proposed plan of consolidation, namely that such plan is unreasonable, discriminatory, and non-essential.

16.  These witnesses are believed to reside in Colorado or Canada, thereby creating scheduling and travel issues which will, no doubt delay completion of discovery.

17.  Finally, in light of the fact that Defendants' pre-answer motion to dismiss has not been ruled upon, and Defendants as of this date, are not required to file their answer, Defendants request that the deadline for the completion of discovery be extended for an additional thirty (30) days.  If Defendants' request is granted by this Court, annexed hereto as Exhibit B is Defendants' Proposed Discovery Plan.

WHEREFORE, Defendants respectfully requests that this Court extend the deadline for the completion of discovery for thirty days.

Dated: February 27, 2008

_____/s/_____

Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax:  (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of February 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system and I hereby certify that I will mail the document by U.S. Mail to the following non-filing user:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143
mlockerby@foley.com

_____/s/_____

Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

COORS BREWING COMPANY,

       Plaintiff,

v.                                 Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

       Defendants.

**<u>DEFENDANTS' PROPOSED DISCOVERY PLAN</u>**

       Defendants Oak Beverage Inc. and Boening brothers, Inc. ("O&B" or Defendants") through their counsel, hereby submit their Proposed Discovery Plan pursuant to Fed. R. Civ. P. 26(f) and state as follows:

       1.    **Pre-Discovery Disclosures.**  The parties shall exchange the automatic disclosure required under Fed. R. Civ. P. 26(a)(1), on or before March 17, 2008.

       2.    **Amendments.**  All motions to amend pleadings, including joinder of additional parties, shall be filed no later than March 21, 2008.

       3.    **Discovery Plan.**

       **(a)** Initial document production demands, interrogatory requests, and requests for admissions shall be served no later than March 21, 2008, and responses to those demands shall be served on or before April 11, 2008.

(b) The number of depositions and time limits for each deposition shall be as designated under the Federal Rules of Civil Procedure.

(c) Initial reports from retained experts and expert disclosure under Rule 26(a)(2) are due from the proponent by Friday May 9, 2008.  The opponent shall submitted rebuttal expert reports and expert disclosure pursuant to Rule 26(a)(2) by May 23, 2008.  Depositions of experts shall be completed by June 2, 2008. The proponent shall submit any evidence that is solely contradictory or rebuttal evidence to the opponent's expert disclosure by June 9, 2008.

(d) All discovery shall be completed no later than June 9, 2008.

4. **Dispositive Motions.** All potentially dispositive motions shall be filed no later than June 23, 2008.

5. **Protective Order.** The parties will submit a Proposed Consent Order Regarding Confidentiality.

6. **Pretrial Conference.** The parties will attend a pretrial conference on March 5, 2008 at 10:00 a.m. before a Magistrate Judge.

7. **Final Pretrial Conference.**  A final pretrial conference shall be scheduled for June 23, 2008.

8. **Alternative Dispute Resolution.**  The parties do not believe that alternative dispute resolution techniques will be of assistance.

9. **Other Matters.** None

Dated:  February 27, 2008                    Respectfully submitted,


                                             By:  ___/s/_____
                                                     Of Counsel

Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax:  (757) 497-7267
mwinslow@wolriv.com

Gary Ettleman, Esq.
ETTELMAN & HOCHHEISER P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, New York 11530
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

# EXHIBIT B

Westlaw.

McKinney's Alcoholic Beverage Control Law § 55-c

c

### Effective: June 15, 2001

Mckinney's Consolidated Laws of New York Annotated Currentness
    Alcoholic Beverage Control Law (Refs & Annos)
        Chapter 3-B. Of the Consolidated Laws
            ⌐ Article 4. Special Provisions Relating to Beer (Refs & Annos)

→ § 55-c. Agreements between brewers and beer wholesalers

1. Purpose. It is hereby declared to be the policy of this state, that the sale and delivery of beer by brewers to beer wholesalers shall be pursuant to a written agreement. That further, the regulation of business relations between brewers and beer wholesalers is necessary and appropriate to the general economy and tax base of this state and in the public interest.

2. Definitions. As used in this section, the following words shall have the following meanings:

(a) "Agreement" means any contract, agreement, arrangement, course of dealing or commercial relationship between a brewer and a beer wholesaler pursuant to which a beer wholesaler is granted the right to purchase, offer for sale, resell, warehouse or physically deliver beer sold by a brewer.

(b) "Brewer" means any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in this state or any successor to a brewer.

(c) "Successor to a brewer" means any person or entity which acquires the business or beer brands of a brewer, without limitation, by way of the purchase, assignment, transfer, lease, or license or disposition of all or a portion of the assets, business or equity of a brewer in any transaction, including merger, corporate reorganization or consolidation or the formation of a partnership, joint venture or other joint marketing alliance.

(d) "Beer wholesaler" and "wholesaler" means the holder of a wholesaler's license pursuant to section fifty-three of this article who purchases, offers to sell, resells, markets, promotes, warehouses or physically distributes beer sold by a brewer.

(e) "Good cause" means and shall be limited to:

(i)(A) The implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential. Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

brand, in whole or in part, as a consequence of a proposed consolidation policy.

(B) An affected brewer receiving notice pursuant to this paragraph may, within one hundred twenty days after receiving such notice, terminate an agreement with a multiple brands wholesaler in the event: (1) the total case purchases computed in twenty-four twelve ounce equivalence units by the wholesaler of the products of the affected brewer amounted to two percent or less of the multiple brands wholesaler's total sales volume during the twelve month period preceding the notice; and (2) the affected brewer, prior to such termination, pays compensation to the multiple brands wholesaler.

(ii) There is a failure by the beer wholesaler to comply with a material term of an agreement required by subdivision three of this section between the brewer and beer wholesaler, provided that: (A) the wholesaler was given written notice by the brewer of the failure to comply with the agreement as provided for in subdivision five of this section and in which the brewer states with particularity the basis for the brewer's determination of non-compliance, and upon the wholesaler's written request within ten days of receipt of the notice, the brewer has supplemented such notice by submitting to the wholesaler in writing the brewer's recommended plan of corrective action to cure the claimed defaults or deficiencies in a manner satisfactory to it; (B) the wholesaler was afforded a reasonable opportunity to assert good faith efforts to comply with the agreement by curing the claimed defaults or deficiencies specified in said notice within the time provided for in clause (C) of this subparagraph; and (C) the wholesaler was afforded fifteen days after receipt of such notice to submit a written plan of corrective action to comply with the agreement by curing the claimed non-compliance and seventy-five days to cure such non-compliance in accordance with the plan. Provided, however, that such period for cure may be increased or reduced to a commercially reasonable period by an order of a court in this state entered after a hearing at which the brewer has the burden to demonstrate that the claimed defaults or deficiencies can be substantially rectified in the period of time afforded the wholesaler or that, after receipt of notice of default or deficiency as provided for in subdivision five of this section, the wholesaler has intentionally engaged in an affirmative course of conduct in which the brewer's current marketing plans and other trade secrets are disclosed to a third party without the prior consent of the brewer or in which the wholesaler acts or threatens to act to significantly impair, harm or dilute the reputation or competitive position of the brewer or otherwise irreparably injure the brewer, its brands or trademarks. Provided, further however: (1) that such period for cure need not exceed forty-five days if within the twelve months immediately following a cure, the wholesaler intentionally engages in conduct which repeats the same specified default and deficiency which the brewer had deemed cured; and (2) that such period for cure need not exceed sixty days in the event that during the twelve month period preceding the notice, the total case purchases by the wholesaler of the affected products of the brewer account for less than one-half of one percent of the wholesaler's aggregate case purchases from all sources or one thousand cases. For purposes of this subdivision, case purchases of affected products whether package or draught shall be computed in twenty-four twelve ounce equivalence units.

(f) "Good faith" means honesty in fact and the observance of reasonable commercial standards in the trade.

(g) "Material modification" of an agreement or to "materially modify" means and includes a substantial and significant change in the competitive circumstances under which the agreement was entered into and is performed which is caused by a brewer without fault on the part of the wholesaler.

(h) "Multiple brands wholesaler" means a wholesaler which pursuant to agreements with different brewers holds the rights to purchase, resell, warehouse or physically deliver two or more competing products in substantially the same geographic area or to the same customer class.

(i) "Fair market value of distribution rights" means the amount a willing seller, under no compulsion to sell, would be willing to accept and a willing buyer, under no compulsion to purchase, would be willing to pay for the distribution rights.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

3. Written agreement required. Except as provided for in subdivision ten of this section, beer offered for sale in this state by a brewer to a beer wholesaler shall be sold and delivered pursuant to a written agreement which conforms to the provisions of this section and which sets forth all essential and material terms, requirements, standards of performance and conditions of the business relationship between a brewer and a beer wholesaler. Such agreement may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided the brewer has acted in good faith.

4. Termination for cause and opportunity to cure. (a) No brewer may cancel, fail to renew, or terminate an agreement unless the party intending such action has good cause for such cancellation, failure to renew, or termination and in any case in which prior notification is required under this section, the party intending to act has furnished said prior notification as provided for in subdivision five of this section and the wholesaler has failed to cure such defaults or deficiencies after a period for cure, as provided for in clause (C) of subparagraph (ii) of paragraph (e) of subdivision two of this section.

(b) No brewer shall amend or materially modify or otherwise terminate any essential and material term or requirement of an agreement unless the brewer has good cause therefor and has furnished the affected party with at least fifteen days prior notification as required by subdivision five of this section.

5. Notice of default or deficiency. (a) Except as provided in paragraph (d) of this subdivision, no brewer may cancel, fail to renew or terminate an agreement unless the brewer or beer wholesaler furnished prior notification in accordance with paragraph (c) of this subdivision.

(b) Notwithstanding any agreement, no brewer or beer wholesaler may materially amend or modify an essential and material term or requirement unless the brewer or beer wholesaler furnished prior notification in accordance with paragraph (c) of this subdivision.

(c) The notification required under paragraphs (a) and (b) of this subdivision shall be in writing and sent to the affected party by certified mail. Such notification shall contain:

(i) a statement of intent to cancel, not renew, otherwise terminate, materially amend or modify an agreement;

(ii) a statement of all reasons therefor, stated with particularity; and

(iii) the date on which such action shall take effect.

(d) A brewer or beer wholesaler may cancel, fail to renew or otherwise terminate an agreement without furnishing the prior notification required under this section only:

(i) in the event the affected party has made an assignment for the benefit of creditors or similar disposition of all or substantially all of the assets of such party's business;

(ii) in the event of a conviction or plea of guilty or no contest to a felony which in the reasonable judgment of the brewer may adversely affect the goodwill or interests of the wholesaler or brewer;

(iii) in the event of the revocation or suspension for thirty-one days or more of any license or permit required of the wholesaler for the normal operation of its business;

(iv) in the event there was fraudulent conduct on the part of the brewer or beer wholesaler in its dealings with the other party;

(v) in the event of the failure by either party to pay sums of money to the other party when due or if either the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

wholesaler or brewer takes any action which would provide grounds for immediate termination pursuant to the reasonable terms of a written enforceable agreement between them, which was freely entered into without threat of termination or other coercion or compulsion and was in full force and effect sixty days from the effective date of the chapter of the laws of nineteen hundred ninety-seven which amended this subparagraph;

(vi) in the event the brewer and beer wholesaler voluntarily agree in writing to terminate the agreement.

6. Right of action. If a brewer fails to comply with the provisions of this section, a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this state for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance. In any such action the court may grant such equitable relief as is necessary or appropriate, considering the purposes of this section, to remedy the effects of any failure to comply with the provisions of this section or the effects of conduct prohibited hereunder, including declaratory judgment, mandatory or prohibitive injunctive relief, or preliminary or other interim equitable relief; provided, however, that permanent injunctive relief shall not be granted to prohibit the effectiveness of a termination or non-renewal of an agreement in furtherance of a policy of consolidation that is in compliance with subparagraph (i) of paragraph (e) of subdivision two of this section. In any legal action challenging any cancellation, termination or failure to renew, or where an issue is the brewer's compliance with the provisions of subparagraph (i) of paragraph (e) of subdivision two of this section, the brewer shall have the burden of proof that its action was based upon good cause, provided however, the wholesaler shall retain the burden of proof in all other respects. The rights and remedies provided in this section to a beer wholesaler with respect to an agreement with a brewer and to an affected wholesaler or an affected brewer shall be intended to supplement and not be exclusive of any rights and remedies otherwise available pursuant to any other statute, or at law or equity.

7. Reasonable compensation. (a) Any brewer who shall implement a national or regional consolidation policy, pursuant to this section, shall not terminate its relationship with an affected wholesaler until compensation as provided for in this subdivision has been paid. Such brewer shall pay the affected beer wholesaler the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with fair and reasonable compensation for other damages sustained.

(b) Every brewer who without good cause amends, cancels, terminates, materially modifies or fails to renew any agreement, or who in violation of this section causes a beer wholesaler to resign from an agreement or denies or withholds consent to any assignment, transfer or sale of a beer wholesaler's business assets or capital stock or other equity or debt securities, shall pay the affected beer wholesaler the fair market value of the beer wholesaler's business, including distribution rights, which have been lost or diminished as the result of the brewer's actions.

(c) In the event that the brewer and the beer wholesaler are unable to agree on the compensation to be paid for the value of the beer wholesaler's business and assets, the matter may with the consent of both the brewer and the beer wholesaler, be submitted to a neutral arbitrator to be selected by the parties; if they cannot agree on such an arbitrator, the same shall be selected by a judge of a court of competent jurisdiction. No brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement. Arbitration costs shall be equally divided by the beer wholesaler and the brewer. The award of the arbitrator shall be confirmed by a court of competent jurisdiction in this state, the judgment of which shall be binding.

8. Sale and transfer of beer wholesaler's business. No brewer shall unreasonably withhold or delay its approval of any assignment, sale or transfer of all or any portion of beer wholesaler's corporate equity or debt or assets, including the beer wholesaler's rights and obligations under the terms of an agreement, whenever the person or persons to be substituted meet objectively reasonable standards imposed by the brewer. A wholesaler who sells, assigns or transfers an agreement made pursuant to this section shall provide written notice of such sale, assignment or transfer to all other brewers with whom it has entered agreements.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

9. (a) A brewer qualified to do business in the state of New York may hold an interest in a limited partnership licensed by the authority as a wholesaler, when the brewer or its affiliate is a limited partner and the beer wholesaler is the general partner. Notwithstanding any other provision of law, such brewer may loan money to a general partner of an aforementioned limited partnership. Provided, however, any brewer or its affiliate who holds an interest in a limited partnership licensed by the authority as a wholesaler or who loans money to a general partner of such limited partnership may only exercise such control of the business as permitted by section 121-303 of the partnership law.

(b) Notwithstanding subdivision (a) of this subdivision, no brewer or its affiliate may acquire or hold an interest in or loan money to a general partner of a multiple brands wholesaler unless and until all other brewers having agreements with said multiple brands wholesaler have been afforded sixty days prior written notice of the particular terms and conditions of the limited partnership or loan agreement or of any change therein. A "loan" for purposes of this subdivision shall not include bona fide credit terms for product purchases customarily extended by a brewer to wholesalers in the normal course of business.

(c) For one hundred twenty days after the formation, licensing and commencement of operations as a beer wholesaler of a limited partnership or the making of a loan, and upon at least fifteen days prior notification as required by subdivision five of this section, a brewer may terminate an agreement with a multiple brands wholesaler in the event: (i) a competing brewer or its affiliate becomes a limited partner with or loans money to a general partner of a multiple brands wholesaler, (ii) by reason of said loan, the performance of a loan agreement, or the terms or conduct of the limited partnership, there is a reasonable likelihood that competition between brands of the competing brewers has been or may be significantly reduced in a relevant geographic area or market, and (iii) in lieu of other rights and remedies it might have under this chapter to terminate for good cause, the terminating brewer pays compensation to the multiple brands wholesaler.

10. Coverage. (a) This section shall not apply to written agreements that were in effect prior to the effective date of this section which set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler, including but not limited to the grounds and procedures which govern: (i) termination of the relationship; (ii) approval and disapproval of managers; (iii) change in ownership; and (iv) whether or not the wholesaler is entitled to compensation in the event the wholesaler is terminated for deficient performance under such agreement or without good cause. Provided, however, that this section shall apply to any agreement entered into, and renewals, extensions, amendments or conduct constituting a material modification of an agreement on or after the effective date of this section.

(b) Where an agreement between a brewer and beer wholesaler in effect prior to the effective date of this section is continuous in nature or has no specific duration or has no renewal provision and fails to set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler, including but not limited to the grounds and procedures which govern: (i) termination of the relationship; (ii) approval and disapproval of managers; (iii) change in ownership; and (iv) whether or not the wholesaler is entitled to compensation in the event the wholesaler is terminated for deficient performance under such agreement or without good cause; such agreement shall be considered for purposes of this section to have been renewed sixty days after the effective date of this section.

11. The requirements of this section may not be altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy arising under a written agreement complying with this section.

CREDIT(S)

(Added L.1996, c. 679, § 1; amended L.1997, c. 612, §§ 1 to 4, eff. Sept. 17, 1997; L.2001, c. 346, §§ 1 to 5, eff. Sept. 19, 2001, deemed eff. June 15, 2001.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

HISTORICAL AND STATUTORY NOTES

2006 Electronic Update

L.2001, c. 346 legislation

Subd. 2, opening par. L.2001, c. 346, § 1, rewrote the opening paragraph, which had read:

" 'Good Cause' means:".

Subd. 2, par. (e), subpar. (i). L.2001, c. 346, § 1, rewrote subpar. (i), which had read:

"The implementation by a brewer of a national or regional policy of consolidation which results in a reduction in the number of a brewer's wholesalers for a brand in this state, provided that all affected wholesalers and affected brewers are afforded ninety days prior notice of the implementation of such policy. Such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy."

Subd. 2, par. (i). L.2001, c. 346, § 2, added par. (i).

Subd. 6. L.2001, c. 346, § 3, rewrote subd. 6, which had read:

"Right of action. If a brewer fails to comply with the provisions of this section, a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this state for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance. Except in the case of a brewer's implementation of a national or regional consolidation policy with regard to its wholesaler network, in any such action the court may grant such equitable relief as is necessary or appropriate, considering the purposes of this section, to remedy the effects of any failure to comply with the provisions of this section or the effects of conduct prohibited hereunder, including declaratory judgment, mandatory or prohibitive injunctive relief, or preliminary or other interim equitable relief. In any legal action challenging any cancellation, termination or failure to renew, the brewer shall have the burden of proof that its action was based upon good cause, provided however, the wholesaler shall retain the burden of proof in all other respects."

Subd. 7. L.2001, c. 346, § 4, rewrote subd. 7, which had read:

"Reasonable compensation. (a) Any brewer who shall implement a national or regional consolidation policy with regard to its wholesaler network in this state or who without good cause amends, cancels, terminates, materially modifies or fails to renew any agreement, or who in violation of this section causes a beer wholesaler to resign from an agreement or denies or withholds consent to any assignment, transfer or sale of a beer wholesaler's business assets or capital stock or other equity or debt securities, shall pay the affected beer wholesaler reasonable compensation for damages sustained.

"(b) In the event that the brewer and the beer wholesaler are unable to agree on the compensation to be paid for the value of the beer wholesaler's business and assets, the matter may with the consent of both the brewer and the beer wholesaler, be submitted to a neutral arbitrator to be selected by the parties; if they cannot agree on such an arbitrator, the same shall be selected by a judge of a court of competent jurisdiction. No brewer or beer wholesaler may impose binding arbitration of any issue as as term or condition of an agreement. Arbitration costs shall be equally divided by the beer wholesaler and the brewer. The award of the arbitrator shall be confirmed by a court of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

competent jurisdiction in this state, the judgment of which shall be binding."

Subd. 9, par. (c). L.2001, c. 346, § 5, substituted "compensation" for "reasonable compensation as provided herein".

L.2001, c. 346, § 7, provides:

"This act shall take effect immediately and shall be deemed to have been in full force and effect on and after June 15, 2001, and shall apply to agreements amended, cancelled, terminated, modified or not renewed on or after such date."

2000 Main Volume

**L.1997, c. 612 legislation**

Subd. 2, par. (b). L.1997, c. 612, § 1, inserted "primarily" and "of alcoholic beverages,".

Subd. 2, par. (e). L.1997, c. 612, § 1, rewrote the paragraph.

Subd. 2, par. (h). L.1997, c. 612, § 1, added paragraph (h).

L.1997, c. 612, § 5 provides:

"This act shall take effect immediately; provided, however, that for a period of 60 days from the effective date of this act, any amendment by a brewer and wholesaler to a written agreement otherwise complying with section 55-c of the alcoholic beverage control law that is allowed by virtue of the provisions of this act and which brings such agreement into compliance with such section as amended by this act shall be deemed for good cause and, therefore, not in violation of such section as it existed prior to the effective date of this act."

**L.1996, c. 679 legislation**

Section effective Sept. 25, 1996, pursuant to L.1996, c. 679, § 3.

L.1996, c. 679, § 2, provided:

"If any provision of this act [adding this section] is declared invalid by a court of competent jurisdiction, such invalidity shall not affect the other provisions of this act which can be given effect without the invalid provisions and to that end the provisions of this act shall be severable."

LEGISLATIVE HISTORIES

L.2001, c. 346: For Legislative, Executive or Judicial memorandum relating to this law, see McKinney's 2001 Session Laws of New York, p. 1237, 1527.
L.1997, c. 612: For Legislative, Executive or Judicial memorandum relating to this law, see McKinney's 1997 Session Laws of New York, p. 2583.

RESEARCH REFERENCES

2006 Electronic Update

Encyclopedias

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

NY Jur. 2d, Alcoholic Beverages § 134, Manufacturers and Wholesalers.

NY Jur. 2d, Statutes § 226, Application of Constitutional Principles.

NY Jur. 2d, Statutes § 227, Application of Constitutional Principles -- Limitations.

NY Jur. 2d, Statutes § 246, Generally.

NOTES OF DECISIONS

    Brewers 2
    Burden of proof 5

    Construction and application 1
    Distribution agreements 3
    Retroactive effect 1.5
    Violations 4

   1. Construction and application

Alcoholic Beverage Control Law governs commercial relationships between brewers and malt beverage wholesalers engaged in the distribution of such products, and requires that distribution agreements between brewers and wholesalers entered into after statute's enactment, and renewals of existing agreements, be in writing which sets forth all essential and material terms, requirements, standards of performance, and conditions of the business relationship. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Intoxicating Liquors ☜ 124

   1.5. Retroactive effect

Amendments to Alcoholic Beverage Control Law (ABCL), regarding termination of a beer wholesaler's distributorship agreement as part of a brewer's consolidation of its distributorship network, apply retroactively to agreements modified or terminated on or after the date the legislature approved the amendments but before the Governor signed them. Garal Wholesalers, Ltd. v. Miller Brewing Co., 2002, 193 Misc.2d 630, 751 N.Y.S.2d 679 . Intoxicating Liquors ☜ 124

Contract Clause did not prevent amendments to Alcoholic Beverage Control Law (ABCL), restricting termination of a beer wholesaler's distributorship agreement as part of a brewer's consolidation of its distributorship network, from being applied retroactively to a brewer's attempted termination of distributorship agreement after the date the legislature approved the amendments but before the Governor signed them; the agreement provided the parties would be bound to "differing termination notice periods, procedures, or justifications" set forth in future state or local laws, so that brewer did not have a contract-based expectation that was substantially impaired by the amendments, beer distribution was a heavily regulated area, and the amendments merely provided a remedy for pre-existing rights and clarified pre-existing law, and did not create new rights. Garal Wholesalers, Ltd. v. Miller Brewing Co., 2002, 193 Misc.2d 630, 751 N.Y.S.2d 679. Constitutional Law ☜ 154(1); Intoxicating Liquors ☜ 124

Even assuming that retroactive application of amendments to Alcoholic Beverage Control Law (ABCL), restricting termination of a beer wholesaler's distributorship agreement as part of a brewer's consolidation of its distributorship network, substantially impaired a brewer's contract rights, retroactive application of the amendments was reasonable, and thus, there was no Contract Clause violation; the amendments cured a court's erroneous interpretation of the Alcoholic Beverage Control Law. Garal Wholesalers, Ltd. v. Miller Brewing Co., 2002, 193

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

Misc.2d 630, 751 N.Y.S.2d 679. Constitutional Law ☜ 154(1); Intoxicating Liquors ☜ 124

### 2. Brewers

Distributor and marketer of malt liquor which sold beer for resale in New York was a "brewer," for purposes of Alcoholic Beverage Control Law. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Intoxicating Liquors ☜ 124

### 3. Distribution agreements

At-will marketing and promotion agreement between beer brewer and wholesaler was not "agreement," within meaning of New York statute allowing termination only for good cause; statutory protection extended only to agreements under which wholesaler was granted right to "purchase, offer for sale, resell, warehouse or physically deliver" beer sold by brewer. Better Brands of N.Y., Inc. v. Pabst Brewing Co., 2000, 107 F.Supp.2d 419. Intoxicating Liquors ☜ 327(1)

In New York, the termination procedures for beer distributorships is wholly a creature of statute, not contract. Garal Wholesalers, Ltd. v. Miller Brewing Co., 2002, 193 Misc.2d 630, 751 N.Y.S.2d 679. Intoxicating Liquors ☜ 124

Under Alcoholic Beverage Control Law, termination, nonrenewal, or material alteration of distribution agreements by brewer requires "good cause," as defined by statute, notice to wholesale distributor, and an opportunity to cure, and only in certain situations, such as the revocation or suspension of a license or permit, an assignment for the benefit of creditors, or fraudulent conduct, can an agreement be terminated without notice. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Intoxicating Liquors ☜ 124

While Alcoholic Beverage Control Law allows brewer or beer wholesaler to cancel, fail to renew, or otherwise terminate agreement without prior notice in event of failure by either party to pay sums of money to the other party when due, such a termination must occur pursuant to terms of reasonable written agreement which complies with Law's requirements. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Intoxicating Liquors ☜ 124

### 4. Violations

Beer wholesaler may maintain a civil action for damages based upon a brewer's failure to comply with provisions of Alcoholic Beverage Control Law. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Action ☜ 3

### 5. Burden of proof

In any legal action under Alcoholic Beverages Control Law in which wholesale distributor challenges brewer's cancellation, termination or failure to renew, brewer has burden of proving that its action was based upon "good cause," but distributor retains burden of proof in all other respects. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Intoxicating Liquors ☜ 124

Brewer failed to demonstrate that in terminating its distribution agreement with beer wholesaler it complied with written notice and opportunity to cure requirements of Alcoholic Beverages Control Law. South End Distributing Corp. v. Hornell Brewing Co., Inc., 1999, 179 Misc.2d 576, 685 N.Y.S.2d 594. Intoxicating Liquors ☜ 124

McKinney's Alcoholic Beverage Control Law § 55-c, NY AL BEV CON § 55-c

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

McKinney's Alcoholic Beverage Control Law § 55-c

Current through L.2006, chapters 1, 4 to 35, 50 to 61 and chapter C[S.6460, veto overridden].

Copr © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COORS BREWING COMPANY,

      Plaintiff,

v.                               Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

      Defendants.

## NOTICE OF HEARING

PLEASE TAKE NOTICE that on Wednesday March 5, 2008 at 10:00 a.m., or as soon thereafter as counsel may be heard, the undersigned will present oral argument regarding Defendants' Motion To Extend The Time to Conduct Discovery and Memorandum of Law in Support thereof.

Dated:  February 27, 2008                Respectfully submitted,

                                      OAK BEVERAGE, INC.
                                      and BOENING BROS., INC.

                                      By _____/s/_____
                                           Of Counsel

Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com

Gary Ettleman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of February, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
Washington Harbour
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143
mlockerby@foley.com

        /s/
Marshall A. Winslow, Jr., Esquire
Virginia State Bar No.  30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc.*
*and Boening Bros., Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **COORS BREWING COMPANY,** | ) | |
| **a Colorado corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 1:07 CV 1235** |
| | ) | |
| **OAK BEVERAGE, INC.,** | ) | |
| **a New York corporation, and** | ) | |
| | ) | |
| **BOENING BROS., INC.,** | ) | |
| **a New York corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COORS' REQUEST FOR ENTRY OF DEFAULT

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF VIRGINIA:**

Plaintiff Coors Brewing Company ("Coors"), by counsel, pursuant to Rule 55(a) of the

Federal Rules of Civil Procedure, respectfully requests that the Clerk of the Court enter the

default of Defendants Oak Beverage, Incorporated ("Oak") and Boening Brothers, Incorporated

("Boening") (collectively, "Defendants") for failure to plead or otherwise defend in a timely

manner.

1.       This request is based on the Affidavit of Michael J. Lockerby, attached hereto as

**Exhibit A**, and the Docket of this Court.

2.       On December 11, 2007, Coors' Complaint was filed in this Court.  (Docket #1).

That same day, this Court issued a Summons as to each of Oak and Boening for service upon the

Secretary of the Commonwealth.  (Docket #3).  Defendants are New York corporations with

their principal places of business in the state of New York.

3.      On January 9, 2008, the Summons and Complaint were served upon counsel for Defendants, Gary Ettelman, Esq. (Docket #6).   Thereafter, on January 15, 2008, the Court received a Certificate of Compliance from the Secretary of the Commonwealth confirming service upon each of Oak and Boening.  (Docket #4, 5).

4.      On January 28, 2008, Defendants moved to transfer venue pursuant to 28 U.S.C. § 1404(a).   Thereafter, Defendants filed an amended motion to transfer venue pursuant to 28 U.S.C.  § 1404(a).   Defendants' motion (Docket #7), Defendants' amended motion (Docket #8), and Defendants' memorandum in support thereof (Docket #10) all stated that Defendants' motion was brought pursuant to 28 U.S.C. § 1404(a).  Defendants' motion, amended motion, and supporting memorandum did ***not*** raise the defense of improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).

5.      The Local Rules of this Court provide that "[a]ll motions, unless otherwise directed by the Court and except as noted herein below in subsection 7(F)(2), shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."   Local Rule 7(F)(1).   Neither Defendants' motion (Docket #7), Defendants' amended motion (Docket #8), nor Defendants' memorandum in support thereof (Docket #10) contained — with respect to a purported motion to dismiss pursuant to Federal Rule 12(b)(3) — any "concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."

6.      On January 31, 2008 — after having been reminded by the Court on January 29, 2008, by way of a Notice of Correction, of the need to file a notice of motion — Defendants filed

WASH_2966742.2

a Notice of Hearing Date.  (Docket #11).  Defendants' Notice of Hearing Date stated that Defendants' previously filed motion to transfer venue was also based on Federal Rule 12(b)(3).

7.     On February 7, 2008, this Court entered a Scheduling Order.  (Docket #14). The Scheduling Order provided that "[a]ny party required to file an answer must do so within twenty (20) days."  Accordingly, the deadline for Defendants to answer Coors' Complaint was February 27, 2008.

8.     The time for Defendants to respond has not been extended by any stipulation of the parties or any subsequent order of this Court.

9.     Defendants have not, to date, filed or served an answer or other responsive pleading to Coors' Complaint.

10.     The applicable time limit for responding has expired.

11.     Defendants are not infants nor are they incompetent.

12.     Defendants are not in military service.


Dated: March 3, 2008

                                        Respectfully submitted,

                                        COORS BREWING COMPANY


                                        By: _____/s/_____
                                                          Counsel

Michael J. Lockerby (Virginia Bar No. 24003)
Kimberly J. Shur[*]
Michael J. Harwin[*]
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone:  (202) 672-5300
Fax:  (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen[**]
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax:  (414) 297-4900

Counsel for Plaintiff Coors Brewing Company

---

[*] Admitted in New York, Georgia and the District of Columbia only

[**] Admitted in Wisconsin only

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2008, a true and correct copy of the foregoing **COORS'**

**REQUEST FOR ENTRY OF DEFAULT** was served by electronic mail through the Court's

ECF system upon the following:

> Marshall A. Winslow, Jr., Esq.
> WOLCOTT RIVERS GATES
> 1 Columbus Center, Suite 1100
> Virginia Beach, Virginia  23462
> MWinslow@wolriv.com

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

> Gary Ettelman, Esq.
> ETTELMAN & HOCHHEISER, P.C.
> 100 Quentin Roosevelt Boulevard, Suite 401
> Garden City, New York  11530

> _____*/s/*_____
> Michael J. Lockerby
> Virginia Bar No. 24003
> Attorney for Coors Brewing Company
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street N.W., Suite 500
> Washington, D.C. 20007-5143
> Phone:  (202) 672-5300
> Fax:  (202) 672-5399
> E-mail:  mlockerby@foley.com

WASH_2966742.2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **COORS BREWING COMPANY,**<br>a Colorado corporation, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Civil Action No. 1:07 CV 1235** |
| | ) | |
| **OAK BEVERAGE, INC.,**<br>a New York corporation, and | ) | |
| | ) | |
| **BOENING BROS., INC.,**<br>a New York corporation, | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF MICHAEL J. LOCKERBY

| | |
|---|---|
| DISTRICT OF COLUMBIA | ) |
| | ) ss: |
| CITY OF WASHINGTON | ) |

Michael J. Lockerby, being first duly sworn, deposes and says as follows:

1.      I am a partner in the law firm of Foley & Lardner LLP, counsel for Plaintiff Coors Brewing Company ("Coors").  I am an attorney in good standing licensed to practice law in the Commonwealth of Virginia and in the District of Columbia.  I have been admitted to practice before this Court since 1984.  I make this affidavit based upon my personal knowledge to advise the Court of certain facts relevant to Coors' Request for Entry of Default against Defendants Oak Beverage, Inc. ("Oak") and Boening Bros., Inc. ("Boening").

2.      On December 11, 2007, Coors' Complaint was filed in this Court.  (Docket #1). That same day, this Court issued a summons as to each of Oak and Boening for service upon the Secretary of the Commonwealth.  (Docket #3).  Defendants are New York corporations with their principal places of business in the state of New York.

3.     On January 9, 2008, the Summons and Complaint were served upon counsel for Defendants, Gary Ettelman, Esq. (Docket #6).   Thereafter, on January 15, 2008, the Court received a Certificate of Compliance from the Secretary of the Commonwealth confirming service upon each of Oak and Boening.  (Docket # 4, 5).

4.     On January 28, 2008, Defendants moved to transfer venue pursuant to 28 U.S.C. § 1404(a).   Thereafter, Defendants filed an amended motion to transfer venue pursuant to 28 U.S.C.   §   1404(a).    Defendants' motion (Docket #7), Defendants' amended motion (Docket #8), and Defendants' memorandum in support thereof (Docket #10) all stated that Defendants' motion was brought pursuant to 28 U.S.C. § 1404(a).  Defendants' motion, amended motion, and supporting memorandum did ***not*** raise the defense of improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).

5.     The Local Rules of this Court provide that "[a]ll motions, unless otherwise directed by the Court and except as noted herein below in subsection 7(F)(2), shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."   Local Rule 7(F)(1).  Neither Defendants' motion (Docket #7), Defendants' amended motion (Docket #8), nor Defendants' memorandum in support thereof (Docket #10) contained — with respect to a purported motion to dismiss pursuant to Federal Rule 12(b)(3) — any "concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."

6.     On January 31, 2008 — after having been reminded by the Court on January 29, 2008, by way of a Notice of Correction, of the need to file a notice of motion — Defendants filed

2

a Notice of Hearing Date.    (Docket #11).    Defendants' Notice of Hearing Date stated that Defendants' previously filed motion to transfer venue was also based on Federal Rule 12(b)(3).

7.      On February 7, 2008, this Court entered a Scheduling Order.  (Docket #14).  The Scheduling Order provided that "[a]ny party required to file an answer must do so within twenty (20) days."    Accordingly, the deadline for Defendants to answer Coors' Complaint was February 27, 2008.

8.      The time for Defendants to respond has not been extended by any stipulation of the parties or any subsequent order of this Court.

9.      Defendants have not, to date, filed or served an answer or other responsive pleading to Coors' Complaint.

FURTHER THE AFFIANT SAYETH NOT.

Subscribed and sworn to before me this **3rd** day of March 2008.

_____
Notary Public

My commission expires: My Commission Expires: June 30, 2008

WASH_2991006.1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK,
-----------------------------------------------------------------x

DOLDO BROTHERS, INC.,
a New York corporation, and

                                    1:08 CV _____

FINGER LAKES BOTTLING CO., INC.,
a New York corporation,

                            Plaintiffs,

                                            **COMPLAINT**

    –against –

COORS BREWING COMPANY,
a Colorado Company

                            Defendant.
-----------------------------------------------------------------x

      Plaintiffs Doldo Brothers, Inc, and Finger Lakes Bottling Co., Inc by their attorneys

Scolaro, Shulman, Cohen, Fetter & Burstein, P.C, for their Complaint allege as follows:

## THE PARTIES

      1.      Plaintiff Doldo Brothers, Inc. ("Doldo"), is a New York corporation with its

principal place of business located at 22888 NYS Route 12, Watertown, New York 13601.

      2.      Plaintiff Finger Lakes Bottling Co., Inc. ("Finger Lakes"), is a New York

corporation with its principal place of business located at 2181 Ellis Drive, Auburn, New York

13021.

      3.      Doldo is a duly licensed, multi-brand distributor of alcoholic and non-alcoholic

beverage products within the State of New York.

      4.      Finger Lakes is a duly licensed, multi-brand distributor of alcoholic and non-

alcoholic beverage products within the State of New York.

      5.      Upon information and belief, Defendant Coors Brewing Company ("Coors") is a

Delaware corporation with its principal place of business located in Jefferson County, Colorado.

6.     Upon information and belief, Coors is a brewer, seller, and importer of beer products within the State of New York.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) because Plaintiffs are citizens of New York and Coors is deemed a citizen of Delaware or Colorado, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8.     Venue lies in this District pursuant to 28 U.S.C. §1391(a)(2) and (a)(3), and 28 U.S.C. §1391(c).

## PLAINTIFFS' RELATIONSHIP WITH MOLSON/COORS

9.     Doldo has been a distributor of Molson brand beer products ("Molson Products") in an exclusive territory consisting of the State of New York, the County of Jefferson and portions of Lewis County, including Fort Drum Military Base (the "Doldo Exclusive Territory").

10.     Finger Lakes became a distributor of Molson Products in 1991, in an exclusive territory consisting of the State of New York, the Counties of Cayuga, Seneca, Ontario, Wayne, and Yates (the "Finger Lakes Exclusive Territory"). Thereafter, in 1997, the County of Oswego was added to the Finger Lakes Exclusive Territory.

11.     On October 25, 1994, Finger Lakes signed a written distributor agreement with Martlet Importing Co. ("Martlet") for the distribution of Molson Products.

12.     On October 24, 1996, Doldo signed a written distributor agreement with Martlet for the distribution of Molson Products.

13.     In the late 1990s, Martlet's importing rights to Molson Beer were assigned to a joint venture between Miller Brewing Company and Molson Canada. Thus, at the time, the

Miller-Molson joint venture became the supplier of Molson Beer to Doldo and Finger Lakes for their exclusive territories.

14.     The Miller Molson relationship was short-lived, with Molson deciding by late 2000 that it would be better served if it terminated its relationship with Miller.  In October 2000, Molson bought back its distribution rights to the Molson Products from the joint venture.

15.     Almost immediately after terminating its distribution relationship with Miller, Molson determined that it was now in its best interest to align with the Coors Brewing Company, ("Coors") and in December 2000 a joint venture was formed between Molson Inc. and Coors, namely Molson 2000 LLC, for the sole purpose of distributing Molson Products in the United States.  Molson 2000 LLC later changed its name to Molson USA LLC (hereinafter "Molson USA").

16.     When the joint venture assumed responsibility for the distribution of Molson Products in January 2001, it proffered new distribution agreements to its wholesalers, which it titled "Amendment to Distribution Agreement" (the "Molson Amendment").

17.     In violation of the New York Alcoholic Beverage Control Laws §55-c ("Section 55-c" or the "Statute"), Molson USA required that Doldo and Finger Lakes execute the Molson Amendment, and, therefore, both Doldo and Finger Lakes did so.

18.     The Molson Amendment amended and materially modified Plaintiffs' prior distribution agreements in that it contained, among other terms, a broad pre-dispute arbitration clause in violation of Section 55-c, whereas neither Doldo's and Finger Lakes' prior distribution agreements contained an arbitration clause.

19.     Neither Doldo and Finger Lakes were involved in a case or controversy with Molson USA, at the time Molson required that the Molson Amendment be signed by Doldo and

Finger Lakes

20.     In early 2001, almost immediately after the formation of the Molson/Coors joint

venture, Molson USA formulated and began to implement what it called its policy of

consolidation.  In reality, Molson USA's policy of consolidation was simply a policy of

alignment pursuant to which Molson sought to align its distribution network with that of Coors.

21.     By late 2002, Molson USA contacted Doldo and Finger Lakes and announced that

it was consolidating its distributors in the New York market and aligning its distribution channel

with Coors' distributors.

22.     Also in late 2002, Molson USA once again proffered new distributor agreements,

which it titled "Molson Distributorship Agreement" (the "Molson Agreement").

23.     Similarly, in violation of the Section 55-c, Molson USA required that Doldo and

Finger Lakes execute the Molson Agreement, and while Doldo did so, Finger Lakes declined.

24.     The Molson Agreement amended and materially modified Doldo's prior

distribution agreement in that it contained, among other terms, permission for Molson and Coors

representatives to inspect all aspects of its operations, including all books and sales records, and

required that Doldo comply with a newly referenced Standards Manual.

25.     In 2003, Doldo and Finger Lakes engaged by way of their legal counsel in

correspondence with Molson USA disputing Molson USA's right and effort to consolidate the

New York market.

26.     Upon information and belief, on February 9, 2005, the parent companies of Coors

and Molson announced a merger, which resulted in the formation of Molson Coors Brewing

Company ("Molson Coors").  Molson USA continued its operations as a wholly owned

subsidiary of Molson Coors.

27.     On March 11, 2005, Molson USA again, in writing, reiterated that it adopted a nationwide policy of consolidation in 2002.

28.     On August 4, 2005, on Molson Coors letterhead, Defendant Coors sent a letter to both Doldo and Finger Lakes stating "[t]he purpose of this letter is to advise our non-Coors New York Molson distributors of our actions [the commencement of the *Ryan* arbitration].  Eventually and as appropriate, MUSA will seek similar declarations permitting the termination of our agreements with each of other [sic] New York non-Coors Molson distributors."

29.     On September 19, 2007, Coors sent another letter to Doldo and Finger Lakes stating "as I advised you in my letter of August 4, 2005 (copy attached), now that the arbitration proceeding with Ryan has been concluded, Molson USA will shortly be commencing action against your company in order to accomplish the consolidation of the Molson brands with the Coors network consistent with New York Consolidated Statutes Section 55-c."

30.     Six years later, by letter dated December 7, 2007, Coors announced to Doldo and Finger Lakes, in connection with the dissolution of Molson USA, that Plaintiffs' respective distribution agreements were now assigned by Molson USA to Coors.

31.     Coors also announced that pursuant to "its" policy of consolidation that it was terminating D&F effective March 15, 2008.

32.     Further, Coors stated that "pursuant to the provisions of subdivision 7(a) of Section 55-c, your company is entitled to compensation for the fair market value of the distribution rights for the Molson Brands being terminated, plus compensation for other damages sustained as a result of this termination.  Consistent with the July 13, 2007 decision of the arbitrator *Molson USA, LLC v. John G. Ryan, Inc.*, a copy of which was previously sent to you, Coors believes that a multiple of 2.9 times your company's gross profit on the sale of the Molson

Brands for the full 12-month period ending February 29, 2008 will compensate your company for the fair market value of the Molson Brand."

**SECTION 55-C OF THE NEW YORK ALCOHOLIC BEVERAGE CONTROL LAW**

33.  The relationship between "brewers" and "wholesalers" of beer in New York is regulated by Alcoholic Beverage Control Law Section 55-c.

34.  Under Section 55-c(2)(a), an "Agreement" is defined as any contract, agreement, arrangement, course of dealing or commercial relationship between a brewer and a beer wholesaler pursuant to which a beer wholesaler is granted the right to purchase, offer for sale, resell, warehouse or physically deliver beer sold by a brewer.

35.  A "Brewer" is defined as any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in New York, or any successor to a brewer, under Section 55-c(2)(b).

36.  "Beer wholesaler" and "wholesaler" means the holder of a wholesaler's license pursuant to Section fifty-three of the Alcoholic Beverage Control Law who purchases, offers to sell, resells, markets, promotes, warehouses or physically distributes beer sold by a brewer, under Section 55-c(2)(d).

37.  Coors is a "brewer" with respect to the Molson Products under Section 55-c.

38.  Doldo is a "wholesaler" with respect to the Molson Products under Section 55-c.

39.  Finger Lakes is a "wholesaler" with respect to the Molson Products under Section 55-c.

40.  In enacting §55-c, New York recognized the substantial role wholesalers play in the development of the market and good will of a brewers' products and the equity that

wholesalers develop in such good will, and sought to protect the significant investment of capital and resources by New York wholesalers by prohibiting, under Section 55-c(4), the termination or the material modification of "Agreements" except for "good cause."

41.     "Good cause" is defined, *inter alia*, as the implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential, under Section 55-c(2)(e)(i)(A).

42.     In 2001, the Section 55-c was amended (the "2001 Amendment"), requiring pursuant to Section 55-c(2)(e)(i)(A), that such policy of consolidation shall have previously been disclosed in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. The 2001 Amendment was enacted to apply retroactively.

43.     Section 55-c(6) provides that a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this State.

44.     Section 55-c(6) also provides that the burden of proof for "good cause" to terminate is with the brewer.

45.     Section 55-c(7) provides that a brewer shall not terminate a wholesaler pursuant to a national or regional consolidation plan until the brewer pays the wholesaler "fair market value" as defined in Section 55-c(2)(i), including distribution rights, which have been lost or diminished as the result of the brewer's actions. In the event that a brewer and wholesaler are unable to agree on the compensation to be paid for the value of the beer wholesaler's business and assets, such "fair market value" must be determined by a court of competent jurisdiction.

46.     Lastly, Section 55-c(11), the protections granted to wholesalers under Section

55-c "may not be altered, waived or modified by written or oral agreement in advance of a bona

fide case and controversy arising under a written agreement complying with this section."

## FIRST CLAIM FOR RELIEF
### (Declaratory Relief)

47.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through

41 as if more fully set forth at length herein.

48.     There is an actual controversy among Plaintiffs Doldo and Fingers Lakes and

Defendant Coors relating to whether Coors' purported termination of the distribution agreements

are unlawful pursuant to Section 55-c.

49.     Coors asserts that the agreements among Coors and Doldo and Finger Lakes can

be terminated pursuant to Section 55-c (2)(e)(i)(A) and "its" plan of consolidation.

50.     Doldo and Finger Lakes assert that Coors wrongfully terminated its agreements

with them under Section 55-c (2)(e)(i)(A) because a distributor agreement may only be

terminated for "good cause" and Coors does not have good cause to terminate the agreements

with Doldo and Finger Lakes.

51.     Section 55-c(2)(e)(i)(A) defines "good cause" as follows:

> "Good cause" means and shall be limited to:
> (i)(A) The implementation by a brewer of a national or regional
> policy of consolidation which is reasonable, nondiscriminatory and
> essential. Such policy shall have been previously disclosed, in
> writing, in reasonable detail to the brewer's wholesalers, and shall
> result in a contemporaneous reduction in the number of a brewer's
> wholesalers not only for a brand in this state, but also for a brand
> in contiguous states or in a majority of the states in which the
> brewer sells the brand. All affected wholesalers and affected
> brewers shall be afforded ninety days prior notice of the
> implementation of such policy, and such notice shall be provided
> by the brewer implementing said policy. Further, an affected
> wholesaler who has actual knowledge of the intended

implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

52.     In order for a consolidation policy to qualify as grounds for good cause for the termination of a New York distributor, a brewer seeking to terminate bears the burden of demonstrating that its policy meets the following objective requirements: (1) the consolidation policy will be implemented on a national or regional level; (2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-discriminatory; and (5) the brewer's implementation of the consolidation policy, if "regional, " will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in the states contiguous to New York, or if "national" the brewer's implementation of the consolidation policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brewer's brand is sold.

53.     In addition, Section 55-c requires that the brewer shall previously disclose the policy of consolidation in writing and with reasonable detail to the brewer's wholesalers.

54.     Thus, Doldo and Finger Lakes assert that Coors wrongfully attempted to terminate its agreement with Doldo and Finger Lakes under Section 55-c (2)(e)(i)(A) because (i) Coors' purported plan of consolidation is not reasonable, non-discriminatory, and essential; and (ii) Coors has failed to previously disclose "its" plan of consolidation in writing and with reasonable detail to Plaintiffs.

55.     Further, Doldo and Finger Lakes assert that Coors may not terminate its agreement with Doldo and Fingers because Coors failed comply with the procedure set forth in Section 55-c(7) by paying Doldo and Finger Lakes "fair market value" as defined in Section 55-

9

c(2)(i) prior to announcing its termination. Because the parties were unable to agree on the compensation to be paid for the value of Doldo's and Finger Lakes' business and assets, Coors was required to seek redress in a court of competent jurisdiction.

56. Further, Doldo and Finger Lakes assert that Coors may not terminate their respective distribution agreements because Coors has not acted with the requisite "good faith" required under §55-c(4) because Coors failed to provide Plaintiffs with details of its consolidation policy and seek a judicial determination that its consolidation policy complies with the statutory requirements and the amount of the compensation required to be paid to Plaintiffs under the statute.

57. In order to prevent immediate adverse legal consequence to Doldo and Finger Lakes, a declaration is necessary that (i) Coors' purported termination of its distribution agreement with Plaintiffs is unlawful as Coors does not have a basis under Section 55-c to terminate the agreement among Coors and Doldo and Finger Lakes regarding their distribution rights of the Molson Products; and (ii) Coors must recognize and honor Doldo and Finger Lakes exclusive distribution rights to the Molson Products in their respective exclusive territories and must perform under the agreement with Doldo and Finger Lakes.

58. By reason of the foregoing, Doldo and Finger Lakes are entitled to a declaration pursuant to 28 U.S.C. §2201 and Fed. R. Civ. P. 57 that that (i) Coors purported termination of its distribution agreements with Doldo and Finger Lakes is unlawful as Coors does not have a basis under Section 55-c to terminate the agreements among Coors and Doldo and Finger Lakes regarding Doldo and Finger Lakes distribution rights of the Molson Products; and (ii) Coors must recognize and honor Doldo and Finger Lakes exclusive distribution rights to the Molson

10

Products in the Exclusive Territories and must perform under the agreements with Doldo and Finger Lakes.

## SECOND CLAIM FOR RELIEF
### (Permanent Injunction)

59.　　Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 52 as if more fully set forth at length herein.

60.　　Pursuant to §55-c(6), beer wholesalers are expressly entitled to injunctive relief to remedy the effect of a brewers failure to comply with §55-c or to remedy the effect of conduct prohibited under §55-c.

61.　　Coors has failed to comply with §55-c by terminating its written agreements with Doldo and Finger Lakes effective March 15, 2008, without "good cause," in bad faith, and without previously disclosing "its" plan of consolidation to Doldo and Finger Lakes.

62.　　Coors' failure to comply with §55-c and its prohibited conduct has directly affected Doldo and Finger Lakes in that Doldo and Finger Lakes will lose its ability to have the exclusive distribution rights to the Molson Products, effective March 15, 2008.

63.　　If Coors is permitted to terminate Doldo and Finger Lakes as the distributors for the Molson Products, then Doldo and Finger Lakes will suffer irreparable harm.

64.　　Doldo and Finger Lakes have no adequate remedy at law.

65.　　By reason of the foregoing, in order to remedy the effect of Coors' improper conduct, D&F are entitled to a permanent injunction enjoining Coors from terminating D&F as the exclusive distributors for the Molson Products in the Doldo Exclusive Territory and the Finger Lakes Exclusive Territory, enjoining Coors from appointing another wholesaler to resell Molson Products in the Doldo Exclusive Territory and the Finger Lakes Exclusive Territory, and

compelling Coors to honor its distribution agreements with Doldo and Finger Lakes.

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a) a declaration pursuant to 28 U.S.C. §2201 and Fed. R. Civ. P. 57 that (i) Coors' purported termination of its distribution agreements with Doldo and Finger Lakes is unlawful as Coors does not have a basis under Section 55-c to terminate the agreements among Coors and D&F regarding Doldo's and Finger Lakes' distribution rights of the Molson Products; and (ii) Coors must recognize and honor Doldo's and Finger Lakes' exclusive distribution rights to the Molson Products in the Exclusive Territories and must perform under the agreement with Doldo and Finger Lakes.

(b) a permanent injunction enjoining Coors from terminating D&F as the exclusive distributors for the Molson Products in the Doldo Exclusive Territory and the Finger Lakes Exclusive Territory, enjoining Coors from appointing another wholesaler to resell Molson Products in the Doldo Exclusive Territory and the Finger Lakes Exclusive Territory, and compelling Coors to honor its distribution agreements with Doldo and Finger Lakes.

(c) granting Plaintiffs their costs and attorney's fees; and

(d) such other and further relief as this Court deems just and proper.

Respectfully submitted,

DOLDO BROTHERS, INC. and
FINGER LAKES BOTTLING CO., INC.


By: ___/s/_ Douglas J. Mahr, Esq.


Douglas J. Mahr, Esq. (Bar Roll No. 506291)
David C. Temes, Esq. (Bar Roll No. 514130)
Scolaro Shulman Cohen Fetter & Burstein, P.C.
507 Plum Street, Suite 300
Syracuse, New York 13204
(315) 471-8111
Fax: (315) 425-1355

Gary Ettelman, Esq. (GE9315)
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY 11530
(516) 227-6300
Fax: (516) 227-6307

*Counsel for Doldo Brothers, Inc. and Finger
Lakes Bottling Co., Inc.*

**Lockerby, Michael J.**

| | |
|---|---|
| **From:** | Lockerby, Michael J. |
| **Sent:** | Monday, February 25, 2008 4:27 PM |
| **To:** | 'Suzanne Fertig' |
| **Cc:** | Gary Ettelman; mwinslow@wolriv.com |
| **Subject:** | RE: Coors v. Oak & Boening |
| **Importance:** | High |

From the Desk of: Michael J. Lockerby



My Location     My V-card     My Bio                                        www.foley.com

Actually, this is the first that I recall having heard of a motion to extend the discovery deadline.

In any event, such extensions are -- to say the least -- uncommon in the Eastern District of Virginia.  As you know, the Court has already issued a Scheduling Order with a May 9, 2008 discovery deadline.  Under the circumstances, I would respectfully suggest that we attempt to agree on a discovery plan based on the discovery deadline now in effect -- without prejudice to Defendants' impending motion for an extension.

As we discussed, this case presents questions of law that can be decided with little to no fact discovery.  Accordingly, Coors will oppose the extension that you are now suggesting.

Michael J. Lockerby
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5143
Direct Dial: 202.945.6079
Cell: 804.399.6089
Fax: 202.672.5399
E-mail: mlockerby@foley.com

Admitted to practice in the District of Columbia and the Commonwealth of Virginia

**FOLEY & LARDNER LLP**

**Boston ▪ Brussels ▪ Century City ▪ Chicago ▪ Detroit ▪ Jacksonville ▪ Los Angeles ▪ Madison ▪ Miami ▪ Milwaukee ▪ New York ▪ Orlando ▪ Sacramento ▪ San Diego ▪ San Diego/Del Mar ▪ San Francisco ▪ Shanghai ▪ Silicon Valley ▪ Tallahassee ▪ Tampa ▪ Tokyo ▪ Washington, D.C.**



3/3/2008

**From:** Suzanne Fertig [mailto:SFertig@e-hlaw.com]
**Sent:** Monday, February 25, 2008 4:12 PM
**To:** Lockerby, Michael J.
**Cc:** Gary Ettelman; mwinslow@wolriv.com
**Subject:** RE: Coors v. Oak & Boening

Michael:  I discussed the Joint Proposed Discovery Plan with Gary and as I stated to you on the telephone he intends to make an application to extend the deadline for thirty days.  As such we are going to prepare a discovery plan pursuant to that time frame. If you agree, we can file a joint plan.  If not, Defendants will file their own plan.  Let me know what you intend to do.  Regards, Suzanne

_____
**Suzanne Brooks Fertig, Esq.**
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd.
Suite 401
Garden City, New York 11530
Phone: 516.227.6300
Fax: 516.227.6307
E-mail: sfertig@e-hlaw.com
Website:  www.e-hlaw.com

*******************************************

CONFIDENTIALITY NOTE

To the extent this document constitutes tax advice subject to Circular 230, this tax advice was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.  (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice).

The information contained in the transmission is intended for the named receiver only.  The transmission may contain privileged and confidential material.  If you are not the named recipient, please be advised that any use, dissemination or unauthorized copying of the  materials is strictly prohibited.  If you have received this transmission in error, please notify the law offices of Ettelman & Hochheiser, P.C. and delete the received transmission.  Thank you.

**From:** Lockerby, Michael J. [mailto:MLockerby@foley.com]
**Sent:** Monday, February 25, 2008 1:56 PM
**To:** Suzanne Fertig
**Cc:** Christiansen, Jon P.; Harwin, Michael J.
**Subject:** RE: Coors v. Oak & Boening

Attached is a draft proposed discovery plan.

The references to ECF filing will be deleted from the certificate of service as I understand that proposed orders are among the exceptions to ECF filing in civil cases.

Michael J. Lockerby
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5143

Direct Dial: 202.945.6079
Cell: 804.399.6089
Fax: 202.672.5399
E-mail: mlockerby@foley.com

Admitted to practice in the District of Columbia and the Commonwealth of Virginia

**FOLEY & LARDNER LLP**

**Boston ▪ Brussels ▪ Century City ▪ Chicago ▪ Detroit ▪ Jacksonville ▪ Los Angeles ▪ Madison ▪ Miami ▪ Milwaukee ▪ New York ▪ Orlando ▪ Sacramento ▪ San Diego ▪ San Diego/Del Mar ▪ San Francisco ▪ Shanghai ▪ Silicon Valley ▪ Tallahassee ▪ Tampa ▪ Tokyo ▪ Washington, D.C.**

-----Original Message-----
From: Suzanne Fertig [mailto:SFertig@e-hlaw.com]
Sent: Monday, February 25, 2008 9:37 AM
To: Lockerby, Michael J.
Subject: RE: Coors v. Oak & Boening

How about two weeks after discovery is served.  That would give us a
week to review and then a week to hold depositions.

_____

Suzanne Brooks Fertig, Esq.
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd.
Suite 401
Garden City, New York 11530
Phone: 516.227.6300
Fax: 516.227.6307
E-mail: sfertig@e-hlaw.com
Website:  www.e-hlaw.com

*********************************************

CONFIDENTIALITY NOTE

To the extent this document constitutes tax advice subject to Circular
230, this tax advice was not intended or written to be used, and it
cannot be used by any taxpayer, for the purpose of avoiding penalties
that may be imposed on the taxpayer.  (The foregoing legend has been
affixed pursuant to U.S. Treasury Regulations governing tax practice).

The information contained in the transmission is intended for the named
receiver only.  The transmission may contain privileged and confidential
material.  If you are not the named recipient, please be advised that
any use, dissemination or unauthorized copying of the  materials is
strictly prohibited.  If you have received this transmission in error,
please notify the law offices of Ettelman & Hochheiser, P.C. and delete
the received transmission.  Thank you.

3/3/2008

-----Original Message-----
From: Lockerby, Michael J. [mailto:MLockerby@foley.com]
Sent: Monday, February 25, 2008 9:34 AM
To: Suzanne Fertig
Subject: Re: Coors v. Oak & Boening

When would you like responses to be due?

----- Original Message -----
From: Suzanne Fertig <SFertig@e-hlaw.com>
To: Lockerby, Michael J.
Sent: Mon Feb 25 09:25:21 2008
Subject: Coors v. Oak & Boening

Michael:  I was thinking about our discussion on Friday with regard to
the proposed discovery plan.  I think we need to agree upon deadlines to
file written requests and to file responses.  We need to have time to
review the response/documents prior to conducting depositions.  A fact
discovery deadline of March 31st will not allow that if the parties have
30 days to respond to discovery requests.  Let me know what you think.
Regards, Suzanne


_____

Suzanne Brooks Fertig, Esq.
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd.
Suite 401
Garden City, New York 11530
Phone: 516.227.6300
Fax: 516.227.6307
E-mail: sfertig@e-hlaw.com <blocked::mailto:sfertig@e-hlaw.com>
Website:  www.e-hlaw.com <blocked::http://www.e-hlaw.com/>


*******************************************


CONFIDENTIALITY NOTE


To the extent this document constitutes tax advice subject to Circular
230, this tax advice was not intended or written to be used, and it
cannot be used by any taxpayer, for the purpose of avoiding penalties
that may be imposed on the taxpayer.  (The foregoing legend has been
affixed pursuant to U.S. Treasury Regulations governing tax practice).


The information contained in the transmission is intended for the named
receiver only.  The transmission may contain privileged and confidential
material.  If you are not the named recipient, please be advised that
any use, dissemination or unauthorized copying of the  materials is
strictly prohibited.  If you have received this transmission in error,
please notify the law offices of Ettelman & Hochheiser, P.C. and delete
the received transmission.  Thank you.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK,
-------------------------------------------------------------------x

DOLDO BROTHERS, INC.,
a New York corporation, and

FINGER LAKES BOTTLING CO., INC.,
a New York corporation,

Plaintiffs,

–against –

COORS BREWING COMPANY,
a Colorado Company

Defendant.
-------------------------------------------------------------------x

U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
FEB 25 2008
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Binghamton

1:08 CV 00206-TJM-GJD

**ORDER TO SHOW CAUSE
FOR A PRELIMINARY
INJUNCTION**

Upon reading the Complaint filed on February 22, 2008, the Affidavit of Patsy

Doldo, sworn to on February 21, 2008, the Affidavit of Tom Vasile, sworn to on

February 21, 2008, the Declaration of Suzanne Fertig, dated February 22, 2008, together

with the annexed exhibits, and Plaintiffs' Memorandum of Law In Support of a

Preliminary Injunction, dated February 22, 2008;

**IT IS HEREBY ORDERED**, that the above-named defendant show cause before

the Honorable Thomas J. McAvoy of this Court located at the U.S. courthouse and

Federal Building, ~~445 Broadway, Albany~~ Binghamton, N.Y., at _10:00_ o'clock in the _fore_ noon, on

March _5th_, 2008, or as soon thereafter as counsel can be heard, why an order

should not be issued pending the outcome of this action, pursuant to Rule 65 of the

Federal Rules of Civil Procedure:

(i)     Enjoining defendant, and its owners, representatives, stockholders,

directors, agents, employees, and all persons acting in concert with

them (collectively the "Defendant") from terminating the wholesale

distribution agreement by and between Plaintiff, Doldo Brothers, Inc. ("Doldo") and Coors Brewing Company ("Coors") which grants Doldo the distribution rights to the Molson brands imported by Coors (the "Molson Brands");

(ii)    Enjoining Defendant from terminating the wholesale distribution agreement by and between Plaintiff, Finger Lakes Bottling Co., Inc. ("Finger Lakes") and Coors which grants Finger Lakes the distribution rights to the Molson Brands;

(iii)    Enjoining Defendant from dishonoring Doldo's exclusive distribution rights to the Molson Brands in its Exclusive Territory (defined as the counties of Jefferson and Lewis in the State of New York) by failing to perform under its wholesale distribution agreement with Doldo;

(iv)    Enjoining Defendant from dishonoring Finger Lakes exclusive distribution rights to the Molson Brands in its Exclusive Territory (defined as the counties of Cayuga, Seneca, Ontario, Wayne, Yates and Oswego in the State of New York) by failing to perform under its wholesale distribution agreement with Finger Lakes;

(v)    Enjoining Defendant from selling the Molson Brands to any other wholesaler, aside from Doldo, to sell in Doldo's Exclusive Territory (as defined herein);

(vi)    Enjoining Defendant from selling the Molson Brands to any other wholesaler, aside from Finger Lakes, to sell in Finger Lakes' Exclusive Territory (as defined herein);

(vii)    Compelling Defendant to perform its obligation pursuant to the respective wholesale distribution agreements with Doldo and Finger Lakes;

(viii)    Compelling Defendant to timely deliver all products ordered by Doldo and Finger Lakes pursuant to purchase orders previously delivered to Defendant;

(ix)    Compelling Defendant to hereafter accept purchase orders and timely deliver products pursuant to such purchase orders to Doldo and Finger Lakes; and

**IT IS FURTHER ORDERED**, that the Service of this Order to Show Cause together with a copy of all the documents filed with the application by overnight mail delivery to defendant, Coors Brewing Company, c/o the law firm of Foley & Lardner LLP, 777 E. Wisconsin Avenue, Milwaukee, Wisconsin, 53202, Attn: Jon P. Christiansen, on or before February *25th*, 2008 be deemed good and sufficient service, *such that the papers are received before 10:00 a.m. on February 26, 2008. Plaintiffs shall also serve a copy via e-mail or fax on or before February 25, 2008*

**IT IS FURTHER ORDERED**, that the Service of Defendant's opposition papers shall be by overnight mail delivery to plaintiffs' counsel *and filed with the Court* on or before ~~March~~ *February 28, 2008*, 2008. *The parties shall contact the Court to ascertain whether the hearing will be held in Albany or Binghamton.*

Dated: _____, New York
Issued: __2/25__, 2008

*Thomas J. McAvoy*
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK,

-------------------------------------------------------------------x

DOLDO BROTHERS, INC.,
a New York corporation, and

FINGER LAKES BOTTLING CO., INC.,                    1:08 CV 00206-TJM-GJD
a New York corporation,

**AFFIDAVIT OF TOM
VASILE IN SUPPORT OF
MOTION FOR
PRELIMINARY
INJUNCTION**

                          Plaintiffs,

      –against –

COORS BREWING COMPANY,
a Colorado Company

                   Defendant.

-------------------------------------------------------------------x

TOM VASILE, being duly sworn, deposes and says:

1.      I am the Vice President of Plaintiff Finger Lakes Bottling Co. Inc.

("Finger Lakes") and as such I have personal knowledge of the facts of this action.

2.      Finger Lakes is a family owned and operated (second generation) licensed

New York State beer wholesaler, which operates in Cayuga, Seneca, Ontario, Wayne,

Yates, and Oswego counties.  Finger Lakes was established in 1933 following the repeal

of prohibition and was incorporated in 1973.

3.      The instant affidavit is submitted in support of Plaintiffs' Motion for a

Preliminary Injunction seeking to enjoin Defendant Coors Brewing Company ("Coors")

from improperly terminating its distributor agreement for Molson brand beer ("Molson

Beer") with Finger Lakes on March 15, 2008.

4.      If a preliminary injunction is not granted, Finger Lakes will suffer

irreparable harm because it will lose a substantial portion of its business and will go from

being a profitable business to an unprofitable one.  Further, Finger Lakes will also suffer

irreparable harm due to the substantial loss of good will associated with Molson Beer,

particularly in upstate New York where Molson is considered a domestic premium beer.

In addition, both the loss of profitability and good will is magnified by the recent

announced merger/joint venture of Coors with Miller Brewing Company since

maintaining the rights to Molson will likely impact the ability of Finger Lakes to

maintain its rights to distribute Miller products or possibly acquire the rights to distribute

Coors products. Miller Brewing Company is Finger Lakes' largest supplier.

### HISTORY OF MOLSON DISTRIBUTION

5.       In 1992, Finger Lakes was granted the exclusive right to distribute Molson

brands in the counties of Cayuga, Seneca, Ontario, Wayne, and Yates from Martlet

Importing Co. ("Martlet").  At that time, Martlet was the exclusive importer of Molson in

the United States.  On November 14, 1994, Finger Lakes signed a written distributor

agreement with Martlet ("Martlet Agreement").  A copy of the Martlet Agreement is

annexed as **Exhibit "A".**

6.       Thereafter, in 1997, Finger Lakes was granted from Martlet the exclusive

right to distribute Molson brands in the county of Oswego.

7.       In the late 1990s, Martlet's importing rights to Molson Beer were assigned

to a joint venture between Miller Brewing Company and Molson Canada. Thus, at the

time, the Miller-Molson joint venture became the supplier of Molson Beer to Finger

Lakes for its exclusive territories.

8.       Finger Lakes' primary domestic brand is, and was at the time of the

Miller-Molson joint venture, Miller.  Miller did not require Finger Lakes to sign a new

written distribution agreement with respect to Molson Beer when Miller was responsible for importing Molson beer pursuant to the Miller-Molson joint venture.

9.      Molson's relationship with Miller ended in 2000.  Thereafter, in December 2000 a joint venture was formed between Molson Inc. and the Coors Brewing Company (Molson 2000 LLC) for the sole purpose of distributing Molson beer in the United States. In or about January 2001, Coors assumed sales and distribution responsibilities of the new joint venture between Molson and Coors.  At that time, Molson 2000 LLC, which later changed its name to Molson USA LLC "(Molson USA"), required Finger Lakes to execute the Molson Amendment.

10.     On February 2, 2001, Finger Lakes executed the Molson Amendment.  A copy of the Molson Amendment is annexed as **Exhibit "B".**

11.     I have been informed by counsel that under §55-c a distribution agreement may not be amended unless "good cause" exists; which is defined as a breach of a material term after an opportunity to cure or the implementation of plan of consolidation. At the time the Molson Amendment was executed, Finger Lakes was fully compliant with the terms of the prior Martlet Agreement and Molson had not yet announced its purported plan of consolidation.

12.     In early 2001, almost immediately after the formation of the Molson/Coors joint venture, Molson USA formulated and began to implement what it called its "policy of consolidation."  By late 2002, Molson USA contacted Finger Lakes and for the first time announced that it was its intent to "consolidate" its distributors in the New York market.  Actually, the policy was not really for "consolidation" as its goal was not to reduce its number of wholesalers, but simply to align its distribution channel

with Coors distributors. For example, when Molson USA terminated John Ryan pursuant to its so-called consolidation policy, two other Coors distributors split the Ryan territory.

13.    Throughout 2003, Plaintiffs engaged by way of their legal counsel in correspondence with Molson USA disputing Molson USA's right and effort to consolidate the New York market under §55-c. Upon information and belief, on February 9, 2005, the parent companies of Coors and Molson announced a merger, which resulted in the formation of Molson Coors Brewing Company ("Molson Coors"). Molson USA continued its operations as a wholly owned subsidiary of Molson Coors.

14.    On March 11, 2005, Molson USA again, in writing, acknowledged that it had, in 2002, adopted a nationwide policy of alignment which it referred to as its policy of consolidation. A copy of the relevant correspondence is annexed as **Exhibit "C".**

15.    On August 4, 2005, on Molson Coors letterhead, Coors Brewing Company sent a letter to Finger Lakes stating "[t]he purpose of this letter is to advise our non-Coors New York Molson distributors of our actions [the commencement of the *Ryan* arbitration]. Eventually and as appropriate, MUSA will seek similar declarations permitting the termination of our agreements with each of other [sic] New York non-Coors Molson distributors." A copy of the August 4, 2005, correspondence is annexed as **Exhibit "D".**

16.    On September 19, 2007, Coors sent another letter to Finger Lakes stating "As I advised you in my letter of August 4, 2005 (copy attached), now that the arbitration proceeding with Ryan has been concluded, Molson USA will shortly be commencing action against your company in order to accomplish the consolidation of the Molson

brands with the Coors network consistent with New York Consolidated Statutes Section 55-c." A copy of the form letter sent by Coors is annexed as **Exhibit "E."**

17.     Six years after Molson USA announced its alleged policy of consolidation, by letter dated December 7, 2007, Coors announced to Finger Lakes that as of December 2, 2007, Coors became, by assignment, the successor to Molson USA as the supplier of Molson brands. By this letter, Coors further announced that "[p]ursuant to Section 55-c of the New York Alcoholic Beverage Control Law . . . Coors has elected to terminate the distribution agreement for the Molson Brands with your company as part of ***its nationwide policy of consolidation*** for the Molson Brands . . . effective March 15, 2008." A copy of the December 7, 2007, letter is annexed as **Exhibit "F".**

18.     Coors also stated that:

> [P]ursuant to the provisions of subdivision 7(a) of Section 55-c, your company is entitled to compensation for the fair market value of the distribution rights for the Molson brands being terminated, plus compensation for other damages sustained as a result of this termination. Consistent with the July 13, 2007 decision of the arbitrator *Molson USA, LLC v. John G. Ryan, Inc.*, a copy of which was previously sent to you, Coors believes that a multiple of 2.9 times your company's gross profit on the sale of the Molson Brands for the full 12-month period ending February 29, 2008 will compensate your company for the fair market value of the Molson Brand.

19.     At no time did Coors ever disclose to Finger Lakes its alleged policy of consolidation referred to in the December 7, 2007, letter. Rather, it seems that Coors is simply attempting to continue the policy of alignment commence by its predecessor over 6 years ago.

20.     Further, in response to the December 7, 2007, Finger Lakes informed Coors that it did not believe that Coors had the right to terminate because its policy of

alignment did not meet the statutory requirements of §55-c and that in any event, reliance on *Ryan's* 2.9 times multiple was inapplicable because that number was determined in an arbitration in which Finger Lakes did not participate and because that value was uniquely based on the nature of Ryan's business (its geographic territory, other brands offered, total revenue, etc.), which is entirely different than the nature of Finger Lake's business.

## FINGER LAKES' OPERATIONS

21.     Molson Beer is the second largest product that Finger Lakes distributes. It accounts for approximately 10% of total sales and approximately 15% of total gross profit (about $450,000). Last year, Finger Lakes' total volume for all beers was approximately 900,000 cases, out of which approximately 86,000 cases was Molson. In 2005, Fingers Lakes was one of 50 largest Molson distributors in the U.S. A copy of a letter dated January 21, 2005, is annexed as **Exhibit "G"**.

22.     Further, Molson is one of only two beers that Finger Lakes distributes in each of its six counties. The other beer being Miller, which is Finger Lakes largest brand.

23.     The other brands that Fingers Lakes distributes are Genesse (Oswego), Yuengling (Cayuga, Seneca, Ontario, Wayne, and Yate), Seagram's Wine Coolers (all six counties), Old Milwaukee (Cayuga and Seneca), and Heineken (Seneca and Cayuga).

24.     However, Molson is the only premium beer (other than Miller) that Finger Lakes sells in all six of its counties. Further, based on the closeness of Finger Lakes' territories to Canada, Molson is really considered a domestic premium beer, on the same level as Miller, Coors, or Budweiser. Premium beers are essential to any distributor because they produce a higher profit margin. In this case, Finger Lakes enjoys a profit margin of approximately $4.50 per case of Molson, a margin higher than most of its other

brands. That is why Molson, which accounts for 10% of total sales for Finger Lakes, represents 15% of its gross profit. Other examples of premium beers include Sam Adams, Guinness, Saranac, Corona, and Smirnoff Ice. Finger Lakes has none of these brands and is thus, except for its distribution of Molson, at a distinct disadvantage with its competitors who do.

25.    For 2007, Finger Lakes' total gross profit (after cost of goods sold) was approximately $2,881,080, and its net profit was approximately $365,890.

26.    If Coors is able to terminate Fingers Lakes' distributor agreement for Molson, Finger Lakes will go from being a profitable business to an unprofitable one because of the large percentage of total profit attributable to sales of Molson. This will have dire consequences on Finger Lakes and its employees.

27.    In 2007, Molson generated approximately $370,000 of total gross profit for Finger Lakes, and its loss would effectively wipe out all of Finger Lakes total profits. Further, due to the nature of Finger Lakes business and unique geographic nature of its territory (namely its rural character and its sheer size), Finger Lakes will not be able to cut expenses in order to offset any part of this loss of business. Finger Lakes' territory is approximately 3700 square miles in area, and in 2007, Finger Lakes' trucks drove approximately 750,000 miles in making deliveries. Certain of its deliveries can be as far away as 75 miles from the Finger Lakes' warehouse. Thus, based on the sheer size, Finger Lakes' will not be able to simply fire employees in order to recoup some of its losses associated with the loss of the Molson brand. Similarly, the cost of its warehouse facilities are fixed and cannot be changed. Furthermore, due to the higher volumes of its

Miller sales, the same number of trucks will have to be used to deliver product, the only difference is that without Molson's volume, the trucks will not be full.

28.    Furthermore, Finger Lakes has no ability to replace Molson with another Canadian brand.  There is virtually only one other Canadian brand in the market, Labatts, and that brand is distributed by a competing distributor.  Indeed, there is little or no likelihood that Finger Lakes can obtain any brand, Canadian or otherwise, to replace the volume it stands to lose with Molson, as most brands, and certainly all established brands, have agreements with other distributors.

29.    Further, because locally Molson is considered a domestic premium beer, Finger Lakes' customers have come to expect a continuous supply of Molson and will look to whomever Coors appoints to continue that supply.  In particular, due to its Canadian origins and its long time association with hockey, Molson has become a staple for bars and business that cater to hockey fans, of which upstate New York has many. Thus, much of the good will that Finger Lakes has helped to create in Molson will be lost.  This will not only permit this new Molson distributor (a competitor of Finger Lakes) to enjoy the significant profit generated by each case of Molson, but will give that competitor an inroad into Finger Lakes' current customers who will want to continue their supply of Molson, allowing that competitor to better compete with Finger Lakes' other brands.  The effect this new competition will have on the operations of Finger Lakes' other brands cannot be calculated.  Therefore, at the very time that Finger Lakes' is suffering a total loss of its profitability, it will also suffer increased competition to it other brands due to the loss of good will associated with Molson.

30.    Further, Coors' termination of Finger Lakes' distributor agreement comes at time of great uncertainty in the beer distributor industry, particularly because of the announced merger/joint venture of Coors and Miller that likely will take place by the end of the summer 2008.  With Coors and Miller merging, there is great unrest and significant questions which exist in the market as to what impact the joint venture will have with respect to their respective distribution networks.  The loss of Molson could dramatically impact Finger Lakes ability to keep its Miller brands after the merger.  As Coors/Miller decide what to do about potential restructuring of their distribution systems due to their consolidation, the loss of Molson could prove fatal for Finger Lakes going forward.

### Conclusion

30.    Based upon the above, it is respectfully requested that this Court grant Plaintiffs' motion for a preliminary injunction enjoining Defendant Coors Brewing Company from improperly terminating its distributor agreement for Molson Beer with Finger Lakes on March 15, 2008.


_____  VP.
Tom Vasile


Sworn to before me this
21st day of February 2008

_____
Notary Public

LORI A. FEENEY
Notary Public, State of New York
No. 01FE5022265
Qualified in Cayuga County
Commission Expires Jan. 3, 20 1 0

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/25/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
MOLSON USA, LLC.                                            :
                                                           :       07CV6965(HB)
                              Petitioner,                   :       DEFAULT JUDGMENT
                                                           :
        -against-                                          :
                                                           :
JOHN G. RYAN, INC.,                                        :
                                                           :
                              Respondent.                  :
------------------------------------------------------------:

Hon. HAROLD BAER, JR. District Judge

        This action having been commenced on August 3, 2007, by the filing of the

Summons and Petition, and Respondent having waived service of the Summons and

Petition on August 14, 2007, and Petitioner having filed such waiver of service on August

14, 2007, and Respondent not having answered the Petition, and the time for answering

the Petition having expired, and the Clerk of the United States District Court for the

Southern District of New York having certified Respondent's default on October 16,

2007, it is

        ORDERED, ADJUDGED AND DECREED: That the Petition of Molson USA,

LLC, to confirm the attached arbitration awards, dated November 6, 2006 and July 13,

2007 (the "Awards"), is granted and the Awards are hereby confirmed.

Dated: New York, New York
        January 15, 2008

                                                       _____
                                                       U.S.D.J.

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

---

MOLSON USA, LLC,

      Claimant,

  vs.                          Case No. 13 181 2798 05

JOHN G. RYAN, INC.,

      Respondent.

---

**AWARD, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

      I , THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated January 2, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties do hereby, AWARD, as follows:

      The undersigned arbitrator rendered an award in Phase I of this arbitration proceeding concluding that Molson USA, LLC ("Molson USA") had adopted and implemented a plan of consolidation constituting good cause of termination of the distributorship agreement and relationship with the respondent, John G. Ryan, Inc. ("Ryan").  That award, dated November 6, 2006, is incorporated herein as a partial basis for the second phase of this proceeding to determine, pursuant to New York Consolidated Statutes 55-c7(a), the amount of compensation due to Ryan for the termination of Ryan's Molson distribution rights.

      Evidence was taken in this matter on April 26 and 27, 2007.  Ryan presented documentary evidence and testimony of Andrew Christon and Jerry Ryan.  Molson presented the

testimony of William H. Beyer, Richard Carroll, Gary Styles, and Lamont Seckman. The parties have each presented post-hearing memoranda and reply memoranda. Submissions in this arbitration proceeding have been closed.

The final award in this matter shall include the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Both parties in this proceeding presented the testimony of expert witnesses who valued the distribution rights of Ryan using a valuation methodology referred to by various terms, but frequently by the term "discounted future cash flow" ("DFCF"). The methodologies of Ryan's expert, Andrew Christon, and Molson's expert, Lamont Seckman, in calculating DFCF were similar, but not identical.

2. Each expert's DFCF calculation was premised upon a projection of sales of Molson products in Ryan's territory for a period of years into the future. Mr. Christon's period was ten years, beginning January 1, 2007, and Mr. Seckman's period was for seven years beginning on the same date. Neither expert was critical of the choice of the other's projection period.

3. One of the key areas of dispute between the experts was the expected performance of the Molson brands in Ryan's territory in the future. Mr. Christon projected that Molson sales would essentially flatten out for the ten year projected period, while Mr. Seckman projected a continued gradual decline in Molson sales during his projected period.

4. The evidence supporting Mr. Christon's view on future Molson performance can be summed up in his phrase that the people running Molson Coors Brewing Company are smart people and would not let future brand declines continue.

5.  Mr. Christon also pointed to Molson's efforts to repackage the Molson product to appear more "Canadian." Molson contends that there is no evidence that these efforts have been or will be successful. However, it appears elementary that Molson would not have undertaken these efforts unless it hoped to benefit from them. While it may be difficult or impossible to forecast the magnitude of the improvement, the makeover effort may be expected to improve sales.

6.  On the other hand, Molson produced substantial evidence suggesting that the downward trend of the Molson brand was likely to continue. Among the factors supporting this conclusion are Molson Coors Brewing Company's ("MCBC") concentration of spending and support on the key Coors Light, Keystone and Blue Moon brands, the concentration of Molson U.S. spending in metropolitan markets, the reduction of Molson SKUs ("stock-keeping units") and the upward change in the pricing of Molson products to import levels. This latter strategy would likely have a disproportionately negative effect in the more economically challenged areas of New York, such as Ryan's territory. While it is not known how much each or all of these factors will impact sales of Molson products in Ryan's market, cumulatively they appear likely to cause a continuation of the downward trend.

7.  In the absence of proof showing the likelihood of positive change, the best guide for future performance is past performance. Therefore, I believe that Mr. Seckman's projections of volume are more likely to occur.

8.  Both experts' calculations of DFCF reached an incremental profit calculation by subtracting the cost of goods sold and incremental costs that would be avoided by Ryan by the loss of the Molson brand rights. The future incremental lost profits were reduced by the application of a discount rate. Mr. Christon's discount rate was 11.17%, and Mr. Seckman's

discount rate was 14.59%. Both experts used a technique known as the "weighted average cost of capital" method of calculating their discount rate.

9. I find Mr. Seckman's calculation of the discount rate to be more credible and applicable to the present circumstances. A potential buyer of distribution rights for an individual brand is at a greater risk than the buyer of an entire distributorship, given the moderating effect of multiple brands within a distribution house, as some brands grow and others decline. The buyer of the distribution rights of an individual brand will expect a pay-back in a short period of time. Thus, even if the hypothetical buyer of the Molson distribution rights were to finance the entire purchase, over the projected DFCF period the balance of debt-to-equity invested in the brands more nearly approaches the 80% equity/20% debt assumed by Mr. Seckman in his model.

10. There was a dispute between the experts on how the "terminal value" calculation would be made. A terminal value calculation seeks to value the brand rights at the end of the projection period. Mr. Christon suggests that the volume number for the last year of the projection period should be used for the terminal value calculation. Mr. Seckman takes an additional year of declining performance to reach the next year, which is the beginning of the terminal value calculation. Molson introduced a text by McKinsey & Co. (Ex. M-30) supporting Mr. Seckman's view of the terminal value calculation. While Mr. Christon suggested that his methodology was supported by a noted expert in the field, he provided no documentation of this view. Therefore, I adopt Mr. Seckman's methodology.

11. Mr. Seckman also analyzed several other Molson brand sale transactions to do a "reality check" of his DFCF calculation. Mr. Christon did not examine any comparable transactions, even those in his company's database of transactions. The result of Mr. Seckman's examination of the Molson database (Ex. M-12) was to increase the valuation from his DFCF

calculations. It appears to me that other transactions could be useful as a reality check for the fair market value of the Molson brands.

12. There was evidence of other transactions also from a summary of Mr. Christon's database (Ex. M-26) and from an industry consultant, Joe Thompson (Ex. R-17). Each of these exhibits support Mr. Seckman's view of valuation.

13. In sum, I am convinced that the valuation proposed by Molson should be adopted in general for the purposes of my award in this arbitration. Mr. Seckman's report concludes with a range of values which, when rounded, range from a low of $700,00.00 (2.59 times 2006 gross profits) to $780,000.00 (2.90 times 2006 gross profits)(Ex. M-2, p. 22). Molson proposes a computation of value midway between the two, *i.e.* $740,000.00. Because I believe a valuation lower than 2.9 times 2006 gross profits would undervalue the distribution rights, I conclude that a value at the higher end of Mr. Seckman's range is appropriate here. Accordingly, I conclude that the fair market value of the Molson distribution rights held by Ryan is $780,000.00, the higher number in Mr. Seckman's range.

14. Ryan put on evidence of other damages that will be suffered by the distributor as a result of the proposed termination. Molson has agreed with Ryan's calculation that the out-of-pocket damages are $7,517.95.

## CONCLUSIONS OF LAW

1.    Ryan has the burden of proof in this phase of the hearing, including both the burden of going forward with the evidence and the risk of non-persuasion.

2.    Under New York law, expert testimony must be supported by an adequate factual basis and not be based upon conjecture or speculation. Here, Mr. Christon's projection of future sales as a part of his calculation of DFCF is based upon his speculation as to what

MCBC's management and Molson's management will do in the future to reverse the trend of lower sales in Ryan's market and the larger beer marketplace. Because the opinion is based upon speculation, Ryan has failed in its burden of proof.

3.    Even if Mr. Christon's opinion were considered to have an adequate basis in fact, I would conclude that in weighing all of the factors, including the credibility of witnesses, the likelihood of future events portrayed by both parties, Ryan's track record of Molson performance, and my assessment of the merits of the methodologies of both experts, Molson's projection of value better estimates the fair market value of Ryan's Molson distribution rights under §55-c7(a).

4.    As to the determination of "other damages sustained" under §55-c7(a), I do not accept the argument of Ryan and Mr. Christon that the difference between Mr. Christon's valuation of Ryan's Molson distribution rights and his calculation of fair market value (resulting from the application of a lack of marketability discount) constitutes the type of damages contemplated by the New York legislature.

5.    When the statute refers to "other" damages, it should be construed to refer to matters other than the value of the brand distribution rights, for which the legislature chose to define fair market value in §55-c2(i). Moreover, it would be illogical for a supplier to be required to pay more for the termination of the brands for good cause pursuant to the implementation of a national plan of consolidation (§55-c7(a)) than for an outright termination without cause (§55-c7(b).

6.    Rather, in my view, the damages provided in addition to fair market value of the terminated brand distribution rights are those sunk costs which the distributor has been unable to recoup or will be unable to recoup after the termination of the brand distribution rights.

7.      Therefore, by applying §55-c7(a) to the facts I have determined in this case, the following is my declaratory award:

a.      Per my award of November 6, 2006, Molson is entitled under all applicable law to terminate its agreement with the respondent Ryan upon notice to Ryan and payment to Ryan in the amount of $787,517.95.

b.      Per the application of §55-c7(c), the costs and arbitrator compensation of this arbitration shall be divided equally between Molson and Ryan. Accordingly, the administrative fees of the American Arbitration Association totaling $5,000.00, and the compensation of the arbitrator totaling $86,318.00 shall be borne equally by the parties. Therefore, Ryan shall reimburse Molson the sum of $2,250.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Molson.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

_July 13, 2007_
Date

_Peter M. Collins_ (signature)
Peter M. Collins

I, Peter, M. Collins, do hereby affirm upon my oath as an Arbitrator that I am the individual described in and who has executed this instrument which is my Award

_July 13, 2007_
Date

_Peter M. Collins_ (signature)
Peter M. Collins

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

MOLSON USA, LLC,

    Claimant,

    vs.                                    Case No. 13 181 2798 05

JOHN G. RYAN, INC.,

    Respondent.

## AWARD, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated January 2, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties do hereby, AWARD, as follows:

    The undersigned arbitrator rendered an award in Phase I of this arbitration proceeding concluding that Molson USA, LLC ("Molson USA") had adopted and implemented a plan of consolidation constituting good cause of termination of the distributorship agreement and relationship with the respondent, John G. Ryan, Inc. ("Ryan"). That award, dated November 6, 2006, is incorporated herein as a partial basis for the second phase of this proceeding to determine, pursuant to New York Consolidated Statutes 55-c7(a), the amount of compensation due to Ryan for the termination of Ryan's Molson distribution rights.

    Evidence was taken in this matter on April 26 and 27, 2007. Ryan presented documentary evidence and testimony of Andrew Christon and Jerry Ryan. Molson presented the

testimony of William H. Beyer, Richard Carroll, Gary Styles, and Lamont Seckman. The parties

have each presented post-hearing memoranda and reply memoranda. Submissions in this

arbitration proceeding have been closed.

The final award in this matter shall include the following Findings of Fact and

Conclusions of Law.

## FINDINGS OF FACT

1.  Both parties in this proceeding presented the testimony of expert witnesses

who valued the distribution rights of Ryan using a valuation methodology referred to by various

terms, but frequently by the term "discounted future cash flow" ("DFCF"). The methodologies

of Ryan's expert, Andrew Christon, and Molson's expert, Lamont Seckman, in calculating DFCF

were similar, but not identical.

2.  Each expert's DFCF calculation was premised upon a projection of sales of

Molson products in Ryan's territory for a period of years into the future. Mr. Christon's period

was ten years, beginning January 1, 2007, and Mr. Seckman's period was for seven years

beginning on the same date. Neither expert was critical of the choice of the other's projection

period.

3.  One of the key areas of dispute between the experts was the expected

performance of the Molson brands in Ryan's territory in the future. Mr. Christon projected that

Molson sales would essentially flatten out for the ten year projected period, while Mr. Seckman

projected a continued gradual decline in Molson sales during his projected period.

4.  The evidence supporting Mr. Christon's view on future Molson performance

can be summed up in his phrase that the people running Molson Coors Brewing Company are

smart people and would not let future brand declines continue.

5. Mr. Christon also pointed to Molson's efforts to repackage the Molson product to appear more "Canadian." Molson contends that there is no evidence that these efforts have been or will be successful. However, it appears elementary that Molson would not have undertaken these efforts unless it hoped to benefit from them. While it may be difficult or impossible to forecast the magnitude of the improvement, the makeover effort may be expected to improve sales.

6. On the other hand, Molson produced substantial evidence suggesting that the downward trend of the Molson brand was likely to continue. Among the factors supporting this conclusion are Molson Coors Brewing Company's ("MCBC") concentration of spending and support on the key Coors Light, Keystone and Blue Moon brands, the concentration of Molson U.S. spending in metropolitan markets, the reduction of Molson SKUs ("stock-keeping units") and the upward change in the pricing of Molson products to import levels. This latter strategy would likely have a disproportionately negative effect in the more economically challenged areas of New York, such as Ryan's territory. While it is not known how much each or all of these factors will impact sales of Molson products in Ryan's market, cumulatively they appear likely to cause a continuation of the downward trend.

7. In the absence of proof showing the likelihood of positive change, the best guide for future performance is past performance. Therefore, I believe that Mr. Seckman's projections of volume are more likely to occur.

8. Both experts' calculations of DFCF reached an incremental profit calculation by subtracting the cost of goods sold and incremental costs that would be avoided by Ryan by the loss of the Molson brand rights. The future incremental lost profits were reduced by the application of a discount rate. Mr. Christon's discount rate was 11.17%, and Mr. Seckman's

discount rate was 14.59%. Both experts used a technique known as the "weighted average cost of capital" method of calculating their discount rate.

9. I find Mr. Seckman's calculation of the discount rate to be more credible and applicable to the present circumstances. A potential buyer of distribution rights for an individual brand is at a greater risk than the buyer of an entire distributorship, given the moderating effect of multiple brands within a distribution house, as some brands grow and others decline. The buyer of the distribution rights of an individual brand will expect a pay-back in a short period of time. Thus, even if the hypothetical buyer of the Molson distribution rights were to finance the entire purchase, over the projected DFCF period the balance of debt-to-equity invested in the brands more nearly approaches the 80% equity/20% debt assumed by Mr. Seckman in his model.

10. There was a dispute between the experts on how the "terminal value" calculation would be made. A terminal value calculation seeks to value the brand rights at the end of the projection period. Mr. Christon suggests that the volume number for the last year of the projection period should be used for the terminal value calculation. Mr. Seckman takes an additional year of declining performance to reach the next year, which is the beginning of the terminal value calculation. Molson introduced a text by McKinsey & Co. (Ex. M-30) supporting Mr. Seckman's view of the terminal value calculation. While Mr. Christon suggested that his methodology was supported by a noted expert in the field, he provided no documentation of this view. Therefore, I adopt Mr. Seckman's methodology.

11. Mr. Seckman also analyzed several other Molson brand sale transactions to do a "reality check" of his DFCF calculation. Mr. Christon did not examine any comparable transactions, even those in his company's database of transactions. The result of Mr. Seckman's examination of the Molson database (Ex. M-12) was to increase the valuation from his DFCF

calculations. It appears to me that other transactions could be useful as a reality check for the fair market value of the Molson brands.

12. There was evidence of other transactions also from a summary of Mr. Christon's database (Ex. M-26) and from an industry consultant, Joe Thompson (Ex. R-17). Each of these exhibits support Mr. Seckman's view of valuation.

13. In sum, I am convinced that the valuation proposed by Molson should be adopted in general for the purposes of my award in this arbitration. Mr. Seckman's report concludes with a range of values which, when rounded, range from a low of $700,00.00 (2.59 times 2006 gross profits) to $780,000.00 (2.90 times 2006 gross profits)(Ex. M-2, p. 22). Molson proposes a computation of value midway between the two, *i.e.* $740,000.00. Because I believe a valuation lower than 2.9 times 2006 gross profits would undervalue the distribution rights, I conclude that a value at the higher end of Mr. Seckman's range is appropriate here. Accordingly, I conclude that the fair market value of the Molson distribution rights held by Ryan is $780,000.00, the higher number in Mr. Seckman's range.

14. Ryan put on evidence of other damages that will be suffered by the distributor as a result of the proposed termination. Molson has agreed with Ryan's calculation that the out-of-pocket damages are $7,517.95.

## CONCLUSIONS OF LAW

1.    Ryan has the burden of proof in this phase of the hearing, including both the burden of going forward with the evidence and the risk of non-persuasion.

2.    Under New York law, expert testimony must be supported by an adequate factual basis and not be based upon conjecture or speculation. Here, Mr. Christon's projection of future sales as a part of his calculation of DFCF is based upon his speculation as to what

Page 5 of 7

MCBC's management and Molson's management will do in the future to reverse the trend of lower sales in Ryan's market and the larger beer marketplace. Because the opinion is based upon speculation, Ryan has failed in its burden of proof.

    3.    Even if Mr. Christon's opinion were considered to have an adequate basis in fact, I would conclude that in weighing all of the factors, including the credibility of witnesses, the likelihood of future events portrayed by both parties, Ryan's track record of Molson performance, and my assessment of the merits of the methodologies of both experts, Molson's projection of value better estimates the fair market value of Ryan's Molson distribution rights under §55-c7(a).

    4.    As to the determination of "other damages sustained" under §55-c7(a), I do not accept the argument of Ryan and Mr. Christon that the difference between Mr. Christon's valuation of Ryan's Molson distribution rights and his calculation of fair market value (resulting from the application of a lack of marketability discount) constitutes the type of damages contemplated by the New York legislature.

    5.    When the statute refers to "other" damages, it should be construed to refer to matters other than the value of the brand distribution rights, for which the legislature chose to define fair market value in §55-c2(i). Moreover, it would be illogical for a supplier to be required to pay more for the termination of the brands for good cause pursuant to the implementation of a national plan of consolidation (§55-c7(a)) than for an outright termination without cause (§55-c7(b)).

    6.    Rather, in my view, the damages provided in addition to fair market value of the terminated brand distribution rights are those sunk costs which the distributor has been unable to recoup or will be unable to recoup after the termination of the brand distribution rights.



7.    Therefore, by applying §55-c7(a) to the facts I have determined in this case, the following is my declaratory award:

a.    Per my award of November 6, 2006, Molson is entitled under all applicable law to terminate its agreement with the respondent Ryan upon notice to Ryan and payment to Ryan in the amount of $787,517.95.

b.    Per the application of §55-c7(c), the costs and arbitrator compensation of this arbitration shall be divided equally between Molson and Ryan. Accordingly, the administrative fees of the American Arbitration Association totaling $5,000.00, and the compensation of the arbitrator totaling $86,318.00 shall be borne equally by the parties. Therefore, Ryan shall reimburse Molson the sum of $2,250.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Molson.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_July 13, 2007_
Date

_Peter M. Collins_ (signature)
Peter M. Collins

I, Peter, M. Collins, do hereby affirm upon my oath as an Arbitrator that I am the individual described in and who has executed this instrument which is my Award

_July 13, 2007_
Date

_Peter M. Collins_ (signature)
Peter M. Collins

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
―――――――――――――――――――――――――――――
MOLSON USA, LLC,

Claimant,                              AAA Case No.: 15 181 00640 05

      v.

JOHN G. RYAN, INC.,

Respondent.
―――――――――――――――――――――――――――――

     I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the

arbitration agreement entered into between the above-named parties and dated January 02, 2001, and

having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby

issue my INTERIM AWARD, as follows:

## INTERIM DECISION

### DISCUSSION

     An evidentiary hearing in this proceeding took place on July 17 and 18, 2006.

The parties have briefed the case comprehensively and both sides have submitted proposed

findings of fact and conclusions of law as well as objections to one another's findings and

conclusions. Accordingly, familiarity with the facts and the contentions of the parties is

assumed.

     Molson USA, LLC ("Molson"), the Claimant herein, is a limited liability

1

company owned by Coors Brewing Company ("Coors") and Molson, Inc. It sells beer products

manufactured by Molson, Inc., in Canada to the United States market. John G. Ryan ("Ryan") is

a duly licensed wholesaler of beer and other alcoholic and non-alcoholic beverages in New York

State and acts as a wholesaler of Molson products in New York pursuant to a written agreement

(the "Agreement") sometimes referred to as the "Molson Amendment."[1]

     Molson seeks a declaratory judgment declaring that Molson has the right to

terminate the Agreement and appoint a distributor of its choosing, and determination of the

amount of compensation due to Ryan by virtue of the termination. Ryan requests denial of the

requested relief in all respects.

     At issue is application of Section 55-c of New York's Alcoholic Beverage Control

Law ("ABCL"). As Ryan has discussed in its pre-hearing submission, pursuant to the protective

measures imposed under ABCL §55-c, a brewer may only terminate a distributor for "good

cause", as it is narrowly defined by the Statute. So far as applicable here, the "good cause"

requirement establishes standards that must be met by a brewer in order to justify termination of

a distributor as part of a national or regional policy of consolidation. The portion of the statute

relevant to the instant dispute provides as follows:

---

[1] While the "Molson Amendment" was by its express terms executed "effective as of the 2nd day of January, 2001," there is some uncertainty concerning the actual times of execution by the signatories. See Findings of Fact, Nos. 14 through 22, *infra*. However, it does not seem to be in dispute that the parties did business from 2001 onward operating under the terms of the Molson Amendment. See Finding of Fact No. 22, *infra*.

2

"Good cause" means and shall be limited to: (i)(A)
The implementation by a brewer of a national or
regional policy of consolidation which is
reasonable, nondiscriminatory and essential. Such
policy shall have been previously disclosed, in
writing, in reasonable detail to the brewer's
wholesalers, and shall result in a contemporaneous
reduction in the number of a brewer's wholesalers
not only for a brand in this state, but also for a brand
in contiguous states or in a majority of the states in
which the brewer sells the brand. All affected
wholesalers and affected brewers shall be afforded
ninety days prior notice of the implementation of
such policy, and such notice shall be provided by
the brewer implementing said policy. Further, an
affected wholesaler who has actual knowledge of
the intended implementation of such policy shall
also notify each affected brewer. The term "affected
brewers" means all other brewers with an agreement
with an affected wholesaler who is a multiple
brands wholesaler. The term "affected wholesalers"
means wholesalers who may reasonably be expected
to experience a loss or diminishment of a right to
distribute a brand, in whole or in part, as a
consequence of a proposed consolidation policy.

N.Y. ABCL. §55-c 2(e)(i)(A).

Under the statutory language quoted above, in order for a consolidation policy to

qualify as grounds for good cause for the termination of a New York distributor, a brewer

seeking to terminate bears the burden of demonstrating that its policy meets the following

requirements: (1) the consolidation policy will be implemented on a national or regional level;

(2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-

discriminatory; and (5) the brewer's implementation of the consolidation policy, if "regional",

will result in a contemporaneous reduction of the number of distributors for its brand both in

New York, as well as in the states contiguous to New York, or if "national" the brewer's

3

implementation of the consolidation policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brewer's brand is sold.

### This Proceeding Is Not Time-Barred

A preliminary issue is raised by Ryan's argument that this proceeding is time-barred by Subparagraph 6.2 of Paragraph 6 ("Dispute Resolution") of the Molson Amendment, which provides in relevant part:

> Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred.

Ryan contends that the present dispute arose during the first half of 2003, when Molson representatives attempted to "persuade or pressure" Ryan and other New York wholesalers into transferring or selling their distribution rights to the local Coors house, and therefore that the parties' agreed one-year limitation bars this proceeding, which was commenced on July 26, 2005. In so doing, he equates the present state of the dispute with what it was in 2003, framing the issue as (then as now) whether Molson had the right to consolidate Ryan and other New York distributors. However, while there is no doubt that disputes between Molson and its New York wholesalers including Ryan were erupting in 2003, it does not follow that *the facts that are the subject of this proceeding* were then in dispute. As Molson's counsel urges, there was no evidence at the hearing that Molson took any steps to terminate Ryan pursuant to the provisions of §55-c until the filing of the arbitration demand in this case, which seeks a declaratory judgment establishing that it may do so. Moreover, as Molson points out, even if the

4

parties had discussed whether Molson had or did not have the right to terminate, this would not trigger a dispute within the intendment of §55-c until some action were taken by Molson to actually pursue termination.

Accordingly, I conclude that this proceeding is not time-barred.

**The 2001 Amendments to ABCL §55-c Apply to This Case**

The sale of alcoholic beverages in the State of New York, as elsewhere in the United States, is subject to comprehensive state regulation. Threshold issues are presented in this case by Section 55-c of New York's ABCL, which governs agreements between brewers and beer wholesalers. That statute was amended by the New York State legislature effective June 15, 2001, during the pendency of the Molson-Ryan Agreement. Molson contends that applying the provisions of ABCL §55-c as amended in 2001 would be unconstitutional since application of the amendment would impair an existing contract in violation of the Contract Clause of the United States Constitution.

In support of its contention Molson cites *Equipment Manufacturere Institute v. Janklow*, 300 F.3d 843 (8ᵗʰ Cir. 2002), in which contractual terms within certain manufacturers' pre-existing dealership agreements dealing with farm equipment were held to have been Constitutionally impaired by a state dealership statute enacted after the contracts went into effect.

To the contrary, Ryan points to *Garal Wholesalers, Ltd. v. Miller Brewing Co.*, 196 Misc.2d 630, 751 N.Y.S.2d 679 (Sup. Ct. Suffolk Co. 2002), which applied the same test as that used by the *Janklow* court to reach an opposite result on its facts. While both cases are well-reasoned, *Garal* has the advantage of being a closer fit to the instant case since, unlike the *Janklow* case, it deals specifically with §55-c of New York's ABCL — the statute here in issue —

5

and addresses precisely the identical issue, *i.e.*, whether the Contracts Clause bars application of the 2001 Amendments to an attempted termination of an agreement entered into prior to the Amendments, pursuant to a brewer's consolidation policy.

As Ryan argues in its Post-hearing Memorandum of Law, *Garal* held that the retroactive application of the amendment of §55-c did not violate the Contracts Clause because:

- The distribution, sale and consumption of alcoholic beverages are highly regulated, and there is no reasonable expectation of unaltered continuation of the regulatory scheme;

- The agreements were entered into after passage of the original §55-c in 1996 and Miller there (like Molson here) knew at the time it entered into the agreement that it could not terminate its distributors without good cause. Ryan argues that the Amendment did not add or alter what constitutes good cause, but only clarified what types of consolidations satisfied the good cause requirement, and that no contractual rights were impaired retroactively by applying the Amendment to the already existing agreement. This may seem a bit of a stretch, but it has the support of the *Garal* court, which expressly reached this conclusion concerning the same statutory language: "In the instant case, the Amendments did not create a right which did not exist before, but merely created, or expanded upon, a remedy for an antecedent right [Citation omitted.]." 193 Misc.2d 630, 751 N.Y.S. 2d 679.

- The statute and the Amendment are "remedial" in nature and should be applied retroactively to avoid undermining its remedial purpose;

- The changes are not "drastic" and do not rise to the level of "substantial

6

impairment"; and

- The Amendment was intended as curative legislation, to clarify the intent behind

    an existing statute, and is properly retroactively applied.

The rationale of the *Garal* decision appears to have application in the present case, and will be

followed here.

### Application of the Dormant Commerce Clause to NYABC Section 55-c

Molson invokes the Commerce Clause of the United States Constitution

to argue that application of the year 2001 amendment provisions to §55-c, requiring the

contemporaneous reduction in the number of wholesalers, either on a national basis or in states

contiguous to New York, is constitutionally invalid.[2] It points to two Supreme Court cases:

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986)

and *Healy v. The Beer Institute*, 491 U.S. 324 (1989) in support of its argument.

Both cases dealt with state statutes requiring affirmations that local prices were no

higher than the prices at which the products in issue were sold in other states, and both

concluded that the state statutes were invalid under the Commerce Clause because of their

"impermissible extraterritorial effect." (*Healy*, 491 U.S. 334).   Citing its previous decision in

*Brown-Forman*, the Court said:

> The [Twenty-first] Amendment did not immunize the State from the Commerce
> Clause's proscription of state statutes that regulate the sale of alcohol in other
> States.

---

[2]The Commerce Clause states: "The Congress shall have Power . . .To regulate
Commerce. . .among the several States. . . ." U.S. Const., Art. 1 ' 8, cl. 3. "This Court long has
recognized that this affirmative grant of authority to Congress also encompasses an implicit or
'dormant' limitation on the authority of the States to enact legislation affecting interstate
commerce. [Citations omitted.]" *Healy v. The Beer Institute*, 491 U.S. 324, 326 n.1 (1989).

491 U.S. at 334.

The Court characterized its decisions concerning extraterritorial effects of state

economic regulation as standing "at a minimum" for the following propositions:

> First, the "Commerce Clause . . . Precludes the application of a state statute to
> commerce that takes place wholly outside of the State's borders, whether or not
> the commerce has effects within the State [Citations omitted.].

                                    *        *        *

> Second, a statute that directly controls commerce occurring wholly outside the
> boundaries of a State exceeds the inherent limits of the enacting State's authority
> and is invalid regardless of whether the statute's extraterritorial reach was
> intended by the legislature.

491 U.S. at 336.

The Court's emphasis is on the practical consequences of the state legislation in

issue:

> The critical inquiry is whether the practical effect of the regulation is to control
> conduct beyond the boundaries of the State. [Citing *Brown-Forman*.]

*Ibid.*

Finally, the Court prescribes consideration of the way the challenged statute may

interact with regulatory measures taken by other states:

> Third, the practical effect of the statute must be evaluated not only by considering
> the consequences of the statute itself, but also by considering how the challenged
> statute may interact with the legitimate regulatory regimes of other States and
> what effect would arise if not one, but many or every State adopted similar
> legislation. Generally speaking, the Commerce Clause protects against
> inconsistent legislation arising from the projection of one state regulatory regime
> into the jurisdiction of another State. [Citation omitted]

*Ibid.*

A well-reasoned opinion following the Supreme Court's *Healy* decision and

8

dealing with the application of the Commerce Clause specifically to §55-c, *S.K.I. Beer Corp v. Baltika Brewery*, 2006 U.S. Dist. LEXIS 47513 (E.D.N.Y. July 13, 2006) has been recently published. In that case Judge Glasser of the Eastern District of New York interpreted the language "in this state" appearing in the definition of "(b)rewer" in §55-c(2)(b) to modify the entire phrase preceding it, thus narrowing its ambit to brewers engaged in the sale and delivery of beer "in this state." Importantly, as one of the grounds of his decision Judge Glasser held that the alternate proffered interpretation of this language "would run afoul of the dormant Commerce Clause." *Id.* at 6. The reasoning underlying this conclusion echoes the Supreme Court's *Healy* decision:

> The "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders whether or not the commerce has effects within the State." [Citing *Healy*.] "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." [Quoting *Healy*.]

*Ibid.*

Finding that "[the alternate interpretation] would impose New York's statutory regime for brewer-wholesaler relations on agreements consummated and completed on the other side of the globe simply because the wholesaler was licensed under New York law" Judge Glasser elected to follow the rubric that "a court should construe legislative enactments to avoid constitutional difficulties if possible. [Citations omitted.]" *Ibid.* This led to the conclusion that since under the terms of the contract there in issue physical delivery of the beer was made at the Balkala brewery at St. Petersburg, Russia, no sale took place in the State of New York which would justify an application of §55-c.[3]

---

[3]Molson contends that the specific finding of the *Baltica* case that under the

9

Based on the foregoing, I find that the §55-c's requirement that "a national or regional policy of consolidation" result in ". . . a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state <u>but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand</u>" (§55-c(2)(e) (i)(A) (emphasis supplied) constitutes facially an effort to regulate "conduct beyond the boundaries of the State" (*Healy*, 491 U.S. 336, quoting *Brown-Forman*), and therefore that this portion of the statute is barred by the Commerce Clause.

### The Molson USA Consolidation Policy is
### Reasonable, Non-Discriminatory, and Essential

Molson asks rhetorically exactly what kind of consolidation could qualify as reasonable and essential under §55-c if the Molson consolidation does not. While declamatory, its argument points to a relevant consideration: in enacting §55-c, the New York legislature must be deemed to have concluded that some consolidations *would* qualify as reasonable and essential. While, admittedly, expressions of intent by individual sponsors and post-passage memoranda are

---

terms of delivery there applicable delivery of the beer took place outside the State of New York entitles it to dismissal here, and Molson "reserves the right" to introduce evidence at any subsequent hearing that Ryan took delivery outside the State of New York. No evidence was presented at the evidentiary hearing tending to show that delivery to Ryan took place outside New York. In addition, Molson states in its Pre-hearing Memorandum (p. 3) that "Molson USA ships Molson products to Ryan in New York." In light of the disposition below, it appears unnecessary to reach Molson's argument on this point.

10

not reliable indicators of the intention of the entire legislature, see *Schrader v. Carney*,

188 A.D.2d 200, 206-207, 586 N.Y.S.2d 687, 691 (4th Dep't 1992), the introducers'

memorandum suggests an intention to avoid "subjective, arbitrary, or retaliatory terminations."

There has been no evidence in the present case that Molson's efforts to terminate the Ryan

relationship have been actuated by such motivations. Perhaps more importantly, principles of

statutory interpretation dictate an effort to interpret a regulatory statute to reach a result that is not

unreasonable.

     To the contrary, Molson has submitted unrebutted evidence of a good-faith effort

to fashion its consolidation policy around compliance with the rather technical requirements of

§55-c. Molson has further demonstrated the need to reduce costs because it has in fact lost

substantial (*i.e.*, multimillion-dollar) sums in four of the last five years. See Finding of Fact No.

38, *infra*. In interpreting a statute governing commerce, it would seem unreasonable to reach

without a very good reason a result imposing continued operation of a business for years at

substantial annual losses.

     The present decision is not the end of this matter. §55-c 7 of the ABC allows

Molson to terminate its distributor agreement with Ryan only upon payment of the fair market

value of the distribution rights which will be lost or diminished by reason of the implementation

of its consolidation policy, together with fair and reasonable compensation for other damages

suffered. In the event that the parties are unable to agree on the amount of that compensation,

such compensation will be determined during the second phase of this arbitration proceeding,

currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the

Association.

11

## FINDINGS OF FACT

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006, hereby makes the following findings of fact.

1.    Molson beer products are brewed in Canada by Molson, Inc. and sold in the United States by Molson USA, LLC ("Molson USA"), which contracts with distributors to sell beer to both on-premise retailers (such as taverns and restaurants) and off-premise retailers (such as grocery stores and convenience stores). Molson is North America's oldest brewer, founded in 1786.

2.    Molson USA is a limited liability company owned by Coors Brewing Company ("Coors") and Molson, Inc. It began operating in 2001 for the purpose of distributing Molson beer products in the United States. (At the time Molson USA was known as Molson 2000, LLC. It subsequently changed its name to Molson USA, LLC)

3.    Beer is sold in the United States through what is referred to as a "three-tier" distribution system. A brewer sells to independent distributors (or wholesalers) who sell to retailers, both off-sale, such as liquor and grocery stores and on-sale, such as bars and restaurants. State law prevents a brewer from selling directly to retailers or from owning wholesalers. A brewer is only as good as its distributors, since the brewer relies upon distributors to get products to retailers.

4.    In today's market Anheuser-Busch has approximately a 50% share of the national market. Miller's national share is approximately 20%. Coors' national share is

12

approximately 10%. The national shares of Heineken and Corona are 3% and 4% respectively.

5.      There are multiple distributors in every market. Each distributor carries multiple brands. Since retail shelf space and beer taps are limited, there is intense competition among distributors for "distribution" of beer brands and packages, meaning the share of the retailer's facility. Wholesalers also want to get brands placed in preferred spots in the distributor's facility, such as high traffic areas. The bigger a supplier is within a distributor's business the more likely that the supplier will have a greater share of the distributor's attention, known in the industry as "share of mind."

6.      Prior to 2001, the distribution of Molson products in the U.S. was done by a subsidiary of Miller Brewing Company under joint venture with Molson, Inc.

7.      John G. Ryan, Inc. is a New York beer distributor with a principal place of business in Pine City New York. It currently is a distributor for Molson beer products and other brands, including Miller, Guinness, Bass, Sam Adams and Seagrams. Its territory for Molson products includes the New York counties of Chemung, Schuyler, Tompkins and parts of Steuben and Yates.

8.      Since 2001, when Molson USA took over the United States distribution of Molson products, Coors Brewing Company has assisted with the sales and marketing of Molson products in the United States.

9.      Coors began a national policy of consolidation in 1997, focused on obtaining economically viable distributors. In many cases, this involved joining Coors and Miller in the same distributor's portfolio.

10.      In February, 2005, various Coors and Molson entities were combined into

what was loosely referred to as a "merger of equals." After the combination, Adolph Coors Company was renamed Molson Coors Brewing Company.

11.     In connection with the unwinding of the prior Miller Brewing Company distribution of Molson products, Molson USA promised Miller in 2000 that existing United States Molson distributors would be allowed the opportunity to continue distributing Molson and a provision of the distribution agreement would contain a provision by which Molson USA would not terminate without cause during the first five years.

12.     In a meeting in Canada prior to the operation of Molson USA, Gerald Ryan heard Daniel O'Neil of Molson, Inc. assure distributors that they would not be terminated if they were performing. Mr. O'Neil did not indicate whether this position would be adopted by the proposed joint venture between Coors and Molson or for how long the status quo would continue.

13.     Mr. Ryan did not testify that his distributorship did anything differently in the intervening six years that he otherwise would not have done in reliance on Mr. O'Neil's comments. Likewise Mr. Ryan did not testify that his distributorship elected not to do something that it would have done in reliance on Mr. O'Neil's comments.

14.     When Molson USA started its operations following the termination of the Miller joint venture, Molson USA could not locate a prior distributorship agreement with Ryan. Therefore, Molson USA created a Molson Amendment for Ryan with a blank exhibit. This was the first written agreement between the newly formed Molson USA and Ryan.

15.     Gerald Ryan signed the Molson Amendment "under protest" and returned the agreement to Coors on February 2, 2001 with a letter noting the protest. He did this after

14

consulting with counsel.

16.     Molson USA refused to accept the amendment with the protest. Counsel for Molson USA, Neal Peters, returned the Molson Amendment to Ryan on February 12, 2001 with a memo that indicated that Ryan should return the signed Molson Amendment with no alteration and without protest or not at all.

17.     Gerald Ryan then signed the Molson Amendment and returned it on March 1, 2001. Mr. Ryan, however, prepared a memo to file noting his protest, but also stating that the protest was not conveyed to Molson USA.

18     When Mr. Ryan sent the Molson Amendment back to Molson USA he intended to create a contract with Molson USA concerning the operation of his distributorship for Molson products.

19.     Molson USA does not know whether or not the Molson Amendment signed by Ryan was signed by anyone on behalf of Molson USA in 2001 or 2002. A search of the Molson USA records does not show one way or another.

20.     On October 28, 2002, Molson USA wrote to Ryan and offered Ryan the opportunity to sign an entirely new Molson distributorship agreement. In that letter, Molson USA acknowledged the previous receipt of Ryan's signed Molson Amendment. Molson USA has no record that Ryan ever signed the new Molson distributorship agreement.

21.     In June 2005, Molson USA discovered that it did not have in its files a Molson Amendment signed by both Ryan and Molson USA. Molson signed another copy of the Molson Amendment on June 27, 2005 and attached the signature page with the demand for arbitration. The full Molson Amendment was sent to Ryan on August 29, 2005

15

22.    Both Ryan and Molson USA did business from 2001 onward operating under the terms of the Molson Amendment.

23.    The Ryan agreement with Molson USA states that it is terminable without cause, except for the first five years during which termination is permitted only for cause and except for any statutory limitation or expansion of the right to terminate.

24.    When Molson USA began the importation and sale of Molson products in 2001, the joint venture partners Molson and Coors determined to consolidate, where possible, the distribution of Molson products into the Coors distribution network in the United States. This has been Molson USA's continuous policy since the formation of Molson USA.

25.    When Molson USA began, there were over 502 Molson distributors in the United States and of these, 65% were not also Coors distributors (referred to from time to time as "unaligned" or "Molson-only" distributors). As of the hearing, there were 452 total Molson distributors. From 2001 to July 18, 2006 the total number of Molson distributors decreased in 24 states. There were 8 states in which the total number of Molson distributors increased. In 19 states the number of Molson distributors stayed the same, but in 10 of these states there was only one distributor to begin with. Molson could not reduce its distributors to zero and still operate in those ten states. In the five states contiguous to New York, during this period, the total number of Molson distributors has decreased from 41 distributors to 24 distributors, while declining in three states and remaining the same in two states.

26.    In New York, the proposed termination of Ryan's distributorship agreement would not cause any reduction in the total number of Molson distributors, but the proposed termination of the other Molson-only distributors in New York would cause the total

16

number of distributors to decrease from nine to five.

27.    Molson USA used a number of tactics in carrying out its plan of consolidation.  Beginning in 2001, Molson USA began attempting to persuade unaligned Molson distributors to voluntarily sell the Molson brands to the local Coors distributor.  This process proved to be very successful.  Over time, Molson USA also used the availability of new brands (although Ryan received all new brands) and the prospect of the appointment of a second Molson distributor (in one state) to encourage consolidation.   Molson distributors in Michigan, Pennsylvania, New York and Ohio resisted voluntary consolidation.

28.    Molson USA implemented its consolidation program with consideration given to the fact that the company was also attempting to grow sales of the Molson brands in the United States.  Molson USA sought to recover from the double digit declines the brand suffered during the period when the brands were distributed in the United States by Miller.  Molson USA invested over 20 million dollars per year in promoting the Molson products.  Sales of Molson products in New York constitute approximately 30% of Molson USA's sales of Molson products in the United States.

29.    Molson's consolidation plan included the targeting of specific groups of distributors for consolidation in each year.  Originally, Ryan was not on the list of targeted distributors.

30.    "Targeting" a distributor referred to the focus and immediacy of the consolidation efforts for that distributor.  If a distributor was not a target for a particular year, it did not mean that Molson USA did not wish to consolidate the brands of that distributor into the local Coors distribution house.  Rather, given the business demands of selling Molson products,

17

it simply meant that the distributor was not the subject of focus by the Coors wholesaler development staff to promote consolidation.

31.    At a point in time in later 2002, Ryan was put on the target list for consolidation. In 2003, Ryan was contacted by a representative of Coors who asked Ryan to consider selling the Molson brands to the local Coors distributor. Mr. Ryan did not testify that termination of the distributorship was an option discussed by the Coors representative.

32.    Ryan, together with other New York distributors, retained counsel to communicate with Molson USA concerning Molson request that Ryan and others voluntarily sell the Molson distribution rights to the local Coors distributors.

33.    Following the merger of Molson and Coors in February, 2005, Molson USA took the first formal step to invoke the consolidation provisions of New York ABC §55-c. On March 11, 2005, Molson Coors sent to all U.S. distributors (except three in Ohio), including Ryan and the other unaligned New York Molson distributors, a notice informing the distributors that Molson Coors would be taking further steps to effect the consolidation of the Molson brands into the local Coors distributors. Molson USA was not able to locate any prior written notice to all of the New York Molson distributors informing them of the Molson USA consolidation process.

34.    Prior to the beginning of 2006, Molson USA made no distinction in its expenditures for marketing and promotion based upon whether a distributor was aligned with Coors. Following the merger of Coors and Molson a decision was made to increase advertising and marketing support for Coors Light. This reduced the amount of funds available to promote Molson products. Molson USA decided to reduce the amount of funds available for media

18

spending and reduced the number of markets in which media spending would be done. Whether

a distributor was aligned with Coors was a part of the decision making process concerning media

spending. Ryan did not receive any media spending in his market in 2005 so there was no

reduction in 2006. As to "tactical spending" (promotions, point of sale materials, and other

similar in-market expenditures) each Molson distributor, including Ryan, regardless of whether

the distributor was aligned or unaligned, was given the same amount of tactical spending in the

distributor's market as had been allocated in 2005.

    35.    In May, 2005 Dean Valdez of Molson Coors visited with Mr. Ryan in New

York. Mr. Valdez indicated that as the result of the Molson/Coors merger, the likely support for

Molson brands would be decreased because of an overall corporate decision to increase

marketing support for Coors Light. He indicated that it would be an opportune time for Ryan to

consider selling to the local Coors distributor because the value of the distributorship might fall

as a result of declining brand sales. Valuation of beer distributorships is typically done on the

basis of trailing 12 month performance. Mr. Ryan declined to sell the distributorship in response

to Mr. Valdez's comments. There is no evidence that the decision to place more corporate

resources in support of the Coors Light brand was done in order to have an effect upon the

Molson consolidation or an effect upon New York Molson-only distributors, including Ryan.

    36.    This arbitration was commenced on July 22, 2005. This is a test case for

Molson, rather than commencing simultaneous actions against all unaligned New York Molson

distributors. Molson USA seeks an award declaring that under §55-c, Molson has the right to

terminate its Distribution Agreement with Ryan pursuant to Molson USA's policy of

consolidation.

19

37.    Molson USA informed all of the other New York Molson-only distributors that it was the intent of Molson USA to pursue similar termination proceedings with respect to each New York distributor in the event that Molson USA was permitted by the arbitrator to terminate Ryan as a Molson distributor, with an appropriate payment for the brands.

38.    Molson USA's financial statements show that it suffered financial losses, as follows:

| 2001 | ($4,415,835) |
| 2002 | ($9,620,816) |
| 2003 | ($5,374,933) |
| 2004 | ($5,882,126) |
| 2005 | ( $986,000) |

39.    Consolidation of the Molson distribution into the Coors distribution houses has a number of substantial benefits.  At the most elemental level, consolidation of the distribution of Molson into the Coors distributors has allowed Coors and Molson USA to have fewer personnel calling on fewer distributors.  This has saved Molson USA and Coors several million dollars, apart from the benefits accruing from the merger between Coors and Molson. This reduction also permits field personnel to concentrate their efforts among fewer distributors, which means that there is more time to spend with each distributor.

40.    Molson Coors obtained costs savings, sometimes referred to as the synergies from the merger, but there were separate and distinct cost savings realized from the elimination of Molson USA employees in the Molson sales network attributable to the consolidation policy and not the merger.  The head count for the Molson USA sales force went from 35 people calling on only Molson USA distributors to the current 15 people who are "fully integrated with Coors," meaning that they call on distributors for both Coors and Molson brands

20

in a network that is 85% aligned.

41.    Consolidation of the Molson and Coors brands in a single distributor also permits both Molson USA and the distributor to increase selling focus on the combined Molson/Coors brands because they constitute a greater overall share of the distributor's business. In the beer business, this is referred to as "share of mind," meaning the ability to convince the distributor to focus on the supplier's brands, instead of diluting efforts across the distributor's entire brand portfolio, which can involve dozens of different brands. For example, the distributor can offer joint promotions to retailers. Instead of having to spend a day with the Molson-only distributor, and then a day with the Coors distributor in the same market, the Molson Coors employees are thus able to serve both brands during a single visit and coordinate the various corporate programs with a single distributor. Also, in a single call the distributor can ensure that the Coors and Molson brands are fresh on the retailer's shelves, thus promoting the important freshness imperative for both Coors and Molson.

42.    Consolidation also assists in creating a larger portfolio for the Coors distributor so that the distributor is in a better position to convince retailers to devote greater shelf space or number of taps to the combined Coors/Molson products. The Coors distributor has an incentive to promote both products to a greater degree.

43.    Consolidation has also shown that over time (and on average) aligned Molson distributors outperform unaligned Molson distributors in sales of Molson products. Some unaligned Molson distributors may outperform some aligned distributors and during some periods the average sales performance of unaligned distributors may exceed that of aligned Molson distributors. Short term sales performance can be affected by several matters, including

such factors as weather, a hockey strike, or changes in performance by a relatively few number of distributors.

## <u>CONCLUSIONS OF LAW</u>

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006 hereby makes the following conclusions of law.

1.      Both by signed document and course of dealing the parties have manifested an intent no later than March, 2001 to be bound by the Molson Amendment, as embodied in Exhibit 88.

2.      Inasmuch as there is no evidence that Molson USA attempted to terminate Ryan or communicated to Ryan its intention to terminate the distributorship contract between them pursuant to §55-c prior to one year before the commencement of this arbitration proceeding, Molson USA has satisfied the terms of paragraph 6.2 of the Molson Amendment, which requires that a dispute be submitted to arbitration within one year of the date that the dispute first arose.

3.      The proposed termination of the distributorship agreement between Molson USA and Ryan is governed by the provisions of §55-c including the 2001 amendments to §55-c which were effective June 15, 2001.

4.      Molson USA's national plan of consolidation is "reasonable, nondiscriminatory and essential" within the meaning of §55-c.

5.      Molson USA's national plan of consolidation is nondiscriminatory because it has been in effect since 2001 and has been pursued steadily since that date.  Molson's decision to

22

stage its consolidation efforts consistent with the limitations of state law and the need to operate

its business does not constitute discrimination. Molson has stated its intention to pursue the

termination of the remaining unaligned distributors in New York if termination is permitted in

this arbitration. There is no contrary evidence suggesting otherwise and, thus, the

commencement of this arbitration as a test case is not discriminatory within the meaning of

§55-c. The term "nondiscriminatory" in the statute refers to the policy of consolidation and not

to the staged implementation of the policy for legitimate business reasons.

     6.     In interpreting the meaning of the terms "reasonable" and "essential" in §55-c,

reference is made to cases interpreting the same terms in the Wisconsin Fair Dealership Law,

Wis. Stat. §135.02(4)(a).

     A.     The terms reasonable and essential must be construed together within the

context of the statute. In order for a national plan of consolidation to be reasonable and essential

under §55-c the brewer need not risk financial ruin if the plan is not implemented or completed.

     B.     Instead, the plan of consolidation is reasonable if it is the product of the

brewer's good faith rational business judgment, which can be shown if it is consistent with

industry practice.

     C.     In order to be essential, the plan of consolidation must be not merely

incidental or desirable, but necessary for the proper functioning of a brewer's distribution

network.

     D.     Factors such as cost savings to Molson USA and its corporate parent

Molson Coors Brewing Company, avoidance of financial losses, increases in distributor

efficiency and focus on the Molson brands that contribute to increased revenues satisfy the

requirement that a plan be reasonable and essential.

    7.      Section 55-c(3) requires that a beer distributorship agreement "may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided that brewer has acted in good faith." The statute defines good faith as "honesty in fact and the observance of reasonable commercial standards in the trade." In the context of this arbitration good faith is to be determined in connection with the decision to terminate and the implementation of the termination of Ryan.

    A.      A brewer does not fail to act in good faith in implementing a plan of consolidation over time. State law and the need to run a business permit a brewer to achieve its consolidation in stages.

    B.      A brewer also does not fail to act in good faith by utilizing lawful means to encourage consolidation, such as selectively awarding brands or planning to "dual" brands in a territory or monitoring sales performance.

    C.      Ryan has presented no evidence that Molson USA did not act with "honesty in fact" in connection with the implementation of the policy of consolidation.

    (1)      The 2000 remarks of Daniel O'Neil do not show dishonesty in fact on the part of Molson USA. Molson USA had yet to be formed. Moreover, Mr. O'Neil's statement does not constitute a promise of any type. Nothing about any statement by Mr. O'Neil of present intention on the part of Molson, Inc. has any impact on the honesty of Molson USA's decision to invoke §55-c nearly five years later. Even after the meeting with Mr. O'Neil, Ryan signed the 2001 Molson Amendment with the five year termination provision. Ryan has also not presented any evidence that it would have done anything different in reliance between the time of

24

Mr. O'Neil's remarks and the announcement by Molson USA of its policy of consolidation.

(2)    Molson USA's encouragement of Ryan to sell in May, 2005 was based upon a factual statement that Molson Coors' support for the Molson brands would decrease as part of an overall company strategy. Molson USA's statement that this would provide an opportune time for Ryan to sell since less marketing support could lead to lesser revenues was not false.

(3)    Molson USA's proposed statements to distributors as to future actions beyond the expiration of the "five year period" was an honest statement of intention, given the legal impediments to forced consolidation faced by Molson USA and the need to continue Molson USA's business with distributors. In any event, there is no evidence that Ryan was ever contacted and presented with these statements.

D.    Ryan has presented no evidence that Molson USA has acted contrary to the observance of reasonable commercial standards in the trade. The only evidence of commercial standards in the trade was provided by Molson USA concerning the consolidation by Stroh Brewing Company.

E.    Molson USA has acted in good faith concerning the termination of Ryan.

8.    Section 55-c requires that a brewer's policy of consolidation "shall have previously been disclosed, in writing, in reasonable detail to the brewer's wholesalers . . ." In addition, "[a]ll affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of the policy." The obvious purpose of these provisions is to provide adequate notice to distributors who will be terminated under the consolidation policy. The notice period is not a maximum period, but a minimum period.

25

A.     In this case, Ryan has been provided more than 90 days notice of Molson USA's policy. The policy was described in writing at least as early as 2003 as a result of correspondence between the attorneys for Molson USA and Ryan. The policy was described in reasonable detail because it is elementally simple: Molson USA desired that the Molson brands be represented by the local Coors distributor.

B.     In addition, Molson USA provided a description of its policy and notice of implementation in its letter of March 1, 2005, which was sent to Ryan and all other New York wholesalers.

C.     Finally, Ryan has also had notice of Molson USA's intent to terminate and the description of the policy by virtue of the arbitration demand in this case, which was filed in July, 2005. Molson USA has not terminated Ryan and more than 90 days have elapsed from the date of the commencement of the arbitration.

9.     Under §55-c, a brewer's policy of consolidation must "result in a reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of states in which the brewer sells the brand." The term "contemporaneous" must be interpreted in a reasonable fashion given the New York legislature's knowledge of the laws restricting terminations in nearly every other state. A brewer could not possibly accomplish consolidation through persuasion in a short time period. The evidence in this case suggests that a national policy of consolidation takes considerable time, given the restrictions of state law and the need to conduct ongoing business. Thus, "contemporaneous" in the context of §55-c means that consolidation is measured over the period of time that the consolidation policy is in effect.

26

10.    That portion of §55-c which conditions termination of a New York distributor on actions of the brewer outside of New York is not enforceable under the Dormant Commerce Clause of the United States Constitution. *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986); *Healy v. The Beer Institute, Inc.*, 491 U.S. 324 (1989). New York has made the operation of §55-c dependent upon the brewer's activities in other states, which has the practical effect of regulating commerce occurring wholly outside of the borders of the state of New York. The inability of Molson USA to compel or persuade distributors to consolidate in contiguous states or in a majority of other states would operate as an effective bar to the brewer's right to invoke the provisions of §55-c and this extra-territorial trigger is not permitted under the Commerce Clause.

11.    Even if the out-of-state conditions of §55-c were to be enforced, Molson USA has complied with the provisions of the Act.

A.    Molson USA's uncontested evidence showed that the number of Molson distributors in states contiguous to New York has been reduced since the adoption of the policy of consolidation by Molson USA. The statute uses the term "in contiguous states," to mean the total number of distributors in those states, not measuring the results in each state. At the commencement of the policy there were 38 Molson distributors in contiguous states and there were 28 distributors in contiguous states at the time of the hearing.

B.    In addition, on a national basis, Molson USA began its operations with only one distributor in each of ten states. Because a brewer may not be expected to reduce its distributors to less than one in any given state (given that a brewer may not sell direct to retailers, but must sell through a distributor), the calculation under 55-c should not consider these states.

27

Given this, Molson USA has used its consolidation policy to reduce the number of Molson distributors in a majority of the states of the United States, reducing the number of Molson distributors in 24 states, increasing or remaining the same in 17 states.

C.    While the number of distributors in New York will not be reduced with the termination of Ryan and the splitting of Ryan's territory among two distributors (one of whom already carries the Molson brands), the implementation of Molson's consolidation policy in New York, as desired by Molson USA, will reduce the number of distributors from nine to five and thus complies with the provisions of §55-c pertaining to New York distributors.

12.    Molson USA is entitled to an award declaring that it has the right under all applicable law to terminate its distributor agreement with Ryan upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with the fair and reasonable compensation for other damages suffered pursuant to §§55-c 7. In the event of failure of the parties to agree to such compensation, such matter will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

_Nov 6 2006_
Date                                    _Peter M. Collins_
                                        Peter M. Collins

I, Peter M. Collins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_Nov 6 2006_
Date                                    _Peter M. Collins_
                                        Peter M. Collins

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X
SPIRIT & SANZONE DISTRIBUTORS CO.,
INC., and SALAMANCA-AREA BEVERAGE
COMPANY INC.,

              Plaintiffs,         **MEMORANDUM and ORDER**

    - against -              08 civ. 0251 (LLS)

COORS BREWING COMPANY,

              Defendant.
- - - - - - - - - - - - - - - - -X

A former Molson beer supplier gave each plaintiff the exclusive right to distribute Molson beer products to retailers in specified New York counties. The distribution agreements were ultimately assigned, through intermediate transactions, to defendant Coors Brewing Company ("Coors"), who now supplies Molson beer to plaintiffs. Each distribution agreement consists of a prior contract and a "Molson Amendment." The Molson Amendments contain identical clauses (quoted below) which require any and all disputes between Coors and each plaintiff to be resolved by arbitration before the American Arbitration Association ("AAA"), in accordance with the AAA Commercial Arbitration Rules.

Coors now wishes to terminate those distribution agreements, and has commenced AAA arbitration proceedings against plaintiffs Spirit & Sanzone Distributors Co., Inc.

("Sanzone") and Salamanca-Area Beverage Company Inc. ("Salamanca").[1]

Sanzone and Salamanca seek an injunction staying the arbitrations and a declaration that Coors cannot terminate the agreements. Such an injunction is appropriate, they assert, for several reasons. First, plaintiffs claim that the arbitration clauses are unenforceable because the prior Molson supplier who required them to sign the Molson Amendments did not have the "good cause" required by New York Alcoholic Beverage Control ("ABC") Law § 55-c to modify the prior contracts (which contained no arbitration provisions). Second, plaintiffs allege that several provisions of N.Y. ABC Law § 55-c, which are incorporated in the agreements by reference, conflict with and supersede the arbitration clauses. Third, plaintiffs argue that an arbitrator does not have the authority to rule on Coors' assertion that N.Y. ABC Law § 55-c violates the Dormant Commerce Clause of the U.S. Constitution.

Coors argues that all those claims, including issues of the validity of the arbitration clauses or the authority of arbitrators, must be decided by an arbitrator, not this Court. The arbitration clauses: (1) incorporate AAA

---

[1]    Coors Brewing Company v. Spirit & Sanzone Distributors Co., Inc. (AAA case no. 13 155 02713 07) and Coors Brewing Company v. Salamanca-Area Beverage Company Inc. (AAA case no. 13 155 02714 07).

Commercial Arbitration Rules which empower arbitrators to rule on their own jurisdiction, including the existence, scope, or validity of arbitration clauses; and (2) provide that "[a]ny and all" disputes shall be submitted to AAA arbitration.  Coors argues that under the Second Circuit's decision in Contec Corp. v. Remote Solution, Co., Ltd., 398 F.3d 205 (2d Cir. 2005), those provisions of the arbitration clauses delegate the issue of arbitrability to an arbitrator.

Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, provides that upon being satisfied that the issues involved in a suit are "referable to arbitration under an agreement in writing for such arbitration", the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."

1.

The distribution agreements are governed by the FAA. Although there is a presumption under the FAA that courts should decide the issue of arbitrability, that issue may be referred to an arbitrator if "the parties have a sufficient relationship to each other and to the rights created under

the agreement", Contec, 398 F.3d at 209, and "'there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'" Id. at 208 (quoting italics in original, and citing cases).

In Contec, the Second Circuit construed an agreement to arbitrate "in accordance with the Commercial Arbitration Rules of the American Arbitration Association", and stated:

> We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.

Id. (citing cases). In addition, a clause referring "any and all" controversies to arbitration is "inclusive, categorical, unconditional and unlimited" and it is a "broad grant of power to the arbitrators" which shows "that the parties intended to arbitrate issues of arbitrability." PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199-1200 (2d Cir. 1996).

Plaintiffs signed Molson Amendments containing arbitration clauses, and there is no claim that they did so under duress, coercion, or protest. The arbitration clauses, which are identical, provide:

- 4 -

Any and all disputes between Distributor and the Company or its agent, Coors, except nonpayment of Distributor's account, including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association.

Molson Amendment § 6.2.

AAA Commercial Arbitration Rule 7 states:

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.

Those provisions satisfy the conditions of Contec.


2.


Plaintiffs cite Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974) and several cases which rely on Gardner-Denver for the proposition that an arbitrator does not have the authority to rule on Coors' argument that N.Y. ABC Law § 55-c violates the Dormant Commerce Clause. That view no longer prevails.

In holding that a claim brought under the Age Discrimination in Employment Act of 1967 can be subjected to compulsory arbitration, the Supreme Court stated that the "mistrust of the arbitral process" expressed in Gardner-Denver "has been undermined by our recent arbitration decisions" and it is "well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 34 n.5 (1991)(quoting and citing cases)(quotation marks omitted). The Gilmer Court also distinguished "the Gardner-Denver line of cases" because "those cases were not decided under the FAA." Id. at 35.

3.

The distribution agreements contain clauses which each provide:

> The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement.

Plaintiffs claim that those clauses incorporate into

the distribution agreements N.Y. ABC Law § 55-c(7)(c) (no beer supplier "may impose binding arbitration of any issue as a term or condition of an agreement"), § 55-c(11) (§ 55-c's requirements "may not be altered, waived or modified by written or oral agreement in advance of a bona fide case and controversy arising under a written agreement"), and § 55-c(6) (a beer distributor "may maintain a civil action in a court of competent jurisdiction" if a beer supplier fails to comply with the provisions of § 55-c). Plaintiffs assert that the distribution agreements thus specifically accept that the New York statutory bar against pre-dispute arbitration clauses conflicts with and supersedes the agreements' arbitration provisions. That poses the issue: who decides which of the N.Y. ABC Law, or the arbitration clauses, prevails? The answer lies in the FAA.

At least to the extent of placing the decision in the hands of the arbitrators, the FAA preempts the provisions of N.Y. ABC Law § 55-c which, according to plaintiffs, conflict with the arbitration clauses. Preston v. Ferrer, No. 06-1463, 552 U.S. ____, slip. op. at 5 (Feb. 20, 2008)("The FAA's displacement of conflicting state law 'is now well established,' and has been repeatedly reaffirmed." (quoting and citing cases)); John G. Ryan, Inc. v. Molson USA, LLC, No. 05 civ. 3984 (NGG)(JMA), 2005 WL 2977767

(E.D.N.Y. Nov. 7, 2005)(Garaufis, J.)(enforcing arbitration clause contained in a Molson Amendment and holding that FAA § 2 preempts the provisions of N.Y. ABC Law § 55-c which purport to invalidate that agreement to arbitrate).

In its most recent FAA decision, <u>Preston v. Ferrer</u>, the Supreme Court construed a contract with clauses granting priority to law to the extent legally necessary,[2] applying California law,[3] and providing for arbitration of "any dispute . . . relating to the terms" of the contract in accordance with AAA rules. <u>Preston</u>, slip. op. at 2, 13. Respondent Ferrer argued that under those clauses the California Labor Commissioner had exclusive jurisdiction over the issue of the validity of the contract. <u>Id.</u> at 13. However, the United States Supreme Court stated in its February 20, 2008 decision:

> The instant petition presents the following question: Does the FAA override not only state statutes that refer certain state-law controversies initially to a judicial forum, but also state statutes that refer certain disputes initially to an administrative agency? We hold

---

[2] "A separate saving clause provides: 'If there is any conflict between this agreement and any present or future law,' the law prevails over the contract 'to the extent necessary to bring [the contract] within the requirements of said law.'" <u>Preston</u>, slip. op. at 13 (alterations in <u>Preston</u>)(quoting contract).

[3] The "contract also contains a choice-of-law clause, which states that the 'agreement shall be governed by the laws of the state of California.'" <u>Preston</u>, slip. op. at 13 (quoting contract).

today that, when parties agree to arbitrate all
questions arising under a contract, state laws
lodging primary jurisdiction in another forum,
whether judicial or administrative, are
superseded by the FAA.

[Id. at 1-2]

* * *

When parties agree to arbitrate all
questions arising under a contract, the FAA
supersedes state laws lodging primary
jurisdiction in another forum, whether judicial
or administrative.

[Id. at 12]

* * *

Preston and Ferrer's contract, as noted,
provides for arbitration in accordance with the
AAA rules. One of those rules states that "[t]he
arbitrator shall have the power to determine the
existence or validity of a contract of which an
arbitration clause forms a part." The
incorporation of the AAA rules, and in particular
Rule 7(b), weighs against inferring from the
choice-of-law clause an understanding shared by
Ferrer and Preston that their disputes would be
heard, in the first instance, by the Labor
Commissioner. Following the guide *Mastrobuono*
provides, the "best way to harmonize" the
parties' adoption of the AAA rules and their
selection of California law is to read the latter
to encompass prescriptions governing the
substantive rights and obligations of the
parties, but not the State's "special rules
limiting the authority of arbitrators."

Id. at 15, quoting Mastrobuono v. Shearson Lehman Hutton,

Inc., 514 U.S. 52, 63-64 (1995).

Here, the "substantive rights and obligations of the

parties" have to do with the business relationships between beer suppliers and distributors, and the conditions for termination of their contracts (the underlying dispute in this case), while the State's restraints on pre-dispute arbitration agreements are collateral and remedial in nature, analogous to "special rules limiting the authority of arbitrators."

4.

Plaintiffs' motion for an injunction staying the arbitrations is denied.

The motion to stay this action pending the completion of the AAA arbitration proceedings is granted. The action is stayed until counsel notify the Court that the AAA arbitration proceedings between defendant Coors and plaintiffs Sanzone (AAA case no. 13 155 02713 07) and Salamanca (AAA case no. 13 155 02714 07) are completed.

So Ordered.

Dated:  New York, New York
        February 29, 2008

_____
LOUIS L. STANTON
U. S. D. J.

- 10 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **COORS BREWING COMPANY,** | ) | |
| a Colorado corporation, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:07 CV 1235** |
| **v.** | ) | |
| | ) | |
| **OAK BEVERAGE, INC.,** | ) | |
| a New York corporation, and | ) | |
| | ) | |
| **BOENING BROS., INC.,** | ) | |
| a New York corporation, | ) | |
| | ) | |
| **Defendants.** | ) | |

**COORS' FIRST REQUESTS FOR ADMISSION
<u>DOCUMENT REQUESTS, AND INTERROGATORIES</u>**

Plaintiff Coors Brewing Company ("Coors"), by counsel, pursuant to Federal Rules of

Civil Procedure 26, 33, 34, and 36, respectfully requests that Defendants Oak Beverage, Inc.

("Oak") and Boening Bros., Inc. ("Boening") (collectively, "Defendants"), within thirty (30)

days of service or such shorter time period as may be fixed by the Court:

1.    admit the truth of the following requests for admission ("Coors' First RFAs");

2.    respond to the following document requests ("Coors' First Document Requests")

by producing and permitting Coors, including its attorneys and agents, to inspect

and copy responsive documents at the offices of Foley & Lardner LLP,

Washington Harbour, 3000 K Street, N.W., Suite 500, Washington, D.C .20007;

and

3.    answer fully and separately, in writing and under oath, the following

interrogatories ("Coors' First Interrogatories").

## DEFINITIONS

For the purposes of Defendants' answers to Coors' First RFAs, Coors' First Document Requests, and Coors' First Interrogatories (collectively, "Coors' First Discovery Requests") the following definitions shall apply:

a.    <u>Defendants</u>.  "Defendants" shall mean and refer, collectively or individually, to Oak and Boening and, where applicable, to their officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, or any other agents thereof, or any other person authorized to act on behalf of Oak or Boening, individually and jointly, including companies and other entities that Oak and Boening own, individually or jointly, or that own Oak and Boening, individually or jointly.

b.    <u>Oak</u>.  The term "Oak" means and refers to Defendant Oak Beverage, Inc. and, where applicable, to its officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, or any other agents thereof, as well as any employees or agents of any entity affiliated with Oak to which or to whom Coors' First Discovery Requests might reasonably apply.

c.    <u>Boening</u>.  The term "Boening" means and refers to Defendant Boening Bros., Inc. and, where applicable, to its officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, or any other agents thereof, as well as any employees or agents of any entity affiliated with Boening to which or to whom Coors' First Discovery Requests might reasonably apply..

d.    <u>You and Your</u>.  "You" and "Your" shall refer to each of Defendants, Oak and Boening, as defined herein.

e.    <u>Communication</u>.  The term "communication" shall mean the transmittal of information, including any oral or written transmittal, and includes e-mail communication.

f.     <u>Document</u>.   The term "document" means all original writings of any nature whatsoever and all non-identical copies thereof in your possession, custody, or control regardless of where they are located, and includes, but is not necessarily limited to the following items, whether printed or recorded, filmed, or reproduced by any other mechanical process, or written or produced by hand or whether or not claimed to be privileged against discovery on any ground, and in the case where original and/or non-identical copies, namely: contracts, agreements, communications, correspondence, policy statements and directives, inspection reports, tape recordings, cablegrams, radiograms and telegrams, minutes, notes, memoranda, electronic mail, telephone slips, studies, reports, summaries, agenda, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, price lists, sketches and drawings, photographs, opinions, loss estimates, ledgers, debit and credit memoranda, diaries, personal calendars, reports of consultants, and any other document as defined in Rule 34 of the Federal Rule of Civil Procedure.

g.     <u>Identify (with Respect to Persons)</u>.   When referring to a person, "identify" means to state, to the extent known or reasonably ascertainable, the person's full name and current or last known address.   When referring to a natural person, "identify" means, additionally, to provide the individual's present or last known place of employment.   Once a person has been identified in accordance with the foregoing definition, only the name of that person need be listed in response to subsequent discovery requests calling for the identification of such person.

h.     <u>Identify (with Respect to Documents)</u>.   When referring to documents, "identify" means to state, to the extent known or reasonably ascertainable, the (a) type of document; (b) its general subject matter; (c) the date of the document; and (d) its author(s), addressee(s), and recipient(s).   If the foregoing information is not available, state whether it is (a) missing or lost,

3

(b) destroyed, (c) transferred, voluntarily or involuntarily, to others, or (d) otherwise disposed of and in each instance, explain the circumstances surrounding the authorization for such disposition thereof and state the date or approximate date thereof.

      i.      <u>Identify (with Respect to Communications)</u>.  When referring to communications, "identify" means to state, to the extent known, the (a) name(s), address(es), and last known place(s) of employment of the parties to the communication; (b) the subject matter of the communication; (c) the location(s) of the communication; (d) the mode of communication, (*e.g.*, written, by telephone, meeting, etc.); and (e) the date of the communication.

      j.      <u>Person</u>.  The term "person" is defined as any natural person or business, legal, or governmental entity or association.

      k.      <u>Concerning</u>.  The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

      l.      <u>Relating and referring</u>.  The phrases "relates to," "relating to" or "refer to" mean containing, identifying, monitoring, evidencing, commenting on, responding to, showing, constituting, reflecting, describing, representing, supporting, contradicting, stating, recording, noting, embodying, mentioning, studying, analyzing, discussing, evaluating, relating to, or referring to, in the broadest sense of these terms.

      m.      <u>Including</u>.  The term "including" means "including but not limited to."

<b><u>INSTRUCTIONS</u></b>

      a.      Coors' First Discovery Requests shall be deemed to seek responses as of the date hereof, and shall also be deemed to be continuing, so that if additional information relating in any way to Coors' First Discovery Requests becomes known to you that in any way modifies your responses to Coors' First Discovery Requests up to and including the time of trial, you shall

4

immediately furnish to the plaintiff your revised responses incorporating all such modification(s).

b.      If you object to one or more of Coors' First Discovery Requests, you must specifically state the nature of your objection and all grounds therefor.

c.      For each of Coors' First RFAs that you do not admit in full, you must specifically admit all elements of that request for admission that can be admitted and qualify or deny the remainder.

d.      If you cannot truthfully admit or deny one or more of Coors' First RFAs due to a lack of information or knowledge, you must certify that you have made a reasonable inquiry and that the information both known by and available to you is insufficient to enable you to admit or deny the request for admission.

e.      If Defendants fail to admit any of Coors' First RFAs the truth of which is later proven by Coors, Coors shall be entitled to recover Coors' reasonable expenses, including attorneys' fees, incurred in making such proof.

f.      When any copy of any document responsive to a request is not identical to the original or any other copy thereof by reason of any notes, comments, markings, alterations or material contained thereon, deleted therefrom, or attached thereto, or otherwise, all such non-identical copies shall also be produced.  Identical copies of documents previously produced pursuant to Defendants' Rule 26(a) disclosures need not be produced.

g.      Documents should be produced in all respects as they are maintained in the ordinary course of business, including file folders or other identifying information, and identified or segregated to correspond to the particular numbered request to which they are considered responsive.

WASH_2699697.3

h.      If any document or information is withheld on the basis of a claim of privilege or immunity, within the time required by Local Rule 26(C), with respect to each such document, communication, or other information, state (i) the date of the document or communication for which privilege or immunity is claimed, (ii) the author(s) and recipient(s) of the document or the parties to the communication for which privilege or immunity is claimed, (iii) the nature of the claimed privilege or immunity, (iv) the nature of the information for which privilege or immunity is claimed, and (v) the specific number(s) of Coors' First Discovery Requests to which the document is responsive.

i.      If any document the production or identification of which is required by Coors' First Discovery Requests has been destroyed, discarded, or lost, or is no longer in existence or within your possession, custody, or control, provide the following information:  (i) the date of the document (or if the precise date is not known or ascertainable, the best approximation thereof); (ii) its title; (iii) the name and position of each person who prepared or assisted in preparing the document; (iv) the name and position of each person to whom the document was addressed or who has seen, has had possession or custody of, or has received disclosure of the contents of the document or any copy thereof; (v) the subject matter of the document; the (vi) specific number(s) of Coors' First Discovery Requests to which the document would have been responsive; (vii) the date it was destroyed, discarded, or lost or when it otherwise left your possession, custody, or control; (viii) the method of and reason for its destruction, discard, or loss, if any; (ix) the identity of the document's last custodian and of each person responsible for the document's destruction, discard, or loss, if any; and (x) the identity of any person whom you reasonably believe has, had, or may have present possession, custody, or control of the document.

WASH_2699697.3

j.      Pursuant to Fed. R. Civ. P. 26(e), Coors' First Discovery Requests shall be deemed continuing so as to require further and supplemental responses by Defendants, in the manner and time required by said rule, in the event Defendants obtain or discover additional information at any time between the time of the initial response and the time of trial.

k.      If you cannot answer an interrogatory in full after exercising due diligence to secure the information, answer to the extent possible and explain your inability to provide a complete answer.  State whatever information or knowledge you have about the unanswered portion of any interrogatory.

l.      In the event that Defendants claim that any of Coors' First Discovery Requests is overly broad, unduly burdensome, irrelevant, or otherwise objectionable, respond to that portion of the discovery request which is unobjectionable and specifically identify the respect in which the discovery request is allegedly overly broad, unduly burdensome, irrelevant, or otherwise objectionable.

m.      Unless stated otherwise, Coors' First Discovery Requests relate to the period commencing January 1, 2001 and continuing through the date of trial.

## REQUESTS FOR ADMISSION

**Request to Admit No. 1:**      Oak and Boening are beer distributors representing the products of numerous suppliers, including Molson products.

**Request to Admit No. 2:**      In 1996, the importer of Molson products was Martlet Importing Co. Inc. ("Martlet").

**Request to Admit No. 3:**      On October 23, 1996, Boening entered into the Distributor Agreement with Martlet attached as Exhibit A to Coors' Complaint (the "Boening Distributor Agreement").

7

**Request to Admit No. 4:**    Pursuant to the Boening Distributor Agreement, Boening was appointed as a distributor of Molson products in a New York territory consisting of Suffolk and Nassau Counties and certain portions of Queens County.

**Request to Admit No. 5:**    On October 23, 1996, Oak entered into the Distributor Agreement with Martlet attached as Exhibit B to Coors' Complaint (the "Oak Distributor Agreement").

**Request to Admit No. 6:**    Pursuant to the Oak Distributor Agreement, Oak was appointed as a distributor of Molson products in a New York territory consisting of Bronx, Putnam, Rockland, and Westchester Counties and that portion of the borough of Manhattan that is north of, but excluding, 106th Street.

**Request to Admit No. 7:**    The Oak and Boening Distributor Agreements were eventually assigned from Martlet to a joint venture between Miller Brewing Company and Molson Canada.

**Request to Admit No. 8:**    In late 2000, the distribution of Molson products in the United States was transferred to a joint venture between Coors and Molson Canada, which later changed its name to Molson USA.

**Request to Admit No. 9:**    Thereafter, the Oak and Boening Distributor Agreements were assigned to Molson USA.

**Request to Admit No. 10:**    Following the assignment of the Oak and Boening Distributor Agreements to Molson USA, Molson USA supplied Molson products to Oak and Boening for resale in their assigned territories.

**Request to Admit No. 11:**    Following the formation of Molson USA, all Molson distributors were offered the right to enter into revised distributor agreements with Molson USA.

**Request to Admit No. 12:**    In 2001, Oak and Boening declined to enter into a new distributor agreement with Molson USA.

**Request to Admit No. 13:**    Since 2001, Molson USA has done business with Oak and Boening pursuant to the Oak and Boening Distributor Agreements, respectively.

**Request to Admit No. 14:**    In 2005, various Coors and Molson entities entered into a series of transactions (the "Merger") that resulted in the acquisition of all of the stock of Molson, Inc. by a subsidiary of Adolph Coors Company (Coors' corporate parent), which was renamed Molson Coors Brewing Company ("Molson Coors").

**Request to Admit No. 15:**    After the Merger, Molson USA continued its operations as a wholly owned subsidiary of Molson Coors, but more and more of the operations of Molson USA were taken over by Coors.

**Request to Admit No. 16:**    On December 2, 2007, the Distributor Agreements were assigned by Molson USA to Coors in connection with a transaction by which nearly all of the assets of Molson USA were transferred to Coors.

**Request to Admit No. 17:**    Coors has continued to supply Molson products to Oak and Boening after December 2, 2007.

**Request to Admit No. 18:**    The Oak and Boening Distributor Agreements state that they can be terminated without cause.

**Request to Admit No. 19:**    In 2001, Molson USA adopted a nationwide plan of consolidation for the distribution of Molson products in the United States (the "Consolidation Plan").

**Request to Admit No. 20:**    The Consolidation Plan was to consolidate the distribution of Molson products into the Coors distribution network.

**Request to Admit No. 21:**    In 2001, there were more than 500 Molson distributors, 65 percent of which were not Coors distributors (referred to as "unaligned" Molson distributors).

**Request to Admit No. 22:**    Oak and Boening were and remain unaligned Molson distributors.

**Request to Admit No. 23:**    By the end of 2003, the percentage of unaligned Molson distributors had shrunk to less than 20 percent.

**Request to Admit No. 24:**    The reduction of unaligned Molson distributors was the result of efforts by Molson USA to encourage the sale of Molson distribution rights by unaligned Molson distributor to the local Coors distributors.

**Request to Admit No. 25:**    In 2005, Molson USA announced to the unaligned Molson distributors in New York that if the unaligned Molson distributors declined to sell their distribution rights to the local Coors distributor, Molson USA would pursue the termination of the distribution rights of the unaligned New York Molson distributors pursuant to the Consolidation Plan.

**Request to Admit No. 26:**    Molson USA attempted to negotiate the purchase of the Molson distribution rights with the remaining unaligned New York Molson distributors, but has been unsuccessful in doing so.

**Request to Admit No. 27:**    Molson USA has given notice to each unaligned New York distributor — including Defendants Oak and Boening — that Molson USA will pursue termination of the Molson distribution rights pursuant to § 55-c of New York's Alcohol Beverage Control Law.

**Request to Admit No. 28:**    The Consolidation Plan begun by Molson USA and continued by Coors satisfies the requirements of § 55-c of New York's Alcohol Beverage

Control Law as it existed at the time that Oak and Boening entered into the Oak and Boening Distributor Agreements in October 1996.

**Request to Admit No. 29:**    Notice of the Consolidation Plan has been given to Defendants in accordance with the requirements of § 55-c of New York's Alcohol Beverage Control Law.

**Request to Admit No. 30:**    Implementation of the Consolidation Plan has or will result in a contemporaneous reduction in the number of Molson distributors nationally, in the states contiguous to New York, and in the state of New York.

## REQUESTS FOR PRODUCTION

**Document Request No. 1:**    All documents that support or disprove any of Defendants' claims or defenses in this action.

**Document Request No. 2:**    To the extent that you claim that you are entitled to damages, all documents relating to the itemization of such damages and all documents that show how you calculate any damages claimed by you in this action, whether economic, non-economic, punitive, or other.

**Document Request No. 3:**    All correspondence between Defendants or between Defendants and any third party relating to any claim or defense in this action.

**Document Request No. 4:**    All correspondence between Defendants (jointly or individually) and Coors relating to any claim or defense in this action.

**Document Request No. 5:**    All documents that reflect any valuation of the "fair market value" of your distribution rights for Molson products.

**Document Request No. 6:**    All documents that form the basis for or provide data that are used in the calculation of the "fair market value" of your distribution rights for Molson products.

WASH_2699697.3

**Document Request No. 7:**    All documents supporting or relating to any calculation of the "fair and reasonable compensation for other damages sustained" resulting from any potential termination of Defendants' distribution rights for Molson products.

**Document Request No. 8:**    All documents relating to the Defendants' acquisition of Molson distribution rights for any portion of the geographic area served by Defendants.

**Document Request No. 9:**    All documents showing any valuation of your Molson distribution rights by from the time you originally secured such rights and any addition thereto for any additional geographic area, including any valuation contained on internally prepared or externally prepared financial statements.

**Document Request No. 10:**    Your annual and monthly financial statements for the period 2002 to the present.

**Document Request No. 11:**    Documents sufficient to show your sales by brand for all beer and other beverage brands for each month and the fiscal year end for the period from January 1, 2001 to the present.

**Document Request No. 12:**    Documents sufficient to show your sales by brand for all beer and other beverage brands for each month and the fiscal year end for the period from January 1, 2001 to the present.

**Document Request No. 13:**    Documents sufficient to show the method used to calculate gross profits in the documents produced in response to the previous requests.

**Document Request No. 14:**    Your annual general ledgers for the period January 1, 2001 to the present, including electronic copies that can be accessed by readily available commercial software.

**Document Request No. 15:**     All documents related to any inquiry since January 1, 2001 by any person to you concerning the purchase of any brand distribution rights or any portion of your business that includes the Molson brands.

**Document Request No. 16:**     All documents related to any inquiry since January 1, 2001 by you concerning the sale of any brand distribution rights or any portion of your business that includes the Molson brands.

**Document Request No. 17:**     Any information in your possession relating to the value of the Molson brands.

**Document Request No. 18:**     All documents related to the potential for you to reduce costs and expenses upon the termination of the Molson distribution rights.

**Document Request No. 19:**     All documents showing or discussing the actual or potential reduction of costs and expenses following the loss or sale of other brand distribution rights, if any, by you during the period from January 1, 2001 to the present.

**Document Request No. 20:**     All documents relating to the purchase or sale of any brand distribution rights by you for any geographic territory during the period from 2001 to the present.

**Document Request No. 21:**     All documents relating to the purchase or sale of any portion of a beer distribution business by you for any geographic territory during the period from 2001 to the present.

**Document Request No. 22:**     All valuations or appraisals of all or any portion of you, your business, or ownership interests therein, for estate purposes or otherwise.

**Document Request No. 23:**     All documents related to any purchase or sale of any portion of your stock to any individual, including tax returns during the period from January 1, 2001 to the present.

WASH_2699697.3

**Document Request No. 24:**     All documents related to the redemption of any portion of your stock during the period from January 1, 2001 to the present.

**Document Request No. 25:**     All documents related to public filings, including filings to the Internal Revenue Service, concerning your gross and net profits during the period of January 1, 2001 to the present.

**Document Request No. 26:**     All documents created or received in connection with other litigation involving either Defendant that relate to the valuation of any beer brand distributed by either of the Defendants or all or a portion of the business of either Defendant.

## INTERROGATORIES

**Interrogatory No. 1:**     Identify all persons who are likely to have personal knowledge of any fact alleged in Coors' Complaint or your answer thereto, and state the subject matter of the personal knowledge possessed by each such person.

**Interrogatory No. 2:**     To the extent that you claim that you are entitled to damages, itemize and show how you calculate any damages claimed by you in this action, whether economic, non-economic, punitive or other.

**Interrogatory No. 3:**     To the extent that you claim that, upon termination of your Molson distribution rights you are entitled to "fair and reasonable compensation for other damages sustained," as that term is used in Ch. 55-c of the New York Alcoholic Beverage Code, itemize and show how you calculate such damages.

**Interrogatory No. 4:**     To the extent that Defendants deny in whole or in part any of Coors' First RFAs, identify all of the documents on which the denial is based.

**Interrogatory No. 5:**     To the extent that Defendants deny in whole or in part any of Coors' First RFAs, identify all of the witnesses that have knowledge of the facts giving rise to Defendants' denial and identify the facts upon which the denial is based.

14

Dated: March 3, 2008

                                        Respectfully submitted,

                                        COORS BREWING COMPANY

                                        By: _____ /s/ Michael J. Lockerby _____
                                                            Counsel

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur[*]
Michael J. Harwin[*]
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone:  (202) 672-5300
Fax:  (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen**
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax:  (414) 297-4900

Counsel for Plaintiff
Coors Brewing Company

---

[*] Admitted in New York, Georgia and the District of Columbia only

[**] Admitted in Wisconsin only

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 3, 2008, I served a true and correct copy of **COORS'**

**FIRST REQUESTS FOR ADMISSION, DOCUMENT REQUESTS, AND INTERROGA-**

**TORIES** by electronic mail upon the following counsel of record for Defendants:

>Marshall A. Winslow, Jr., Esq.
>WOLCOTT RIVERS GATES
>1 Columbus Center, Suite 1100
>Virginia Beach, Virginia 23462
>E-mail: mwinslow@wolriv.com
>
>Gary Ettelman, Esq.
>ETTELMAN & HOCHHEISER, P.C.
>100 Quentin Roosevelt Boulevard, Suite 401
>Garden City, New York 11530
>E-mail: gettelman@e-hlaw.com

>/s/ *Michael J. Lockerby*
>Michael J. Lockerby (VSB No. 24003)
>Attorney for Coors Brewing Company
>FOLEY & LARDNER LLP
>Washington Harbour
>3000 K Street N.W., Suite 500
>Washington, D.C. 20007-5143
>Phone: (202) 672-5300
>Fax: (202) 672-5399
>E-mail: mlockerby@foley.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **COORS BREWING COMPANY,** ) <br> a Colorado corporation, ) <br> ) <br> **Plaintiff,** ) <br> v. ) <br> ) <br> **OAK BEVERAGE, INC.,** ) <br> a New York corporation, and ) <br> ) <br> **BOENING BROS., INC.,** ) <br> a New York corporation, ) <br> ) <br> **Defendants.** ) | **Civil Action No. 1:07 CV 1235** |

**COORS' OPPOSITION TO**
**DEFENDANTS' MOTION FOR DISCOVERY EXTENSION**

Plaintiff Coors Brewing Company ("Coors"), by counsel, respectfully states as follows in opposition to the Motion for Discovery Extension filed by Defendants Oak Beverage, Inc. ("Oak") and Boening Bros., Inc. ("Boening"). In support of this Opposition, Coors relies upon the accompanying Affidavit of Michael J. Lockerby ("Lockerby Affidavit").

It has been nearly a month since Defendants' counsel received this Court's February 8, 2008 Scheduling Order setting a discovery deadline of May 9, 2008. The Scheduling Order concluded: "Discovery may begin upon receipt of this Order." Rather than begin discovery, however, Defendants have merely sought to postpone its completion.

To the extent that Defendants believe that written discovery and depositions are necessary, completing that discovery ought not be difficult. For Defendants' counsel, litigation of this case is — in the immortal words of Yogi Berra — like "déjà vu all over again." Defendants' counsel have been involved in several other proceedings involving the termination of beer wholesalers in New York pursuant to a plan of consolidating MOLSON® brands with

Coors distributors. In one of those proceedings, an arbitration styled *Molson USA, LLC v. John G. Ryan, Inc.* ("*Ryan*"), there has already been extensive discovery to determine whether that plan of consolidation establishes the requisite "good cause" for termination under § 55-c of New York's Alcohol Beverage Control Law. The respondent in the *Ryan* arbitration was a similarly situated New York wholesaler of MOLSON® brands represented by the same counsel as Defendants in this case. Copies of (1) the arbitrator's November 6, 2006 Interim Decision, (2) the arbitrator's July 13, 2007 Award, Including Findings of Fact and Conclusions of Law, and (3) the January 25, 2008 Order of the U.S. District Court for the Southern District of New York confirming the July 13, 2007 Award (collectively, the "*Ryan* Arbitration Award") are attached to the Lockerby Affidavit as **Exhibit F**.

Of course, the extent to which various provisions of § 55-c of New York's Alcohol Beverage Control Law even apply to the distribution contracts at issue in this case presents a question of law for this Court to decide. If Defendants *really* need additional information about the consolidation plan that was not addressed in the proceedings that culminated in the *Ryan* Arbitration Award, they should be able to obtain that information well before the May 9, 2008 discovery deadline.

To the extent that either party needs discovery, it is more likely to be Coors — if this Court decides, as a matter of law, that Coors has any liability in the first place. Under those circumstances, the most likely subject of discovery is likely to be the amount of any "reasonable compensation" to which Defendants may — or may not — be entitled under Subdivision 7 of § 55-c of New York's Alcohol Beverage Control Law. Accordingly, Coors has already served Defendants with written discovery requests designed to ascertain whatever basis they may have

WASH_2990956.1

for claiming entitlement to "damages sustained" and/or the "fair market value of the distribution rights" under § 55(c).  *See* Lockerby Affidavit, **Exhibit H**.

Discovery is not the only obligation to this Court that Defendants have seen fit to ignore. The Scheduling Order also directed them to file their answer by February 27, 2008.  Defendants' failure to do so prompted Coors' Request for Entry of Default filed earlier today.  (Docket #22).

While ignoring their obligations to this Court, counsel for Defendants have been quite active commencing litigation in other courts on behalf of other New York wholesalers of MOLSON® products.  This other litigation —which was filed after Coors filed its Complaint in this action on December 11, 2008 — includes the case of *Spirit & Sanzone Distributors Co. v. Coors Brewing Company*, filed on January 11, 2008 as Civil Action No. 1:08cv251 (the "SDNY Action"), and the case of *Doldo Brothers, Inc. v. Coors Brewing Company*, filed on February 25, 2008 as Civil Action No.:  1:08 CV 00206-TJM-GJD (the "NDNY Action").

The plaintiffs in the SDNY Action, two New York wholesalers of MOLSON® brands, are represented by the same counsel as Defendants in this case.  The plaintiffs filed suit in the Southern District of New York notwithstanding the fact that their distribution agreements required arbitration and Coors had previously commenced an arbitration against both of them on December 11, 2007.  The February 29, 2008 decision in the SDNY Action denied the plaintiffs' motion for preliminary injunction and stayed the litigation pending arbitration of the plaintiffs' claims.  *See* Lockerby Affidavit, **Exhibit G**.

The plaintiffs in the NDNY Action, two other New York wholesalers of MOLSON® brands, are represented by the same counsel as Defendants in this case.  The NDNY Action was commenced on February 22, 2008.  *See* Lockerby Affidavit, **Exhibit A**.  On February 25, 2008 — while counsel for Defendants in this case sought to delay rather than expedite discovery (*see*

3

Lockerby Affidavit, **Exhibit B**) — the plaintiffs in the NDNY Action sought a preliminary injunction in response to notices of termination that they had received on December 7, 2007. Coors' opposition to the preliminary injunction motion in the NDNY Action was due February 28, 2008, and a hearing on the motion for preliminary injunction in the NDNY Action has been set for 10:00 a.m. on Wednesday, March 5, 2008 in Binghamton, New York. *See* Lockerby Affidavit, **Exhibit C**.

    In support of their preliminary injunction motion, the plaintiffs in the NDNY Action submitted affidavits in which they speculated that retaining distribution rights to MOLSON® brands *might* help them *if* Coors and Miller Brewing Company eventually consummate a previously announced joint venture and *if* Coors and Miller eventually consolidate their distribution. These affidavits also claimed that the joint venture was likely to be consummated by the summer of 2008. *See* Lockerby Affidavit, **Exhibit D** and **Exhibit E**.

    Delaying resolution of this case thus appears to be part of a coordinated effort to delay the terminations of several New York distributors in the hope that doing so might help them acquire distribution rights to Coors products that they do not currently have. Regardless of how well thought out this strategy may or may not be, one thing is clear: Defendants have not met their burden of showing why good cause exists for this Court to deviate from the schedules and deadlines that it typically imposes. Accordingly, Coors respectfully requests that this Court deny Defendants' Motion for Discovery Extension.

WASH_2990956.1

Dated: March 3, 2008

Respectfully submitted,

COORS BREWING COMPANY

By: _____/s/_____
                              Counsel

Michael J. Lockerby (VSB No. 24003)
Kimberly J. Shur[*]
Michael J. Harwin[*]
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone:  (202) 672-5300
Fax:  (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen**
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax:  (414) 297-4900

Counsel for Plaintiff Coors Brewing Company

---

[*] Admitted in New York, Georgia and the District of Columbia only

[**] Admitted in Wisconsin only

5

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of March, 2008, I will electronically file the foregoing

COORS' OPPOSITION TO DEFENDANTS' MOTION FOR DISCOVERY EXTENSION with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following counsel of record for Defendants:

> Marshall A. Winslow, Jr., Esq.
> WOLCOTT RIVERS GATES
> 1 Columbus Center, Suite 1100
> Virginia Beach, Virginia  23462
> MWinslow@wolriv.com

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

> Gary Ettelman, Esq.
> ETTELMAN & HOCHHEISER, P.C.
> 100 Quentin Roosevelt Boulevard, Suite 401
> Garden City, New York  11530

> _____/s/_____
> Michael J. Lockerby
> Virginia Bar No. 24003
> Attorney for Coors Brewing Company
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street N.W., Suite 500
> Washington, D.C. 20007-5143
> Phone:  (202) 672-5300
> Fax:  (202) 672-5399
> E-Mail:  mlockerby@foley.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

COORS BREWING COMPANY,

        Plaintiff,

v.                                    Case No.  1:07cv1235

OAK BEVERAGE, INC.,
and BOENING BROS., INC.,

        Defendants.

**<u>AFFIRMATION IN OPPOSITION TO REQUEST FOR DEFAULT JUDGMENT</u>**

        Marshall A. Winslow, Jr., an attorney duly admitted to practice before this Court, affirms the following under the penalties of perjury:

        1.       I am a partner with the law firm of Wolcott Rivers Gates, attorneys for Defendants Oak Beverages and Boening Brothers ("O&B") and I am fully familiar with the above captioned proceeding.  The source of my knowledge is my review of the file maintained in my office and discussions with my co-counsel, Gary Ettelman.

        2.       This affirmation is submitted in opposition to Plaintiff's request for the entry of a default judgment against Plaintiffs.

        3.       This action was commenced by Plaintiff Coors Brewing Company ("Coors") on December 11, 2007.  On January 9, 2008 Defendants accepted service of the summons and complaint.

        4.       Pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. 1404(a), on January 28, 2008, Defendants filed a pre-answer motion to dismiss and/or transfer for improper venue.

5.      In their motion, Defendants argued that venue is not proper in this District pursuant to Fed. R. Civ. P. 12(b)(3) because there is no binding forum selection clause; the clause Plaintiff relies upon having been superseded by the clear and unambiguous terms of the Distribution Agreements in issue by a provision calling for venue in New York.

6.      Alternatively, Defendants argued that even if the Court determines that venue is proper, because this case has no connection to the Eastern District of Virginia, under applicable law the Court should transfer it to the Southern District of New York pursuant to 28 U.S.C. 1404(a).

7.      This motion was originally returnable on February 8, 2008 and was thereafter adjourned at the Court's direction to March 6, 2008.

8.      As of this date, Defendants' pre-answer motion to dismiss has not been decided.

9.      Because Defendants' pre-answer motion to dismiss has not been decided, Defendants are not required under the Federal Rules to file their answer to Plaintiff's complaint.

10.      Similarly, because Defendants pre-answer motion to dismiss has not yet been decided, Defendants were not required to file an answer pursuant to this Court's scheduling order dated February 7, 2008.

11.      By filing their pre-answer motion to dismiss based upon improper venue, Defendants have plead and/or otherwise defended this action pursuant to Fed. R. Civ. P 55.

WHEREFORE, Defendants respectfully requests that this Court deny Plaintiff's motion for the entry of a default judgment.

Dated:  March 4, 2008

_____/s/_____
Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax:  (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March 2008 I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael J. Lockerby, Esquire
FOLEY & LARDNER, LLP
3000 K. Street N.W., Suite 500
Washington, D.C.  20007-5143
mlockerby@foley.com

_____/s/_____
Marshall A. Winslow, Jr., Esq.
Virginia State Bar No. 30307
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633
Fax: (757) 497-7267
mwinslow@wolriv.com
*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*

MAGISTRATE JUDGE: _Buchanan_    DATE: _3-5-08_

CA- _07 CV 1235_

Time: _25 min_

APPEARANCES: Counsel for: Plaintiff (✓) Defendant (✓) Pro-se ( )

INITIAL PRETRIAL CONFERENCE  _Motion for Extension of Time to Conduct Discovery—for 30 days_

DISCOVERY PLAN: ( ) APPROVED    (✓) APPROVED AS AMENDED
    (✓) FILE By _5/23_

_Complete discovery by 5/23 - Expert deposition by 5/30_
_Pretrial Submissions by 6/6 - Objections - 6/13_
CONSENT TO TRIAL BY A MAGISTRATE JUDGE: ( ) YES Consent signed

ADR/SETTLEMENT: ( ) PENDING    ( ) WILL DISCUSS    ( ) OTHER

(✓) ORDER TO ISSUE

Case Continued to _5/15 @ 10_ for 16(b) Conference. _before Judge Lee_

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COORS BREWING COMPANY,    )
                          )
        Plaintiff,        )
                          )
                          )
                          )
v.                        )    Civil Action No. 1:07CV1235
                          )
OAK BEVERAGE, INC.        )
BOENING BROS., INC.,      )
                          )
        Defendants.       )
                          )
                          )

## SCHEDULING ORDER

1. Upon consideration of the submissions presented, the Court makes the following rulings:

a. The Plaintiff's Proposed Discovery Plan is approved and shall control discovery to the extent of its application as modified by the Court.

2. Any motion to amend the pleadings or to join a party shall be made as soon as possible after counsel becomes aware of the grounds for the motion.

3. All motions, except for summary judgment, shall be noticed for hearing on the earliest possible Friday before the pretrial conference. Ten working days' notice is required for motions to dismiss, for summary judgment, for patent claim construction, and for judgment on the pleadings. Non-dispositive motions must be filed and delivered by the Friday before the Friday for which noticed, with oppositions due no later than

Wednesday and replies due no later than Thursday before the hearing on Friday. Copies of all non-dispositive motions and all papers relating to such motions shall be *delivered directly to the chambers of the undersigned magistrate judge* when the originals are filed with the clerk.

4. *Sealing of Documents.* Filings under seal are disfavored and discouraged. See <u>Virginia Department of State Police v. The Washington Post, et al</u>, 386 F.3d 567, 575-76 (4th Cir. 2004). Any motion to file documents under seal, including a motion for entry of a protective order containing provisions for filing documents under seal, must comply with Local Civil Rule 5 and must be docketed for a hearing or made in open court. The motion must state sufficient facts supporting the action sought and each proposed order must include specific findings. *See* <u>Virginia Department of State Police, supra</u>, and Local Civil Rule 5.

5. Without leave of court, all Fed. R. Civ. P. 12 issues shall be raised in one pleading. Similarly, unless Court permission is obtained in advance, all summary judgment issues must be presented in the same pleading.

6. All motions must adhere to the page limits set in Local Rule 7(E)(3). No pleading shall be in type less than ten (10) pitch or twelve (12) point.

7. Depositions, interrogatories, requests for documents and admissions and answers thereto shall not be filed except on order of the Court or for use in any motion, or at trial.

8.   In non-jury cases, counsel shall file with the clerk at the beginning of trial written proposed findings of fact and conclusions of law.   In jury cases, instructions shall be filed five (5) days prior to trial in accordance with Local Rule 51. Violation of this rule will constitute a waiver of objections to any instructions given.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

Theresa Carroll Buchanan
United States Magistrate Judge

Date: March 5, 2008
Alexandria, Virginia
This Order is being mailed to local counsel only.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| COORS BREWING COMPANY,<br>a Colorado corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:07 CV 1235 |
| v. | ) | |
| | ) | |
| OAK BEVERAGE, INC.,<br>a New York corporation, and | ) | |
| | ) | |
| | ) | |
| BOENING BROS., INC.,<br>a New York corporation, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PROPOSED DISCOVERY PLAN OF
## PLAINTIFF COORS BREWING COMPANY

Plaintiff Coors Brewing Company, ("Coors"), by counsel, hereby submits its Proposed

Discovery Plan pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and the Court's

Order dated February 7, 2008 (the "Scheduling Order"), and respectfully states as follows:

1. **Conference.** Pursuant to the Scheduling Order, the parties conferred at various

times regarding a Proposed Joint Discovery Plan via correspondence and telephone calls.

Participants included the undersigned counsel for Coors and counsel for Defendants Oak

Beverage, Inc. ("Oak") and Boening Brothers, Inc., ("Boening") (collectively "Defendants").

Initially it appeared as if counsel for Coors and Defendants would be able to agree upon a

Proposed Joint Discovery Plan as contemplated by the Scheduling Order. On February 25 and

26, 2008, counsel for Coors learned that counsel for Defendants intended to seek an extension of

the May 9, 2008 discovery deadline contained in the Scheduling Order and/or bifurcation of

discovery so that discovery with respect to damages would continue beyond May 9, 2008. At

that point, counsel for Defendants expressed an unwillingness to agree to the previously discussed deadlines contained herein, and counsel for Coors expressed an unwillingness to agree to an extension of the May 9, 2008 discovery deadline contained in the Scheduling Order.  As a result of this impasse, Coors is submitting its own Proposed Discovery Plan.

2.    **Pre-discovery Disclosures.**  Each party shall serve its initial disclosures required by Rule 26(a)(1) no later than Friday, March 7, 2008.

3.    **Discovery Plan.**  Coors proposes to the Court the following discovery plan:

a.    Discovery will be needed on the following subjects:

i.    Coors' claims against the Defendants, and Defendants' defenses;

ii.    Defendants' claims against Coors, if any, and Coors' defenses;

iii.    Damages; and

iv.    Expert issues.

b.    As required by the Scheduling Order, all discovery will be completed by Friday, May 8 **23**, 2008. *Expert depositions may be completed by May 30, 2008*

c.    ~~All fact discovery will be completed by Monday, March 31, 2008.~~

d.    Coors and Defendants collectively shall propound no more than thirty (30) requests for production of documents, including parts and subparts thereof, to one another.  The parties shall serve their requests for production by e-mail on the other party no later than Friday, February 29, 2008.

e.    Coors and Defendants collectively shall propound no more than thirty (30) interrogatories, including parts and subparts thereof, to one another.  The parties shall serve their interrogatories by e-mail on the other party no later than Friday, February 29, 2008.

2

f.     Coors and Defendants collectively shall propound no more than thirty (30) requests for admission, including parts and subparts thereof, to one another. The parties shall serve their requests for admission by e-mail on the other party no later than Friday, February 29, 2008.

g.     Objections and answers to the requests for production of documents, interrogatories, and requests for admission shall be served by e-mail on the party requesting discovery no later than Friday, March 14, 2008.

h.     Documents responsive to requests for production of documents not objected to shall be sent by overnight courier to the requesting party no later than Friday, March 14, 2008.

i.     Coors and Defendants collectively shall take no more than ten (10) depositions — including no more than five (5) non-party, non expert witness depositions — on their claims, counterclaims, and defenses against each other.

j.     Each deposition, other than expert depositions, is limited to a maximum of one (1) day, consisting of seven (7) hours of deposition time unless extended by agreement of the parties or order of the Court.

k.     Except as otherwise provided herein, depositions and written discovery (responses to requests for production of documents, interrogatories, and requests for admission) will take place as provided in the Federal Rules of Civil Procedure and the Local Rules of this Court.

l.     Initial reports from retained experts and expert disclosure under Rule 26(a)(2) are due from the proponent by Friday, April 4, 2008. The opponent shall submit rebuttal expert reports and expert disclosure pursuant to Rule 26(a)(2), limited to

3

contradicting or rebutting initial expert opinions disclosed by the proponent, by Friday, April 25, 2008. The proponent shall submit any evidence that is solely contradictory or rebuttal evidence to the opponent's disclosure by Friday, May 2, 2008. Drafts of expert reports and expert communications with counsel need not be retained or produced.



m.      Supplementations under Rule 26(e) are due no later than Friday, May 2, 2008.

n.      The parties will submit a proposed Stipulated Protective Order to the Court that will include provisions for the recall, destruction, and/or return of inadvertently produced privileged documents. The parties contemplate entering into a Stipulated Protective Order or Confidentiality Agreement that will permit them to designate information they produce in discovery as "Confidential" if it is eligible for protection under Fed. R. Civ. P. 26(c).

o.      The parties agree that electronically stored information comes within the scope of their discovery obligations.

p.      The parties agree that they must undertake reasonable and good faith efforts to preserve electronically stored information relevant to the claims or defenses in this matter, including a-mails and other electronic documents (including those in formats such as Word, WordPerfect, Excel, PowerPoint, Acrobat PDF, tiff and other off-the-shelf application and those in proprietary formats). To adequately discharge their preservation obligations, the parties are not required to suspend their respective automated document destruction policies or systems, nor to retain or restore backup tapes.

4

q.    Given the nature of the case, the parties do not currently anticipate any need to access electronically stored information that is not reasonably accessible, such as deleted electronically stored information.

r.    All productions of electronically stored information shall be sent to the opposing party on a CD, DVD, hard drive, or other electronic media.

s.    The parties agree that all electronically stored information not produced in native format shall be produced in searchable .tiff or searchable .pdf format, or in .tiff, or .pdf format with corresponding text files, with appropriate Concordance load files. The parties agree that corresponding metadata will not be provided; however, the parties reserve the right to request metadata for individual documents upon a showing of particularized need. Each page of electronically stored information that is produced shall bear a unique Bates number. The parties agree that documents kept in paper form in the ordinary course of business need not be converted to .tiff or .pdf format for purposes of production, but a party may do so at its own election. The parties agree that call detail records will be produced in native form in industry-standard format.

t.    The parties agree that productions of electronically stored information and documents shall be served by overnight courier on the requesting party's attorney of record.

u.    The parties agree that, absent the showing required under Rule 26(b) for cost shifting, each party should bear its own costs for preservation and production of electronically stored information. If any party requests that back-up tapes be maintained or restored, or requests forensic imaging of electronically stored information, then the requesting party shall bear the costs associated with such a request, although the parties

5

reserve their respective rights to file appropriate motions pursuant to Rule 26(b) should any such requests related to backup tapes or forensic imaging impose unreasonable burdens beyond cost.

4.    **Other items.**

a.    The parties will attend a pretrial conference on March 5, 2008 at 10:00 a.m. before a Magistrate Judge.

~~b.    The parties propose that they will have until March 21, 2008 to amend their pleadings.  The parties propose that they will have until March 21, 2008 to add additional parties.  Responses to amended pleadings shall be served ten (10) days from service.~~

c.    A Final Pretrial Conference is scheduled for Thursday, May 15, 2008 at 10:00 a.m.

~~d.    All potentially dispositive motions should be filed no later than April 15, 2008.~~

e.    At this time the parties do not believe alternative dispute resolution techniques would be fruitful in encouraging settlement.  The parties may revisit this question if the Court dismisses any of the claims from the case.

f.    Final lists of witnesses to be called at trial, lists of the exhibits to be used at trial, the exhibits themselves, and a written stipulation of uncontested facts under Rule 26(a)(3) should be exchanged with opposing counsel at or before ~~the May 15, 2008 Final Pretrial Conference.~~ June 6, 2008

g.    The parties will have until ~~May 22, 2008~~ June 13, 2008 to file objections to the opposing party's final lists of witnesses and exhibits under Rule 26(a)(3).

6

h.    Based on the parties and pleadings as they currently stand, the parties

expect approximately 3 days of trial.

i.    Other matters.  NONE

Dated:  February 27, 2008

Respectfully submitted,

COORS BREWING COMPANY

By:    _____/s/_____
Counsel

Michael J. Lockerby (VSB No. 24003)[*]
Kimberly J. Shur[*]
Michael J. Harwin[*]
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone:  (202) 672-5300
Fax:  (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen[**]
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax: (414) 297-4900

Counsel for Plaintiff
    Coors Brewing Company

---

[*] Admitted in New York, Georgia, and the District of Columbia only

[**] Admitted in Wisconsin only

7

## CERTIFICATE OF SERVICE

I hereby certify that, on February 27, 2008, a true and correct copy of the Proposed Discovery Plan of Plaintiff Coors Brewing Company was served by electronic mail through the Court's ECF system upon the following counsel of record for Defendants Oak Beverage, Inc. and Boening Brothers, Inc.:

> Marshall A. Winslow, Jr., Esq.
> WOLCOTT RIVERS GATES
> 1 Columbus Center, Suite 1100
> Virginia Beach, Virginia 23462
> MWinslow@wolriv.com

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user who is counsel of record for Defendants Oak Beverage, Inc. and Boening Brothers, Inc.:

> Gary Ettelman, Esq.
> ETTELMAN & HOCHHEISER, P.C.
> 100 Quentin Roosevelt Boulevard, Suite 401
> Garden City, New York 11530

> /s/
> _____
> Michael J. Lockerby
> Virginia Bar No. 24003
> Attorney for Coors Brewing Company
> FOLEY & LARDNER LLP
> Washington Harbour
> 3000 K Street N.W., Suite 500
> Washington, D.C. 20007-5143
> Phone: (202) 672-5300
> Fax: (202) 672-5399
> E-mail: mlockerby@foley.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
COORS BREWING COMPANY,         )
                               )
          Plaintiff,           )
                               )
     v.                        )  Civil Action No. 1:07cv1235
                               )
OAK BEVERAGE, INC., et al.,    )
                               )
          Defendants.          )
```

ORDER


     FOR REASONS stated from the bench and in accord with

specific rulings and instructions thereto, it is

     ORDERED that defendants' Motion for Extension of Time to

Conduct Discovery (# 18) is GRANTED IN PART AND DENIED IN PART.

The deadline to complete discovery is extended to May 23, 2008,

but expert depositions may be conducted as late as May 30, 2008.

The parties will then have until June 6, 2008 to exchange

pretrial disclosures and until June 13, 2008 to object to those

disclosures.  The final pretrial conference remains scheduled for

May 15, 2008.  It is further

     ORDERED that the parties will submit to the Court by Monday,

March 10, 2008 proposed dates for the production of expert

reports, pursuant to Fed. R. Civ. P. 26(a)(2).  It is further

     ORDERED that, provided defendants' pending Motion to

Transfer is not granted, defendants shall file an answer to

plaintiff's Complaint by March 14, 2008.  The Court shall deem

such answer timely filed. Accordingly, the Clerk is directed not to enter default as to defendants.

The Court will enter a separate Order adopting the proposed discovery plan as revised.

ENTERED this 5th day of March, 2008.


_____/s/_____
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE


Alexandria, Virginia

2

*[handwritten: 3-6-08]*
*[handwritten: 10:09 - 10:47]*
*[handwritten: r: Wilson]*
*[handwritten: 36]*

# U.S. District Court
## Eastern District of Virginia (Alexandria)
### CIVIL DOCKET FOR CASE #: 1:07-cv-01235-GBL-TCB
### Internal Use Only

*[handwritten: Appearances: Counsel]*

Coors Brewing Company v. Oak Beverage, Inc. et al
Assigned to: District Judge Gerald Bruce Lee
Referred to: Magistrate Judge Theresa Carroll Buchanan
Demand: $75,000
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 12/11/2007
Jury Demand: None
Nature of Suit: 196 Contract: Franchise
Jurisdiction: Diversity

**Plaintiff**

**Coors Brewing Company**
*a Colorado corporation*

*[handwritten: On for hrg on D. motion to change venue (#98) - argued and granted - transferred to SDNY. Order to follow.]*

represented by **Michael J. Lockerby**
Foley & Lardner LLP
3000 K St NW
Suite 500
Washington, DC 20007-5143
(202) 672-5300
Fax: (202) 672-5399
Email: mlockerby@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Oak Beverage, Inc.**
*a New York corporation*

*[handwritten: Gary Ettleman - Pro Hac Vice]*

represented by **Marshall Allen Winslow, Jr.**
Wolcott Rivers Gates
One Columbus Center
Suite 1100
Virginia Beach, VA 23462
(757) 497-6633
Fax: (757) 497-7267
Email: mwinslow@wolriv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Boening Bros., Inc.**
*a New York corporation*

represented by **Marshall Allen Winslow, Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/11/2007 | 1 | COMPLAINT against Oak Beverage, Inc., Boening Bros., Inc. ( Filing fee $ 350 receipt number 100005324.), filed by Coors Brewing Company. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Civil Cover Sheet # 6 Receipt # 7 Cover letter #1# 8 Cover letter #2)(yguy, ) (Entered: 12/14/2007) |
| 12/11/2007 | 2 | Financial Interest Disclosure Statement (Local Rule 7.1) by Coors Brewing Company. |



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| **COORS BREWING COMPANY,** | ) | |
| a Colorado corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 1:07 CV 1235** |
| v. | ) | |
| | ) | |
| **OAK BEVERAGE, INC.,** | ) | |
| a New York corporation, and | ) | |
| | ) | |
| **BOENING BROS., INC.,** | ) | |
| a New York corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## CONSENT ORDER REGARDING
## CONFIDENTIALITY OF DISCOVERY MATERIAL

Pursuant to Federal Rule of Civil Procedure 26(c), by agreement of the parties, and for good cause shown, IT IS HEREBY ORDERED that certain material and information disclosed during discovery that the parties consider to be confidential shall be treated as follows:

1.    Designation of Discovery Materials as Confidential.    A party may designate documents, testimony, and information produced during the course of discovery as "Confidential Information," as set forth below:

a.    The designation of Confidential Information shall be made by placing or affixing on the document, in a manner which will not interfere with its legibility, the word "CONFIDENTIAL." A party that produces material may designate it as Confidential Information only when such person in good faith believes that it contains sensitive personal information, personnel information, information subject to prior confidentiality agreements, trade secrets, or other confidential research, development,

commercial, financial, or proprietary information. Except for documents produced for inspection, the designation of Confidential Information shall be made either before or contemporaneously with the production or disclosure of such information. In the event that documents are produced for inspection, such documents may be produced for inspection before being marked confidential. Once specific documents have been designated for copying, any documents containing Confidential Information will then be marked confidential after copying, but before delivery to the party that inspected and designated the documents. There will be no waiver of confidentiality by the inspection of confidential documents before they are copied and marked confidential pursuant to the foregoing procedure.

b. Portions of depositions shall be deemed Confidential Information only if they are designated as such when the deposition is taken or within fifteen (15) days after receipt of the transcript, except that all deposition testimony shall be considered Confidential Information during such fifteen-day (15-day) review period. Any testimony that describes a document that has been designated as Confidential Information, as described above, shall also automatically be deemed to be designated as Confidential Information.

c. Information or documents designated as Confidential Information under this Order shall not be used or disclosed by the parties or counsel for the parties or any persons identified in subparagraph "d." below for any purposes whatsoever other than preparing for and conducting the litigation in which the information or documents were disclosed (including appeals).

2

d.      The parties and counsel for the parties shall not disclose or permit the disclosure of any documents or information designated as Confidential Information under this Order to any other person or entity, except that disclosures may be made in the following circumstances:

i.      Disclosure of Confidential Information may be made to counsel and employees of counsel for the parties who have direct functional responsibility for the pre-trial preparation and trial of this lawsuit.

ii.     Disclosure of Confidential Information may be made to court reporters engaged for depositions and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents.

iii.    Disclosure of Confidential Information may be made to consultants, investigators, or experts (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation and trial of the lawsuit.  Before disclosure to any expert, the expert must be informed of and agree in writing to be subject to the provisions of this Order requiring that the documents and information be held in confidence.  (*See* **Attachment A**).

e.      Except as provided in subparagraph "d." above, counsel for the parties shall keep all documents designated as Confidential Information which are received under this Order secure within their exclusive possession and shall take reasonable efforts to place such documents in a secure area.

f.      All copies, duplicates, extracts, summaries, or descriptions (hereinafter referred to collectively as "copies") of documents or information designated as

3

Confidential Information under this Order or any portion thereof, shall be immediately affixed with the word "CONFIDENTIAL" if that word does not already appear.

2.    Confidential Information Filed with Court. No "CONFIDENTIAL" documents or information derived therefrom may be filed in Court unless the Parties have agreed in advance of such filing (either orally or in writing) to adequate measures to ensure that the confidentiality of the documents and information is preserved. If the Parties are unable to reach agreement after good faith negotiations, no document containing Confidential Information shall be filed in Court unless the Party proposing to file the document first redacts all information except that which is essential to the purpose of the Court filing, or obtains the consent of the Court to file the document under seal.

3.    Challenging Designation of Confidentiality. A designation of confidentiality may be challenged upon motion. The burden of proving the confidentiality of designated information remains with the party asserting such confidentiality, however, the Party challenging the designation of confidentiality shall first meet in good faith with the other Party to resolve any issues regarding the designation of confidentiality.

4.    Inadvertent Disclosure. Inadvertent failure to designate Confidential Information shall not be construed as a waiver, in whole or in part, and may be corrected by the producing party by written notification to the recipient promptly upon discovery of the failure to designate; provided, however, that no disclosure of inadvertently disclosed Confidential Information occurring before the date of such notification shall be deemed to be in violation of this Order.

5.    No Waiver of Privilege or Immunity. Nothing in this Order shall be deemed to be a limit or waiver of the attorney-client privilege, the work product immunity doctrine, or any other relevant privilege.    Further, inadvertent production of privileged or work product

4

information shall not waive the claimed privilege or immunity. If privileged information is inadvertently produced, the recipient agrees that, upon request from the producing party, it shall promptly return all copies of documents containing the privileged information, delete any versions of the documents containing the privileged information on any database or computer filing system it maintains, and make no use of the privileged information.

6.    No Waiver of Objections. The terms of this Order shall not be construed to constitute a waiver of any objection to discovery, including written discovery or depositions or of any right to seek to compel discovery.

7.    Third Party Information. In the event that Plaintiff or Defendants or their counsel obtain information from a third party that Plaintiff or Defendants believes to be confidential, they may designate such information as Confidential Information pursuant to this Order and it shall be treated as such in accordance with this Order.

8.    Return of Confidential Information at Conclusion of Litigation. At the conclusion of the litigation, all Confidential Information (including copies) that has not been received in evidence shall be returned to the originating party or, at the option of the receiving party, the material may be destroyed instead of being returned; provided, however, that counsel for any party opting to destroy documents rather than return them shall attest to such destruction. The Clerk of the Court may return to counsel for the parties, or destroy, any sealed material at the end of the litigation, including any appeals.

9.    Court Jurisdiction. The provisions of this Order shall survive the entry of final judgment or the filing of any stipulation discontinuing the action. The Court shall retain jurisdiction, both before and after the entry of final judgment in this case, whether by settlement or adjudication, to construe, enforce, and amend the provisions of this Order. This Order shall

remain in full force and effect until modified, superseded, or terminated by mutual consent of the

parties or by the Court.

SO ORDERED this **5** day of **March**, 2008.

/s/
_____
Gerald Bruce Lee
United States District Judge
The Honorable Gerald Bruce Lee
United States District Court
Eastern District of Virginia

We ask for this:

_____
Michael J. Lockerby (VA Bar No. 24003)
Kimberly J. Shur*
Michael J. Harwin*
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street N.W., Suite 500
Washington, D.C. 20007-5143
Phone: (202) 672-5300
Fax: (202) 672-5399
E-mail: mlockerby@foley.com

Jon P. Christiansen**
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-5557
Fax: (414) 297-4900

Counsel for Plaintiff Coors Brewing
Company

_____
Marshall A. Winslow, Jr.
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
E-mail: mwinslow@wolriv.com

Gary Ettelman
ETTELMAN & HOCHHEISER, P.C.
100 Quentin Roosevelt Boulevard
Suite 401
Garden City, New York 11530

Counsel for Defendants Oak Beverage, Inc.
and Boening Bros., Inc.

_____

* Admitted in New York, Georgia and the District of Columbia only

** Admitted in Wisconsin only

6

## EXHIBIT A

## AGREEMENT CONCERNING INFORMATION
## COVERED BY A CONFIDENTIALITY ORDER

The undersigned hereby acknowledges (1) having read the Confidentiality Order ("Order") in *Coors Brewing Company v. Oak Beverage Inc.*, Civil Action No. 1:07 CV 1235; (2) understanding its terms; (3) agreeing to be bound by each of those terms; and (4) agreeing to be subject to the personal jurisdiction of the United States District Court for the Eastern District of Virginia for the purpose of enforcing its terms. Specifically, and without limitation upon such terms, the undersigned agrees not to use or disclose any Confidential Information other than in accordance with the Order.

Dated: _____

By: _____

_____
(type or print name of individual)

of: _____
(name of employer)


**FOLEY**

FOLEY & LARDNER LLP

ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C. 20007-5143
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
202.945.6079
mlockerby@foley.com EMAIL

CLIENT/MATTER NUMBER
065765-0148

March 4, 2008

**DELIVERED BY HAND**

Mr. Fernando Galindo
Clerk of the Court
U.S. District Court for the
Eastern District of Virginia
401 Courthouse Square
Alexandria, Virginia 22314

Re:    *Coors Brewing Company v. Oak Beverage, Inc. and Boening Bros., Inc.*
       **Case No. 1:07CV1235**

Dear Mr. Galindo:

Enclosed please find a proposed Consent Order Regarding Confidentiality of Discovery Material.

Thank you for your assistance with this matter.

Sincerely,

Michael J. Lockerby
Enclosure

cc:    Gary Ettelman, Esq.
       Marshall A. Winslow, Jr., Esq.

BOSTON          LOS ANGELES      SACRAMENTO        TALLAHASSEE
BRUSSELS        MADISON          SAN DIEGO         TAMPA
CHICAGO         MILWAUKEE        SAN DIEGO/DEL MAR TOKYO
DETROIT         NEW YORK         SAN FRANCISCO     WASHINGTON, D.C.
JACKSONVILLE    ORLANDO          SILICON VALLEY

WASH_3008668.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA,
Alexandria Division
-------------------------------------------------------------------x

COORS BREWING COMPANY,
a Colorado Company
                         Plaintiff,


    -   against –                             Case No. 07 CV 1235


OAK BEVERAGE, INC.,                        **ANSWER**
a New York corporation, and

BOENING BROS., INC.,
a New York corporation,

                         Defendants.
-------------------------------------------------------------------x

      Defendants Oak Beverage, Inc. and Boening Bros., Inc. ("Defendant"), by their attorneys,

Wolcott Rivers Gates and Ettelman & Hochheiser, P.C., answering to the Complaint

("Complaint") of the Plaintiff, Coors Brewing Company ("Plaintiff"), allege as follows:

        1.   Defendant admits the allegations contained in Paragraph 1 of the Complaint.

        2.   Defendant admits the allegations contained in Paragraph 2 of the Complaint.

        3.   Defendant admits the allegations contained in Paragraph 3 of the Complaint.

        4.   Defendant admits the allegations contained in Paragraph 4 of the Complaint.

        5.   Defendant denies the allegations contained in Paragraph 5 of the Complaint,

except admits that one of the issues that may arise in the litigation is the value of distribution

rights for Molson products and that such value exceeds $75,000 exclusive of interest and costs.

        6.   Defendant denies the allegations contained in Paragraph 6 of the Complaint.

        7.   Defendant denies the allegations contained in Paragraph 7 of the Complaint.

8.    Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 8 of the Complaint.

9.    Defendant admits the allegations contained in Paragraph 9 of the Complaint.

10. Defendant admits the allegations contained in Paragraph 10 to the extent that some of the shareholders and officers of Defendant are the same but deny the remaining allegations contained in this Paragraph 10 of the Complaint.

11. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 11 of the Complaint, except admits that in 1996 the importer of Molson Products was Martlet Importing Co., Inc., ("Martlet") and that Martlet was a New York Corporation with an office located in the Commonwealth of Virginia.

12. Defendant admits the allegations contained in Paragraph 12 of the Complaint.

13. Defendant admits the allegations contained in Paragraph 13 of the Complaint.

14. Defendant denies the allegations contained in Paragraph 14 of the Complaint, except admits that the Distributor Agreements (as defined in the Complaint) are almost identical to one another.

15. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 15 of the Complaint, except admits that the Miller/Molson joint venture as alleged therein imported and sold Molson products to Oak and Boening.

16. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 16 of the Complaint.

17. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 17 of the Complaint, except admits that Molson USA supplied Molson Products to Oak and Boening for resale in their assigned territories.

18. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 18 of the Complaint, except admits that Defendant declined to enter into a new Molson distributor agreement with Molson USA.

19. Defendant denies the allegations contained in Paragraph 19 of the Complaint, except admits that it did business with Molson USA pursuant to the Distributor Agreements, the parties' course of dealing and applicable laws including, without limitation New York Alcoholic Beverage Control Law §55-c ("Section 55-c").

20. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 20 of the Complaint.

21. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 21 of the Complaint, except Defendant admits that Coors currently supplies Molson products to Defendant.

22. Defendant denies the allegations contained in Paragraph 22 of the Complaint, and respectfully refer this Court to Section 55-c; the terms of which is expressly incorporated into the Distributor Agreements, which governs the termination of a distributor by a brewer.

23. Defendant denies the allegations contained in Paragraph 23 of the Complaint; except admits that Molson USA desired to align its distribution network with the Coors distribution network.

24. Defendant lacks knowledge or information sufficient to form a belief with respect to the allegations contained in Paragraph 24 of the Complaint.

25. Defendant denies the allegations contained in Paragraph 25 of the Complaint, except admits that it received correspondence from Molson USA in 2005 with regard to what Molson USA dubbed its policy of consolidation.

26. Defendant denies the allegations contained in Paragraph 26 of the Complaint, except admits that Molson USA commenced an arbitration against Ryan seeking a declaration that it had the right to terminate Ryan for good cause under Section 55-c.

27. Defendant admits the allegations contained in Paragraph 27 of the Complaint.

28. Defendant neither admits nor denies the allegations contained in Paragraph 28 of the Complaint as those allegations are wholly unrelated to Coors claims herein and are asserted to harass and prejudice Defendant and for other improper purposes.

29. Defendant neither admits nor denies the allegations contained in Paragraph 29 of the Complaint and respectfully refers this court to the arbitration award annexed to the Complaint as Exhibits "C" and "D"; Defendant further alleges that no part of the arbitration award is binding precedent with respect to this action.

30. Defendant denies the allegations contained in Paragraph 30 of the Complaint, except admits that Molson USA has attempted to force a sale of Defendants' distributor rights and that Defendant received correspondence from Molson USA regarding termination.

31. Answering Paragraph 31 of the Complaint, Defendant asserts that there are no allegations of fact contained therein and therefore, no responsive pleading is required.

32. Defendant admits the allegations contained in Paragraph 32 of the Complaint.

## IN RESPONSE TO PLAINTIFF'S FIRST COUNT

33. Defendant repeats and realleges the responses to Paragraphs 1 through 32 as if fully set forth at length herein.

34. Defendant denies the allegations contained in Paragraph 34 of the Complaint.

### IN RESPONSE TO PLAINTIFF'S SECOND COUNT

35. Defendant repeats and realleges the responses to Paragraphs 1 through 34 as if fully set forth at length herein.

36. Defendant denies the allegations contained in Paragraph 36 of the Complaint, and refers all questions of law to this Court for its determination.

37. Defendant denies the allegations contained in Paragraph 37 of the Complaint, and refers all questions of law to this Court for its determination.

38. Defendant denies the allegations contained in Paragraph 38 of the Complaint, and refers all questions of law to this Court for its determination.

39. Defendant denies the allegations contained in Paragraph 39 of the Complaint, and refers all questions of law to this Court for its determination.

40. Defendant denies the allegations contained in Paragraph 40 of the Complaint.

41. Defendant denies the allegations contained in Paragraph 41 of the Complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

42. Failure to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

43. Section 55-c of New York's Alcoholic Beverage Control Law ("ABC §55-c) provides, among other things, that a brewer may not terminate a beer wholesaler without good cause.

44. Plaintiff is a brewer as defined in ABC §55-c.

45. Defendant is a wholesaler as defined in ABC §55-c.

46. ABC §55-c 2(e)(i)(A) defines good cause as including:

> The implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential. Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

47. Plaintiff seeks to terminate Defendant based solely upon what it calls the adoption of "a nationwide policy of consolidation" which it claims satisfies the requirements of ABC §55-c 2(e)(i)(A).

48. Plaintiff has failed to comply with the requirements of ABC §55-c in that, among other things,

    a. Plaintiff's policy is not reasonable;

    b. Plaintiff's policy is not nondiscriminatory;

    c. Plaintiff's policy is not essential;

    d. Plaintiff's policy has not been disclosed in reasonable detail to Plaintiff's wholesalers;

    e. Plaintiff's policy has not resulted in a contemporaneous reduction of the number of Plaintiff's wholesalers;

   f. Plaintiff's wholesalers and affected brewers were not given the required ninety day notice of the implementation of its policy of consolidation; and

   g. Plaintiff has failed to act in good faith.

<b><u>AS AND FOR A THIRD AFFIRMATIVE DEFENSE</u></b>

   49. By its own admission Coors does not have its own policy of consolidation.

   50. Coors has merely continued the policy of consolidation that was implemented by Molson USA.

   51. The Molson USA policy of consolidation is not reasonable, essential and non-discriminatory as it relates to Coors, and thus, does not constitute good cause as defined in Section 55-c.

<b><u>AS AND FOR A FOURTH AFFIRMATIVE DEFENSE</u></b>

   52. Coors failed to notify the New York Attorney General pursuant to Fed. R. Civ. P. 5.1, and thus cannot maintain its challenge to the constitutionality of Section 55-c.

<b><u>JURY DEMAND</u></b>

   53. Defendant demands a trial by jury pursuant to Fed. R. Civ. P. 38.

   WHEREFORE, defendant demands judgment dismissing the Complaint and for such other and further relief as to the Court may seem just and proper.

Dated:  March 14, 2008                         Respectfully submitted,

                                               OAK BEVERAGE, INC. and
                                               BOENING BROS., INC.


                                               By:  ___/s/_____
                                                         Of Counsel

Marshall A. Winslow, Jr., Esq. (VSB#30307)
WOLCOTT RIVERS GATES
One Columbus Center, Suite 1100
Virginia Beach, Virginia 23462
(757) 497-6633; Fax: (757) 497-7267
mvinslow@wolriv.com

Gary Ettelman, Esquire
Ettelman & Hochheiser, P.C.
100 Quentin Roosevelt Blvd., Suite 401
Garden City, NY  11530
(516) 227-6300; Fax: (516) 227-6307

*Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*


## **CERTIFICATE OF SERVICE**

        I hereby certify that on the 14th day of March, 2008, I will electronically file the foregoing
with the Clerk of Court using the CM/ECF system which will then send a notification of such filing
(NEF) to the following:

        Michael J. Lockerby, Esquire
        FOLEY & LARDNER, LLP
        3000 K. Street N.W., Suite 500
        Washington, D.C.  20007-5143
        mlockerby@foley.com


                                    _____/s/_____
                                    Marshall A. Winslow, Jr., Esq.  (VSB# 30307)
                                    WOLCOTT RIVERS GATES
                                    One Columbus Center, Suite 1100
                                    Virginia Beach, Virginia 23462
                                    (757) 497-6633; Fax: (757) 497-7267
                                    mvinslow@wolriv.com
                                    *Counsel for Oak Beverage, Inc. and Boening Bros., Inc.*


8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

MAR 1 3 2008

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
CRIMINAL RULE 57.4

In Case Number __1:07CV1235__ , Case Name __Coors Brewing Company v. Oak Beverage Inc., and Boening Bros, Inc.__

Party Represented by Applicant: __Coors Brewing Company__

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

PERSONAL STATEMENT

FULL NAME (no initials, please) __Kimberly J. Shur__
Bar Identification Number __975014__         State __DC__
Firm Name __FOLEY & LARDNER LLP__
Firm Phone # __(202) 672-5300__         Direct Dial # __(202) 945-6011__         FAX # __(202) 672-5399__
E-Mail Address __kshur@foley.com__
Office **Mailing** Address __3000 K Street, N.W., Suite 500, Washington, D.C. 20007-5143__

Name(s) of federal court(s) in which I have been admitted __Eastern District of New York; Southern District of New York; Northern District of Georgia; Eleventh Circuit Court of Appeals__

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice* admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence is current.

I am _____ am not __✓__ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

_____
(Applicant's Signature)

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and petition the court to admit the applicant *pro hac vice*.

_____                                    __2/20/08__
(Signature)                                                          (Date)
Michael J. Lockerby
(Typed or Printed Name)

Court Use Only:

Clerk's Fee Paid _____ or Exemption Granted _____

The motion for admission is GRANTED __✓__ or DENIED _____

_____/s/_____
Gerald Bruce Lee
United States District Judge          __3/17/08__
(Judge's Signature)                      (Date)



Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 1
Receipt Number: 100007093
Cashier ID: Tbroaden
Transaction Date: 03/05/2008
Payer Name: KIMBERLY SHUR

PRO HAC VICE
For: KIMBERLY SHUR
Case/Party: D-VAE-1-08-CR-PROHAC-001
Amount:          $100.00

CHECK
Remitter: FOLEY AND LARDNER
Check/Money Order Num: 1107679
Amt Tendered: $100.00

Total Due:        $100.00
Total Tendered: $100.00
Change Amt:        $0.00

PRO HAC VICE

107CV1235

KIMBERLY SHUR AND MICHAEL HARWIN

MAR 1 3 2008

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
CRIMINAL RULE 57.4    Coors Brewing Company v.

In Case Number   1:07CV1235   , Case Name    Oak Beverage Inc., and Boening Bros, Inc.

Party Represented by Applicant:  Coors Brewing Company

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

## PERSONAL STATEMENT

FULL NAME (no initials, please)  Michael J. Harwin
Bar Identification Number  502870    State  DC
Firm Name  FOLEY & LARDNER LLP
Firm Phone #  (202) 672-5300    Direct Dial #  (202) 672-5327    FAX #  (202) 672-5399
E-Mail Address  mharwin@foley.com
Office **Mailing** Address  3000 K Street, N.W., Suite 500, Washington, D.C.  20007-5143

Name(s) of federal court(s) in which I have been admitted Southern District of New York; District of Maryland; District of
Columbia District Court; Middle District of Georgia

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice*
admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a
member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court
and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of
Evidence is current.

I am _____ am not ✓ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

(Applicant's Signature)

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant
personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have
examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and
petition the court to admit the applicant *pro hac vice*.

(Signature)

Michael J. Lockerby
(Typed or Printed Name)

2/28/08
(Date)

Court Use Only:

Clerk's Fee Paid _____ or Exemption Granted _____

The motion for admission is GRANTED _____ or DENIED _____

/s/

Gerald Bruce Lee
United States District Judge
(Judge's Signature)

2-13-08
(Date)



Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 1
Receipt Number: 100007093
Cashier ID: Tbroaden
Transaction Date: 03/05/2008
Payer Name: KIMBERLY SHUR

PRO HOC VICE
  For: KIMBERLY SHUR
  Case/Party: D-VAE-1-08-CR-PROHAC-001
  Amount: $100.00

CHECK
  Remitter: FOLEY AND LARDNER
  Check/Money Order Num: 1107679
  Amt Tendered: $100.00

Total Due:       $100.00
Total Tendered:  $100.00
Change Amt:        $0.00

PRO HAC VICE

107CV1235

KIMBERLY SHUR AND MICHAEL HARWIN

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| COORS BREWING COMPANY,<br>a Colorado corporation, | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | Case No. 1:07 CV 1235(GBL) |
| OAK BEVERAGE, INC.,<br>a New York corporation, | )<br>)<br>) | |
| BOENING BROS., INC.,<br>a New York corporation,<br>Defendants. | )<br>)<br>) | |

### MEMORANDUM ORDER

THIS MATTER is before the Court on Defendants Oak Beverage and Boening Brother's Motion to Transfer Venue or, in the Alternative to Dismiss for Improper Venue.  This case concerns Defendants' attempt to invalidate the Forum Selection Clause appearing in the Distributor Agreements between the parties, which names the Eastern District of Virginia as the location for dispute resolution, and to transfer this matter to the Southern District of New York.

There are two issues before the Court.  First, whether the parties' Forum Selection Clause is enforceable under New York's Alcoholic Beverage Control Law § 55-c.  Second, whether Defendants' Motion to Transfer Venue should be granted pursuant to 28 U.S.C. § 1404(a), where Plaintiff's choice of forum is the Eastern District of

1

Virginia, but Defendants, as well as some witnesses and evidence, are located in New York and Plaintiff is located in Colorado, and the matter involves interpretation of New York's Alcoholic Beverage Control Statute.

The Court finds that the Forum Selection Clause is unenforceable because § 55-c New York Alcoholic Beverage Control Law is incorporated into the parties' Distributor Agreements and supersedes the Forum Selection Clause.  Furthermore, the Court finds that, notwithstanding the unenforceability of the Forum Selection Clause, the 28 U.S.C. § 1404(a) factors weigh in favor of transfer because: (1) Plaintiff's choice of forum is a foreign forum rather than Plaintiff's home forum and therefore, is entitled to little weight; (2) the Eastern District of Virginia has no connection to this case while New York has a significant interest in the interpretation of New York law; and (3) the witnesses' inconvenience will be the same whether they must travel to Virginia or New York for litigation.

## I. Background

This case comes before the Court to determine whether the parties' Distributor Agreement's Forum Selection Clause is enforceable under New York's Alcoholic Beverage Control Law § 55-c ("§ 55-c") and, regardless of the enforceability of the parties' Forum Selection Clause, whether transfer is proper under 28 U.S.C. § 1404(a).

Defendants, Oak Beverage and Boening Brothers ("O&B") are

2

headquartered and have their principal places of business in New
York.  (Compl. ¶¶ 2-3.)  O&B are beer distributors representing the
products of numerous suppliers, including Molson Products.[1]  (Compl.
¶ 9.)  Plaintiff, Coors Brewing Company ("Coors") is a Colorado
corporation with its principal place of business in Golden, Colorado.
(Compl. ¶ 1.)

In 1996, the Martlet Importing Co. ("Martlet") had an office in
Reston, Virginia, and held the importing rights to Molson Products.
In October 1996, Martlet and O&B executed Distributor Agreements for
O&B to distribute Molson Products in certain New York counties.
O&B's Distributor Agreements are virtually identical except for the
sections relating to distribution territory.  Each Distributor
Agreement contains a provision mandating dispute resolution "solely
and exclusively in the United States District Court for the Eastern
District, Alexandria Division, State of Virginia".  (Distrib.
Agreement ¶ 17 (b).)

In 1997, Martlet assigned its importing rights to a joint
venture comprised of the Miller Brewing Company, a Wisconsin company,
and Molson Canada, a Canadian company.  In 2000, the importing rights
to Molson Products were assigned again, this time to a joint venture
between Molson Canada and Coors Brewing Company.  In 2007, the

---

[1]     Martlet and Coors are beer suppliers or brewers.  Distributors
or wholesalers such as O&B purchase beer from suppliers in order to
resell, market, and promote the beer to retailers.  Retailers then
sell the beer to the general public.  (Def.'s Mem. in Supp. Mot. to
Transfer Venue  5.)

3

importing rights were assigned for a third time to Coors in an individual venture. (Compl. ¶¶ 3-4.) O&B have remained the distributors of Molson Products for their assigned counties in New York pursuant to the Distributor Agreements.

Plaintiff, Coors Brewing Company, is filing this declaratory action in an effort to terminate its Distributor Agreements with Defendants, O&B, pursuant to a national consolidation plan. This action is similar to the arbitration action that Plaintiff's predecessor-in-interest, Molson USA LLC ("Molson"), commenced in New York on August 2, 2007, against John G. Ryan, Inc. ("Ryan"), a former Molson distributor. In that case, Molson sought a declaration that its national consolidation plan constituted 'good cause' sufficient to grant the right to terminate its Distribution Agreement with Ryan under § 55-c.[2] (Compl. ¶ 26.) The arbitrator concluded that Molson's consolidation plan complied with the requirements of § 55 and permitted termination of the Distributor Agreement. *Id.* At a second hearing, the arbitrator determined the fair market value of the distribution rights.[3] *Id.* Molson USA applied to the United

_____

2.    Section 55-c permits a brewer to terminate the distribution relationship with a distributor pursuant to the brewer's national or regional plan of consolidation. The consolidation policy must result in a "contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in [New York], but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand." New York's Alcoholic Beverage Control Law § 55-c(2)(e)(i)(McKinney 2001).
3.    Pursuant to § 55-c, a wholesaler is required to compensate a terminated distributor the fair market value of its distribution rights. Section 55-c(9)(c)(iii).

4

States District Court for the Southern District of New York for the sole purpose of confirming the arbitration award.

This suit is similar in nature to the Ryan matter because it involves Coors Brewing Company's attempt to terminate O&B's Distribution Agreements. On January 25, 2008, the United States District Court for the Southern District of New York granted and confirmed the arbitration award. That court did not address the merits of the award because the confirmation petition was not opposed. The matter concluded with the confirmation of the award.

## II. Discussion

### A. Standard of Review

Forum Selection Clauses are "prima facie valid and should be enforced unless enforcement is shown to be unreasonable under the circumstances." *Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1,10 (1972). "In determining unreasonableness under the circumstances, a Forum Selection Clause should be a consideration that figures centrally in a transfer analysis. It should receive neither dispositive consideration . . . nor no consideration[,] . . . but rather the consideration for which Congress provided in § 1404(a)." *Stewart Org., Inc., v. Ricoh Corp.,* 487 U.S. 22, 23 (1988); *BHP Int'l Inv., Inc., v. Online Exch., Inc.,* 105 F.Supp 2d 493, 495-96 (E.D. Va. 2000).

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court

5

may transfer any civil action to any other district or division where
it might have been brought." 28 U.S.C. § 1404(a). When considering
a motion to transfer venue, a court must consider and balance the
plaintiff's choice of venue, the convenience of the parties and
witnesses, and the interest of justice. *GTE Wireless, Inc., v.
Qualcomm, Inc.,* 71 F.Supp 2d 517, 519 (E.D. Va. 1999). The interest
of justice includes circumstances such as "the pendency of a related
action, the court's familiarity with the applicable law, docket
conditions, access to premises that might have to be viewed, the
possibility of unfair trial, the ability to join other parties and
the possibility of harassment." *Bd. of Tr., v. Baylor Heating & Air
Conditioning,* 702 F.Supp. 1253, 1260 (E.D.Va. 1988). The movant
bears the burden to establish that transfer is proper in view of
these considerations. *Cognitronics Imaging Sys., Inc., v.
Recognition Research Inc.,* 83 F. Supp. 2d 689, 696 (E.D. Va. 2000).

**B. Analysis**

The Court grants Defendants' Motion to Transfer Venue to the
Southern District of New York because the Forum Selection Clause is
unenforceable. Notwithstanding the unenforcability of the Forum
Selection Clause, the Court grants Defendants' Motion to Transfer
Venue because Plaintiff's choice of forum is not its home forum and
therefore, is entitled to little weight, the Eastern District of

6

Virginia has no connection to this case while New York has a
substantial connection, and the witnesses' inconvenience will be the
same whether they must travel to Virginia or New York for litigation.

### 1. Forum Selection Clause Enforceability

The Court holds that the Forum Selection Clause is unenforceable
because § 55-c New York Alcoholic Beverage Control Law applies
retroactively to the Distributor Agreements and renders waivers of
the forum selection rights unenforceable.  The O&B Distributor
Agreement's Forum Selection Clause waives O&B's rights granted in §
55-c and thus, is unenforceable under § 55(c)(6).

#### *a) Retroactive Application of § 55-c to the Distributor Agreements.*

The Court finds that the 2001 amendments to § 55-c apply
retroactively because the statute evinces the legislative intent to
make the statute apply retroactively and the legislature's judgment
is within the bounds of the Constitution.

Generally, in determining legislative intent, statutes are to be
construed as prospective except in cases where the legislature
clearly expresses an intention and purpose to justify retroactive
application or, when failure to do so would undermine the statute's
initial purpose.  *See Garal Wholesalers Ltd., v. Miller Brewing Co.,*
751 N.Y.S.2d 679 (2002)(categorizing § 55-c as remedial where the
legislature sought to address perceived ambiguities in the current
law, justifying retroactive application).

7

On June 15, 2001, the New York State Legislature passed
amendments to § 55-c which provided that "a beer wholesaler may
maintain a civil action in a court of competent jurisdiction within
[New York] . . ." § 55-c (McKinney 2001).  The New York legislature
expressly provided that "[t]his act shall take effect immediately and
shall be deemed to have been in full force and effect on and after
June 15, 2001, and shall apply to agreements amended, canceled,
terminated, modified or not renewed on or after such date".  New
York's Alcoholic Beverage Control Law § 55-c (McKinney 2001).

The statute's original purpose, when it was enacted in 1996, was
"to provide a more equitable framework for the business dealings
between beer brewers and importers and their wholesalers" and to
protect wholesalers "from arbitrary termination and denial of the
appointment of their successors".  *See Garal,* 751 N.Y.S.2d at 693
(*citing* Governor's Bill Jacket, L 1996, ch 679, at 4).  The 2001
amendments seek to further the statute's original purpose by
providing beer wholesalers access to venue in courts within the state
of New York.

In this case, the New York legislature clearly expressed an
intention and purpose to justify retroactive application and failure
to do so would undermine the statutes initial purpose.  Retroactive
application is therefore proper.

Plaintiff, in its Complaint, challenges the constitutionality of
retroactive application of § 55-c as it pertains to the Contract

8

Clause of the United States Constitution.  (Compl. ¶¶ 36, 38.)  In
considering whether a state law violates the Contract Clause, the
threshold question is whether the state law substantially impairs a
contractual relationship.  *Energy Reserves Group, Inc. v. Kansas
Power & Light Co.,* 459 U.S. 400, 411 (1983); *Schieffelin & Co. v.
Dep't of Liquor Control,* 479 A.2d 1191, 1199 (Conn. 1984).  To
determine the severity of an impairment, the court must consider,
first, the extent to which the law frustrates a party's "reasonable
expectations," and, second, the extent to which the area has been
subjected to previous regulation.  *Id.*

In this case, Plaintiff could not have reasonably relied on the
continuity of the statutory scheme when the Distributor Agreements
provided that they were subject to alteration by state law.  (*See*
Distrib. Agreement, ¶ 17 (a).)  The parties in this matter contracted
in an area that is historically "heavily regulated."  *Garal,* 751
N.Y.S.2d at 637.  Because of heavy regulation in this area of law,
Plaintiff should have anticipated legislative alterations.
Retroactive application of § 55-c, therefore, does not substantially
impair the parties' reasonable expectations under the Distributor
Agreements or impose unreasonable consequences sufficient to
constitute violation of the Contract Clause.

The New York legislature expressed a clear intent for the
statute to be applied retroactively.  Failure to apply § 55-c
retroactively would conflict with that intent.  Furthermore,

9

retroactive application of § 55-c does not substantially impair the parties' contractual relationship so severely that it violates the Contract Clause.  Therefore, the Court holds that retroactive application of § 55-c to the parties' Distributor Agreements is proper and the Distributor Agreement's Forum Selection Clause is unenforceable given the statutory right granted to distributors to maintain actions in New York.

### b) Validity of ¶ 17 (b) waiver of the § 55-c right.

Having concluded that the 2001 amendments apply retroactively, the Court finds § 55-c's "anti-waiver clause" controlling.  The Forum Selection Clause is, thus, unenforceable because it constitutes "waiver or modification" of the § 55-c right for beer wholesalers to maintain actions in New York.

The 1997 amendments to § 55-c(11) provides that "[t]he requirements of this section may not be altered, waived, or modified by written or oral agreement in advance of a bona fide case or controversy."  § 55-c(11).

O&B entered into Distributor Agreements with Martlet on October 23, 1996.  (Ex. B, 9.)  The Distributor Agreements provide that disputes between the parties, their successors, and assigns shall be initiated and prosecuted "solely and exclusively in the United States District Court for the Eastern District of Virginia, Alexandria Division, and each party waives freely and completely any right to dismiss and/or transfer any action".  (Distrib. Agreement, ¶ 17 (b).)

10

Because O&B are original parties to the 1996 Distributor Agreements, and Coors is a successor to the agreement, all parties are bound by its terms.  (Compl. ¶¶ 12-21.)

The bona fide controversy between the parties began on December 11, 2007, when Coors filed the Complaint in this matter.  (Compl.) The plain language of the Forum Selection Clause "waives or modifies" the requirements of  § 55-c  "in advance of their bona fide case or controversy."  That waiver is unambiguously prohibited by the language of § 55-c(11).  The Distributor Agreements incorporate the laws of New York and provide that where conflict arises between the laws of New York and the Distributor Agreements, the laws of New York supersede any conflicting provision of the Distributor Agreements. (Distrib. Agreements, ¶ 17 (a).)  As such, New York law supersedes the Distributor Agreement's Forum Selection Clause and renders the parties' waiver of any right to dismiss or transfer action invalid.

Accordingly, the Forum Selection Clause of the Distributor Agreements is unenforceable under New York law because § 55-c prohibits waiver of the right to move to dismiss or transfer action.

### 2. 28 U.S.C. § 1404 (a)

The Court holds that Defendants' Motion to Transfer Venue is granted because Plaintiff's choice of forum, regardless of the enforceability of the parties' Forum Selection Clause, is clearly outweighed by other factors in the transfer analysis such as the chosen forum's lack of connection to the cause of action, the

11

convenience of the parties, and the interest of having local controversies decided at home.

In deciding a Motion to Transfer, the Court considers the following factors: (1) Plaintiff's choice of forum; (2) the ease of access to sources of proof; (3) the convenience of parties and witnesses; (4) the interest of having local controversies decided at home; (5) and the interest of justice. *See Intranexus, Inc., v. Siemens Med. Solutions Health Serv. Corp.*, 227 F.Supp 2d 581, 583 (E.D. Va. 2002).

The Court finds that each of these factors either weighs in favor of transfer or weighs neutrally in the transfer analysis. Thus, notwithstanding the enforceability of the Forum Selection Clause, the Court finds that transfer to the Southern District of New York is in the interest of justice.

### a) *Plaintiff's Choice of Forum*

The Court finds that the plaintiff's choice of forum factor weighs in favor of transfer to the Southern District of New York because the Forum Selection Clause is unenforceable, Plaintiff's choice of forum is a foreign forum rather than its home forum, and Virginia has no connection to the controversy.

Generally, a plaintiff's choice of forum is entitled to substantial weight, which varies according to the connection between the forum and the cause of action. *Acterna, L.L.C., v. Adtech, Inc.*, 129 F. Supp. 2d 936, 937 (E.D.Va. 2001). Consistent with the Supreme

12

Court precedent established in *Brenmen v. Zapata Off Shore Co.*, 407
U.S. 1, 10 (1972), the Fourth Circuit generally enforces Forum
Selection Clauses; thus, the weight given to Plaintiff's choice of
forum is increased to some extent. *Sterling Forest Assocs., Ltd., v.
Barnett-Range Corp.,* 840 F.2d 249, 250 (4th Cir. 1988). While the
existence of a Forum Selection Clause is not a controlling factor, it
is significant. *Stewart,* 487 U.S. at 22; *Baylor*, 702 F. Supp. at
1257; *BHP Int'l Inv., Inc.,* 105 F. Supp. 2d at 495-96. Before
transfer is warranted, a defendant must demonstrate that a
plaintiff's choice of forum is clearly outweighed by other factors.
*Baylor*, 702 F. Supp. at 1256.

In this case, the Forum Selection Clause is unenforceable; thus,
Plaintiff's choice of forum is afforded less weight. Even if the
Forum Selection Clause were valid, Plaintiff's choice of forum is
entitled to little weight because the Eastern District of Virginia is
a foreign forum rather than Plaintiff's home forum, as Plaintiff is a
Colorado corporation with its principal place of business in
Colorado. (Compl. ¶ 1.) The dispute pertains to O&B's distribution
of beer in the state of New York pursuant to Distributor Agreements,
which are governed by New York law. (Compl. ¶¶ 12, 13); (Distrib.
Agreement ¶ 17 (a).) Moreover, the Eastern District of Virginia has
no connection with this case because the actions giving rise to the
dispute occurred in New York, the case is governed by New York law,
and the case must be determined by the interpretation of New York's

13

Alcoholic Beverage Control law.

Accordingly, Plaintiff's choice of forum in this case carries little significance, and is afforded little weight in the transfer analysis.

### b) The Convenience of Parties and Witnesses

The Court finds that the convenience of the parties and witnesses factor weighs in favor of transfer because four of the witnesses are located in New York, while none are located in Virginia.

In a motion to transfer venue, the court must weigh the convenience of the parties and witnesses. *Acterna*, 129 F. Supp. 2d at 939. When using this factor to influence a transfer of venue, the movant must identify the prospective witnesses and specifically describe their proposed testimony. This is "necessary to enable the court to ascertain how much weight to give a claim of inconvenience." *Baylor*, 702 F. Supp. at 1257. A plaintiff is assumed to have filed suit in the forum most convenient for it. *Id.* at 1259. If the result of transfer would only serve to shift the balance of inconvenience, then the motion to transfer venue will be denied. *Id.*

Defendants are headquartered and have their principal places of business in New York. (Def.'s Mem. in Supp. Mot. to Transfer Venue 1.) Defendants claim that "[a]ll of the documents and witnesses relating to the action are located in either New York, or Colorado; none are located in Virginia". (*Id.* at 4.) Defendants have

14

identified four witnesses located in New York, their positions within Defendants' company, and the reasons which necessitate their testimony. This satisfies the requirement of a persuasive showing of specific and detailed information as to the relevance of witnesses and documents located in New York. *Baylor*, 702 F. Supp. at 1258.

Although Plaintiff is assumed to have filed suit in the forum most convenient for it, no facts support this assumption. Plaintiff is a Colorado company whose documents and witnesses are located in Colorado. Virginia is no more convenient than New York because both forums require Plaintiff's witnesses to travel a significant distance. Consequently, Plaintiff's convenience will not be increased nor decreased by litigating in New York rather than Virginia, while Defendants' convenience will increase if transfer to New York is granted. Transfer would not "shift the balance of inconvenience" from Defendants to Plaintiff but only increase the convenience for Defendants. *Baylor*, 702 F. Supp. at 1258. The Court, therefore, concludes that convenience of the parties' witnesses weighs in favor of granting the Defendants' Motion to Transfer Venue to the Southern District of New York.

### c) *Having Local Controversies Decided at Home*

The having local controversies decided at home factor weighs in favor of transfer because the issues presented in this matter require interpretation of New York law, and Virginia does not have any interest in interpreting New York law.

Local courts have a strong interest in having local controversies decided at home. *See BHP Int'l Inv., Inc.,* 105 F. Supp. 2d at 499 (finding that local forum would be better equipped to interpret the local statute that was in question). Neither Plaintiff nor Defendants conduct business or have significant contacts with Virginia. The cause of action occurred in New York, as performance of the Distributor Agreements occur solely in New York. Furthermore, this case turns on interpretation and application of a New York statute. Thus, the interest in having this local controversy decided at home weighs in favor of transfer.

### d) Interest of Justice

The Court finds that the interest of justice weighs in favor of granting Defendants' Motion to Transfer Venue because while the pendency of the related action, docket conditions, the possibility of unfair trial and access to premises that might have to be viewed weigh neutrally, the Court's familiarity with the applicable law, the ability to join other parties and the possibility of harassment all weigh in favor of transfer.

"The 'interest of justice' category is designedly broad." *Baylor,* 702 F. Supp. at 1260. A district court is required to consider this factor unrelated to witnesses and party convenience. *Acterna,* 129 F. Supp. 2d at 939-940. The court should consider circumstances such as "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to

16

premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties and the possibility of harassment." *Baylor*, 702 F. Supp. at 1260.

In general, the pendency of a related action in the transferee forum favors transfer. *Id.* at 1261. However, the general rule is inapplicable here because consolidation is not possible as the Ryan matter has concluded. (Compl. ¶¶ 29-30.) Therefore, possibility of consolidation receives no consideration in the transfer analysis.

The Court's unfamiliarity with the applicable law does, however, weigh in favor of transfer. The parties agree that New York's Alcoholic Beverage Control statute governs the Distributor Agreements. While the Court could familiarize itself with New York law, New York courts have a strong interest in having local controversies such as this one, decided at home. *BHP Int'l Inv., Inc.*, 105 F. Supp. 2d at 499.

Finally, the last issue to consider in the interest of justice is the ability to join other parties, specifically the New York Attorney General. Defendants claim that denial of its Motion to Transfer Venue would effectively prohibit the New York Attorney General from intervening. The Attorney General has a right to intervene because the constitutionality of a state statute is being challenged. (Def.'s Mem. in Supp. Mot. to Transfer Venue 14.) Plaintiff claims that it is not challenging the constitutionality of New York's Alcoholic Beverage Control Law and therefore, is not

17

required to join the New York Attorney General.  (Pl.'s Opp. to Mot.
to Transfer Venue  17.)

    The Court finds that the clear and unambiguous language of
Plaintiff's Complaint undoubtedly challenges the constitutionality of
New York's Alcoholic Beverage Control Law.  (*See* Compl. ¶¶ 36, 38.)
Consequently, Plaintiff is required to notify the New York Attorney
General pursuant to Federal Rule of Civil Procedure 5.1(a)(2) which
states: "[a] party that files a pleading, written motion, or other
paper drawing into question the constitutionality of a federal or
state statute must . . . serve the notice and paper on the . . .
state attorney general if a state statute is in question. . . ."

    Should the New York Attorney General choose to intervene in this
action, the convenience of the parties would include the convenience
of the New York Attorney General.  While the New York Attorney
General could travel to Virginia, it would be an inconvenient forum
in contrast with the Southern District of New York.  Although the
convenience of the New York Attorney General is not determinative, it
weighs in favor of transfer.

    The Court finds that the "interest of justice" factors weigh in
favor of granting Defendants' Motion to Transfer Venue to the
Southern District of New York.

### III. Conclusion

    After giving due weight to all of the applicable factors, the
Court finds that Defendants' Motion to Transfer Venue is granted

because the 28 U.S.C. 1404(a) factors weigh in favor of transferring this case to the Southern District of New York.

Although Forum Selection Clauses are generally a consideration that figures centrally in a transfer analysis, in this case, the parties' Forum Selection Clause warrants little consideration, as its terms are unenforceable.  Notwithstanding the Court's determination that the Distributor Agreement's Forum Selection Clause is unenforceable under New York law, the Court finds that transfer is proper under § 1404(a).

The 28 U.S.C. § 1404(a) factors weigh in favor of transfer.  The Plaintiff's choice of forum factor has little weight because Virginia is not Plaintiff's home forum, nor is there any connection to the cause of action in contrast to New York, which is closely connected to this case.  This factor weighs in favor of transfer.  The convenience of the parties factor weighs in favor of transfer to the Southern District of New York because four of Defendants' witnesses are located in New York and none of the witnesses or documents are located in Virginia.  The interest of having local controversies decided at home factor weighs in favor of transfer because New York has an interest in deciding New York law.

Finally, the interest of justice factors weigh in favor of transfer to the Southern District of New York because while the pendency of the related action, docket conditions, the possibility of unfair trial weigh neutrally, the Court's familiarity with the

19

applicable law, the ability to join other parties and, the possibility of harassment all weigh in favor of transfer.

These factors tip the § 1404(a) analysis in favor of Defendants' Motion to Transfer and therefore, notwithstanding the unenforcability of the Distributor Agreement's Forum Selection Clause under New York law, the Court finds that transferring this case to the Southern District of New York is proper.

Accordingly, it is hereby ORDERED that Defendants O&B's Motion to Transfer Venue is GRANTED.  This case is transferred to the United States District Court for the Southern District of New York.

The Clerk is directed to forward a copy of this order to Counsel.

Entered this *17th* day of April, 2008.



_____*/s/*_____
**Gerald Bruce Lee**
**United States District Judge**



Alexandria, Virginia
4/*17*/08



20

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

FERNANDO GALINDO
CLERK OF COURT

ALEXANDRIA
NEWPORT NEWS
NORFOLK
RICHMOND

April 30, 2008

Clerk, United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y.  10007-1312

Re: Coors Brewing Company -v- Oak Beverage, Inc., et al. 1:07cv1235

Dear Sir or Madam:

Pursuant to an order of this Court, filed April 17, 2008, and signed by the Honorable Judge Gerald Bruce Lee, United States District Judge, the above entitled matter was transferred to your court.

The documents from our case file can be accessed on our website, https://ecf.vaed.uscourts.gov.   A certified copy of both the docket entries and the transfer order are also enclosed.

A copy of this letter is enclosed for your convenience in acknowledging receipt.

Very truly yours,

FERNANDO GALINDO, CLERK

By: _____
                                    Deputy Clerk

RECEIVED BY: _____

DATE: _____